UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEURWARD L. HUGHES, MD, )<br><br>Plaintiff, )<br><br>v. )<br><br>MARTHA'S VINEYARD HOSPITAL )<br><br>Defendant. ) | Civil Action No. 04 10564 DPW |

## DEFENDANT MARTHA'S VINEYARD HOSPITAL'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL FURTHER ANSWERS IN RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND MOTION TO COMPEL FURTHER PRODUCTION OF DOCUMENTS

### I.    Introduction

Defendant Martha's Vineyard Hospital, hereby opposes Plaintiff Deurward L. Hughes, M.D.'s Motion to Compel Further Answers in Response to Plaintiff's First Set of Interrogatories and Motion to Compel Further Production of Documents (the "Motions").[1] As discussed below, Plaintiff's Motions should be denied in their entirety because (i) Plaintiff's requests aimed at establishing a pattern and practice claim do not seek discovery concerning similarly situated individuals; (ii) documents protected by the peer review privilege are not relevant to the issues in dispute in this case; (iii) a comparison of the treatment of Plaintiff to a second physician, Dr. Jason Lew, is neither relevant to the issues in dispute nor directed toward establishing a discrimination claim; and (iv) Defendant has not deliberately withheld any responsive, relevant documents from production.

---

[1]    Because Plaintiff's Motions are broken down into identical topic areas, Defendant will respond to both Motions in this single Opposition.

This case involves a dispute concerning Defendant's right to terminate Plaintiff's employment contract. Plaintiff alleges Defendant exercised this contractual right and harassed him because of his race and age. As such, Plaintiff has pled a straightforward disparate treatment claim. He now seeks to compel production of a wide variety of documents and interrogatory responses that have absolutely no bearing on the issues in dispute. Because Plaintiff's document and interrogatory requests are not relevant, they are not discoverable. See Fed. R. Civ. P. 26(b)(1).

## II.    Factual Background[2]

Plaintiff is an Obstetrician/Gynecologist ("OB/GYN") who moved to Martha's Vineyard in late summer 2000. Prior to his move, Plaintiff was on the faculty of a teaching hospital in Philadelphia. Before Plaintiff moved to the island, there was only one OB/GYN on the island and on staff at the Hospital, Dr. Lew. Because it was costly to provide coverage for Dr. Lew from off-island physicians, in December 2000, Defendant and Plaintiff signed a letter of understanding with respect to Plaintiff's providing coverage of Dr. Lew. Plaintiff was paid $39,000 per year for this coverage arrangement. The employment relationship between Plaintiff and Defendant was later expanded when Defendant decided to expand the midwifery services available to island women.

In April 2001, Defendant entered an employment contract with Plaintiff, then a 69 year-old black OB/GYN, to provide oversight for Defendant's midwifery practice, Vineyard Midwifery, and to provide coverage for Catherine Chase, a certified nurse midwife employed by

---

[2]    Defendant's discussion of the facts is limited to those events most pertinent to the Motions. Defendant does not attempt herein to refute each of Plaintiff's factual assertions, most of which have nothing to do with the issues presently before the Court.

Defendant.[3] Unlike most Hospital physicians, who are granted staff privileges to see patients but are not employed or compensated by Defendant, Plaintiff was Defendant's employee. At the time of his termination, Plaintiff's salary was $208,000 per year. His employment contract had an initial term of three years and could be terminated without cause by either party upon 180 days written notice. Two years into the contract term, Defendant decided it wanted to expand the services of Vineyard Midwifery and hire a physician who would grow the practice by working full time at Vineyard Midwifery (as opposed to Plaintiff's part-time schedule) and treating both obstetric and gynecologic patients. Accordingly, in spring 2003, Defendant placed an advertisement with a recruiter seeking an OB/GYN to practice at Vineyard Midwifery and to oversee the OB/GYN department. Plaintiff never requested to interview for this position.

The desire to hire a new OB/GYN in spring 2003 was based on numerous factors. During the time Plaintiff was employed by Defendant, he provided limited coverage to other Hospital physicians, and often did so only after difficult and contentious negotiations with Defendant. Plaintiff's response to Defendant's request for coverage was especially troubling given his already high rate of compensation for limited work - - he only worked 1 ½ days per week. Given Plaintiff's limited work schedule, inflexibility concerning coverage, argumentative nature, and Defendant's desire to grow the OB/GYN and women's health practice, Defendant commenced its search for a new OB/GYN.

---

[3]    In February 2001, Defendant decided to expand the midwifery services available to island residents by offering office space to Catherine Chase, a certified nurse midwife ("CNM"). Prior to this time, Catherine Chase had been employed by Dr. Lew under an arrangement whereby Defendant reimbursed Dr. Lew for her salary. Dr. Lew ended his relationship with Catherine Chase in February 2001, at which time Defendant hired her. A CNM, however, must work with a collaborating physician who does periodic chart reviews with the CNM. Plaintiff was hired, in part, to act as Catherine Chase's collaborating physician. This position required Plaintiff to provide coverage for Ms. Chase, to review her charts, and to assist in complicated deliveries. Plaintiff did not have an independent obstetrics practice.

Defendant's a search for an OB/GYN who could meet its needs ultimately resulted in the hire of a 47 year-old Caucasian male, Dr. Patrick Donegan. Dr. Donegan was hired to act as Catherine Chase's collaborating physician at Vineyard Midwifery and to expand the OB/GYN services being provided by Defendant. Unlike Plaintiff, Dr. Donegan sees both obstetric and gynecology patients and works full-time, seeing patients in the office, performing surgeries, and providing coverage for Catherine Chase. Dr. Donegan has undertaken efforts to build his practice, to increase the number of surgeries performed at the Hospital, and to work with Catherine Chase to expand the midwifery practice.

After Dr. Donegan was hired, Defendant did not have the resources, nor was there an adequate patient load, to keep both doctors in its employ. In accord with the terms of their contract, Defendant terminated Plaintiff's employment contract effective February 10, 2004. Although Plaintiff's employment by the Hospital ended in February 2004, he remained a member of the staff, and was free open his own practice and to see his own patients if admitted to the Hospital. He was simply no longer drawing a salary from Defendant. Plaintiff, however, chose to let his privileges lapse.

### A.    **Procedural Background**

On or about July 8, 2004, Plaintiff served Defendant with his First Request for the Production of Documents (the "Document Requests") and First Set of Interrogatories (the "Interrogatories"). The Document Requests consisted of 69 individual requests. The Interrogatories consisted of 22 requests set forth in paragraph format; but, if broken out, many of these interrogatories would have contained numerous subparts. Plaintiff also served twelve requests for admission.

Defendant responded to each of the discovery requests on August 23, 2004. Since that time, Defendant has supplemented its interrogatory responses twice, and produced 1845 pages of

documents to Plaintiff. Yet Plaintiff continues to seek extensive discovery in this

straightforward discrimination case.[4]

## III.    Argument

### A.    Document Requests and Interrogatories Aimed At Establishing a Pattern of Discrimination Are Not Narrowly Tailored to the Issues In Dispute. (Interrogatory Nos. 12, 16; Document Request Nos. 31, 32, 37, 38, 58)

Plaintiff seeks discovery relating to nurses, officers and members of the board, who in

many cases, are not even Defendant's employees. Such discovery is neither germane to a

disparate treatment case, nor relevant to establish a pattern or practice of discrimination.

Therefore, Defendant responded to each of these requests with respect to doctors only, who,

arguably, are considered to be similarly situated to Plaintiff.[5,6] Documents and interrogatory

responses relating to non-physicians cannot be used to prove Plaintiff's discrimination claims;

therefore, they are not discoverable.

Plaintiff argues that certain courts have permitted extensive discovery to establish a

pattern of discrimination by the employer. See Memorandum in Support of Plaintiff's Motion to

Compel Further Production of Documents at 7-8 ("Memorandum"). But, a plaintiff's latitude to

---

[4]        While it is the "generally held view that liberal discovery should be permitted in actions alleging unlawful discrimination, the scope of discovery is not without limits. The responses sought . . . must not impose an undue burden on the responding party." Robbins v. Camden City Bd. of Educ., 105 F.R.D. 49, 55 (D.N.J. 1985). Defendant is a small community hospital and the burden imposed by responding to an exceedingly large number of discovery requests, in what is otherwise a straightforward employment case, has been substantial. Nonetheless, to the extent Defendant objected to Plaintiff's discovery requests as overbroad or unduly burdensome, it has still answered each of the requests.

[5]        Interrogatory No. 16 sought information only with respect to nurses; therefore, Defendant objected to providing any response. Also, contrary to Plaintiff's assertion, Defendant informed Plaintiff that it produced all responsive documents to Document Request No. 58 and that its production was not limited to Plaintiff. To alleviate any confusion with respect to Defendant's position, Defendant will provide Plaintiff with a Supplemental Document Response setting forth its response.

[6]        Defendant does not concede that all doctors are similarly situated to Plaintiff, insofar as Plaintiff was Defendant's employee whereas the majority of physicians who practice at the Hospital are only members of the Defendant's staff. See infra §C. Nonetheless, in an attempt to narrow certain of the discovery disputes between the parties, Defendant agreed to produce responsive documents concerning doctors employed by, or on staff at, the Hospital.

dig into a defendant's operations is not unfettered, especially when the plaintiff is engaged in nothing more than a fishing expedition. Indeed, it is well-settled that discovery "should be tailored to the issues involved in the particular case." Hardrick v. Legal Servs. Corp., 96 F.R.D. 617, 618 (D.D.C. 1983). In sum, the discovery must seek to elicit information about similarly-situated employees. As this Court noted when considering a similar motion to compel:

> Discovery in Title VII cases involving highly individualized claims of discriminatory treatment should be restricted to the practices at issue in the case, applied to employees in similar circumstances to determine if the employer treats all of its employees under those circumstances in the same manner, or whether it treats employees similarly circumstanced differently and there is some basis for concluding that the difference in treatment is predicated on . . . grounds of unlawful discrimination.

Whittingham v. Amherst College, 164 F.R.D. 124, 127 (D. Mass. 1995) (citations omitted); see also Hardrick, 96 F.R.D. at 618-19 (same); Griffiths v. Cigna Corp., No. 91-2356, 1992 U.S. Dist. LEXIS 754, at *5 (D. Pa. Jan. 23, 1992) (denying discovery into charges of discrimination by employees in other departments on the grounds that it was not relevant); Sykes v. Stores, No. 00C5112, 2002 WL 554505, at *3 (N.D. Ill. Apr. 15, 2002) (discovery limited to similarly situated employees). Cases cited by Plaintiff stand for this proposition. For example, Jackson v. Harvard Univ., 111 F.R.D. 472 (D. Mass. 1986), simply stands for the traditional proposition that information concerning *similarly situated* employees is discoverable. Jackson involved the discrimination claim of a university faculty member. The court denied plaintiff's motion to compel discovery as to non-faculty members on the grounds that decisions concerning that class of individuals would not be based on the same objective criteria as that applied to faculty. See id. at 474.

Like the non-faculty members in Jackson, information concerning nurses, officers and board members has no bearing on whether age or race discrimination was the basis for terminating Plaintiff's employment contract. "Discovery in disparate treatment cases has been

limited to employees within certain work units and who have suffered similar treatment as the plaintiff." Whittingham, 164 F.R.D. at 127; see also Okoye v. Univ. of Texas Houston Health Science Ctr., 245 F.3d 507, 514 (5th Cir. 2001) (noting that physicians were not similarly situated where each had distinct performance related issues). It is beyond dispute that officers and board members, who may not even be physicians, much less employed by Defendant, are not similarly situated to Plaintiff. Likewise, nurses are simply not similarly situated to Plaintiff. E.g., Jones v. Family Health Ctrs., Inc., 323 F. Supp.2d 681, 691 (D.S.C. 2003) ("[p]hysicians are not similarly-situated to the nurse practitioners" for purposes of Title VII claim); Young v. Univ. of Chicago Hosps., No. 02C8176, 2003 WL 21038492, at *3 (N.D. Ill. May 8, 2003) (finding in a Title VII case that "physicians and nurses are not similarly situated employees because they do not have the same performance or qualification requirements"). The doctors employed by Defendant (of which there are only a handful) and nurses report to different supervisors; have different expectations, different responsibilities, different training, different scheduling demands; and, are subjected to a different disciplinary and oversight process.[7] Additionally, Defendant's nurses are unionized and subject to a collective bargaining agreement. See Williams v. Frank, 757 F. Supp. 112, 118 (D. Mass. 1991) ("[E]mployees are not similarly situated where their duties and responsibilities are not the same or at least comparable."); Jones 323 F. Supp.2d at 691. Plaintiff has made no showing that any of the nurses suffered similar treatment as Plaintiff. "Without a showing of such relevance, Plaintiff [should not be] entitled to discovery." Whittingham, 164 F.R.D. at 127.

Moreover, Plaintiff has alleged no facts to support an allegation that Defendant engaged in a pattern or practice of discrimination with respect to treatment of nurses, treatment of doctors,

---

[7] The Director of Nursing has the authority to fire nurses, subject to their collective bargaining agreement. Tim Walsh, Defendant's President, has the authority to fire doctors employed by Defendant.

how applicants were treated or its hiring practices.  Absent a showing that any of the material he

seeks to discover is relevant to his claims, Plaintiff's Motions, as they relate to allegations of

discrimination by non-physicians (Interrog. No. 16; Doc. Req. Nos. 31, 32) or hiring efforts[8]

(Interrog. No. 12; Doc. Req. Nos. 37, 38), [9] should be denied.[10]  See Hardrick, 96 F.R.D. at 618-

19 (denying discovery into hiring practices because the requests were not tailored to the issues

involved in the case).

### B.    Documents Protected by the Peer Review Privilege Are Not Relevant to the Issues In Dispute. (Doc. Req. Nos. 15, 52, 53, 54, 55, 57, 62)

Defendant withheld a limited number of documents concerning peer review of Plaintiff's

cases on two grounds:  (1) they are protected from production by the medical peer review

privilege, and (2) they are not relevant to the issues in dispute.  Plaintiff's Memorandum cites no

facts or legal authority to support a conclusion that this material is discoverable.

Defendant acknowledges that this Court, in the one case that considered the issue,

declined to apply the peer review privilege in a discrimination case.  See Krolikowski v. Univ. of

Mass., 150 F. Supp.2d 246, 249 (D. Mass. 2001).  That decision, however, does not stand for the

proposition that the medical peer review privilege is *never* available in federal court.  See

---

[8]      There can be no question that Defendant does not discriminate in its hiring process as it hired Plaintiff with full knowledge that he was black and age 69 and recently hired another black physician as its employee.

[9]      Document Request No. 38 seeks documents relating to "efforts on the part of minority doctors . . . who unsuccessfully sought to be hired by the Hospital."  Defendant objected to this Request on the grounds that it was vague and the term "efforts" was undefined.  It is not at all clear to Defendant what the substance of the information sought is.  During the Rule 37.1 conference, Plaintiff's counsel agreed to attempt to clarify this request; but, to date, he has not done so.  To the extent the request is clarified, Defendant has no objection to providing a response as it relates to doctors only.

[10]     To the extent Plaintiff posed Interrogatory Nos. 12 and 16 to obtain statistical data about the composition of Defendant's nursing staff, the requests are improper because they are not limited in scope to Plaintiff's job category.  See Robbins, 105 F.R.D. at 59.  Moreover, this Court has noted that statistical evidence in a disparate treatment case is rarely probative.  See Heard v. Commonwealth of Mass., 2003 WL 21960726, at *6 (D. Mass. Aug. 11, 2003); see also Worlds v. Therman Indus. Inc., 928 F. Supp. 115 (D. Mass. 1996) (the fact that the plaintiff was the only African-American employee of Defendant was not sufficient to support a race discrimination claim).

<u>Weekoty v. United States</u>, 30 F. Supp.2d 1343, 1346-47 (D.N.M. 1998) (concluding that federal law recognizes the medical peer review privilege); <u>Whitman v. United States</u>, 108 F.R.D. 5, 7 (D.N.H. 1985) ("federal law now recognizes a privilege protecting hospital peer review records from disclosure"). Instead, the <u>Krolikowksi</u> court, like many courts who have considered the issue, recognized that whether a state evidentiary privilege should be applied by a federal court depends on the facts of the case. See <u>Ryan v. Commissioner of Internal Revenue</u>, 568 F.2d 531 (7th Cir. 1977) (noting that whether a privilege is applicable depends on the factual circumstances of a given case); <u>Marshall v. Spectrum Med. Group</u>, 198 F.R.D. 1, 3-4 (D. Me. 2000) (determining that the privilege should not apply based on the facts of the case); <u>Patt v. Family Health Sys., Inc.</u>, 189 F.R.D. 518, 524 (E.D. Wis. 1999) (recognizing that when deciding whether to provide comity to a state peer review privilege, "it is important to take into account the particular factual circumstances of the case in which the issue arises"). Here, the facts support application of the privilege.

In determining whether to recognize a state evidentiary privilege, the Court must determine if Massachusetts would recognize the privilege. Here, the answer is clearly yes. Second, the Court must assess "whether the injury that would inure to the relation by the disclosure of the communications [would be] greater than the benefit thereby gained for the correct disposal of litigation." See <u>Krolikowksi</u>, 150 F. Supp. 2d at 248. In <u>Krolikowksi</u>, the court declined to recognize the medical peer review privilege, finding that "disclosure of documents and information <u>bearing primarily on employment issues</u> does not materially conflict with the fundamental objectives of promoting quality health care served by the peer review principle." <u>Id.</u> (emphasis added). The facts of this case do not mandate a similar result. The

documents withheld on a claim of privilege do not bear on any employment issues or have any relevance to Plaintiff's discrimination claim. Therefore, there is no benefit to their disclosure.

Plaintiff argues that <u>Marshall</u> is "particularly on point" and that the reasoning in that case should be applied here. <u>See</u> Memorandum at 13. In fact, <u>Marshall</u> is not at all similar to this case. In <u>Marshall</u>, which involved claims brought under the Americans With Disabilities Act, the plaintiff alleged that the Defendant abused the credentialing process to cast doubt about the plaintiff's mental and emotional stability. <u>See</u> <u>Marshall</u>, 198 F.R.D. at 2. Here, Defendant has produced Plaintiff's entire credentialing file except those documents which reflect peer review of Plaintiff's cases. Moreover, Plaintiff cannot point to a shred of evidence that the credentialing process was used to cast doubt about his ability to practice because of his age or race. In fact, Defendant has admitted that Plaintiff's clinical capabilities did not play any role in its decision to terminate his employment contract. <u>See</u> Defendant's Response to Plaintiff's Request for Admissions, Nos. 2 and 5 (admitting that the Hospital was satisfied with the clinical role Dr. Hughes provided at the Hospital). Unlike the plaintiff in <u>Marshall</u>, Plaintiff does not need access to privileged documents to vindicate his rights because quality of care is simply not at issue in this case. Accordingly, Defendant should not be compelled to produce its privileged documents. <u>See</u> <u>Patt</u>, 189 F.R.D. at 524 (noting concern of extending privileges where they operate to exclude <u>relevant</u> evidence).

The privileged documents consist largely of review forms or reports, completed by internal and external reviewers, which summarize Plaintiff's cases. Plaintiff has not set forth any reason why the purpose of the privilege, to promote quality health care, should be set aside to allow access to this non-relevant material. <u>See</u> <u>id.</u> Nothing Plaintiff could learn from production of these materials would lead to admissible evidence that would have a bearing on his ability to

establish a discrimination claim.  Accordingly, under the circumstances of this case, the privilege

should be recognized and these non-relevant documents should not be produced.[11]

### C. Document Requests and Interrogatories Concerning Dr. Lew Have No Bearing On The Issues In Dispute. (Interrog. Nos. 21, 22; Doc. Req. Nos. 63, 64, 65)

There is no discernable basis for Plaintiff to seek specific discovery relating solely to Dr.

Lew's practice and resignation.  A comparison of Plaintiff's employment termination with Dr.

Lew's decision not to continue to practice at the Hospital is not relevant to this dispute and

cannot be used to establish a discrimination claim because: (1) Plaintiff was Defendant's

employee; Defendant could terminate his contract at any time upon 180 days notice, whereas Dr.

Lew was merely a member of the Hospital staff; (2) even after his employment contract ended,

Plaintiff was free to retain staff privileges; and (3) contrary to Plaintiff's assertion, Defendant did

not allow Dr. Lew to resign from the staff under favorable conditions - - his  privileges lapsed on

February 29, 2004, and he chose not to renew them.  See Answer ¶ 15.

Two types of physicians practice at the Hospital: (1) doctors employed by Defendant, i.e.

they have an employment contract with Defendant and receive a salary from Defendant; and (2)

doctors who are granted staff privileges to see their own patients at the Hospital if admitted;

these doctors have no employment contract and do not receive a salary from Defendant.  Plaintiff

falls into the former category, Dr. Lew into the latter - - he was a staff physician.  Contrary to

Plaintiff's implications, Defendant could not retain or fire Dr. Lew, a member of the staff.  Staff

privilege issues are left to the discretion of the Medical Executive Committee, which is

composed of other staff physicians.[12]  See Memorandum in Support of Plaintiff's Motion to

---

[11]     To the extent the Court orders production of this material, such order should be limited to references of Plaintiff only.

[12]     The Committee makes recommendations to the Board as to whether privileges should be granted.

Compel Further Answers in Response to Plaintiff's First Set of Interrogatories at 4 ("Dr. Hughes contends that he was terminated, while Jason Lew, M.D., the other OB/GYN with Hospital staff privileges, was retained by the Hospital."). But, Defendant could terminate Plaintiff's contract of employment. Moreover, once Plaintiff ceased to be employed by Defendant, he remained a member of the staff, just like Dr. Lew.

Defendant never had any concerns with Plaintiff remaining a member of the staff. In fact, Defendant hoped he would renew his privileges so that he could continue to provide coverage for other staff physicians. But, Plaintiff chose not to renew his privileges. Because there is absolutely no issue relating to medical staff privileges and practices as they relate to Plaintiff, Plaintiff's motion to compel production of documents and answers to interrogatories concerning Dr. Lew's practice and departure from the staff should be denied.

### 1. The Circumstances Surrounding Plaintiff's Employment Termination and Dr. Lew's Departure from the Staff Cannot Be Compared.

It is axiomatic that to establish disparate treatment, Plaintiff must show that Defendant "gave preferential treatment to another employee under 'nearly identical' circumstances; that is, that the misconduct for which [Dr. Hughes] was discharged was nearly identical to that engaged in by [Dr. Lew]." Okoye, 245 F.3d at 514. In undertaking this analysis, it is of paramount significance that Dr. Lew was not Defendant's employee. Moreover, Plaintiff's own allegations demonstrate that the circumstances under which the two doctors ceased to practice at the Hospital are distinct. To overcome this weakness in his argument, Plaintiff attempts to raise areas of comparison. None of them, however, are supported by the facts.

For example, Plaintiff argues that the two doctors can be compared because they both served on medical committees. This fact does not support a conclusion that the two were similarly situated. In fact, Plaintiff has not alleged that Dr. Lew received more favorable

treatment with respect to committee membership.[13] See Compl. ¶ 18 ("The Hospital operated the Committee without the participation of any OB/GYN physician."); see also supra § III. A. Plaintiff also alleges that Dr. Lew remained on staff for a period of time despite questions about the quality of care he was providing. Quality of care, however, is not at issue in this action. Defendant never stated that it questioned Plaintiff's quality of care, or that it terminated his employment on that basis. In fact, the opposite is true. See Defendant's Response to Plaintiff's Request for Admissions, Nos. 2 and 5 (admitting that the Hospital was satisfied with the clinical role Plaintiff provided at the Hospital). After his employment contract was terminated, Plaintiff remained a member of the Hospital staff -- the exact same position held by Dr. Lew until he chose to let his privileges lapse. Because Plaintiff cannot compare the termination of his contract with Dr. Lew's failure to renew his staff privileges, any discovery into Dr. Lew's practice or resignation is irrelevant to this matter. Accordingly, Plaintiff's motion should be denied.

## 2.    Plaintiff's Requests Are Aimed to Harass the Hospital.

There is no plausible connection between Plaintiff's request for documents and information concerning an alleged (but unproven) investigation into Dr. Lew's billing practices (Interrog. No. 22, Doc. Req. No. 64) and the discrimination claims at issue in this action. Nor are the terms of Dr. Lew's departure (Interrog. No. 21), documents concerning criticisms of him (Doc. Req. No. 63), or documents concerning his termination or discipline (Doc. Req. No. 65) even remotely related to Plaintiff's age and race claims. Simply put, there are no issues involving medical staff privileges and Dr. Lew's practice that bear on Plaintiff's race and age claims.

---

[13]     Even if Plaintiff alleged discrimination with respect to his involvement with Defendant's various committees, his discovery requests are not narrowly tailored to elicit this information.

The relationship between Plaintiff and Dr. Lew was contentious during most of Plaintiff's period of employment with Defendant. It is apparent that Plaintiff has directed highly specific discovery requests toward issues concerning Dr. Lew in an attempt to gather personal information to which he is otherwise not entitled. That Plaintiff has not propounded similar requests concerning other doctors who have left Defendant's staff speaks volumes to Plaintiff's motive in seeking this discovery.[14]

### D.    Defendant Did Not Deliberately Withhold Documents. (Doc. Req. Nos. 33, 34)

Plaintiff's document requests sought production of minutes from Hospital Board of Director meetings, Executive Committee meetings and Joint Conference Committee meetings in which allegations of race and/or age discrimination and the "need or desire to hire younger doctors" was discussed. See Doc. Req. Nos. 33 & 34. Defendant has produced all responsive documents in its possession, custody and control responsive to these requests.

Defendant acknowledges that one responsive document was not included as part of its first document production. Plaintiff, aware of the existence of the missing document from a third-party, brought this to Defendant's attention during the Rule 37.1 Conference. Defendant investigated the reason for the non-production and confirmed that when it completed its first production, it was missing Joint Conference Committee minutes from a short period in 2001. Defendant searched for the missing documents and informed Plaintiff that it was unable to locate them. Defendant, however, did not end its obligation to respond to Plaintiff's discovery requests with that response. Rather, it continued its search for the missing material. Given the high level of turnover among Defendant's administrative staff in the preceding years, the search was difficult. Yet, after an extensive search, the missing minutes were located. All responsive

---

[14]    Even if such requests were propounded, Defendant would object to them on the basis of relevance.

portions of these minutes were produced as part of Defendant's supplemental document production.[15]

Despite Defendant's good faith efforts to comply fully with its discovery obligations, Plaintiff now requests that this Court impose the draconian measure of having Defendant produce all minutes, responsive or not, in unredacted form. This request is beyond the pale.

There is no justifiable basis for Plaintiff to be entitled to review non-responsive minutes, which contain confidential discussions of Defendant's administration and business matters. Defendant reviewed all minutes in its possession, custody and control and produced all responsive material. Accordingly, there is absolutely no basis on which Plaintiff should be given access to all of Defendant's documents or allowed to "check" its production.[16]  See Memorandum at 17.

Plaintiff's Memorandum makes clear that his request is nothing more than a fishing expedition. Plaintiff states: "It is simply not believable that the "mixed feelings about Dr. Hughes' age were only expressed in one conversation." Memorandum at 16.  Plaintiff's subjective beliefs are irrelevant to an analysis of Defendant's compliance with its discovery obligations. He further claims that a former Board member informed him there were "ongoing discussions" about the desire to bring younger doctors into the Hospital, which are not reflected in the produced documents. Even if there were discussions, which Defendant does not acknowledge, Plaintiff has adduced no evidence that these discussions were transcribed and

---

[15]    As with other previously produced minutes, non-responsive portions were redacted.  Plaintiff's counsel was informed that only portions of the minutes responsive to the requests would be produced.  Accordingly, there was no need for Defendant to list the redactions on a privilege log.  See Memorandum at 17.

[16]    To the extent that the Court adopts Plaintiff's argument, production should be limited to the Joint Committee minutes.  Plaintiff has not alleged that Defendant deliberately withheld any other category of minutes. Defendant, of course, feels that no additional discovery is warranted with respect to any minutes.

made part of the meeting minutes that he now seeks to review. If they were part of the minutes, they would have been produced.

Defendant's position is best summed up by <u>Sundaram v. Brookhaven Nat'l Lab. Assoc. Univs., Inc.</u>, No. CV-94-2330, 1996 WL 563829 (E.D.N.Y. Mar. 11, 1996), in which the court stated:

> The court cannot order Defendants to create responsive documents. To the extent that Defendants have asserted clearly and unequivocally . . . that they do not have [additional] requested documents in their possession custody or control, their obligation concerning discovery of such documents is complete. Defendants' assertion concerning the absence or non-existence of particular documents may of course be tested by the plaintiff at trial or during deposition.

<u>Id.</u> at *1. Plaintiff has informed Defendant that he intends to depose at least four current or former board members, and individuals who sat on the other committees. To the extent that he believes there were additional conversations on race or age at board or committee meetings, he is free to explore those issues through depositions. He may not, however, compel production of non-responsive confidential business documents by claiming that he believes additional material should exist where it clearly does not.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court deny Plaintiff's Motions to Compel Further Production of Documents and Further Answers in Response to Plaintiff's First Set of Interrogatories in their entirety.

Respectfully submitted,

MARTHA'S VINEYARD HOSPITAL

By its attorneys,


*Jennifer A. Brennan*

Thomas E. Shirley, Esq. (BBO # 542777)
Jennifer A. Brennan (BBO #647356)
CHOATE, HALL & STEWART
Exchange Place
53 State Street
Boston, Massachusetts  02109
(617) 248-5000

Dated: November 9, 2004


Certificate of Service

I hereby certify that I served a copy of the above-entitled document on counsel of record for defendant in this case by mail on this 9th day of November, 2004.


*Jennifer A. Brennan*

Jennifer A. Brennan


3764258_2