UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEURWARD L. HUGHES, MD, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 04 10564 DPW |
| MARTHA'S VINEYARD HOSPITAL, | ) |
| Defendant. | ) |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Martha's Vineyard Hospital (the "Hospital") respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment.

**INTRODUCTION**

Plaintiff, an OB-GYN employed by the Hospital from 2001 to February 2004, alleges that the Hospital discriminated against him because of his race and age. In reality, the evidence shows only that the Hospital's Chief Executive Officer, Timothy Walsh ("Mr. Walsh"), gave Plaintiff 180 days' notice that the Hospital was terminating his employment contract (as specifically provided for in the contract) because he reasonably concluded that a less difficult and more collegial physician, with a less one-sided contractual arrangement, could help the Hospital expand its OB-GYN practice, increase its volume, and attract OB-GYN patients who were going off-Island for care. Because Plaintiff's allegations of discrimination are supported by only mere speculation and dubious inferences, he cannot defeat summary judgment, and his claims must be dismissed as a matter of law.

3919369v2

## FACTS

The material facts as to which there are no genuine issues to be tried, and upon which the Hospital relies in its Motion for Summary Judgment, are set forth in the accompanying Statement of Material Facts (referred to herein as "Facts ¶__"). In the interest of brevity, the Hospital does not repeat those facts here.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is "a device that 'has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways.'" Mullin v. Raytheon Co., 164 F.3d 696, 698 (1st Cir. 1999), cert. denied, 528 U.S. 811 (1999), quoting Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991); see also, e.g., Pasco v. Potter, 214 F. Supp.2d 183, 185-186 (D. Mass. 2002). It should be granted where there is no material fact in dispute, and the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1985); Ward v. Mass. Health Research Inst., Inc., 209 F.3d, 29, 32 (1st Cir. 2000). "Even in employment discrimination cases, where elusive concepts such as motive and intent are at issue, this standard compels summary judgment if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 5 (1st Cir. 2000) (internal quotations omitted); see also, e.g., Sullivan v. Liberty Mut. Ins. Co., __ Mass. __ (2005), 2005 WL 851330 (Apr. 15, 2005).

On issues where the non-movant bears the ultimate burden of proof, he must present "definite, competent evidence to rebut the motion." Mesnick, 950 F.2d at 822. "[T]he question is not whether there is literally no evidence favoring the non-movant, but whether there is any upon which a jury could properly proceed to find a verdict in that party's favor." Connell v. Bank of Boston, 924 F.2d 1169, 1178 (1st Cir. 1991); see also Anderson, 477 U.S. at 249-50

2

3919369v2

(evidence that "is merely colorable or is not significantly probative" cannot defeat summary judgment). As set forth below, under the foregoing standards, the Hospital is entitled to summary judgment on all of Plaintiff's claims.

## ARGUMENT

I. **THE HOSPITAL IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RACE DISCRIMINATION CLAIMS.**

A. **The Legal Framework.**

Plaintiff alleges race discrimination in Counts III, IV and V of his Complaint, claiming, respectively, that the Hospital violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq. ("Title VII"), 42 U.S.C. § 1981, and Mass. Gen. L. ch. 151B ("Chapter 151B"). He has conceded that he does not believe he was subject to race discrimination in any respect other than the termination of his Contract with the Hospital. See Edson Aff., Ex. 3 at 27-28, 113-114, 237-238. It is undisputed that Mr. Walsh, the Hospital's CEO, made the Contract termination decision. See id. at 238, Ex. 2 at 16. The issue, therefore, is whether Mr. Walsh did so because of Plaintiff's race.

There is no direct evidence of race discrimination in this case. See generally Wynn & Wynn, P.C. v. Mass. Comm'n Against Discrimination, 431 Mass. 655, 667 (2000) ("Direct evidence in this context is evidence that 'if believed, results in an inescapable, or at least highly probable, inference that a forbidden bias was present in the workplace.'") (citation omitted); Febres v. Challenger Caribbean Corp., 214 F.3d 57, 61 (1st Cir. 2000). The McDonnell Douglas burden-shifting framework therefore governs. See, e.g., Washington v. Milton Bradley Co., 340 F. Supp.2d 69, 75 (D. Mass. 2004) (McDonnell Douglas applies to race discrimination claims under Title VII); Ahmed v. Berkshire Med. Ctr., Inc., No. 94-30250-FHF, 1998 WL 157016, at *6 (D. Mass. Mar. 31, 1998); (McDonnell Douglas applies to § 1981 claims); Sullivan, __ Mass.

3

__ (2005), 2005 WL 851330 (McDonnell Douglas applies to Chapter 151B claims).

Solely for purposes of summary judgment, the Hospital will assume that Plaintiff can make the "small showing" necessary to establish a prima facie case under McDonnell Douglas. See Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003). The burden then shifts to the Hospital to articulate a lawful reason for its employment decision. E.g., Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 44 (1st Cir. 2002); Sullivan, __ Mass. __ (2005), 2005 WL 851330.

The Hospital easily satisfies that burden here. As stated in the Hospital's Statement of Undisputed Material Facts, there was no one precipitating event that led to Mr. Walsh's decision to terminate Plaintiff's Contract. See Facts ¶ 53. Stated most broadly, Mr. Walsh believed that the Hospital's OB-GYN practice "was not being well served by the arrangement we had." Specifically:

(a)    He was concerned about the contentious relationship between Plaintiff and most of the medical staff. A key objective was to bring the staff back to being part of a team.

(b)    He believed that Plaintiff's Contract was disadvantageous to the Hospital. From Mr. Walsh's perspective, it basically limited Plaintiff's obligation to the role of collaborating physician and overseer of the midwife. It imposed no obligation on him to attempt to expand the OB-GYN practice or to work more cooperatively with other physicians.

(c)    Mr. Walsh himself had a very difficult time working with Plaintiff after becoming CEO. Mr. Walsh did not like the fact that, from his perspective, Plaintiff "kept going around me to the Board" and turned coverage issues into contractual disputes with attorneys.

(d)    He believed the Hospital could expand its OB-GYN practice, increase its volume, and attract OB-GYN patients who were going off-Island for care. Given the concerns

4

summarized above, he did not believe Plaintiff was the right person to lead this effort. Id.

Mr. Walsh accordingly elected to exercise the Hospital's right to terminate Plaintiff's Contract on 180 days' notice after a suitable candidate had been retained. Id. ¶ 58. This decision had no effect on Plaintiff's ability to remain on the Hospital's medical staff and maintain a private practice on the Island, just as the other practicing OB-GYN on the Hospital's medical staff, Dr. Lew, had done for over 20 years. Id. ¶ 63.

Under McDonnell Douglas, the burden now shifts back to Plaintiff to prove that the Hospital's articulated reason is a mere pretext and that the actual cause of his termination was discrimination. Bloomfield v. Bernardi Automall, 170 F. Supp.2d 36, 41 (D. Mass. 2001). At this point, there is some confusion as to whether federal and Massachusetts law diverge slightly regarding the evidence necessary to defeat a motion for summary judgment. See, e.g., Joyal v. Hasbro, Inc., 380 F.3d 14, 17 (1st Cir. 2004); Washington, supra, at 75; Bloomfield, supra, at 41-42. Cf. also 45 MASSACHUSETTS PRACTICE, EMPLOYMENT LAW § 8.39 ( West Group 2d ed. 2003).

Federal law seems clear: a finding that a stated reason was pretextual will not, by itself, necessarily defeat summary judgment. This is because the "ultimate question" remains whether the totality of the evidence "has raised a genuine issue of fact as to whether the termination of the Plaintiff's employment was motivated by . . . discrimination." Wallace v. O.C. Tanner Recognition Co., 299 F.3d 96, 100 (1st Cir. 2002), quoting Dominguez-Cruz v. Settle Caribe, Inc., 202 F.3d 424, 431 (1st Cir. 2000); see also, e.g., Zapata-Matos, supra, at 45; Bloomfield, supra, at 41.

In contrast, Massachusetts law at least arguably can be read to permit a plaintiff to defeat summary judgment by showing merely that one of the employer's stated reasons is false. This

5

result has been questioned by a number of courts, including this one. See Bloomfield, supra, at 42 n.4 (questioning analytical underpinnings of such a result); Joyal, supra, at 17 (questioning whether such "an oddly mechanical rule" is in fact Massachusetts law); Washington, supra, at 75 n.6. Cf. also EMPLOYMENT LAW § 8.39 at 529-530 (observing that relevant language in Abramian v. President & Fellows of Harvard College, 432 Mass. 107 (2000), was dicta); Bloomfield, supra (making same observation relative to relevant language in Lipschitz v. Raytheon Co., 434 Mass. 493 (2001)).

The difference -- to the extent it exists at all -- is not relevant to the instant case for at least two reasons. First, Plaintiff has no evidence of pretext in any event. Second, no matter what gloss is applied to the burden-shifting formula, Plaintiff must still adduce sufficient evidence to show that, when his Contract was terminated, Mr. Walsh had a discriminatory intent, motive or state of mind based on his race and that such animus was "a material and significant ingredient in the discharge." Sullivan, __ Mass. __ (2005), 2005 WL 851330, quoting Knight v. Avon Prods., Inc., 438 Mass. 413, 426-427 (2003) and citing Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 127 (1997). This, Plaintiff cannot do.

  B.   **Plaintiff Has No Credible Evidence of Pretext or Racial Animus.**

Both federal and Massachusetts law are in accord that, in evaluating evidence of pretext, the focus must be on "'the perception of the decisionmaker,' that is, whether the employer believed its stated reason to be credible." Washington, supra, at 76, quoting Mesnick, 950 F.2d at 824; Smith College v. Mass. Comm'n Against Discrimination, 376 Mass. 221, 232 (1978). "'[I]f the reason given by the employer is the real reason for its action,' it does not matter if 'the employer's action was arbitrary or unwise.'" Joyal, supra, at 19, citing Wheelock College v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130 (1976). Put differently, under

any formulation of the pretext analysis, only evidence of a "<u>deliberately false reason</u>" will get Plaintiff to a jury. <u>Joyal, supra</u>, at 17 (emphasis supplied).

There is positively no evidence of such a "deliberately false reason" in this case. It must be emphasized at this juncture that the Hospital is a small 15-bed community hospital on a tiny island 7 miles off Cape Cod. Facts ¶ 1. It had spent significant sums and devoted endless hours in the several years preceding Mr. Walsh's decision to an effort to resolve the seemingly endless problems within its OB-GYN practice. <u>Id.</u> ¶¶ 6, 17, 24-32, 34, 40-51. Mr. Walsh did not then undertake a further extensive or detailed analysis as to precisely how many hours Plaintiff was working or how many potential patients were going off-Island for their OB-GYN medical needs in reaching the conclusion that a change was necessary. In many respects, the only question is why he did not act sooner.

Even a summary review of the record evidence supports this conclusion. Mr. Walsh succeeded Mr. Burchill as CEO in April 2002. <u>Id.</u> ¶¶ 35, 38. At the <u>first meeting</u> of the Joint Conference Committee that he attended in his new role, the difficulties with the OB-GYN practice were the focus of discussion, and the need for an "integrated plan for the future" was stressed. As the minutes reflect:

> The group discussed the issues between the Midwifery's office and Dr. Lew's office. It was noted that the Medical Staff would like to see an integrated plan for the future at Martha's Vineyard Hospital. Also noted was the need for better communication between the practices. In order to move forward, the Hospital should try to blend the 3 together (Dr. Hughes/Midwife/Dr. Lew).

<u>Id.</u> ¶ 42.

Following this meeting, in August and September of 2002, Mr. Walsh made a concerted effort to obtain a more collegial -- or at least functional -- working relationship between Plaintiff and Dr. Lew. <u>Id.</u> ¶ 44. Plaintiff responded by retaining counsel, advising Mr. Walsh of his

7

3919369v2

contractual entitlements, and expressing a willingness to consider a "trial" cross-coverage arrangement only if a list of conditions was met. Id. ¶¶ 45, 46.

Later, in October 2002, Plaintiff and the other members of the OB-GYN practice met with Dr. Shah, a Board-Certified OB-GYN who had been retained at considerable expense by the Hospital to serve as the designated outside OB-GYN quality assurance reviewer. Plaintiff had been insisting that such an independent reviewer from a major outside hospital was necessary almost since joining the medical staff. Facts ¶ 28. Notwithstanding this, Plaintiff then immediately clashed with Dr. Shah, circulating a memorandum after the group's meeting which contained a vituperative attack against Dr. Shah. Id. ¶ 49.

In the words of Dr. MacArthur, the Hospital's Chief of Staff, "every time we met with Dr. Hughes, it ended up in a donnybrook, an argument, a fight." Id. ¶ 50. It should come as no surprise, therefore, that at a Joint Conference Committee meeting on December 6, 2002, "[t]here was a lengthy discussion about creating a department of OB-GYN and if it would fall under primary care and how to select a chairperson . . . . Dr. Lew feels there is no collegiality between OB-GYN staff. Internally, it seems incredibly difficult to work the attitude/divisional problems out." Id. ¶ 51. Shortly thereafter, Mr. Walsh made his decision to hire a new OB-GYN and terminate Plaintiff's Contract with the Hospital. Id. ¶ 52.

In discovery, Plaintiff has devoted considerable time to the issue of whether he was "part-time" or "full-time." This effort is completely misguided. However one defines those terms, the fact remains that Plaintiff himself went on record -- in an effort to justify his refusal to do more -- that "[m]y salaried position with the Hospital is to cover the midwife and to do any office GYN procedures and any referred GYN surgery." Id. ¶ 23. This is entirely consistent with the description of his role which Mr. Burchill gave to the Board of Registration in Medicine in April

8

3919369v2

2002, which Plaintiff saw and concedes is correct. Facts ¶ 37. It is undisputed that he did not maintain an independent obstetrical practice and maintained office hours one and one-half days per week. Id. ¶ 23. His Contract did not require him to do more, and it provided him with no incentive to cooperate with the other physicians on the Hospital's medical staff. Id. ¶¶ 21, 22.

Mr. Walsh reasonably believed that a less difficult and more collegial physician could help the Hospital expand its OB-GYN practice, increase its volume, and attract OB-GYN patients who were going off-Island for care. Id. ¶ 53. He himself had a difficult time working with Plaintiff after becoming CEO. Id. As Mr. Walsh bluntly told Plaintiff, he did not like the fact that Plaintiff went around him to the Board and turned coverage issues into contractual disputes with attorneys. Id. He therefore concluded that a search for an outside candidate would take place. Facts ¶ 54. And, when the ultimately successful outside candidate was interviewed, key considerations for the Hospital -- all shared with that candidate, Dr. Samuel Donegan ("Dr. Donegan") -- were his willingness to try to expand the OB-GYN practice and make a focused attempt to attract patients who were going off-Island for OB-GYN care. Id. ¶ 57.

Significantly, Mr. Walsh did <u>not</u> simply conclude that Plaintiff was not the ideal candidate to lead this effort. Id. ¶ 53. The other incumbent OB-GYN, Dr. Lew, was also not invited to apply for the position. Id. ¶ 54.

There is thus no evidence of pretext. Evidence of racial animus -- the ultimate issue in any race case -- is also nonexistent. As noted above, Plaintiff has conceded that he was not the subject of race discrimination in any respect and at any time prior to the termination of his Contract. At his deposition, he testified that he nevertheless believes Mr. Walsh terminated his Contract because of his race, because (1) the Hospital did not have other African-American active staff physicians, nurses, or administrators at the time of his Contract termination; (2) "Mr.

9

3919369v2

Walsh is from South Boston"; and (3) in his view, there is no other explanation for the decision because he was doing a good job. See Edson Aff., Ex. 3 at 239. None of these theories support his claim.

Plaintiff's attempt to rely upon statistical information relating to nurses and staff has already been rejected by Magistrate Judge Cohen on the grounds that to "the extent that plaintiff seeks information concerning the hiring of, or efforts to hire, minority nurses and other non-physician officers of the defendant...plaintiff has simply fallen far short of establishing the relevance of those overly broad requests." December 29, 2004 Order. This ruling was clearly correct. See, e.g., Whittingham v. Amherst College, 164 F.R.D. 124, 127 (D. Mass. 1995); Jackson v. Harvard Univ., 111 F.R.D. 472, 474 (D. Mass. 1986); Hardrick v. Legal Servs. Corp., 96 F.R.D. 617, 618 (D.D.C. 1983).

Reliance on statistical information regarding other physicians is only marginally more relevant, and still of no probative value. As the Supreme Judicial Court explained in Sullivan, in the context of a plaintiff attorney's attempt to rely upon statistical evidence in support of her age claim following a reduction in force:

> although this evidence helped Sullivan establish her prima facie cases, it has limited probative value at this stage. The evidence fails to rebut Liberty's proffered reasons for laying off Sullivan and does not, by itself, create reasonable inferences of discriminatory animus and causation. See, e.g., Rummery v. Illinois Bell Tel. Co., 250 F.3d 553, 559 (7th Cir. 2001) (statistics that do not account for employer's legitimate nondiscriminatory explanations do not establish pretext); Coleman v. Quaker Oats Co., 232 F.3d 1271, 1283 (9th Cir. 2000), cert. denied sub nom. Gentile v. Quaker Oats Co., 533 U.S. 950 (2001) (statistics that do not account for factors pertinent to selection of plaintiff for discharge do not alone establish pretext). Sullivan's evidence similarly fails to eliminate other explanations for the disproportionate statistics, such as random chance (given the small discrepancies and small sample size involved here) or the actual distribution of aptitudes or expertise among attorneys of differing

> ages and genders both before and after of the reduction in force. See, e.g., Smith v. Xerox Corp., 196 F.3d 358, 371 (2nd Cir. 1999) (statistics that do not account for other possible causes of disparity do not establish pretext); Fallis v. Kerr-McGee Corp., 944 F.2d 743, 747 (10th Cir. 1991) (statistics must eliminate nondiscriminatory reasons for disparity).

Sullivan, __ Mass. __ (2005), 2005 WL 851330.

Plaintiff's attempt to rely on statistical evidence is similarly ineffectual here. Mr. Walsh, the decisionmaker whose motivation is in question, had been CEO less than a year when, in early 2003, he made the decision to terminate Plaintiff's Contract. Facts ¶¶ 35, 38, 52. He can hardly be held responsible for the overall demographic profile of any material part of the Hospital's workforce or medical staff at that time. Further, a number of physicians on the Hospital's medical staff are minorities, and Plaintiff has made no showing whatsoever that their representation on the staff is in any way disproportionate to the minority population on Martha's Vineyard Island. Id. ¶¶ 68-70. The fact is that a second African-American physician, Dr. Gerald Morris, became an active staff member on March 2004 and an employee of the Hospital in June 2004, shortly after the termination of Plaintiff's contract. Id. ¶ 67. Consistent with this, Plaintiff himself is not aware of any African-American physicians who he believes have been improperly denied medical staff privileges at the Hospital; who have been improperly denied employment with the Hospital or any Hospital-entity; or, who have been discriminated against by the Hospital in any way since he first joined its staff. Id. ¶ 71.

Plaintiff's attempted reliance on statistical evidence is, therefore, unavailing. His attempt to base his claim on the fact that Mr. Walsh "is from South Boston" is equally unpersuasive. Even Plaintiff backed away from this theory in support of his claim at his deposition, testifying in this regard as follows:

> Q: I believe in some context you told me that you understood

11

3919369v2

> Mr. Walsh, during the time of the busing issues in South Boston, had gone to a private school?
>
> A:   So I was told.
>
> Q:   And what possible connection do you see between that and your termination?
>
> A:   A background that it might be possible. I didn't say it was. It might be possible from that background.

Edson Aff., Ex. 3 at 303. Such speculation is hardly the basis for a claim.

Plaintiff's final theory in support of his race discrimination claim is that there is no other explanation for Mr. Walsh's decision, because, in Plaintiff's view, he was doing a good job. This kind of assertion is plainly also insufficient to defeat summary judgment. As the Court noted in <u>Williams v. Raytheon Company</u>:

> The issue is not whether reasonable jurors could find that Raytheon lacked good cause to terminate Williams -- Williams was an at-will employee and Title VII, in any event, does not prohibit wrongful discharge -- but, rather, whether Williams made a substantial showing that the reason given for the termination was false.

220 F.3d 19, 19 (1st Cir. 2000); <u>see also, e.g.</u>, <u>Sullivan</u>, __ Mass. __ (2005), 2005 WL 851330 ("[O]ur task is not to evaluate the soundness of Liberty's decision making, but to insure that it does not mask discriminatory animus. <u>See</u> <u>Mesnick</u>, <u>supra</u>, at 825 ('Courts may not sit as super personnel departments, assessing the merits--or even the rationality--of employers' nondiscriminatory reasons')").

In sum, Plaintiff has failed to adduce any credible evidence that the reason given for his termination was deliberately false. He has failed to adduce any credible evidence of racial animus. As a result, the Hospital should be granted summary judgment on Plaintiff's claims of race discrimination in Counts III, IV, and V of the Complaint.

## II. THE HOSPITAL IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S AGE DISCRIMINATION CLAIMS.

In Counts I and II of his Complaint, Plaintiff alleges that he was terminated because of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1), and Ch. 151B, respectively. As was true for Plaintiff's race discrimination claims, there is no direct evidence of age discrimination in this case. The same McDonnell Douglass burden-shifting framework therefore applies. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148 (2000) (applying McDonnell Douglas to ADEA claims); Sullivan, __ Mass. __ (2005), 2005 WL 851330 (applying McDonnell Douglas to age claims under Ch. 151B).

Here again, the Hospital will assume solely for purposes of summary judgment that Plaintiff has made the "small showing" necessary to establish a prima facie case. The Hospital, as seen above, has articulated a legitimate nondiscriminatory reason for its decision to terminate Plaintiff's Contract. The question thus again becomes whether Plaintiff can meet his burden of demonstrating that the Hospital's articulated reason for its action was a pretext and that the actual cause of his termination was his age.

The Hospital incorporates by reference its discussion above as to why Plaintiff lacks any credible evidence that the articulated reason for his termination was deliberately false. He also lacks any credible evidence that the real reason for his termination was his age.

The focus again is on the decisionmaker, Mr. Walsh. Plaintiff was asked at his deposition if he believed Mr. Walsh made the termination decision because of his age. His initial testimony was as follows:

> Q: Now, if we could, let's turn our focus to the decision to terminate your employment agreement.
>
> Who do you believe was responsible for that decision?
>
> A: I believe Tim Walsh was responsible for it.

13

> Q: Do you believe that his decision was based in any material way on age discrimination against you?
>
> A: I'm not sure of that.

Edson Aff., Ex. 3 at 238.

Testimony relating to Plaintiff's claim that race played a role in Mr. Walsh's decision was then elicited. At this point his counsel requested a break. Immediately thereafter, Plaintiff amended his response, as follows:

> BY MR. SHIRLEY:
>
> Q: Dr. Hughes, does that complete your answer with respect to why you believe Mr. Walsh was motivated by racial animus in making the decision to terminate your contract?
>
> A: I'm sorry, the question again?
>
> Q: Have you given me all of the reasons why you believe Mr. Walsh was motivated by racial animus in reaching the decision to terminate your Contract?
>
> A: Well, I said mostly race, but I really -- I've probably given all the reasons, but I also believe with Mr. Walsh, as with everybody else, that both age and race played a significant role in my termination. Both of them, not just race.
>
> Q: It's interesting, before the break, I believe you testified that you were not sure if age did play a role; after the break, you've said that it certainly did. What caused you to change your testimony so dramatically from what it was just before the break?
>
> A: Well, because when I started discussing what had happened in '02 with age, I sort of got on the bandwagon of talking about race with Mr. Walsh. But I believe it's a combination of the two.
>
> \*\*\*
>
> Q: Let me try to pose the question again, if I could. Why do you now believe that age was also a consideration in Mr.

14

> Walsh's decision?
>
> A: Because I think the combination of the two had to be used together.
>
> Q: What do you mean by that?
>
> A: That's all I can come up with.

Id. at 243-45.

This is not evidence to defeat summary judgment. Nor is there any such evidence in the record. Mr. Walsh himself was 53 as of February 2002. Facts ¶ 38. The Hospital's Chief of Staff, Dr. MacArthur, was 69. Id. ¶ 12. The new OB-GYN hired by the Hospital, Dr. Donegan, was 47. Id. ¶ 56. There is nothing, anywhere, in the record to suggest that the latter's age was a factor in the Hospital's decision to retain him.

Plaintiff also attempts to allege that prior issues -- none even remotely involving Mr. Walsh -- involved age bias toward him. He appears to focus on the following:

(a) When Plaintiff initially applied for staff privileges in late 2000, an unnamed Hospital representative allegedly asked a reference why someone Plaintiff's age would still want to practice obstetrics. Edson Aff., Ex. 3 at 92.

(b) As part of the same initial staff application process, Board minutes from January 27, 2001 state that "there was discussion regarding the Dr. Hughes/Kriedman team. Medical Staff had feelings that age had much to do with the mixed feelings of Dr. Hughes working in Maternity." Walsh Aff., Ex. 26.

(c) Plaintiff asserts that age was the reason that after his application for privileges was granted, Dr. MacArthur asked to monitor him in the operating room for one to two months. Edson Aff., Ex. 3 at 92, 102.

15

(d)  Plaintiff appears to assert that his issues with other physicians, culminating in an anonymous complaint concerning Plaintiff made to the Board of Registration in Medicine in early 2002, are at least partly tied to his age. Id. at 102, 170, 237.

None of these allegations remotely suggest age discrimination by Mr. Walsh in reaching his decision to terminate Plaintiff's Contract in early 2003. Mr. Walsh did not even become CEO until after the last of the alleged issues -- the anonymous Board of Registration complaint -- had occurred. Facts ¶¶ 35, 38, 39. Moreover, all of the allegations appear to involve issues relating to clinical competence, a factor which Mr. Walsh did not even consider in making his termination decision. Id. ¶ 52  In short, none of these allegations have any probative value relative to Plaintiff's claim. See, e.g., Wallace, supra, at 100-101 (issues involving individuals who played no role in the challenged decision and/or which are remote in time lack probative value); Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001), citing McMillan v. Mass. Society for Prevention of Cruelty to Animals, 140 F.3d 288, 300 (1st Cir. 1998); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000); Shorett v. Right-Aide of Me., 155 F.3d 8, 13 (1st Cir. 1998).[1]

Finally, Plaintiff has asserted that a neighbor, Donald Lyons, told him that he had asked a Board member why the Hospital was terminating Plaintiff. According to Plaintiff, Lyons told him that the Board member, Earle Ray, had told him that "they were looking to get someone who

---

[1] One could go on. The alleged reference inquiry is based only on hearsay, and is hardly reflective of age bias per se -- the fact is that Plaintiff received staff privileges. Facts ¶ 13. The Board minutes say nothing whatsoever about who had "mixed feelings" about Plaintiff working in Maternity or why; if anything, the minutes appear to reflect that the medical staff and Board did not believe those "feelings" had merit -- again, as evidenced in part by the fact that Plaintiff received his privileges (and retained them until he elected to let them lapse in February 2004). Facts ¶¶ 13, 34, 64. There is simply no evidence that Dr. MacArthur's monitoring request was discriminatory, particularly since (1) Dr. MacArthur himself was 67 years old at the time and still actively practicing medicine as the Hospital's Chief of Staff (as he continues to do to this day) Facts ¶¶ 12-15; (2) Plaintiff's replacement, Dr. Donegan, participated in the same limited monitoring when he joined the Hospital, Facts ¶ 62; and (3) Plaintiff himself said he had "no issue" with monitoring at the time. Facts ¶ 15. Finally, Plaintiff can only speculate as to who made the anonymous complaint to the Board of Registration in Medicine and what their (or his, or her) reasons -- proper or improper -- may have been. He has no evidence the complaint was age-based.

would be here for a long time, something of that nature. I can't recall the exact words of what he said." Edson Aff., Ex. 3 at 214. Even putting to one side the hearsay nature of this testimony, its probative value is limited. Ray himself testified simply that "[i]t was clear to me that if they were hiring another physician, there was no need to extend the contract for Dr. Hughes." Edson Aff., Ex. 51 at 33. He did not second guess the decision and does not recall any discussion with Mr. Walsh (the actual decisionmaker) concerning it. See id. at 53. Consistent with this, he has no recollection of any conversation with Donald Lyons along the lines described by Plaintiff. In short, his alleged comment, standing alone, is insufficient to support an inference of discrimination. See Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 6 n. 8 (1st Cir. 1998); Fontaine v. Ebtec Corp., 415 Mass. 309, 314, n. 7 (1993) ("[I]solated or ambiguous remarks, tending to suggest animus based on age, or insufficient, standing alone, to prove an employer's discriminatory intent"). Summary judgment should be granted, therefore, on Plaintiff's discrimination claims in Counts I and II of his Complaint.

## CONCLUSION

For the foregoing reasons, the Hospital respectfully requests that this Court grant its Motion for Summary Judgment.

Respectfully submitted,

MARTHA'S VINEYARD HOSPITAL

By its attorneys,

_____
Thomas E. Shirley, Esq. (BBO # 542777)
Gretchen L. Edson (BBO #644742)
CHOATE, HALL & STEWART LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109
(617) 248-5000

I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD FOR EACH OTHER PARTY BY MAIL/HAND ON: 5-2-05

Dated: May 2, 2005

3919369v2