UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ | ) | |
| DEURWARD L. HUGHES, MD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04 10564 DPW |
| | ) | |
| MARTHA'S VINEYARD HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, Defendant Martha's Vineyard Hospital hereby submits this statement of material facts as to which there is no genuine issue to be tried.

**The Hospital**

1.    Martha's Vineyard Hospital (the "Hospital") is the only hospital on Martha's Vineyard Island (the "Island"). It is licensed for a maximum of 15 beds. See Affidavit of Timothy Walsh ¶ 2 ("Walsh Aff. ").

2.    There are three principal categories of medical staff at the Hospital: active, associate, and replacement. See id. ¶ 4. Active staff members must have their primary practice on the Island. See id. Associate staff have their primary affiliation with another hospital. Replacement staff members may replace active staff members for up to 90 days per year. See id.

3.    There are presently 28 active staff members, 24 associate staff members, and 19 replacement staff members at the Hospital. See id. ¶ 5.

4.    In addition to having medical staff privileges, some physicians are also employees of the Hospital. See id. ¶ 6 This is presently true for 14 of the Hospital's 71 staff members. See Walsh Aff. ¶ 6.

**The Midwifery Practice**

5.    From 1982 until early 2001, Dr. Jason Lew ("Dr. Lew") was the only OB-GYN on the Hospital's active staff. Id. ¶ 11. Dr. Lew was never an employee of the Hospital. See id.

6.    In 1998, an OB-GYN nurse at the Hospital, Kathleen Chase ("Ms. Chase"), became a certified nurse-midwife ("CNM"). See Deposition of Kathleen Chase at 7.[1] A CNM may not practice midwifery in Massachusetts without a collaborating physician. See Deposition of Timothy Walsh at 36.[2] The Hospital accordingly entered into a three year contract with Dr. Lew, pursuant to which he employed Ms. Chase and served as her collaborating physician in return for a financial stipend from the Hospital. See Edson Aff., Ex. 1 at 7.

**Plaintiff's Background and Application for Privileges**

7.    Plaintiff Deurward L. Hughes, MD ("Plaintiff") is an African-American physician who was born on May 3, 1931. See Deposition of Deurward L. Hughes, M.D. at 9.[3] He is married to Dr. Terry Kriedman ("Dr. Kriedman"). See id. Both are OB-GYN's. See id. at 15.

8.    For many years both Plaintiff and Dr. Kriedman served as OB-GYN's on the faculty of teaching hospitals in Philadelphia. See at 14-15, Ex. 4. They also owned a vacation home on the Island. See id. Ex. 3 at 13-14. In 2000, they decided to leave Philadelphia and live year-round on the Island. See id.

---

[1] A copy of the referenced excerpts from the Chase deposition are attached as Exhibit 1 to the Affidavit of Gretchen L. Edson ("Edson Aff.") filed herewith.
[2] A copy of the referenced excerpts from the Walsh deposition are attached as Exhibit 2 to the Edson Aff.
[3] A copy of the referenced excerpts from the Hughes deposition are attached as Exhibit 3 to the Edson Aff.

2

9.    Dr. Kriedman began a practice on the Island limited to in-office gynecology which has continued to the present. See Edson Aff., Ex. 3 at 16, 228. In December 2000, Plaintiff signed a contract with the Hospital to provide 84 days of coverage for Dr. Lew in 2001 in return for a salary of $39,000. See id. Ex. 5.

10.    Both Plaintiff and Dr. Kriedman applied for medical staff privileges with the Hospital in the latter half of 2000. See Walsh Aff., Ex. 1.

11.    Pursuant to the Medical Staff's Credentials Policy, the Chief of Staff reviews all initial applications for appointment. See id. Ex. 2 at 18-22. Applications must then be approved by the Credentials Committee, the Medical Executive Committee, and ultimately the Hospital's Board of Trustees. See id. at 20-22.

12.    Dr. John MacArthur ("Dr. MacArthur"), a surgeon, was the Hospital's Chief of Staff at all times relevant to this action. See Deposition of John MacArthur at 7.[4] In this capacity he oversaw the process by which Plaintiff's application for staff privileges was reviewed. See id. at 19. Dr. MacArthur was born on January 17, 1934. See Walsh Aff. ¶ 7.

13.    Plaintiff's application for privileges was approved in February 2001 (as was Dr. Kriedman's). See Edson Aff., Ex. 7. However, Dr. MacArthur and the other physicians involved in the review process were unable to obtain sufficient information which, in their judgment, demonstrated Plaintiff's recent experience and clinical volume. See id. Ex. 3 at 36-37, Ex. 6 at 40, 47, 48, 51-52; Walsh Aff., Exs. 3-4.

14.    To address this concern, Dr. McArthur asked Plaintiff to provide him with a summary of the number and kinds of procedures he had performed over the prior three years. See

---

[4] A copy of the references excerpts from the MacArthur deposition are attached as Exhibit 6 to the Edson Aff.

3

Edson Aff., Ex. 6 at 49, 53.  Plaintiff refused.  <u>See</u> <u>id.</u> at 52.  Dr. MacArthur then asked for

information over the prior six months; Plaintiff again refused.  <u>See</u> <u>id.</u> at 52-53.

15.    Dr. MacArthur accordingly advised Plaintiff that he wanted to observe, or monitor,

him in the operating room.  <u>See</u> <u>id.</u> at 48.  Plaintiff told Dr. MacArthur this was perfectly

acceptable to him.  <u>See</u> <u>id.</u> Ex. 3 at 36-37.  Dr. MacArthur then monitored Plaintiff in the operating

room for a period of one to two months, for a total of no more than five procedures.  <u>See</u> <u>id.</u> Ex. 6

at 48.  Plaintiff had no issues with this monitoring and it did not identify any particular concerns

relative to the quality of Plaintiff's care.  <u>See</u> Edson Aff., Ex. 6 at 51-52, Ex. 3 at 36-37.

**<u>The Hospital Hires Plaintiff to Oversee the Midwifery Practice</u>**

16.    Kevin Burchill ("Mr. Burchill") began employment with the Hospital as its Chief

Executive Officer ("CEO") in October 1999.  <u>See</u> Walsh Aff. ¶ 10.  This was after a predecessor

CEO had entered into the three-year agreement with Dr. Lew involving the latter's employment of

Ms. Chase referenced in Paragraph 6 above.

17.    Dr. Lew's agreement was scheduled to expire on March 31, 2001.  <u>See</u> <u>id.</u> ¶ 12.  He

and Burchill were unable to agree on what subsidy, if any, he should continue to receive in

connection with his employment of Ms. Chase.  <u>See</u> Edson Aff., Ex. 2 at 35-36.  Their discussions

became contentious and, toward the end of March 2001, Dr. Lew terminated Ms. Chase from his

practice.  <u>See</u> <u>id.</u>

18.    Mr. Burchill immediately adopted a new model pursuant to which the Hospital,

through an entity called Vineyard Midwifery, (a) employed Ms. Chase directly and (b) hired

Plaintiff to provide coverage for her.  <u>See</u> <u>id.</u>

4

19.     Plaintiff signed a letter of agreement to provide such coverage on March 30, 2001, with the understanding that a more complete contract formalizing the arrangement would be prepared. See id. Ex. 8.

20.     Plaintiff and the Hospital subsequently entered into a formal contract, effective April 1, 2001 (the "Contract"). The Contract had a three year term and gave both Plaintiff and the Hospital the right to terminate it at any time without cause upon 180 days prior written notice. See id. Ex. 9 § 3.2. Plaintiff received a salary of $130,000 and was eligible for additional compensation to the extent he performed additional specified services. See id. at Exhibit A.

21.     Although Plaintiff had been initially employed by the Hospital to provide coverage for Dr. Lew, the Contract did not contain any express requirement that he continue to do so. It also obligated the Hospital to provide "off-Island" coverage for Plaintiff if he did not wish to have Dr. Lew cover for him. See Edson Aff., Ex. 9 § 2.4.

22.     The Contract specified that Plaintiff was obligated to devote "sufficient time and effort" to perform his duties thereunder. See id. § 1.2. This was in contrast to the Hospital's standard physician contract, which requires physicians to devote "full-time and best efforts to the physician's duties." Id. Ex. 2 at 56-57.

23.     In a letter to Dr. MacArthur dated July 2, 2001, Plaintiff characterized his own understanding of his limited role under the Contract as follows: "My salaried position with the Hospital is to cover the midwife and to do any office gyn procedures and any referred gyn surgery." Id. Ex. 10. He did not have an independent obstetrical practice and maintained office hours one and one-half days per week. See id. Ex. 3 at 261-62.

5

**Plaintiff's First Year Under His Contract**

24.     Plaintiff had a positive relationship with Mr. Burchill through the first year of his contract. Almost immediately, however, he and his wife developed an acrimonious and hostile relationship with many of the Hospital's medical staff physicians and committees. See id. Ex. 11 at MVH 339

25.     Many, but far from all, of the issues involved Plaintiff's refusal to cover for Dr. Lew, a member of the medical staff for over 18 years. See Edson Aff., Ex. 11 at MVH 339-40.

26.     The medical staff members, as reflected in Medical Executive Committee minutes of July 17, 2001, "felt that coverage is the fundamental essential relationship physicians have with each other at this small hospital." See Walsh Aff., Ex. 5 at MVH 0342.

27.     Plaintiff initially cited "differing practice philosophies" and argued that coverage was not required under his contract. See id. Ex. 6 at MVH 336, Ex. 7; Edson Aff., Ex. 10; see also Edson Aff., Ex. 11.

28.     Plaintiff then asserted that he had concerns that the quality of Dr. Lew's care. See Edson Aff., Ex. 11 at MVH 0340. When advised that OB-GYN cases were reviewed through the Hospital's quality improvement process by an outside reviewer, he questioned the quality improvement process. See id. Dr. Lew, in turn, questioned the quality of Plaintiff's care. See id. Ex. 12; Walsh Aff., Ex. 5 at MVH 342.

29.     The matter eventually embroiled the Medical Executive Committee, the Quality Improvement Committee, the Joint Conference Committee, and escalated up to the Board level. See Edson Aff., Exs. 12, 14-18; Walsh Aff. Ex. 5 at MVH 0342, Exs. 8-9, Ex. 10 at MVH 0347, Ex. 11 at MVH 0316.

6

30.     It was ultimately decided that the American College of Obstetrics and Gynecology ("ACOG") would perform a four-day, comprehensive review of the entire OB-GYN program in October 2001 and prepare a report for the Hospital.  See Walsh Aff., Ex. 10 at MVH 0347, Ex. 11 at MVH 0316.

31.     ACOG performed the review in October 2001 and issued its report in late January 2002.  Following the report, Dr. Lew agreed to participate in a voluntary peer review/quality course of action while maintaining full privileges at the Hospital.  See Edson Aff., Ex. 3 at 160.

32.     Before and after the ACOG report, the coverage dispute between Dr. Lew and Plaintiff continued.  See id. Ex. 19; Walsh Aff., Exs. 12-14.

**Plaintiff's Application for Reappointment to the Medical Staff**

33.     Plaintiff's initial award of privileges was, under the Hospital's Medical Staff By-Laws, for a one year term.  See Edson Aff., Ex. 3 at 31.  In the late fall of 2001, he applied for reappointment to the medical staff for a two year term.  See id. Ex. 20.

34.     Plaintiff's application for reappointment was approved on February 22, 2002.  See id. Ex. 21.  However, there was discussion at the Medical Executive Committee level regarding his "cooperation with other physicians, citizenship issues, and physician's willingness to participate in coverage."  Walsh Aff., Ex. 13 at MVH 0351.  Additionally, a surgeon on the Hospital's Medical Staff, Dr. Richard H. Koehler ("Dr. Koehler"), born on May 27, 1956, wrote a letter to the Medical Staff opposing Plaintiff's award of full staff privileges in surgery pending more complete review of his recent surgical history.  See id. ¶ 8; Edson Aff., Ex. 22.

7

**Mr. Burchill Resigns as CEO and Is Succeeded by Timothy Walsh**

35.     Dr. Koehler had earlier announced his decision to resign from his position with the Hospital due to irremediable conflicts with Mr. Burchill on January 9, 2002. See Walsh Aff. ¶ 8. Mr. Burchill himself then announced his decision to resign on March 23, 2002. See id. His resignation became effective on April 17, 2002. See id.

36.     On April 3, 2002, Mr. Burchill agreed to change Plaintiff's compensation arrangement with the Hospital to a flat salary of $200,000. See Edson Aff., Ex. 23. This was increased to $208,000 shortly thereafter. See id. Ex. 3 at 130.

37.     On April 12, 2002, Mr. Burchill wrote to the Board of Registration of Medicine on Plaintiff's behalf after a complaint relating to Plaintiff had been filed with the Board. In it, Burchill described Plaintiff's "principal activities at the Hospital" as follows:

> Dr. Hughes began work at the Hospital in December, 2000. … Dr. Hughes was not expected to establish a private practice but to provide coverage when the one full-time OB-GYN in private practice, Dr. Jason Lew was off-island. The Hospital had agreed to arrange coverage for Dr. Lew for 105 days a year; Dr. Hughes was to provided coverage for 80 of those 105 days. Dr. Hughes' obligations expanded when, in February 2001, Dr. Lew's midwife was terminated from his private practice. Owing to the island's need, the Hospital hired that midwife as of April 1, 2001; Dr. Hughes undertook responsibility as her "collaborating physician." These are Dr. Hughes' principal activities at the Hospital.

Id. Ex. 24. Plaintiff saw this letter and agrees it is accurate. See id. Ex. 3 at 138-39.

38.     Burchill was succeed as CEO by Timothy Walsh ("Mr. Walsh"), who had been hired to serve as the Hospital's Chief Financial Officer in July 2000. See id. Ex. 2 at 6. Mr.

8

Walsh had not been involved in any prior decision or issue involving Plaintiff. See Walsh Aff. ¶

3. Mr. Walsh was born on February 26, 1947. See id. ¶ 1.

     39.     Plaintiff has described his relationship with Mr. Walsh before the latter became

CEO in April 2002 as "fine." Edson Aff., Ex. 3 at 126.

**Plaintiff's Second Year Under His Contract**

     40.     Plaintiff's contentious relationship with the medical staff continued into the second

year of his contract. His dysfunctional relationship with Dr. Lew carried forward. He and Dr.

Koehler, prior to the latter's departure on July 8, 2002, were adversarial. See id. Ex. 22. He also

became embroiled in a dispute with Dr. Stephen London ("Dr. London"), born on January 16,

1954, an anesthesiologist who chaired the Perioperative Services Committee. See id., Exs. 25-29;

Walsh Aff. ¶ 9.

     41.     The perspective of Dr. London and other members of the medical staff was that

Plaintiff sought to dictate the terms under which he would participate in normal quality

improvement procedures and work with other members of the medical staff. In a April 25, 2002

memorandum to the Chair of the Hospital's Medical Quality Improvement Committee, Dr.

William Tsikitas, Dr. London stated that "the processes that are currently being followed for

Quality Improvement review are consistent with the current by-laws and again I plead with Dr.

Hughes to, rather than setting terms that meet to his satisfaction, cooperate with the processes that

exist that all of the other staff physicians seem to have no particular difficulty in following."

Edson Aff., Ex. 29.

3918026v3

42.    In a meeting of the Joint Conference Committee on April 26, 2002 (at which Mr.

Walsh participated for the first time as CEO), the midwife and OB-GYN practices were discussed.

The minutes read in part as follows:

> The group discussed the issues between the Midwifery's office and
> Dr. Lew's office.  It was noted that the Medical Staff would like to
> see an integrated plan for the future at Martha's Vineyard Hospital.
> Also noted was the need for better communication between the
> practices.  In order to move forward the Hospital should try to
> blend the 3 together (Dr. Hughes/Midwife/Dr. Lew).

Walsh Aff., Ex. 15.

43.    On May 29, 2002, Plaintiff advised the Hospital that he had sixty (60) vacation

days available for the second year of his contract.  See Edson Aff., Ex. 30.

44.    In August 2002, Mr. Walsh made a concerted effort to obtain ongoing, acceptable

cross-coverage arrangements for the OB-GYN practice between Plaintiff and Dr. Lew.  See id.

Exs. 31-35; Walsh Aff., Exs. 16-24.

45.    Plaintiff's first response was to express a willingness to enter into a mutual

coverage arrangement under a specified set of conditions which he set forth in a August 20, 2002

memorandum.  His conditions were as follows:

> 1.    This committee and the administration will provide me
> with a written statement that it is their opinion that Dr. Lew's
> practice meets the national standard of care.
>
> 2.    It is recognized by administration that my contract provides
> for a specified number of weekend days, CME days, and vacation
> days, and during the first year while the  practice was being
> established, most of these days were not taken, and remain to be
> taken.  During that same time, I provided coverage for numerous
> vacations taken by Dr. Lew, as well as covering almost all
> holidays.  Therefore, we do not start anew, but need to take some
> past history into account.

10

> 3.    I would request that there be two mediators, each one acceptable to Dr. Lew and to myself, to help initially in setting up the coverage, for at least the first year.

> 4.    Dr. Kriedman, Cathy Chase, and I would cover Dr. Lew. Dr. Lew would cover Dr. Kriedman's practice as well, whenever he is covering and she desires the coverage.

Edson Aff., Ex. 31.

46.    Plaintiff then had counsel write a September 18, 2002 letter to Mr. Walsh, setting forth his understanding of his contractual entitlements and imposing a still more detailed set of conditions upon which he would be willing to enter into a cross-coverage arrangement with Dr. Lew.  These were as follows:

> 1.    The arrangement would be for a four (4) month period only to cover the period of October 1, 2002 through January 31, 2003 (the "Trial Period").

> 2.    Dr. Hughes could terminate the arrangement upon thirty (30) days written notice to the Hospital.

> 3.    The Hospital shall provide coverage for Dr. Hughes, whether by Dr. Lew or, if necessary, by "off-island" physicians for all of the time off, whether for vacation or for CME, to which Dr. Hughes is contractually entitled, as specified in ¶4 on page one of this letter.

> 4.    The Hospital shall forthwith notify Dr. Hughes, through his counsel, of the number of days that Dr. Hughes is expected to cover for Dr. Lew during the Trial Period and shall specify what, if any, major holidays for which coverage is being requested.

> 5.    A determination of dates for cross-coverage is to be mutually agreed upon.  In the event there is a disagreement, the Hospital administration shall participate in resolving such disagreement.

> 6.    During the periods that Dr. Lew is covering for Dr. Hughes, he shall also provide coverage for Dr. Kriedman.

11

> Please note that the above-described proposal is put forth strictly as
> an accommodation to the Hospital and is intended merely as a trial.
> Dr. Hughes does not waive any right granted to him under the
> Contract, either by this proposal nor by his participation in the trial
> cross-coverage contemplated thereby.

Id. Ex. 36.

47.     Following the ACOG report, the Hospital had retained Dr. Reza Shah, a Board-

certified OB-GYN on the staff of Women's and Infants' Hospital in Providence, Rhode Island, to

serve as the designated outside OB-GYN quality assurance reviewer.  A meeting was scheduled

for October 26, 2002 with Dr. Shah, Plaintiff, Dr. Kriedman, Dr. Lew, and Ms. Chase to address

quality of care and cross-coverage issues.  See id. Ex. 37.

48.     In a letter to Dr. MacArthur dated October 21, 2002, Plaintiff voiced continuing

criticisms of the quality assurance process.  Among other things, he questioned why his cases were

being reviewed by Dr. Shah on the grounds that "I believe my teaching credentials to be at least as

good as his are."  See id.

49.     At the October 26, 2002 meeting, Plaintiff and his wife immediately entered into an

adversarial relationship with Dr. Shah.  Following the meeting, they circulated a memorandum

which read in part as follows:

> … [F]or the record, we would like to register our concerns with the
> choice of Dr. Shah for the position which has now been labeled as
> "consultant" to the ob-gyn department.  The attitude that he
> displayed at the meeting on Saturday was offensive.  He is being
> paid a substantial fee, we are sure, to work for Martha's Vineyard
> Hospital, but conveyed that he was far too busy to spend time in an
> institution with only about 100 deliveries.  We agree that Women's
> and Infants is a fine hospital, but no better than others where we
> have worked.  Dr. Shah's smug self assurance communicated that
> he was an authority on obstetrics and gynecology.  He is not.  He
> may be a well trained, board-certified, clinician who trains

> residents (as did we both do in Philadelphia), but he does not
> dictate the standard of care.
>
> … Finally, we do not see how his knowledge of the Greek or Latin
> root of the word "meconium" makes him anything other than
> someone with a superiority complex who likes to show off.

Id. Ex. 38.

50.    In the words of Dr. MacArthur, the Hospital's Chief of Staff, "every time we met

with Dr. Hughes, it ended up in a donnybrook, an argument, a fight."  Id. Ex. 6 at 70.  "Dr.

Hughes, in his discussions with the Medical Executive Committee, had proven to all concerned

that he was disruptive, and that he was not willing to discuss things.  He wanted to argue."  Edson

Aff., Ex. 6 at 70-71.

51.    At a Joint Conference Committee Meeting on December 6, "[t]here was a lengthy

discussion about creating a department of OB-GYN and if it would fall under primary care and

how to select a chairperson… Dr. Lew feels there is no collegiality between OB-GYN staff.

Internally, it seems incredibly difficult to work the attitude/divisional problems out."  Walsh Aff.,

Ex. 25 at MVH 0299.

**Walsh Decides to Hire a Different OB-GYN**

52.    By February 2003, Mr. Walsh made the decision to hire a different OB-GYN and

terminate Plaintiff's contract with the Hospital.  See Edson Aff., Ex. 2 at 18.  Mr. Walsh's

decision was not based on Plaintiff's clinical competence.  See id. at 14.

53.    There was no one precipitating event that led to Mr. Walsh's decision.  See id. at

30.  Stated most broadly, he believed that the practice "was not being served well by the

arrangement we had."  See id. at 19.  In his view, this was true for a number of reasons:

13

(a)     He was concerned about the contentious relationship between Plaintiff and most of the medical staff.  See id. at 16-17, 19, 37-38, 50, 76-77.  A key objective was to bring the staff back to being part of a team.  See id. at 19, 38.

(b)     He believed that Plaintiff's contract was disadvantageous to the Hospital.  See Edson Aff., Ex. 2 at 16-17, 38-42, 48, 50.  From Mr. Walsh's perspective, it basically limited Plaintiff's obligation to the collaborating physician and overseer of the midwife.  See id. at 53.  It imposed no obligation on him to attempt to expand the OB-GYN practice or to work more cooperatively with other physicians.  See id. Ex. 9.

(c)     Mr. Walsh himself had a very difficult time working with Plaintiff after becoming CEO.  See id. Ex. 2 at 20, 50.  Mr. Walsh did not like the fact that, from his perspective, Plaintiff "kept going around me to the Board" and turned coverage issues into contractual disputes with attorneys.  See id. at 20, 82-84, Ex. 3 at 208.

(d)     He believed the Hospital could expand its OB-GYN practice, increase its volume, and attract OB-GYN patients who are going off-Island for care.  See id. Ex. 2 at 51-52, 115, 126.  Given the concerns summarized above, he did not believe Plaintiff was the right person to lead this effort.  See Walsh Aff. ¶ 13.

54.     Mr. Walsh similarly concluded that Dr. Lew was not a viable candidate for the new and expanded role he envisaged.  See id. ¶ 14.  As a result, a placement firm was retained and instructed to focus on external applicants.  See Edson Aff., Ex. 2 at 25-26.

55.     Plaintiff first learned that a recruitment process was underway in April 2003 when he saw an advertisement for the position in a medical journal.  See id. Ex. 3 at 174-175.

56.     The Hospital ultimately hired Dr. Samuel Donegan in August 2003. See Affidavit

of Samuel Patrick Donegan ("Donegan Aff.") ¶ 2. Dr. Donegan is Caucasian and was born on

February 15, 1956. See id. ¶ 1.

57.     During the interview process, Dr. Donegan was told that the Hospital wanted to

expand the OB-GYN practice, introduce new procedures, and make a focused attempt to attract

patients who were going off-Island for OB-GYN care. See Deposition of Samuel Patrick Donegan

at 11, 17.[5] For its part, the Hospital gauged Dr. Donegan's willingness to try to grow the practice,

his ability to work with a midwife, and his interest in activities above and beyond the practice such

as community and public health initiatives. See id. at 20.

58.     After Dr. Donegan accepted the Hospital's offer, the Hospital advised Plaintiff on

August 12, 2003 that it was exercising its right to terminate his contract without cause on 180 days

notice. See Edson Aff., Ex. 40. Consistent with this, he was advised that the effective date of his

contract termination would be February 10, 2004. See id. This was less than two months before

the contract's term would have ended in any event. See id. Ex. 9 § 3.1.

59.     After receiving this notice, Plaintiff discussed the termination of his contract with

Mr. Walsh. Mr. Walsh advised him that the Hospital wanted a new person, that it wanted to

attract more patients, and, that Mr. Walsh did not like to get "letters from lawyers" and "calls from

members of the Board of Trustees." Id. Ex. 3 at 207-208.

60.     Plaintiff has no reason to believe that Mr. Walsh was not being entirely truthful

when he said that he did not like getting letters from lawyers or calls from Board members. See

id. at 259-60. It is a fact that Plaintiff had gone to Board members on some number of occasions,

---

[5] A copy of the referenced excerpts from the Donegan deposition are attached as Exhibit 39 to the Edson Aff.

15

Case 1:04-cv-10564-DPW    Document 28    Filed 05/02/2005    Page 16 of 17

beginning immediately after Mr. Walsh became CEO. See id. at 145-47, 273, Ex. 2 at 20, 47, 50, 76-83, Exs. 26 - 28, Ex. 41 at Response No. 4.

     61.     Plaintiff's disagreements with other members of the medical staff continued through the date of his notice. See, e.g., Edson Aff., Exs. 43-47.

     62.     As had been true for Plaintiff, Dr. Donegan was monitored in the operating room for his first several months with the Hospital. See Donegan Aff. ¶ 3.

     63.     The Hospital's decision to terminate Plaintiff's contract had no effect on his medical staff privileges. See Edson Aff., Ex. 3 at 218. He was free to continue a private OB-GYN practice, just as Dr. Lew had done for many years. See id.

     64.     Plaintiff nevertheless elected not to reapply for medical staff privileges when his two-year appointment ended on February 22, 2004. See id. Ex. 48.

     65.     Dr. Lew similarly elected not to seek medical staff privileges beyond February 29, 2004 pursuant to an agreement in which the Hospital purchased his OB-GYN practice. See Walsh Aff. ¶ 15.

**The Composition of the Hospital's Medical Staff**

     66.     Although the Hospital did not maintain records to track such information in 2001 and 2002, it believes that Plaintiff was the only African-American physician on its active staff during those two years. See id. ¶ 16.

     67.     A second African-American physician joined the active staff on March 21, 2004 and entered into an employment relationship with the Hospital on June 22, 2004. See id. This was Dr. Gerald Morris ("Dr. Morris"), who practices internal medicine and remains on the active staff and in the employ of the Hospital through the present. See id.

16

3918026v3

68.    Hospital records for 2003 and 2004 reflect that, in addition to Dr. Morris, the Hospital had a number of minority physicians on its medical staff, including an African-American physician with associate staff privileges in 2003 and 2004 and an African-American physician with replacement staff privileges in 2004. See Edson Aff., Ex. 3 at 265-266, Ex. 49.

69.    There are presently 3 African-American physicians on the Hospital's staff, or 4.2% of the total. See id. Ex. 49.

70.    Census data reflect that as of 2000, the Island had 14,987 residents, 359 of whom were African-American, or 2.4% of the total. See id. Ex. 50.

71.    Plaintiff is not aware of any African-American physicians who he believes have been improperly denied medical staff privileges at the Hospital; who have been improperly denied employment with the Hospital or any Hospital-related entity; or, who have been discriminated against by the Hospital in any way since he first joined its staff. See id. Ex. 3 at 266-67.

72.    The Hospital does not specifically maintain records reflecting the ages of its medical staff members. See Walsh Aff. ¶ 17.

Respectfully submitted,

MARTHA'S VINEYARD HOSPITAL

By its attorneys,

_____

Thomas E. Shirley, Esq. (BBO # 542777)
Gretchen L. Edson (BBO #644742)
CHOATE, HALL & STEWART LLP
Exchange Place
53 State Street
Boston, Massachusetts  02109
(617) 248-5000

I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD FOR EACH OTHER PARTY BY MAIL/HAND ON: 5·2·05

Dated:  May 2, 2005

17

3918026v3