# Affidavit of Gretchen Edson Part 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DEURWARD L. HUGHES, MD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04 10564 DPW |
| | ) | |
| MARTHA'S VINEYARD HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AFFIDAVIT OF GRETCHEN L. EDSON

I, Gretchen L. Edson, depose and state as follows:

1.      I am an attorney at Choate, Hall & Stewart, and an attorney of record representing Martha's Vineyard Hospital (the "Hospital") in the above-captioned action.

2.      Attached hereto as Exhibit 1 are true and accurate copies of pages from the transcript of the deposition of Katherine Chase.

3.      Attached hereto as Exhibit 2 are true and accurate copies of pages from the transcript of the deposition of Timothy Walsh.

4.      Attached hereto as Exhibit 3 are true and accurate copies of pages from the transcript of the deposition of plaintiff Deurward L. Hughes, M.D.

5.      Attached hereto as Exhibit 4 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 3 and identified as a May 10, 2000 Letter from D. Hughes to H. Neider.

3918871v2

6.      Attached hereto as <u>Exhibit 5</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 6 and identified as a December 15, 2000 Letter of Understanding from K. Burchill to D. Hughes.

7.      Attached hereto as <u>Exhibit 6</u> are true and accurate copies of pages from the transcript of the deposition of John MacArthur.

8.      Attached hereto as <u>Exhibit 7</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 8 and identified as a February 23, 2001 Letter from K. Burchill to D. Hughes.

9.      Attached hereto as <u>Exhibit 8</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 9 and identified as a March 30, 2001 Letter of Agreement.

10.     Attached hereto as <u>Exhibit 9</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 21 and identified as the April 1, 2001 contract between D. Hughes and Martha's Vineyard Hospital.

11.     Attached hereto as <u>Exhibit 10</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 13 and identified as a July 2, 2001 Letter from D. Hughes to J. MacArthur.

12.     Attached hereto as <u>Exhibit 11</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 14 and identified as the July 10, 2001 Medical Executive Committee Business Minutes ("MEC Bus. Min.").

13.     Attached hereto as <u>Exhibit 12</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 18 and identified as a July 26, 2001 Letter from B. Tsikitas to D. Hughes.

2

14.     Attached hereto as <u>Exhibit 13</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 15 and identified as a July 10, 2001 Memorandum from D. Hughes to J. MacArthur.

15.     Attached hereto as <u>Exhibit 14</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 16 and identified as a July 13, 2001 Letter from B. Tsikitas to D. Hughes.

16.     Attached hereto as <u>Exhibit 15</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 17 and identified as a July 18, 2001 Letter from D. Hughes to B. Tsikitas.

17.     Attached hereto as <u>Exhibit 16</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 19 and identified as a July 29, 2001 Letter from D. Hughes to B. Tsikitas.

18.     Attached hereto as <u>Exhibit 17</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 20 and identified as a July 31, 2001 Letter from B. Tsikitas to D. Hughes.

19.     Attached hereto as <u>Exhibit 18</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 22 and identified as an August 17, 2001 Joint Conference Committee Min.

20.     Attached hereto as <u>Exhibit 19</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 24 and identified as the December 11, 2001 MEC Bus. Min.

21.     Attached hereto as <u>Exhibit 20</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 23 and identified as an Application for Reappointment.

3

22.    Attached hereto as Exhibit 21 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 26 and identified as a February 25, 2002 Letter from K. Burchill to D. Hughes.

23.    Attached hereto as Exhibit 22 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 25 and identified as a February 19, 2002 Memorandum from R. Koehler to Medical Staff Members.

24.    Attached hereto as Exhibit 23 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 27 and identified as a Personnel Action Form.

25.    Attached hereto as Exhibit 24 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 28 and identified as an April 12, 2002 Letter from K. Burchill to M. Keenan.

26.    Attached hereto as Exhibit 25 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 29 and identified as an April 12, 2002 Memorandum from S. London to D. Hughes.

27.    Attached hereto as Exhibit 26 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 30 and identified as an April 22, 2002 Letter from D. Hughes to S. London.

28.    Attached hereto as Exhibit 27 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 31 and identified as an April 23, 2002 Memorandum from D. Hughes and T. Kriedman to T. Sweet at 108.

29.    Attached hereto as Exhibit 28 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 32 and identified as an April 23, 2002 Memorandum from D. Hughes and T. Kriedman to T. Sweet at 109.

4

30.    Attached hereto as Exhibit 29 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 33 and identified as an April 25, 2002 Memorandum from S. London to B. Tsikitas.

31.    Attached hereto as Exhibit 30 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 34 and identified as a May 29, 2002 Memorandum from D. Hughes to E. Leone.

32.    Attached hereto as Exhibit 31 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 35 and identified as an August 20, 2002 Response of D. Hughes.

33.    Attached hereto as Exhibit 32 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 36 and identified as an August 27, 2002 Memorandum from S. Clauss-Zanger to D. Hughes and J. Lew.

34.    Attached hereto as Exhibit 33 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 37 and identified as a September 9, 2002 Memorandum from S. Clauss-Zanger to D. Hughes.

35.    Attached hereto as Exhibit 34 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 38 and identified as a September 9, 2002 Memorandum from S. Clauss-Zanger to D. Hughes and J. Lew.

36.    Attached hereto as Exhibit 35 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 39 and identified as a September 10, 2002 Memorandum from S. Clauss-Zanger to D. Hughes and J. Lew.

37.     Attached hereto as Exhibit 36 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 40 and identified as a September 18, 2002 Letter from M. Engel to T. Walsh.

38.     Attached hereto as Exhibit 37 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 41 and identified as an October 21, 2002 Memorandum from D. Hughes to J. MacArthur.

39.     Attached hereto as Exhibit 38 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 42 and identified as an October 26, 2002 Memorandum from D. Hughes and T. Kriedman to Members of QA et al.

40.     Attached hereto as Exhibit 39 are true and accurate copies of pages from the transcript of the deposition of Samuel Patrick Donegan.

41.     Attached hereto as Exhibit 40 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 49 and identified as an August 12, 2003 Letter from K. Chisholm to D. Hughes.

42.     Attached hereto as Exhibit 41 is a true and accurate copy of document marked as Plaintiff's Deposition Exhibit 52 and identified as Plaintiff Deurward L. Hughes, MD's Answers to Defendant Martha's Vineyard Hospital's First Set of Interrogatories.

43.     Attached hereto as Exhibit 42 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 43 and identified as an April 17, 2003 Memorandum from D. Hughes to Director of Clinical Management.

44.     Attached hereto as Exhibit 43 is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 44 and identified as an April 18, 2003 Letter from B. Hendrixon to S. Clauss-Zanger.

6

45.     Attached hereto as <u>Exhibit 44</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 45 and identified as a June 11, 2003 Memorandum from Quality Improvement to D. Hughes.

46.     Attached hereto as <u>Exhibit 45</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 46 and identified as a June 18, 2003 Memorandum from P. Pil to D. Hughes et al.

47.     Attached hereto as <u>Exhibit 46</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 47 and identified as a Quality Improvement Report.

48.     Attached hereto as <u>Exhibit 47</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 48 and identified as a July 29, 2003 Letter from M. Goldfein to D. Hughes.

49.     Attached hereto as <u>Exhibit 48</u> is a true and accurate copy of a document marked as Plaintiff's Deposition Exhibit 50 and identified as a December 29, 2003 Letter from D. Hughes to S. London.

50.     Attached hereto as <u>Exhibit 49</u> is a true and accurate copy of Defendant's First Supplemental Response to Plaintiff's First Set of Interrogatories.

51.     Attached hereto as <u>Exhibit 50</u> are true and accurate copies of pages from the 2004 Massachusetts Municipal Profiles which reports data collected from the U.S. Census Bureau.

52.     Attached hereto as <u>Exhibit 51</u> are true and accurate copies of pages from the transcript of the deposition of Earle Ray.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 2nd day of May, 2005.

Gretchen L. Edson

I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD FOR EACH OTHER PARTY BY MAIL/HAND ON: 5·2·05

3918871v2

7

# Exhibit 1

1

Pages:    1-89

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

DOCKET NO. 04-10564-DPW

**********************************

DEURWARD L. HUGHES, M.D.              *

    Plaintiff                         *

vs.                                   *

MARTHA'S VINEYARD HOSPITAL            *

    Defendant                         *

**********************************


    DEPOSITION of KATHLEEN CHASE, a Witness called by

the Plaintiff, taken pursuant to the provisions of the

Federal Rules of Civil Procedure, before Peter J.

Wood, a Professional Court Reporter and Notary Public

in and for the Commonwealth of Massachusetts, at

Mansion House, 9 Main Street, Vineyard Haven,

Massachusetts, on Wednesday, March 9, 2005, commencing

at 1:20 p.m.


WOOD COURT & CONFERENCE REPORTING
77 SUMMER STREET
COHASSET, MA 02025
(781) 383-6621

7

1        graduation from the midwifery program.  Then

2        starting in 1998, I began practicing in Dr. Lew's

3        office, was technically employed by Dr. Lew who

4        was being reimbursed by the hospital to pay my

5        salary, and that was for two years.  In the third

6        year of my practice with Dr. Lew, he was then

7        becoming -- was contributing towards my salary as

8        well as the hospital, and after my third year

9        with Dr. Lew, I was laid off by Dr. Lew and was

10       hired by the hospital to work where I am now

11       practicing in midwifery.

12   Q   When were you laid off by Dr. Lew?

13   A   After my third year of practice which would have

14       been 2001.

15   Q   What time of year?

16   A   It was in March.  I had just gotten back from my

17       vacation, and I was told by the CEO that I was

18       laid off.

19   Q   Is the CEO somebody other than Jason Lew?

20   A   It was Kevin Burchell.

21   Q   Was it the hospital that laid you off, or was it

22       Dr. Lew that laid you off?

23   A   Dr. Lew laid me off.

24             MS. EDSON:  Just so the court reporter

WOOD COURT & CONFERENCE REPORTING

# Exhibit 2

1

Pages:    1-171

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

DOCKET NO. 04-10564-DPW

**********************************

DEURWARD L. HUGHES, M.D.              *

     Plaintiff                        *

vs.                                   *

MARTHA'S VINEYARD HOSPITAL            *

     Defendant                        *

**********************************


DEPOSITION of TIMOTHY WALSH, a Witness called by

the Plaintiff, taken pursuant to the provisions of the

Federal Rules of Civil Procedure, before Peter J.

Wood, a Professional Court Reporter and Notary Public

in and for the Commonwealth of Massachusetts, at the

offices of Engel & Schultz, 125 High Street, Boston,

Massachusetts, on Thursday, March 10, 2005, commencing

at 9:40 a.m.



WOOD COURT & CONFERENCE REPORTING
77 SUMMER STREET
COHASSET, MA 02025
(781) 383-6621

6

1       school for about three years.  Then I went to

2       work at Boston City Hospital.  I was the deputy

3       commissioner at the Department of Health and

4       Hospitals for the City of Boston for -- I was

5       there for ten years.  I was deputy commissioner

6       for about five of those ten.

7               From there, I went to Roger Williams

8       General Hospital in Providence, Rhode Island

9       where I was the chief financial officer for three

10      years.  Then I went to Carney Hospital in Boston

11      where I was the chief financial officer for 17

12      years, and then I went to Martha's Vineyard

13      Hospital as the chief financial officer in 2000.

14   Q   In what month of 2000 did you come to Martha's

15      Vineyard Hospital?

16   A   It was July.

17   Q   When did you become the CEO at Martha's Vineyard

18      Hospital?

19   A   April of 2003.

20   Q   Are you sure it wasn't 2002?

21   A   I'm sorry, you're right, 2002.  I'm sorry.

22   Q   Were you interviewed for the job of CEO of

23      Martha's Vineyard Hospital?

24   A   Yes, I was.

14

1    you believed that Dr. Hughes was performing his

2    job in a competent manner when his contract was

3    terminated?

4    A    I believe he was performing his clinical duties

5         in a very competent manner.

6    Q    You had no problems with the standard of care he

7         was offering the patients; isn't that correct?

8    A    That's correct.

9    Q    I'm just going to read you a quote which was a

10        quote from Tim Sweet, at least as reported in the

11        Martha's Vineyard Gazette, and I just would like

12        to know if you agree with the statement, at least

13        as it was quoted in the newspaper.  "We remain

14        grateful to Dr. Hughes for his dedicated service

15        in overseeing our midwife program.  During his

16        tenure at the hospital, we have always held him

17        in high regard both as a physician and an

18        individual."  Do you agree with that statement?

19   A    Yes.

20   Q    Who has authority at Martha's Vineyard Hospital

21        to terminate a doctor?

22   A    I do.

23             MR. SHIRLEY:  I'm sorry, a point of

24        clarification.  For staff privileges or to

WOOD COURT & CONFERENCE REPORTING

1    operations and what's in my purview and what they

2    should try to stay out of and what's in their

3    purview, and I think we have a pretty good board

4    with regard to that, but yes, I would do it

5    informally, and I may do it formally, too, as

6    part of my report to the board on our monthly or

7    bimonthly meeting.

8    Q    Who first suggested that Dr. Hughes' contract be

9         terminated?

10   A    I did.

11   Q    What were the circumstances when you made that

12        suggestion?

13   A    Well, I think going back, you know, as I looked

14        at it and saw the history that was going on

15        between the medical staff and certainly with the

16        documents you have, you see there is a lot of

17        history going on on the medical staff.  It was a

18        contentious relationship, I would say, between

19        Dr. Hughes and most of the medical staff at the

20        time.

21             I also had a contract that was a very

22        unique contract for the hospital.  It's not a

23        full-time contract.  It's not our traditional

24        full-time contract.  It has a lot of loopholes in

17

1      it.  It's basically not a very good contract from

2      the hospital's standpoint.  I had great

3      difficulty working with Dr. Hughes, and I thought

4      things were pretty bad.

5              In terms of the medical staff

6      relationships, it was starting to come out where,

7      you know, things were happening in front of

8      staff, in front of patients, arguments between

9      Dr. Hughes and other members on the medical

10     staff, so I thought I really needed to do

11     something.  I analyzed where I thought we were

12     and what was going on.

13             As I said, it was a part-time contract.

14     Dr. Hughes was very much into his rights under

15     the contract with which I was okay with, but I

16     had rights under the contract, too, and I ended

17     up exercising those rights which there was a

18     clause that had either party could terminate the

19     contract with a 180-day notice, and I decided to

20     do that.

21  Q   When did you make the decision to replace Dr.

22      Hughes?

23             MR. SHIRLEY:  Objection to the form of

24      the question.


WOOD COURT & CONFERENCE REPORTING

18

1              THE WITNESS:  I should answer?

2              MR. SHIRLEY:  Yes.

3    Q    Any objection, you should answer.  If he

4         instructs you not to answer a question, it will

5         be on a matter of privilege.  I'm sure you'll

6         hear from me on that, too, and we'd have a

7         discussion, but an objection is for the record.

8         Counsel could say differently, but I believe I'm

9         stating it accurately just so we can move it

10        along.

11   A    Okay.

12             MR. SHIRLEY:  I agree.

13   A    I think it was around February of 2003, in that

14        time frame.  I don't have an exact date, but it

15        was in around that time.

16   Q    When you made this decision, did you have any

17        conversations with anybody about the decision

18        prior to finalizing it in your mind, or was this

19        something you just finalized in your mind that

20        this is what you wanted to do, and then you

21        started talking to people about it?

22   A    No.  I think I spoke with the vice chair of the

23        board, Tim Sweet, about it.  The makeup of the

24        board, the chairman of the board is off island.

WOOD COURT & CONFERENCE REPORTING

1    He's a summer resident.  The vice chair of the

2    board is Tim Sweet.  He's on island all the time,

3    so I end up, you know -- he's sort of the go-to

4    person for me with regard to the board, so he

5    would be the one that I would work with on it.

6    I'm sure I had discussions with him.

7  Q    Would you relate to me your recollection of these

8    initial discussions you had with Mr. Sweet?

9  A    Well, I really kind of explained what I saw going

10    on.  There was a lot of problems with the medical

11    staff.  There was a lot of problems with trying

12    to make a team out of what we were doing.  We

13    were trying to bring back -- to bring the medical

14    staff really to be part of a team, and it had

15    gone through a long period under Kevin Burchell,

16    my predecessor, of having a really tumultuous

17    time with various people on the medical staff,

18    and the medical staff was really kind of torn

19    apart, I thought, and I was trying to bring that

20    together.

21          I thought that the OB practice was not

22    being served well by the arrangement we had, and

23    again, nothing to do with the clinical side of

24    it.  I've always had high regard for Dr. Hughes'

20

1    clinical abilities.  It really had to do with the

2    fact that it wasn't a full-time position, so it's

3    a combination of things, but it -- and I had a

4    very difficult time working with Dr. Hughes.  Dr.

5    Hughes I don't think ever really accepted me as

6    the CEO and would continually go around me to the

7    board which, you know, you really don't like.  As

8    a CEO, it's not good to have employees that go to

9    the board.

10   Q    Let me go back to this question, though, of your

11        conversations with Mr. Walsh.  What, if anything,

12        do you recollect Mr. Walsh saying to you when you

13        first spoke to him about the possibility of your

14        thoughts of terminating Dr. Hughes' contract?

15             MR. SHIRLEY:  Objection to the form.

16        Do you mean his conversations with Mr. Sweet?

17             MR. SCHULTZ:  Yes, I did.  Who did I

18        say?

19             MR. SHIRLEY:  Mr. Walsh.

20   A    I think he understood what I was saying, and he

21        concurred.

22   Q    I said I wouldn't interrupt you, and I'm going to

23        violate my own rule now.  I'm going to tell you

24        what counsel told you.  I don't want to know what

1      you think or what a possibility is.  I'm asking

2      your recollection of what is your recollection of

3      what Mr. Sweet said to you when you talked to

4      him?

5    A  He thought I was correct in what I was doing.

6    Q  Do you recollect what he said other than that?

7    A  No, I don't.

8    Q  Had you already signed a contract with a

9      recruiter for a new OB-GYN prior to speaking with

10     Mr. Sweet?

11   A  No, I did not.

12   Q  So you spoke to Mr. Sweet prior to going out and

13     arranging the contract with the recruiter?

14   A  Yes.

15   Q  So from a time point of view, if the contract

16     with the recruiter is signed sometime I believe

17     it is February of 2002, it would be sometime

18     before that --

19   A  Yes.

20   Q  -- that you had made this decision that you

21     believed that this would be in the best interests

22     of the hospital; is that correct?

23   A  That's correct.

24   Q  After you talked to Mr. Sweet, again to try to

WOOD COURT & CONFERENCE REPORTING

22

1    get a time line on this, approximately what

2    period of time passed between that conversation

3    and signing the contract with the OB-GYN search

4    group?

5    A    I don't know.  I don't know the time frame.

6    Q    Was it months, was it weeks?

7    A    It could have been months.  I know I had a

8    discussion with the board, with the full board,

9    at some point as part of my report, to explain

10    what I was doing, so I don't know the timing of

11    the board meetings, but it would have been backed

12    up to that board.

13    Q    Did you have a discussion with the full board

14    prior to hiring this OB-GYN search group?

15    A    Yes.  That's what I mean.

16          MR. SCHULTZ:  Let's mark as Exhibit 3

17    to this deposition a letter from OB-GYN Search to

18    Martha's Vineyard Hospital dated February 18,

19    2003.

20          (Whereupon the Letter dated

21          2/18/03 was Marked Exhibit No. 3.)

22    Q    Mr. Walsh, I've placed in front of you what's

23    been marked as Exhibit 3 to this deposition, and

24    this is a proposal from OB-GYN Search to conduct

WOOD COURT & CONFERENCE REPORTING

25

```
 1          transcribe them, and once they're approved at the
 2          next board meeting, the tapes are gone.  They
 3          reuse the tape.
 4     Q    So the only tape that would exist would be one
 5          tape at a time?
 6     A    Yes, one or two tapes at a time, but they keep
 7          reusing them.
 8     Q    After this initial board meeting, did any members
 9          of the board ever discuss with you the decision
10          to terminate Dr. Hughes' contract?
11     A    Yes.
12     Q    Who would that be?
13     A    Well, Tim Sweet, and I believe I talked to Tim
14          Guiney, Dr. Guiney.  He ended up, as you know,
15          getting involved.
16     Q    Would you relate to me please your recollections
17          of conversations you had with Mr. Sweet after
18          this initial board meeting?
19     A    I think I talked with Mr. Sweet because he got a
20          call from Dr. Guiney, and he was calling me to
21          let me know that I think Dr. Guiney met with Dr.
22          Hughes, and it was really more informational just
23          to let me know that.  There was a discussion with
24          Dr. Guiney about that whole incident about
```

26

1          whether or not he could apply for the position,

2          and he tried to go to the search firm to apply,

3          and the search firm -- what happened, I told --

4          well, the search firm said well, we're not going

5          to present a candidate obviously that's already

6          on staff.  They're being hired to find new

7          candidates.  My word was he's free to apply.  He

8          can go to the H.R. office and apply as an

9          internal candidate.

10    Q    Did Dr. Guiney speak to you directly?

11    A    I'm not sure.  I think he did.

12    Q    What, if any, recollection do you have of what

13         Dr. Guiney said to you?

14    A    I think it was about applying for the job was his

15         discussion with me.

16    Q    Do you recall anything more than that?

17    A    No.

18    Q    Did Dr. Guiney request that Dr. Hughes be

19         interviewed for the position?

20    A    I think he requested that he be allowed to be

21         interviewed for the position, that he be allowed

22         to apply for the position, which I told him he

23         could.

24    Q    What, if anything, did you do to follow up to see

30

1           correct?

2    A      Yes.

3    Q      Did you make that clear to Dr. Donegan when he

4           was hired?

5    A      Yes.

6    Q      When did you make that clear to Dr. Donegan?

7    A      Right from the beginning, the first time I met

8           him, that was the understanding.

9    Q      Was it the understanding or is that what you told

10          him?

11   A      That's what I told him.

12   Q      Was there any one precipitating event that led to

13          the decision to terminate Dr. Hughes' contract?

14   A      No.  There were many different pieces to it.

15   Q      Did you ever report to the board on any occasions

16          other than this initial occasion which occurred

17          prior to February of 2003 relating to the

18          progress you were making in finding a doctor to

19          replace Dr. Hughes?

20   A      Yes, I believe I did.

21   Q      On how many occasions did you do so?

22   A      I don't know, probably just one.  I don't know.

23   Q      As you sit here today, you have a recollection of

24          doing so on at least one occasion?

WOOD COURT & CONFERENCE REPORTING

35

1      medical staff closer together and get by all of

2      the problems that we were having but in a very

3      general way.

4   Q  Again, I'm not asking you what may have happened.

5      Do you have a recollection of that happening?

6   A  No.

7   Q  So again, as you sit here today, you have no

8      recollection of giving any instructions to the

9      people conducting interviews?

10  A  No.

11              MR. SHIRLEY:  Beyond what he believes

12     may have happened.

13  Q  Prior to your deciding to terminate Dr. Hughes'

14     contract, did you ever give Dr. Hughes any

15     warning that he might be terminated if certain

16     things didn't change?

17  A  No.

18  Q  Why not?

19  A  It really -- I mean, I really need to talk about

20     the whole package of where I think things were as

21     I saw it.  I was part of the -- in the early --

22     prior to Dr. Hughes coming on board when Dr. Lew

23     was employing the midwife, Dr. Lew got in a real

24     disagreement with Kevin Burchell, my predecessor,

36

1    about the midwife subsidy.

2                The hospital was subsidizing the

3    midwife.  Dr. Lew was a private physician.  He

4    employed the midwife, and the hospital subsidized

5    him a piece of the midwife's salary, and there

6    was a disagreement over how much that subsidy --

7    I think the hospital's intention, Kevin

8    Burchell's intention, was to back out of the

9    subsidy.  Dr. Lew wanted more money.  It became

10   pretty contentious to the point where Dr. Lew

11   said he would let the midwife go if Kevin

12   Burchell didn't give him more money, which he

13   didn't do.

14               Dr. Lew let the midwife go.  That's

15   when Kevin hired Dr. Hughes to oversee the

16   midwife.  The midwife needs to have a

17   collaborating physician to practice, and he hired

18   Dr. Hughes to do that.  The unique part of Dr.

19   Hughes' contract at that time was, in my mind,

20   had to do with the cross-coverage that was

21   written into that contract that basically allowed

22   Dr. Hughes to refuse cross-coverage, something

23   that is in direct contradiction with the bylaws

24   of the medical staff.

WOOD COURT & CONFERENCE REPORTING

37

1           The bylaws of the medical staff require

2     that physicians in the same discipline cross-

3     cover each other.  I think it looked to me and

4     certainly to some members of the medical staff

5     that Kevin Burchell was really kind of going

6     after Jason because if Jason didn't have

7     coverage, he was pretty much out of business.

8     You can't work 24/7, 365 days a year which is

9     what that would mean if he didn't have cross-

10    coverage.

11          I think that's really where, you know,

12    as we went down that track with the whole medical

13    staff, you know, you have all these documents

14    that show a lot of that, it was quite a problem

15    to the whole medical staff that Dr. Hughes would

16    not cross-cover Dr. Lew.  I know there's a lot in

17    there about quality issues about Jason Lew, and

18    Jason Lew had quality issues about Dr. Hughes,

19    and the medical staff was really trying to say

20    look, if you have quality issues, there's the

21    quality committee.  When it comes to the bylaws,

22    you have to cross-cover.  We should keep them

23    separate.

24          That's really like a history of over a

WOOD COURT & CONFERENCE REPORTING

38

1        two-year period, really, that really caused a

2        load of problems on the medical staff, and that

3        really, you know, I was trying to deal with that.

4        In the middle of all of that, I became the CEO,

5        and Kevin Burchell had been asked to leave by the

6        board really because of all the problems with the

7        medical staff.  Richard Koehler left.  He

8        resigned.  He was a surgeon on the staff.  The

9        community liked him.  It was a mess.  It was a

10       real mess.

11              The problem was that contentious

12       relationship between Dr. Hughes and really the

13       medical staff of the hospital continued, and when

14       I took over as CEO, you know, my goal was to have

15       everybody treated the same and to work with

16       everybody.  We had gone through an awful lot

17       around the quality issues.  We had, you know, a

18       report done by an outside agency, you know, under

19       the peer review process.  We followed their

20       recommendations.  We really tried to do

21       everything, and it continued, and even after all

22       of that, the problems continued and persisted.

23              Then I was left with a contract that

24       really, you know, with all the rights, the

39

1    hospital had very little rights.  The salaries
2    that were given in that, originally Dr. Hughes
3    was hired at $130,000 to oversee the midwife.
4    That got bumped up to $200,000 the last week of
5    Kevin Burchell's employment at the hospital.  So
6    it ended up being really a bad contract for the
7    hospital.
8              It wasn't a full-time contract.  Our
9    full-time contracts are standard, and they give a
10   lot of rights to the hospital, and there are a
11   lot of issues in there of cross-coverage and what
12   you can do outside, you know, whether or not you
13   can do anything else outside of the practice
14   which is pretty restrictive, and I had none of
15   those rights in the contract that I had.
16 Q  Tell me everything that was not in Dr. Hughes'
17   contract that you believe was in the, quote,
18   standard contract for other doctors.
19 A  I think probably the biggest issue is the
20   standard contract under the time and effort
21   required states that the duties under this
22   contract will require your full-time effort and
23   focus, and that you're not allowed to do
24   anything, lectures, any other kind of service to

WOOD COURT & CONFERENCE REPORTING

40

1        any other organization without getting a written

2        approval from the hospital.

3    Q    Was Dr. Hughes working for someone other than the

4        hospital at the time he was terminated?

5    A    I have no idea.

6    Q    So you had no idea if the lack of this contract

7        provision was making any difference as to what

8        Dr. Hughes was doing?

9                MR. SHIRLEY:  Objection.  That's not

10       what he said at all.

11               MR. SCHULTZ:  Let's not have a speech.

12       I note your objection.

13   Q    Can you answer the question?

14               MR. SHIRLEY:  Can we have the question

15       read back, please?  I'll object to the form of

16       the question as well, and if we could slow down

17       just a little bit, it would be helpful to me and,

18       I suspect, to all of us.

19       (The question was read back by the reporter.)

20   A    Well, where the contract really was a hindrance

21       to me was around the coverage issue, as an

22       example.

23   Q    I'm not asking about the coverage.  You had said

24       the most important difference in the contract, I

WOOD COURT & CONFERENCE REPORTING

41

1    believe was your testimony, was the fact that it

2    didn't require Dr. Hughes to work only for the

3    hospital full-time and didn't have this provision

4    which was in these other contracts.

5              MR. SHIRLEY:  He said that was the

6    biggest difference in the contracts.

7  Q  My question to you is isn't it true that at the

8    time that you decided to terminate Dr. Hughes,

9    you had no idea whether or not the lack of that

10   provision in Dr. Hughes' contract had made any

11   difference, had any practical effect in the sense

12   of whether or not Dr. Hughes was, in fact,

13   spending any time working for anyone other than

14   the hospital?

15             MR. SHIRLEY:  Objection to the form of

16   the question.

17 A  The lack of that provision meant that I couldn't

18   sit down and talk to Dr. Hughes about what he was

19   doing, okay, because I didn't have the rights

20   under the contract to demand to know what was

21   going on in any other part of his life, all

22   right?  When I have a full-time contract with the

23   provisions -- and I'm trying to remember what

24   they say -- but there is a distinct difference

WOOD COURT & CONFERENCE REPORTING

42

1    between a standard full-time contract and Dr.

2    Hughes' contract.

3    Q   Mr. Walsh, did you ever seek to sit down with Dr.

4        Hughes and ask him if he was working for anyone

5        other than the hospital?

6    A   No, I didn't.

7    Q   Did you ever ask Dr. Hughes if he would be

8        willing to amend his contract by adding a

9        provision which indicated he would only work for

10       the hospital?

11               MR. SHIRLEY:  I'm going to note early

12       in this deposition that during the deposition of

13       the plaintiff, plaintiff's counsel frequently,

14       arguably appropriately, objected not just to the

15       question posed but to the manner by which the

16       question was posed.  There was a specific

17       objection raised on several occasions to sarcasm,

18       to the tone of voice, to the tenor of the

19       question.  I regret that I need to make the same

20       objection for the record as early in the day.

21               MR. SCHULTZ:  I will note for the

22       record that the objection is well taken, and I

23       will make an effort only because the objection

24       noted that my objections are well taken the other

WOOD COURT & CONFERENCE REPORTING

47

1    three meetings, how long did they take place?
2    For the two that you recall, how lengthy were
3    these meetings?
4  A    I don't recall.  I don't know how long.  I don't
5    think they were too long.
6  Q    Five, ten-minute meetings?
7  A    I don't know.
8  Q    Do you have any recollection of Dr. Hughes being
9    cantankerous or difficult in either of those
10    meetings?
11  A    Yes.  You know, on the issue of the CME, it was
12    pretty cantankerous, I would say.
13  Q    So the only occasion you personally observed Dr.
14    Hughes being cantankerous would relate to his
15    desire to have some CME credits?
16  A    No.  You know, Dr. Hughes also kept going to the
17    board on several occasions to different board
18    members, and that's just -- you know, when you're
19    the CEO, you just can't have that.
20  Q    I understand that, but my question was isn't it
21    true that the only time that you personally
22    observed Dr. Hughes being cantankerous or
23    difficult related to his desire to be given some
24    CME credits?

48

1   A   No.

2               MR. SHIRLEY:  Objection.

3   Q   What's inaccurate about that statement?

4   A   Well, there were other issues.  There were other

5       issues around vacation, carryovers and how much

6       vacation time he had, and they were all -- you

7       know, what I felt was happening is we were

8       getting kind of nitpick on the contract, and it

9       was, you know, very difficult.  In my opinion,

10      contracts are really meant to be kind of a global

11      thing that you work with.  They're not to go in

12      and vary and specifically outline how you get

13      along and how you work as a group.  It doesn't

14      work that way.

15  Q   Let's accept that the problem is with my

16      question.  Does the only occasion that you

17      personally observed Dr. Hughes being cantankerous

18      or difficult relate to this one meeting when he

19      was talking about CME credits, vacation, and

20      whatever else was talked about at that meeting?

21  A   Well, there were several meetings.  You know, the

22      vacation and CME were two different issues.

23              MR. SHIRLEY:  I'm unclear.  Is the

24      question meant to say that the only time he

WOOD COURT & CONFERENCE REPORTING

50

1    anything that happened after that.  Is it fair to

2    say that that third meeting dealt with issues of

3    vacation?

4  A  I don't know which one it was, one of them.

5  Q  Would you state for me, please, each and every

6    reason why Dr. Hughes was terminated?

7  A  He was a disruptive force with the medical staff.

8    He kept going around me to the board.  He had a

9    contract that was really not in the best interest

10   of the hospital.  The salary that was given in

11   that contract in the last week of Kevin

12   Burchell's tenure really priced it in a way that

13   was way too high for what it was.

14 Q  Anything else?

15 A  And his relationship with me was I think not a

16   good one.

17 Q  Is it fair to say you had talked to him

18   personally for maybe less than an hour after you

19   became CEO?

20 A  Oh, I think it was more than that, but I don't

21   know.

22 Q  But that could be the ballpark?

23 A  Probably, yes.  Yes, that could be the ballpark.

24 Q  Was the fact that Dr. Hughes was only a part-time

WOOD COURT & CONFERENCE REPORTING

53

1      me, you hope to form a team when you have people

2      working together, and to try to kind of put that

3      together and make it work right, I think that was

4      an indication to me certainly that it wasn't much

5      of a team.

6   Q   Now, you had indicated, I believe, when I was

7      asking you the list of reasons that Dr. Hughes

8      was terminated that one of the reasons that he

9      was terminated was because you wanted to move

10     from a part-time to a full-time OB-GYN doctor; is

11     that correct?

12  A   Yes.

13  Q   What, if anything, in Dr. Hughes' employment

14     agreement made him a part-time doctor?

15  A   It basically says he will be the collaborating

16     physician and be overseer of the midwife.

17  Q   Does it say anything about his being part-time?

18  A   No.

19  Q   So there's nothing in the contract that made him

20     a part-time doctor; isn't that correct?

21          MR. SHIRLEY:  Objection.  He gave an

22     answer.  You may not have liked the answer, but

23     he just gave an answer.

24          MR. SCHULTZ:  I'm asking another

56

1        for comparison purposes.  It can be more than one

2        if that's what you would like.

3    A   Dr. Fraser, I think.

4            MR. SCHULTZ:  Let's mark as Exhibit 6

5        the contract between the Martha's Vineyard

6        Hospital and Dr. Fraser.

7                    (Whereupon Dr. Fraser's Employment

8                    Agreement was Marked Exhibit No.

9                    6.)

10   Q   Mr. Walsh, you have in front of you Dr. Hughes'

11       employment agreement and Dr. Fraser's employment

12       agreement?

13   A   Yes.

14   Q   Taking as much time as you would like to answer

15       these questions, with the ability to look at both

16       of these contracts for reference, can you tell me

17       what, if anything, in Dr. Hughes' contract makes

18       it a part-time contract?

19   A   If you look in Dr. Hughes' contract, Item 1.2,

20       time and effort, you'll see it says, "During the

21       term of this agreement, the physician shall

22       devote sufficient time and effort for the

23       physician to perform his duties under this

24       agreement."

57

1           If you look at Item 1.2 on Dr. Fraser's

2     contract for time and effort, you see, "During

3     the term of this agreement, the physician shall

4     devote full-time and best efforts to the

5     physician's duties under this agreement.  Full-

6     time acknowledges the physician is entitled to

7     time off with vacations and CMEs as defined

8     further in Exhibit B.

9           "The physician's knowledge that the

10    obligations incumbent upon the physician under

11    this agreement constitute the primary claim upon

12    the physician's professional time and effort,

13    energy and skill, and agrees to undertake only

14    such additional professional obligations as will

15    in no way compromise the physician's ability to

16    carry out her obligations under this agreement in

17    a complete and timely manner.

18          "The physician further agrees not to

19    undertake any such additional professional

20    obligations without obtaining the prior written

21    consent of the hospital's chief executive officer

22    or his designee.  In addition to the full-time

23    work, the physician shall provide on call

24    coverage as reasonably required by the needs of

76

1      day notice.  It was medical staff problems we

2      were having, problems we were having with

3      different physicians having problems in front of

4      employees and patients with Dr. Hughes.  It had

5      to do with, in particular, Dr. Hughes going to

6      the board around me.

7    Q  So the conflict that Dr. Hughes had with Dr. Lew

8      over coverage was not one of the reasons he was

9      terminated; is that correct?

10   A  That's correct, it was not a direct reason why he

11     was terminated.

12   Q  You said the conflicts Dr. Hughes had with the

13     medical staff was one of the reasons he was

14     terminated.  What conflicts did you have in mind

15     when you made that testimony?

16   A  If you review the minutes of the Medical

17     Executive Committee which I know you've seen a

18     lot of them, you'll see that for quite a long

19     time, all they were dealing with was the issue

20     around Dr. Hughes and Dr. Lew.  There was a real

21     problem on the coverage side, again because the

22     bylaws of the medical staff require cross-

23     coverage.  It's a particularly important issue to

24     all of the physicians on the medical staff.

77

1  Q    So the conflict he had with the medical staff
2       related to his concerns of having what he
3       considered to be an incompetent doctor covering
4       for him; is that correct?
5  A    That's correct.
6  Q    Is there anything else that you have in mind when
7       you say he had conflicts with the medical staff?
8  A    Every meeting that I was in attendance on once I
9       became CEO, several meetings, it was a very bad
10      situation.  I think that's -- I think there's a
11      lot in the files that you looked through where
12      you'll see it.
13 Q    Did they all deal with the same subject of the
14      coverage with Dr. Lew?  Is that what you're
15      talking about?
16 A    No, no.  You know, there were issues about -- you
17      know, there was an outside review done.  As a
18      result of that, an outside physician was engaged
19      by the hospital to oversee both OB-GYN
20      physicians.  There was a lot of conflict around
21      that.  It was just an untenable situation, in my
22      mind, and a very difficult time for me to try to
23      deal with all of that.
24 Q    How many times did Dr. Hughes go to the board to

78

1              get around you?

2    A    I'm not sure of all the times I'm aware of.  I

3         know when I first became CEO, he went to the

4         chairman of the board.

5    Q    To do what?

6    A    To complain.

7    Q    About what?

8    A    I don't know.  The chairman of the board told him

9         to come and see me, which he didn't do.

10   Q    Do you know what this was about?

11   A    He didn't come and see me.

12   Q    So one occasion is he went to the chairman of the

13        board about something, but you don't know what it

14        was about; is that correct?

15   A    Right.

16   Q    What other occasions did Dr. Hughes go to members

17        of the board to, quote, get around you?

18   A    Well, I think he went to the chairman of the

19        board on more than one occasion.  He spoke with

20        Tim Sweet, the vice chair of the board, and he

21        spoke with Tim Guiney, Dr. Guiney.

22   Q    About what?

23   A    Well, Dr. Guiney, it was about the termination.

24   Q    That was after he had already been terminated?

WOOD COURT & CONFERENCE REPORTING

79

1    A    Yes, right.

2    Q    So that couldn't have been one of the reasons you

3         terminated him.

4    A    Right.

5    Q    So the only occasion you can recall is one

6         occasion with the chairman of the board that you

7         don't remember what it was about, and Dr. Hughes

8         then never followed up?

9              MR. SHIRLEY:  Objection to the form of

10        the question.

11   Q    Is that the only occasion you can recall?

12             MR. SHIRLEY:  Objection to the form of

13        the question.  It's completely inconsistent with

14        the record.  If that's the way we're going to

15        proceed, that's fine.  Objection to the form.

16   Q    Can you recall any other occasion?

17   A    I believe he went several times to the chairman

18        of the board.  He was going to complain about and

19        register complaints about what was going on at

20        the hospital and his problems with the medical

21        staff, I believe.  He didn't come and talk to me

22        as was suggested by the chairman of the board.

23   Q    Why do you believe this?

24   A    Because I --

WOOD COURT & CONFERENCE REPORTING

80

1          MR. SHIRLEY:  I'm going to suggest

2      again that both the attorney and the deponent

3      wait for the other to finish before they begin.

4      I'm also going to again ask that we maintain an

5      appropriate level of civility in terms, in

6      particular, of the questions that are being posed

7      to the witness.

8   Q   Why do you believe that?

9   A   Because that's what was going on in the hospital.

10      That's what -- we had a joint conference

11      committee where we brought in Dr. Hughes and his

12      wife.  Dr. Kriedman wanted to come in and address

13      the joint conference.  I know you've seen some of

14      the minutes of those meetings.  They were

15      complaining about their treatment by the medical

16      staff, so there was a lot -- you know, all of

17      that stuff, you know, for me to have an employee

18      doing that, okay, any employee, you know,

19      shouldn't go to the chairman of the board once,

20      in my mind, because I'm the CEO.  That's my job.

21          My job is to deal with that and, you

22      know, that happened right when I was made CEO.

23      He didn't come to me first.  It's not like he

24      came to me and was unsatisfied with something.

WOOD COURT & CONFERENCE REPORTING

81

1   He went to the chairman of the board.  He did

2   talk to Tim Sweet, the vice chair of the board,

3   and they would always call me and tell me.  I

4   believe their message was always the same, that

5   you need to go talk to the CEO because it's

6   operational issues.

7   Q   On how many occasions do you recall them telling

8       you that Dr. Hughes had gone to them about some

9       issue?

10  A   The two to the chairman of the board and once

11      with the vice chair.

12  Q   Why did Dr. Hughes go to the chairman of the

13      board on these two occasions?

14          MR. SHIRLEY:  Objection.  Do you want

15      him to speculate?

16  Q   What were you told?

17          MR. SHIRLEY:  That's a different

18      question.  Can you answer that one?

19  A   I was told that Dr. Hughes wanted to see him,

20      that he started to express -- to complain about

21      the way things were going on with the medical

22      staff and thought that he was being mistreated by

23      the medical staff, and they told him to come see

24      me.  That's what I was told.

82

1    Q    The question specifically was to the chairman of

2         the board, so I'm confused when you give an

3         answer of "they" told him to go see you.  The

4         chairman of the board is Mr. Ferguson?

5    A    Yes.

6    Q    On how many occasions do you recall speaking with

7         Mr. Ferguson?

8                   MR. SHIRLEY:  On this subject?

9                   MR. SCHULTZ:  On this subject.

10   A    Two times.

11   Q    What's the time frame, more or less, of the first

12        occasion?

13   A    The first occasion was around April, May of 2002.

14   Q    So that's right after you were appointed acting

15        CEO?

16   A    Right.

17   Q    What is it your recollection Mr. Ferguson said to

18        you on that occasion?

19   A    Basically, that he told Dr. Hughes he should come

20        see me.

21   Q    What was it that he told you that Dr. Hughes had

22        said to him?

23   A    That he was complaining about his treatment by

24        the medical staff is the best I can recall.

WOOD COURT & CONFERENCE REPORTING

83

1    Q    What is the second occasion you recollect Mr.

2         Ferguson telling you that he had had contact from

3         Dr. Hughes?

4    A    I can't remember the time frame.

5    Q    Can you recall anything about that conversation?

6    A    No.

7    Q    When did Mr. Sweet come to you and tell you that

8         he had had contact from Dr. Hughes?

9    A    I don't remember the time frame.

10    Q    Do you recollect whether or not this was soon

11         after you took office, or was this --

12    A    I don't recall.

13    Q    Do you know whether or not this was, in fact,

14         before you made the decision to terminate Dr.

15         Hughes?

16    A    Yes.

17    Q    Do you recollect what it was that Mr. Sweet told

18         you Dr. Hughes had said to him?

19    A    No.

20    Q    Do you recollect what Mr. Sweet said to you?

21    A    That he told him that he should come talk to me.

22    Q    But you have no recollection as to why it was

23         that Dr. Hughes had gone to Mr. Sweet?

24    A    No.  I don't know that I was given -- I don't

84

1    know that Mr. Sweet knew.  I don't know.  I don't

2    know when it was in their conversation that they

3    suggested he come see me, so I don't know.

4    Q    Did you ever consider revoking Dr. Lew's

5         privileges at the hospital as one method of

6         resolving the conflict that existed between Dr.

7         Hughes and Dr. Lew?

8    A    Say it again, revoking?

9    Q    Dr. Lew's privileges to practice at the hospital.

10   A    No.  The answer is no, not as a resolution to

11        anything.

12   Q    Why did you not consider revoking Dr. Lew's

13        privileges after you had received the ACOG

14        report?

15   A    It's really a medical staff matter.  I mean, it

16        has to do with the peer review.  The medical

17        staff working with outside consultants put

18        together a plan after the ACOG report.  You know,

19        that's not something a CEO does.

20   Q    You stated, I believe, that Dr. Lew had complied

21        with the ACOG recommendations?

22   A    Yes.

23   Q    What were the recommendations with which he

24        complied?

WOOD COURT & CONFERENCE REPORTING