# Affidavit of Gretchen Edson Part 2

# Exhibit 3

1

```
1                    Volume: I
2                  Pages: 1 to 305
3                  Exhibits: 1 to 53
4          UNITED STATES DISTRICT COURT
5      DISTRICT OF MASSACHUSETTS OF MASSACHUSETTS
6    - - - - - - - - - - - - - - - - - - - - - - x
7    DEURWARD L. HUGHES, M.D.,
8            Plaintiff,
9        v.              Civil Action No.
10   MARTHA'S VINEYARD HOSPITAL,    04 10564
11           Defendant.
12   - - - - - - - - - - - - - - - - - - - - - - x
13   DEPOSITION OF DEURWARD L. HUGHES, M.D.
14       Tuesday, February 15, 2005
15            9:34 a.m.
16       Martha's Vineyard Hospital
17          One Hospital Road
18         Oak Bluffs, Massachusetts
19
20   Court Reporter:  Carolyn Haddox, RPR
21
22
23
24
```

Carolyn Haddox, RPR
(508)420-5691

2

```
1    APPEARANCES:
2      ENGEL & SCHULTZ, P.C.
3      By: Stephen Schultz, Esq.
4      125 High Street, Suite 2601
5      Boston, Massachusetts 02110
6      (617)951-9980
7      sschultz@engelschultz.com
8      On behalf of the Plaintiff.
9
10     CHOATE, HALL & STEWART
11     By: Thomas E. Shirley, Esq.
12     Exchange Place
13     53 State Street
14     Boston, Massachusetts 02109
15     (617)248-5000.
16     tshirley@choate.com
17     On behalf of the Defendant.
18
19   ALSO PRESENT:
20     Kenneth Chisholm
21
22
23
24
```

Carolyn Haddox, RPR
(508)420-5691

3

```
1                   I N D E X
2    Examination of:              Page
3    DEURWARD L. HUGHES, M.D.
4    By Mr. Shirley               7
5
6               E X H I B I T S
7    No.                          Page
8    1 Curriculum Vitae            9
9    2 Letter dated May 26, 2000      11
10   3 Letter dated May 10, 2000      13
11   4 Letter dated July 21, 2000     16
12   5 Application for Medical Staff  18
13   6 Letter dated December 15, 2000  26
14   7 Letter dated January 10, 2001  28
15   8 Letter dated February 23, 2001  31
16   9 Letter dated March 30 2001     36
17   10 Letter dated April 9, 2001    40
18   11 Letter dated May 17, 2001     45
19   12 Letter dated June 27, 2001    57
20   13 Letter dated July 2, 2001     59
21   14 Business minutes             60
22   15 Letter dated July 10, 2001    61
23   16 Letter dated July 13, 2001    62
24
```

Carolyn Haddox, RPR
(508)420-5691

4

```
1                 E X H I B I T S
2    No.                          Page
3    17 Letter dated July 18, 2001    66
4    18 Letter dated July 26, 2001    67
5    19 Letter dated July 29, 2001    69
6    20 Letter dated July 31, 2001    73
7    21 Employment Agreement         74
8    22 Joint Conference Committee document  86
9    23 Martha's Vineyard Hospital Application
10     for Reappointment            97
11   24 Business minutes            101
12   25 Letter dated February 19, 2002  118
13   26 Letter dated February 25, 2002  121
14   27 Personnel Action Form       127
15   28 Letter dated April 12, 2002   138
16   29 Letter dated April 12, 2002   141
17   30 Letter dated April 22, 2002   141
18   31 Letter dated April 23, 2002   142
19   32 Letter dated April 23, 2002   143
20   33 Letter dated 4/25/2002       149
21   34 Memo dated May 29, 2002       150
22
23
24
```

Carolyn Haddox, RPR
(508)420-5691

9

1    A.    1955.
2    Q.    Did it end in divorce?
3    A.    Yes.
4    Q.    Was it in the 1960s?
5    A.    It was, if I recall, and I would
6 have to categorize it by saying it may not be
7 accurate.  Seventeen, eighteen years ago
8 approximately.
9    Q.    Did you have any children from your
10 first marriage?
11    A.    Yes.
12    Q.    How many?
13    A.    Three.
14    Q.    Have you had any children from your
15 second marriage?
16    A.    No.
17    Q.    What's your birth date?
18    A.    May 3rd, 1931.
19    MR. SHIRLEY:   I would like the court
20 reporter to mark as our first exhibit what I
21 believe is a copy of your curriculum vitae.
22        (Exhibit Number 1 was marked for
23 identification.)
24 BY MR. SHIRLEY:

10

1    Q.    Take a moment, please, to review it,
2 Dr. Hughes, and my question will be:  Is it, in
3 fact, a copy of your curriculum vitae?
4    A.    (Reviewing document.)  It does not
5 have my tenure here at Martha's Vineyard
6 Hospital.
7    Q.    If you would turn to the bottom of
8 the second page, the very bottom left-hand
9 corner, you'll see, I think, what appears to be
10 an abbreviated reference to Revised 1/01.  Do I
11 understand that correctly?
12    A.    Yes.
13    Q.    Would this be your curriculum vitae
14 as of January of 2001?
15    A.    Yes.
16    Q.    And may I assume that it was
17 accurate as of that time?
18    A.    Yes.
19    Q.    Other than with reference to
20 Martha's Vineyard Hospital, would there be any
21 changes to the curriculum vitae that would make
22 it more currently correct as we sit here today?
23    A.    No.
24    Q.    Doctor, I understand that you

11

1 applied for a license to practice medicine in
2 Massachusetts in 1999.  Does that sound right to
3 you?
4    A.    Yes.
5    Q.    And did you actually obtain a
6 license from our Commonwealth in June of 2000?
7    A.    Yes.
8    Q.    Do you recall submitting a letter
9 with your counsel to the Board of Registration in
10 Medicine with respect to your application for a
11 license?
12    A.    Yes.
13        (Exhibit Number 2 was marked for
14 identification.)
15    MR. SCHULTZ:   The license has been
16 marked as Exhibit 2?
17 BY MR. SHIRLEY:
18    Q.    Let me ask you to look at what has
19 just been marked as Exhibit 2 and ask you if you
20 can identify it for me, please.
21    A.    (Reviewing document.)  Identify it as
22 being correct, or -- I don't understand.
23    Q.    Is this a letter that you and your
24 then counsel sent to the Board of Registration in

12

1 Medicine?
2    A.    Yes.
3    Q.    And, Doctor, if you look at the next
4 to last page, is that your signature which
5 appears on the document?
6    A.    (Reviewing document.)  Yes.
7    Q.    Should I assume that by signing this
8 letter you believed that every representation
9 contained within it was accurate?
10    A.    Yes.
11    Q.    If you would turn, please, sir, to
12 page 2 of the letter?
13    A.    (Witness complies.)
14    Q.    The second full paragraph.
15    A.    Yes.
16    Q.    Take a moment, please, to review the
17 first half of that second paragraph.
18    A.    (Reviewing document.)  Okay.
19    Q.    Is it correct, sir, that frequently
20 you would have no direct clinical contact with a
21 patient during your years with the training
22 program?
23    A.    Yes.
24    Q.    Doctor, do I understand that in 2000

13

```
1    you applied for staff privileges at Martha's
2    Vineyard Hospital?
3         A.    Yes.
4               (Exhibit Number 3 was marked for
5    identification.)
6    BY MR. SHIRLEY:
7         Q.    Please review what we've marked as
8    Exhibit 3 for a moment.
9         A.    (Reviewing document.)
10        Q.    Is this the first expression of
11   interest on your part relative to an application
12   for staff privileges at Martha's Vineyard
13   Hospital?
14        A.    I don't recall whether that's
15   correct or not.
16        Q.    Do you recall any prior discussions
17   with anyone connected with the hospital relative
18   to applying for staff privileges?
19        A.    At the moment I do not recall.
20        Q.    Okay.  Do you recall writing and
21   sending this letter?
22        A.    Yes.
23        Q.    You refer in the letter to having
24   owned a house on Martha's Vineyard for several
```

14

```
1    years; is that correct?
2         A.    Correct.
3         Q.    Is that your current home?
4         A.    Yes.
5         Q.    You said you would be moving to
6    Martha's Vineyard as of July 1, 2000; is that
7    correct?
8         A.    That isn't correct.  July 1 -- oh,
9    yes, yes, that's correct.
10        Q.    And did you, in fact, do so?
11        A.    Yes.
12        Q.    And why did you do so?
13        A.    Why did we do so?
14        Q.    Right.
15        A.    We decided to leave Philadelphia and
16   come to Martha's Vineyard because the climate in
17   Philadelphia was not pleasant.
18        Q.    In what respect or respects?
19        A.    In respect to the malpractice
20   situation there.
21        Q.    Could you elaborate a little bit on
22   that, please?
23        A.    One, the malpractice premiums were
24   extraordinarily high.  Two, being an Associate
```

15

```
1    Professor at Hahnemann Medical College, we were
2    involved in cases in which I was not directly
3    responsible, and the juries in Philadelphia, what
4    we thought unfairly, awarded compensation to
5    patients which were not accurate, I would say, so
6    we decided it was time to pack up and leave.
7         Q.    And by "we," are you referring to
8    yourself and your wife?
9         A.    Yes.
10        Q.    Had yourself been the subject of
11   what you considered to be meritless malpractice
12   claims in Philadelphia?
13        A.    Yes.
14        Q.    Had your wife?
15        A.    I can't answer that.  I don't recall
16   what her situation was.  I would say that there
17   isn't a doctor in Philadelphia that wasn't
18   involved in some malpractice litigation.
19        Q.    Is that why you also were leaving a
20   faculty position at Hahnemann MCP University
21   Hospital in late June?
22        A.    No.  My tenure was over at Hahnemann
23   Medical College at that time.
24        Q.    Was there a mandatory retirement
```

16

```
1    age?
2         A.    I don't recall that there was.
3         Q.    What caused your tenure to conclude
4    as of that time?
5         A.    Because my contract had ended and I
6    didn't want to reapply at the time because we
7    decided to move.
8         Q.    Did you intend to practice on
9    Martha's Vineyard?
10        A.    I intended to seek some sort of
11   position here, yes.
12        Q.    And at the time you wrote this
13   letter, what sort of practice did you hope to
14   establish?
15        A.    I had no idea.
16        Q.    Was your wife also hoping to
17   establish a practice on the island at that time?
18        A.    Yes.
19              (Exhibit Number 4 was marked for
20   identification.)
21        A.    (Reviewing document.)
22        Q.    Is this a letter that you wrote to
23   Dr. Henry Nieder?
24        A.    Yes.
```

25

```
 1    committee?
 2         A.    Yes, as I recall.
 3         Q.    Did you understand that the
 4    application had to be reviewed and approved by,
 5    for example, the medical executive committee?
 6         A.    No.
 7         Q.    By the medical staff committee?
 8         A.    No, I wasn't told any of that.
 9         Q.    By the board of trustees?
10         A.    No.
11         Q.    Regardless of what you were told at
12    the time, do you understand that those committees
13    had to approve the application as we sit here
14    today?
15         A.    As I recall, I knew that the
16    executive committee and the board of trustees had
17    to approve it, yes, as I recall.
18         Q.    Sir, while your application for
19    medical staff privileges was pending, do you
20    recall entering into a letter of understanding
21    with the hospital relative to providing coverage
22    for Dr. Lew?
23         A.    I don't understand that question.
24         Q.    Okay.  Let me try to reframe it in a
```

26

```
 1    more comprehensible way.
 2              (Exhibit Number 6 was marked for
 3    identification.)
 4    BY MR. SHIRLEY:
 5         Q.    Can you briefly identify what we've
 6    marked as Exhibit 6, please?
 7         A.    (Reviewing document.)
 8         Q.    Can you identify this two-page
 9    document, sir?
10         A.    I signed it.
11         Q.    And what do you understand it to be?
12         A.    I really don't know.  I really don't
13    recall what this is.
14         Q.    Does it indicate directly below its
15    salutation to you that this letter of
16    understanding will serve to outline the OB/GYN
17    coverage at Martha's Vineyard Hospital that you
18    will —
19         A.    It outlined —
20         Q.    — independently contract for the
21    2001 calendar year?
22         A.    Yes.  It outlined my participation
23    in that coverage, yes.
24         Q.    And I assume, sir, that you signed
```

27

```
 1    it understanding at the time what you believed it
 2    covered?
 3         A.    Yes.
 4         Q.    And it committed you to provide
 5    coverage for 84 of the 105 days that Dr. Lew was
 6    away?
 7         A.    Yes.
 8         Q.    And provided that you would receive
 9    a salary of $39,000 per year?
10         A.    Yes.
11         Q.    And certain other additional
12    compensation components for such things as chart
13    review and nursing teaching and in-services?
14         A.    Yes.
15         Q.    Sir, let's stop here.  In fact,
16    let's, in my mind's eye, go through the end of
17    calendar year 2000.  You submitted an application
18    for staff privileges to Martha's Vineyard
19    Hospital and you just executed this document that
20    we've marked as Exhibit 6.  Through the end of
21    calendar year 2000, do you believe that you had
22    been the subject of any form of age
23    discrimination relative to Martha's Vineyard
24    Hospital?
```

28

```
 1         A.    No.
 2         Q.    The same question with respect to
 3    race discrimination.
 4         A.    No.
 5         Q.    Let's proceed to 2001, if we could.
 6    I'm going to ask you, please, to review what
 7    we'll mark as Exhibit 7.
 8              (Exhibit Number 7 was marked for
 9    identification.)
10    BY MR. SHIRLEY:
11         Q.    Is this a letter that you wrote to
12    Dr. MacArthur on or about January 10, 2001?
13         A.    (Reviewing document.) Yes.
14         Q.    Is it correct that your original
15    request was to be considered for replacement
16    staff?
17         A.    Yes.
18         Q.    You refer in your letter to
19    discussions with Dr. Lew and Dr. MacArthur; is
20    that correct?
21         A.    Yes.
22         Q.    And following those discussions, you
23    were now requesting that you be considered for
24    active staff; is that correct?
```

**Page 29**

```
1       A.    Yes.
2       Q.    What discussions were you referring
3   to in this letter?
4       A.    I don't recall exactly.  In essence,
5   it had to do with emergency room coverage, as I
6   recall, but that may or may not be accurate.  I
7   don't recall the exact conversation.
8       Q.    Without asking you for the specific
9   or exact details, which I wouldn't expect you to
10  be able to recall, do you have any clearer or
11  better memory of what those discussions entailed?
12      A.    No.
13      Q.    What, if anything, do you recall
14  relative to emergency room coverage that would
15  have been discussed during this timeframe?
16      A.    That as active staff, I would have
17  to participate in emergency room coverage.
18      Q.    Do you recall, was this something
19  that Dr. Lew or Dr. MacArthur wanted you to do?
20      A.    I don't recall that, no.
21      Q.    Was it something that you wanted to
22  do?
23      A.    It was something that I was advised
24  to do by Mr. Birchill.
```

**Page 30**

```
1       Q.    Did he say why he was advising you
2   to do it?
3       A.    I don't recall that.  It had to do
4   with my future at the hospital.
5       Q.    In what respect?
6       A.    As to whether or not I would want to
7   be a full participant in practicing in the
8   future.
9       Q.    I'm sorry, could you explain that
10  for me, please?
11      A.    That if I wanted to expand and open
12  a practice or join my wife or whatnot.
13      Q.    This would enable you to do so more
14  readily?
15      A.    Yes.
16      Q.    Doctor, do you recall that before
17  being granted provisional active staff
18  privileges, you received a temporary appointment
19  to the staff?
20      A.    Yes.
21      Q.    And is that typically the first step
22  that is taken, to permit someone to practice on a
23  limited scale while the application for fuller
24  privileges is pending?
```

**31**

```
1       A.    I can't answer that.  I don't know.
2       Q.    Well, what's your understanding of
3   what temporary privileges mean?
4       A.    That's what happened to me.  That I
5   would be allowed to practice covering Dr. Lew
6   until I got fuller privileges.
7       Q.    Doctor, I'll ask you to review what
8   we'll mark as Exhibit 8, please.
9             (Exhibit Number 8 was marked for
10  identification.)
11            (Reviewing document.)
12      Q.    Do you recall receiving this letter
13  from Mr. Birchill on or about February 23, 2001?
14      A.    Yes.
15      Q.    Advising you that you had been
16  appointed to the provisional active staff?
17      A.    Yes.
18      Q.    Did you understand that that was
19  going to be a one-year appointment?
20      A.    Yes.
21      Q.    And did you understand that was
22  consistent with the medical staff bylaws in place
23  at that time?
24      A.    Yes.
```

**32**

```
1       Q.    I don't think I've asked you, was
2   Kevin Birchill the Chief Executive Officer of the
3   hospital at this time?
4       A.    Yes.
5       Q.    And had he been, to your knowledge,
6   when you first expressed an interest in
7   submitting an application in June of 2000?
8       A.    Yes.
9       Q.    Were you aware, Doctor, as your
10  application was being reviewed and evaluated, of
11  any concern relative to the inability to
12  establish recent clinical volume for you?
13      A.    While my application was being
14  evaluated?
15      Q.    Yes, sir.
16      A.    No.
17      Q.    Did you ever become aware that that
18  was the subject of discussion?
19      A.    Yes.
20      Q.    When did you first become so aware?
21      A.    After I received this letter and
22  talked to Dr. MacArthur.  Or he called me in.
23      Q.    You had a meeting with
24  Dr. MacArthur?
```

33

```
1          A.    Yes.
2          Q.    In his office?
3          A.    Yes, probably.
4          Q.    As best you can recall.
5          A.    As best I can recall.
6          Q.    It was a face-to-face meeting?
7          A.    Yes.
8          Q.    Using the February 23 letter as a
9    possible frame of reference, do you recall when
10   your meeting with Dr. MacArthur took place?
11         A.    After this letter.  The specific
12   date, I cannot recall.
13         Q.    And I'm sorry, I wasn't looking for
14   a specific date if you couldn't recall it.
15               Approximately how long after that
16   letter?
17         A.    I really don't recall.
18         Q.    Do you have a recollection of
19   whether it was within the month after?
20         A.    Within the month.
21         Q.    Understanding that you are giving us
22   just your best memory.
23         A.    Yes.
24         Q.    And what do you recall Dr. MacArthur
```

34

```
1    saying to you in the course of that meeting and
2    your saying to Dr. MacArthur?
3          A.    He said to me that the medical staff
4    wanted to have me monitored in the operating room
5    and wanted me to submit three years of my cases
6    to the medical staff.  My response to him was --
7    let me go back.
8                The only problem he said was that
9    they weren't sure as to who should monitor me in
10   the operating room.  My response to him was:  It
11   matters not to me who monitors me in the
12   operating room, you can have the entire medical
13   staff in the operating room, I have no concerns
14   about that.  However, I will not submit three
15   years of my cases to the medical staff.
16         Q.    What, if anything, did he say in
17   response to that?
18         A.    I don't recall.
19         Q.    Do you recall anything else that
20   either one of you said during the course of that
21   conversation?
22         A.    No.
23         Q.    Was anyone else present during any
24   part of the conversation?
```

35

```
1          A.    No.
2          Q.    How were things left at the
3    conclusion of the conversation?
4          A.    I can't recall.  That he would take
5    it back to the medical staff and that we would
6    work out some monitoring in the operating room.
7          Q.    How were things left relative to the
8    review of medical records?
9          A.    I don't recall.
10         Q.    What, if anything, was ultimately
11   done relative to the monitoring side of things?
12         A.    Dr. MacArthur monitored me in the
13   operating room.
14         Q.    For how long approximately?
15         A.    Approximately a month or two.
16         Q.    Approximately how many procedures
17   would you say?
18         A.    Approximately six to ten.
19         Q.    And at the conclusion of that
20   monitoring process, did he indicate that he had
21   any concerns or issues?
22         A.    No.
23         Q.    Did he affirmatively state that he
24   did not?
```

36

```
1          A.    He had no issues.
2          Q.    And what issues, if any, did you
3    have relative to his monitoring for those one to
4    two months?
5          A.    None.
6          Q.    What, if anything, became of the
7    request that prior years medical records be
8    reviewed?
9          A.    Nothing, as I recall.
10         Q.    That request was abandoned --
11         A.    Yes.
12         Q.    -- or withdrawn?
13         A.    Yes.
14         Q.    Dr. Hughes, let me ask you, please,
15   to review what we'll mark as Exhibit 9.
16               (Exhibit Number 9 was marked for
17   identification.)
18         A.    (Reviewing document.)
19         Q.    Can you identify this document, sir?
20         A.    Yes.
21         Q.    Please do so.
22         A.    It's a preliminary contract with the
23   hospital for me to become full-time in covering
24   the nurse midwife for a new practice which Kevin
```

37

1   Birchill was setting up.
2        Q.    Do I understand correctly, sir, that
3   prior to this point in time, the nurse midwife,
4   Cathy Chase, had been an employee of Dr. Lew's?
5        A.    Yes.
6        Q.    And that employment relationship had
7   ended; is that correct?
8        A.    He terminated Cathy Chase.
9        Q.    Do you understand why he terminated
10  her?
11       A.    No.
12       Q.    Is it your understanding that
13  Mr. Birchill then determined to set up a
14  midwifery practice through the hospital?
15       A.    Yes.
16       Q.    Making Ms. Chase an employee?
17       A.    Yes.
18       Q.    I understand that she needed a
19  collaborating physician in order to practice
20  midwifery?
21       A.    Yes.
22       Q.    And is it correct that Mr. Birchill
23  approached you about being that collaborating
24  physician --

38

1        A.    Yes.
2        Q.    -- for or with her?
3        A.    Yes.
4        Q.    Did you have discussions with him
5   about that before entering into this letter of
6   agreement?
7        A.    Yes.
8        Q.    What, if anything, do you recall of
9   those discussions?
10       A.    As I recall, Mr. Birchill called me
11  on the phone and asked me could I have lunch with
12  him and Ellen Leone?
13       Q.    Who is Ms. Leone?
14       A.    She was then the head nurse -- not
15  head nurse, but Director of Nursing Services at
16  Martha's Vineyard Hospital.
17       Q.    And did you accept the invitation?
18       A.    Yes.
19       Q.    And in general terms, sir, describe
20  for me, if you could, what you recall of your
21  discussion with him.  Which I assume took place
22  over lunch?
23       A.    It took place over lunch.  He
24  informed me that Dr. Lew had terminated Cathy

39

1   Chase, and would I be interested in being the
2   corroborating physician for Cathy Chase?
3        Q.    What, if anything, did you say?
4        A.    Yes.
5        Q.    What else do you recall being
6   discussed, if anything?
7        A.    I don't recall anything else being
8   discussed except that he would work on it.
9        Q.    And should I understand, sir, that
10  there were subsequent discussions prior to this
11  letter being executed?
12       A.    I would say I recall that there were
13  a few in reference to how the practice was going
14  to be set up, where it was going to be set up,
15  and my participation in that practice.
16       Q.    And what do you recall being
17  discussed in those respects?
18       A.    That I would be the corroborating
19  physician for the nurse midwife; that I would see
20  any patients that wanted to see a physician.
21       Q.    Was there any discussion relative to
22  the extent of your commitment in that regard?
23       A.    The extent?  I don't recall that
24  there was.

40

1        Q.    I gather, sir, that when this
2   March 30 letter of agreement was signed, both you
3   and Mr. Birchill intended for a more
4   comprehensive contract to be drawn up?
5        A.    Yes.
6        Q.    And that was eventually done,
7   correct?
8        A.    Yes.
9        Q.    But not for a while?
10       A.    I don't recall how long it took, but
11  it was worked on and worked out, and it was
12  eventually done, yes.
13       Q.    Does this accurately -- "this"
14  meaning Exhibit 9 -- reflect your understanding
15  of the key terms of the agreement that you and
16  Mr. Birchill had reached as of March 30, 2001?
17       A.    As of March 30, yes.
18       Q.    Doctor, please review what we'll
19  mark as Exhibit 10.
20             (Exhibit Number 10 was marked for
21  identification.)
22       A.    (Reviewing document.)
23       Q.    Can you identify this document?
24       A.    Yes.

1    Q.    Now, I'm focusing more on scheduling
2    coverage.
3    A.    There was no problem in scheduling
4    coverage.
5    MR. SCHULTZ:   Prior to —
6    THE WITNESS:   April.
7    MR. SHIRLEY:   Yes.  Thank you for
8    that clarification.  That's what we're focusing
9    on for the moment.
10   BY MR. SHIRLEY:
11   Q.    During that same timeframe, prior to
12   April 1, 2001, did you report to any medical
13   committee any concerns relative to the quality of
14   Dr. Lew's care?
15   A.    As I recall, no.
16   Q.    And you believe you did have
17   concerns relative to his care prior to April 1,
18   2001?
19   A.    Yes.
20   Q.    Why didn't you report those concerns
21   to any medical committee?
22   A.    I don't recall why, I just didn't.
23   Q.    After April 1 of '01, did you have
24   issues relative to scheduling coverage with

1    Dr. Lew?
2    A.    Yes.
3    Q.    And how would you characterize those
4    scheduling issues?
5    A.    Because of my clinical evaluation of
6    the care that Dr. Lew was giving women, because
7    of the complaints that I was getting from the
8    nurse midwife, nurses, and from cases that I had
9    seen myself on the weekends that I covered, and
10   from patients that my wife had seen who were
11   former patients of Dr. Lew, I did not wish to
12   enter into a cross-covering agreement with
13   Dr. Lew.
14   Q.    And when did you make that decision?
15   A.    The date?
16   Q.    Yes, the approximate timeframe.
17   A.    Within the period of the time from
18   January until April 1st I made the decision.
19   MR. SCHULTZ:   Could we just stop for
20   a second?  Because I would like a break.
21   MR. SHIRLEY:   Of course.
22   MR. SCHULTZ:   And I know you only
23   have seven hours, so my suggestion is — I had a
24   starting at 9:35, we're at 10:40, and my taking

1    care of myself obviously doesn't cut into your
2    time, so I suggest we stop and just sort of try
3    to keep a running tally.
4    MR. SHIRLEY:   My only quibble — and
5    I hope it doesn't become material — is I have us
6    at 9:34 as a start time, but let's take a short
7    break.
8    (Recess taken from 10:40 a.m. to
9    10:50 a.m.)
10   BY MR. SHIRLEY:
11   Q.    My apologies, my notes aren't as
12   good as they should be.  Had you formed the
13   conclusion that you would not cover for Dr. Lew,
14   or that he wouldn't cover for you, or both?
15   A.    That issue was still open for
16   discussion at that time.  The discussion I had
17   with Mr. Birchill was definitely that Dr. Lew
18   would not cover the Vineyard midwifery practice,
19   and we were working on — originally, there was
20   no cross coverage at all, although the contract
21   hadn't been signed yet.
22   Q.    Let me just try to make sure I
23   understand your answer, sir.  It was still open
24   for discussion at the time, I think you said.

1    Are you referring to that early April timeframe,
2    2001?
3    A.    As of April 1st, yes.
4    Q.    And certainly up to that point, you
5    had been contractually responsible for covering
6    Dr. Lew?
7    A.    Yes.
8    Q.    And had you concluded at that point
9    that you would no longer cover him?
10   A.    No.
11   Q.    That was still open for discussion?
12   A.    I was still covering him through
13   May 1st
14   Q.    What were your intentions subsequent
15   to May 1?
16   A.    That there would be no cross
17   coverage.
18   Q.    That you would not cover for him?
19   A.    Yes.
20   Q.    And that he would not cover for you?
21   A.    Yes.
22   Q.    Had he covered for you at any point
23   prior to May 1?
24   A.    No.

89

1 that I cross cover with Dr. Lew, even though I
2 specifically outlined why I would not do this
3 coverage. What date is this?
4        Q.    I think you'll see a reference to
5 August 17, 2001, in the top left-hand corner of
6 each page.
7        A.    There was one doctor who said that
8 the operating room personnel -- that was
9 Dr. Richard Koehler -- were complaining about me,
10 and specifically he stated that the OR technician
11 was complaining about me. Carol Baldwell
12 subsequently replied to that that she had
13 investigated that accusation, and the OR
14 technician stated he had never talked to
15 Dr. Koehler and certainly he had never complained
16 about me.
17        They questioned Dr. Kriedman's
18 participation in the Martha's Vineyard Hospital
19 and the fact that even as a part-time, she was
20 not contributing to any coverage at all, although
21 she is a private practitioner doing gynecology
22 and who sends more mammograms to the radiology
23 department and at that time offered to cover
24 Dr. Lew on Wednesdays, to which Dr. Lew replied

90

1 he didn't need her to cover him at all. Even
2 with my stating that I would cover Dr. Lew any
3 time that he wanted, that still was not
4 sufficient to satisfy the medical staff.
5        Those are just a few of the examples
6 that we were encountering at that time. We were
7 never -- we never had opinions that were listened
8 to. We were never asked for any opinions or any
9 consultations. Those are just a few.
10        Q.    Well, what else do you recall? I
11 would like to get as comprehensive a list as you
12 can provide to me. And, again, we're focused on
13 the time period up to August 17, 2001.
14        A.    That's why I can't qualify it.
15 That's about all I can think of up to that time,
16 as I recall. I would add to that, however, that
17 even though there are records that you presented
18 previously in which my care of patients was being
19 criticized or challenged by Dr. Lew, nobody ever
20 presented that to me.
21        As far as the QI committee was
22 concerned and my challenge that -- not challenge,
23 but my statement that there was no obstetrican
24 on that committee, and Dr. MacArthur's reply, as

91

1 you saw, was because Dr. Lew and I were
2 competing. And I offered to have both Dr. Lew
3 and me and Dr. Kriedman on the committee for
4 education, and that was refused.
5        Q.    Is there anything else you can think
6 of through that mid-August 2001 timeframe?
7        A.    As I recall through that time,
8 nothing that I can think of at this moment.
9        Q.    Doctor, there's a reference on the
10 second page, the first bullet point, that I would
11 like to go over for a moment if I could. Take a
12 moment to review that, please.
13        A.    (Reviewing document.) The first
14 paragraph?
15        Q.    Yes, Doctor, the one with that first
16 bullet point, "Dr. Hughes' initial encounter" is
17 how it begins.
18        A.    Yes.
19        Q.    I gather, sir, this was an example
20 of behavior that you and Dr. Kriedman provided to
21 the joint conference committee?
22        A.    The first paragraph?
23        Q.    Correct.
24        A.    Dr. Hughes' initial encounter?

92

1        Q.    Correct.
2        A.    No. That wasn't presented by us,
3 that was discussed after we left. That was not
4 discussed by us. The executive committee
5 discussed it after we departed.
6        Q.    Okay. So you weren't in the room
7 for that discussion?
8        A.    I was not.
9        Q.    Okay. Were you yourself, as of
10 August 17, 2001, concerned about any age issue at
11 the time that you first met with the executive
12 committee?
13        A.    Yes, I was concerned because the
14 medical staff had appointed one of the physicians
15 to call one of my references, and the reference,
16 quote, told me that that physician asked her, Why
17 would a physician in my age group, as old as I
18 was, still want to practice obstetrics? And her
19 response to that was, Because he loves obstetrics
20 and because he's so good at it.
21        The challenge that they put -- not
22 challenge. The fact that they required me to be
23 monitored in the operating room disturbed me
24 quite a bit, because I came from a teaching

101

1   after they finished their report — I mean,
2   finished their evaluation.
3         Q.    And your best recollection is
4   October of 2001, therefore?
5         A.    If that's the four days they were
6   here, that's my recollection.
7         Q.    Fair enough.
8         A.    They didn't leave without giving it.
9         Q.    Let me ask you to review what we'll
10  mark as our next exhibit, please.
11                (Exhibit Number 24 was marked for
12  identification.)
13        A.    (Reviewing document.)
14        Q.    Have you seen this document before,
15  Doctor?
16        A.    This document? Let's see, no —
17  I've seen it, yes. I've seen it, I'm sorry.
18        Q.    Was the first time you saw it in the
19  course of discovery in this case?
20        A.    Yes.
21        Q.    Were you aware that there was
22  continuing discussion into December relative to
23  concerns over coverage issues between yourself
24  and Dr. Lew?

102

1         A.    At that point I was not aware of any
2   discussions.
3         Q.    Do you recall Dr. MacArthur meeting
4   with you on or after December 11, 2001, to
5   discuss the issue?
6         A.    I don't recall specifically.
7         Q.    Do you recall having discussions
8   with anyone else in that timeframe —
9         A.    No.
10        Q.    — relative to that issue?
11        A.    No, I don't recall that I did.
12        Q.    Let's do what we did when we came to
13  the end of the year 2000; that is, I would like
14  you to focus on calendar year 2001 for the
15  purposes of my next series of questions to you.
16  We may have talked a little bit about this
17  already, but my next question to you will be: Do
18  you believe that you were the subject of age
19  discrimination at the hospital during calendar
20  year 2001?
21        A.    I think I answered that question
22  previously. Yes.
23        Q.    And in what respects — and I
24  appreciate your patience — do you believe you

103

1   were the subject of age discrimination during
2   that year?
3         A.    All of the critique about me being
4   in the operating room. Again, going back to the
5   requirement that I be monitored in the operating
6   room. The insistence that I follow the dictum of
7   the medical staff, even though I had pointed out
8   my concerns and nobody listened to it. And my
9   continued — the only person that was aware of or
10  showed what my contribution during that time to
11  this institution was, and to patient care, would
12  have been my nurse midwife, Cathy Chase, and the
13  obstetrical nurses in this institution. But
14  nothing from the staff.
15        Q.    Meaning the medical staff?
16        A.    Yes.
17        Q.    You mentioned you believe that you
18  were monitored because of your age?
19        A.    As I recall, that's what I believed.
20        Q.    Who do you believe was responsible
21  for the decision that you should be monitored for
22  a one-to-two-month period in the operating room?
23        A.    From what I was told, it was the
24  medical staff.

104

1         Q.    So you believe the entire medical
2   staff?
3         A.    From what I was told, as I recall,
4   Dr. MacArthur said to me that the medical staff
5   had concerns about my operative ability and,
6   therefore, wanted me monitored.
7         Q.    So I'm sorry, my question would be:
8   Do you believe that every one of the medical
9   staff was, therefore, guilty of age
10  discrimination to you in that respect?
11              MR. SCHULTZ:    Objection.
12        A.    I can't say. I can't answer that.
13        Q.    Who was responsible for the
14  discrimination, if you know?
15        A.    I cannot answer that. I don't know.
16  I don't know.
17        Q.    And why do you believe that the
18  concern was tied to your age?
19        A.    There was no other reason to have
20  concern. I came with outstanding credentials,
21  outstanding credentials. And there was no
22  reason, from my perspective, to monitor me. I
23  had come from a clinical practice. I had been
24  chief of gynecology at a teaching institution.

113

1    committee wasn't acting in a way that you felt
2    was appropriate because of your age?
3         A.    I can't -- that would only be me
4    surmising. I can't answer that.
5         Q.    You indicated that you believe the
6    only person who -- I'm going to paraphrase again,
7    with apologies -- understood and appreciated
8    your contribution to Martha's Vineyard Hospital
9    and patient care, the only persons were Cathy
10   Chase and the OB nurses, none of the medical
11   staff, correct?
12        A.    They didn't tell me.
13        Q.    Do you believe that was because of
14   your age?
15        A.    I can't answer that.
16        Q.    Did you complain to anyone within
17   the hospital that you believed that actions were
18   being taken against you in 2001 because of your
19   age?
20        A.    As I recall, I did not.
21        Q.    Do you recall why you didn't?
22        A.    I don't recall.
23        Q.    Let's move our focus back to the
24   entire calendar year for 2001. And with that

114

1    focus, let me ask you this question: Do you
2    believe that you were the subject of race
3    discrimination at the hospital over the course of
4    that year?
5         A.    I didn't believe it at that time.
6         Q.    Should I infer that at some later
7    point you did believe that over the course of
8    that year you had been the subject of race
9    discrimination?
10        A.    I can't say at this time. I don't
11   recall when that came to light. I don't recall
12   the exact time. We're in 2001? I don't recall
13   it happening in 2001.
14             MR. SCHULTZ:    I don't think that's
15   the question he asked. Listen to the question.
16             MR. SHIRLEY:    Let me try and make
17   sure we have a clear record.
18   BY MR. SHIRLEY:
19        Q.    Sitting here today, do you believe
20   that you were the subject of race discrimination
21   at the hospital in 2001?
22        A.    I answered that no.
23        Q.    Now let's move into 2002, if we
24   could, Doctor. You'll recall that your

115

1    application for active staff privileges was under
2    consideration through the first part of that
3    year?
4         A.    Yes.
5         Q.    Is it your understanding that it
6    would have been discussed at the medical
7    executive committee?
8         A.    Yes.
9         Q.    Were you aware that as part of that
10   discussion, concerns relative to your cooperation
11   with other physicians was a subject for
12   discussion?
13        A.    No.
14        Q.    In your view, should it have been?
15        A.    No.
16        Q.    Were you aware that concerns
17   relative to citizenship issues at the hospital
18   were the subject of discussion?
19        A.    No.
20        Q.    In your opinion, should they have
21   been?
22        A.    No.
23        Q.    Were you aware that concerns
24   relative to your willingness to participate in

116

1    coverage were the subject of discussion at the
2    medical executive committee?
3         A.    I wasn't aware of it, but it doesn't
4    surprise me.
5         Q.    I think I can guess your answer to
6    this question. Do you believe those concerns
7    should have been a concern of the medical
8    executive committee?
9         A.    No.
10        Q.    Doctor, my apologizes for my own
11   poor memory. We talked briefly earlier today
12   about your understanding of the staff privileges
13   application process, and I believe you told me
14   that your understanding was that the medical
15   executive committee and the board had to approve
16   the application. Do I remember correctly?
17        A.    Yes.
18        Q.    Isn't it the case that the medical
19   staff also had to pass on the issue?
20        A.    Yes.
21        Q.    So it would be medical executive
22   committee, medical staff, board approval or
23   rejection as the process?
24        A.    Are you saying in that order?

125

1   A.   I do not.
2   Q.   Do you recall who replaced him?
3   A.   Yes.
4   Q.   Who?
5   A.   Tim Walsh.
6   Q.   Was Mr. Walsh already employed by
7   the hospital at that time?
8   A.   Yes.
9   Q.   In what position?
10  A.   Financial officer, I believe.
11  Q.   Perhaps Chief Financial Officer?
12  A.   I believe that to be correct.
13  Q.   To what extent had you had dealings
14  with Mr. Walsh prior to his becoming CEO?
15  A.   He oftentimes was present when I had
16  conferences with Kevin Birchill.
17  Q.   Were there any issues between you
18  through the point when he became CEO?
19  A.   I don't recall.  You mean before he
20  became CEO?
21  Q.   Correct.
22  A.   I don't recall that there were.
23  Q.   How would you describe your
24  relationship before he became CEO?

126

1   A.   I would say it was fine.
2   Q.   Do you recall Mr. Birchill
3   increasing your salary at the midwifery center
4   shortly before his effective date of resignation?
5   A.   He didn't increase my salary.
6   MR. SCHULTZ:   Was that a didn't or
7   did?
8   THE WITNESS:   He did not increase my
9   salary.
10  BY MR. SHIRLEY:
11  Q.   Did your salary increase shortly
12  before he left?
13  A.   It did not.
14  Q.   Did it increase at any point after
15  it was initially set at $130,000?
16  A.   It increased after two years, I
17  think, when I got the percentage of increase.
18  And we had to bring that to administration's
19  attention.  They didn't volunteer to give it to
20  me.
21  Q.   I'm going to ask you, please, to
22  review a document.  And I apologize, it's the
23  best copy of it that I've got.  Let's see if we
24  can do our best to read it.

127

1   MR. SCHULTZ:   Just to move this
2   along -- and I in no way want to suggest answers,
3   but I just don't want to see us go into
4   something.  In answering questions, distinguish
5   between salary and total compensation so that
6   there's not a misunderstanding between the
7   question and the answer, when you probably both
8   agree to the facts.  But I think you are hearing
9   him say one thing when he is saying something
10  else, and we're maybe leading to unnecessary
11  time.  If you could just talk about what happened
12  to your total compensation at some point, maybe
13  we can move it along quicker.
14  MR. SHIRLEY:   And I think we're all
15  doing our best, so for heaven's sake, be patient
16  with me.  But why don't we mark this as our next
17  exhibit, and I think we will be able to move it
18  along quickly to our comparative satisfaction.
19  (Exhibit Number 27 was marked for
20  identification.)
21  A.   (Reviewing document.) I'm sorry, i
22  can't read it.  Maybe you can help me.  I can't
23  read it.
24  Q.   Well, let's all do our best.  Let me

128

1   ask you a question about it, if I could, that you
2   may or may not be able to answer.  Even though
3   you can't read every word, as I can't, first,
4   does this appear to you to be a personnel action
5   form for the hospital?
6   A.   Yes.
7   Q.   And does it refer to you in Category
8   Number 1?
9   A.   Yes.
10  Q.   And at the very bottom, does it
11  appear to be signed by someone whose initials are
12  KAB?
13  A.   Yes.
14  Q.   And are Mr. Birchill's initials K --
15  actually -- RB?
16  A.   I know they are KB.  I don't know
17  the middle one.
18  Q.   All right.  And is the date next to
19  those initials 4/3/02?
20  A.   Yes.
21  Q.   And does it appear in the second
22  section for information that effective sometime
23  in 4/02 there would be an increase to $200,000
24  for year two of contract?

1    A.    Well, the compensation was 200,000,
2  but it did not change.  It was the same as the
3  year before.  The total compensation was 200,000,
4  about.
5    Q.    Let me make sure I'm understanding.
6  Is it true that prior to this early April 2002
7  timeframe you had a -- I'll refer to it as a base
8  salary of $130,000?
9    A.    Base salary of 130, yes.
10    Q.    And that was W-2 income to you?
11    A.    I don't know how it —
12    Q.    And you were paid, I think we've
13  established, certain set amounts for additional
14  work you performed?
15    A.    Yes.
16    Q.    And is it your understanding, sir,
17  that as of this early April 2002 timeframe, all
18  of that was going to be rolled into a single
19  salary?
20    A.    Yes.
21    Q.    And that salary was going to be
22  $200,000?
23    A.    Yes.
24    Q.    And is it your further understanding

Carolyn Haddox, RPR
(508)420-5691

1  that approximately, all in, your compensation for
2  the prior year was about $200,000?
3    A.    Yes.
4    Q.    So your view is your total
5  compensation, in fact, didn't change?
6    A.    Yes, that's my view.
7    MR. SHIRLEY:   Okay.  Off the record.
8    (Discussion off the record.)
9    MR. SHIRLEY:   Back on the record.
10  BY MR. SHIRLEY:
11    Q.    While we're talking about
12  compensation and salary, Dr. Hughes, do you
13  recall that your salary was later increased to
14  $208,000 at some point?
15    A.    It was increased after we brought it
16  to their attention that we had not gotten —
17  brought it to administration or Mr. Chisholm —
18  that we not gotten the automatic increase in
19  salary that I was due.  Because everybody,
20  non-union people, had gotten an increase, and I
21  didn't.  So we took it to Mr. Chisholm, and he
22  corrected it.
23    Q.    You say that "we took it to Mr.
24  Chisholm"?

Carolyn Haddox, RPR
(508)420-5691

---

131

1    A.    Well, my wife and I went to
2  Mr. Chisholm.
3    Q.    And do you recall when you brought
4  that to his attention approximately?
5    A.    I think it was a month after I got
6  the first check and it didn't include it, so —
7    Q.    A month after —
8    A.    I think it must have been after
9  March, the fiscal year.
10    Q.    Of 2002?
11    A.    Yes.
12    Q.    Doctor, is it your recollection that
13  in this same first part of 2002 timeframe you
14  were the subject of a complaint to the Board of
15  Registration in Medicine?
16    A.    Yes.
17    Q.    Do you have an understanding as to
18  who forwarded that complaint or concern to the
19  Board of Registration in Medicine?
20    A.    The Board of Registration said it
21  was an anonymous complaint, but there are only
22  three doctors who could have documented the cases
23  that they presented.
24    Q.    And who are those three doctors?

Carolyn Haddox, RPR
(508)420-5691

132

1    A.    Dr. Koehler, Dr. London, and Dr. —
2  starts with a P.  He was an anesthesiologist.
3    MR. SCHULTZ:   Pil?
4    A.    No, not Pil.  I can't remember his
5  name.  But he was the other anesthesiologist at
6  that time.  They were the only ones who had
7  access to that information.  And Koehler was the
8  only one who had access to my salary, which was
9  mentioned in that complaint in which they were
10  trying to get my license revoked.
11    Q.    What three cases were the subject of
12  the report?
13    A.    There weren't three, there were ten.
14    Q.    I'm sorry, I thought you told me
15  that you believed it was one of these three
16  physicians, or some number of them, because they
17  were the only ones who had access to the three —
18    A.    Three physicians, not cases.
19    Q.    So there were ten cases?
20    A.    Yes.
21    Q.    I'm sorry.  Was there any general
22  theme to the concerns, as you understood them?
23    A.    The theme to the concerns were all
24  false accusations.  The board said they took no

Carolyn Haddox, RPR
(508)420-5691

137

1  are, who had never been in the operating room
2  with me, who had never seen me operate, who has
3  no idea of my care of patients to make those
4  types of accusations.
5      Q.    So there was nothing to discuss?
6      A.    Unless MacArthur stood up and said
7  it's not true.
8      Q.    All right.  Your credentials should
9  not have been questioned by anyone, correct,
10 that's your opinion?
11     A.    That's not what I said.
12     Q.    I'll move on.  I'll withdraw the
13 question.  I apologize.  Now, in response to the
14 complaint to the Board of Registration in
15 Medicine, you forwarded to Mr. Birchill a letter
16 that you wanted him to send to the board, did you
17 not?
18     A.    I don't recall forwarding a letter
19 to Mr. Birchill.
20     Q.    He prepared a letter and sent it to
21 the Board of Registration in Medicine, correct?
22     A.    Yes.
23     Q.    And you didn't have any input into
24 that?

138

1      A.    No.
2      Q.    You didn't see it before it went
3  out?
4      A.    No, I don't recall that I did.
5      Q.    Okay.  I have only a single copy,
6  but I think we can move through it quickly.  I
7  would like you to review, please, what we'll mark
8  as Exhibit 28, and what I'll suggest is that we
9  provide a clean copy at some point.  I just have
10 what I hope are not obtrusive markings on one or
11 two of the pages.  If it's a problem, we can
12 address it when you have a chance to look at it.
13         (Exhibit Number 28 was marked for
14 identification.)
15     A.    (Reviewing document.)
16     Q.    Just a couple of questions with
17 respect to that document.  Have you seen this
18 before, Doctor?
19     A.    Yes.
20     Q.    Did you see it shortly after it was
21 authored by Mr. Birchill?
22     A.    I can't recall the exact time, but I
23 saw it before.
24     Q.    In substance, does it appear correct

139

1  to you?
2      A.    Yes.
3      Q.    Now, ultimately the Board of
4  Registration concluded that there was
5  insufficient merit to the report for any further
6  action to be taken, correct?
7      A.    They didn't say insufficient, they
8  just said they were taking no action and they
9  would file it away.
10     Q.    Did you ever report any concern
11 relative to Dr. Lew to the Board of Registration
12 in Medicine?
13     A.    No.
14     Q.    Why not?
15     A.    It wasn't my position to report to
16 the Board of Registration.
17     Q.    You didn't understand, sir, that as
18 a condition to practicing medicine in
19 Massachusetts you had an obligation to report
20 concerns to the Board of Registration in
21 Medicine?
22     A.    I did not understand that, no.
23     Q.    Do you understand that to be the
24 case as we sit here today?

140

1      A.    I still don't, no.  I think that the
2  QI committee and the hospital executive office
3  has that obligation.
4      Q.    Now, we talked about Mr. Birchill's
5  departure.  Is it correct that Dr. Koehler also
6  left at some point in 2002?
7      A.    Yes.
8      Q.    Do you recall approximately when he
9  left the staff?
10     A.    I think he left in June or July.  He
11 fulfilled his contract, as I recall.
12     Q.    Do you understand why he left at
13 that time?
14     A.    No.
15     Q.    Did he have any continuing
16 relationship with the hospital thereafter?
17     A.    To my knowledge, he did not.
18     Q.    You had disagreements with
19 Dr. London over the course of 2002, did you not?
20     A.    Yes.
21     Q.    One set of disagreements related to
22 the perioperative committee?
23     A.    I don't know what you are referring
24 to.

145

```
1        Q.     And what was the purpose of meeting
2   with him?
3        A.     To discuss these issues.
4        Q.     And why with him?
5        A.     And to discuss the critique that
6   Koehler and company had sent to the Board of
7   Registration.
8        Q.     Why with him?
9        A.     Because he was the vice chair, and
10  we got no help or response from anybody in the
11  hospital.
12       Q.     Why not the chair?
13       A.     We went to the chair, and he would
14  not listen to us.  He referred us to Tim Walsh.
15       Q.     Okay.  That does get us to the
16  question of which chair you went to.
17       A.     Ferguson.
18       Q.     So he would have been the chair by
19  this point in time?
20       A.     I think so.
21       Q.     Okay.  So your recollection is that
22  Mr. Ferguson asked you to go to Mr. Sweet?
23       A.     No, he didn't.  No, no.
24       Q.     I'm sorry, what --
```

Carolyn Haddox, RPR
(508)420-5691

146

```
1        A.     Tim Walsh, not Sweet.  Tim Walsh,
2   the CEO.
3        Q.     I'm sorry, to whom did you first
4   attempt to raise these concerns?
5        A.     As I recall, to Tim Sweet.
6        Q.     So you went to Sweet first?
7        A.     As I recall.
8        Q.     Okay.  And my question is:  Why did
9   you go to Sweet first?
10       A.     Because he was on the island and
11  Ferguson is not.
12       Q.     Why didn't you go to Mr. Walsh
13  first?
14       A.     I didn't feel I would get a response
15  from Mr. Walsh.
16       Q.     Why is that?
17       A.     Because since he had been here, he
18  was trying to force me to cross cover with Lew.
19       Q.     I think we've established that he
20  wouldn't have been the CEO for more than a month
21  at the most?
22       A.     Uh-huh.
23       Q.     And that was already a problem for
24  you as of the date of this meeting with
```

Carolyn Haddox, RPR
(508)420-5691

147

```
1   Mr. Sweet?
2        A.     I can't recall.  I can't recall the
3   timeframes.  I can only recall the things that
4   happened.  I can't put them into succession.
5        Q.     Except we know that if you didn't go
6   to Walsh because you weren't happy with his
7   approach to the coverage issue, that the coverage
8   issue with Walsh must have preceded your meeting
9   with Mr. Sweet, correct?
10       A.     I'll rephrase that.  I had more
11  contact with Tim Sweet than I did with Mr. Walsh.
12       Q.     What, if anything, did he say in
13  response?
14       A.     That he would look into it.
15       Q.     Was anyone else present?
16       A.     No.
17       Q.     Did he ever follow up with you?
18       A.     No.
19       Q.     Did you ever ask him to do so?
20       A.     I don't recall that I did.
21       Q.     Did your wife?
22       A.     I don't recall that she did.
23       Q.     Are you saying that you didn't, or
24  that you just don't remember either way?
```

Carolyn Haddox, RPR
(508)420-5691

148

```
1        A.     I don't recall what I'm saying.
2        Q.     Is there any reason why --
3               MR. SCHULTZ:   I'm not sure you've
4   answered his question, so --
5               THE WITNESS:   He asked me if I did
6   or didn't.
7               MR. SCHULTZ:   If he's happy, that's
8   fine.
9   BY MR. SHIRLEY:
10       Q.     You don't recall whether you did or
11  didn't; is that correct?
12       A.     I don't recall whether I did, I'll
13  say that.  I don't recall that we followed up
14  with Sweet.
15       Q.     Would there have been any reason why
16  you wouldn't have done so?
17       A.     My feeling was we had presented the
18  case to him, and if he was going to follow up, we
19  would hear from him.
20               MR. SHIRLEY:   Can we just go a
21  couple more minutes and then we'll take our lunch
22  break?
23               MR. SCHULTZ:   If we can go until
24  1:20, that would be my suggestion, only because,
```

Carolyn Haddox, RPR
(508)420-5691

157

1  the practice of the obstetrical and gynecological
2  department. Several things happened which still
3  put me with concerns. One is that Dr. Lew did
4  not go to New England Medical Center for any
5  remedial work. He went — I'm sorry, he went
6  twice for remedial work, and that was it.
7              Two, whatever contact he had with
8  Dr. Shah was not in-person — I take it back, I
9  don't know whether it was in-person or not, but
10  Dr. Shah was not on island to evaluate his work,
11  and as far as I know, his only evaluation was
12  reviewing his records. And in my estimate, that
13  was not remedial at all. So therefore, I still
14  had serious concerns about cross covering with
15  Dr. Lew.
16      Q.    Sir, I'm a little confused. Was it
17  your function to serve as a one-person quality
18  improvement committee?
19      MR. SCHULTZ:    Objection.
20      A.    No.
21      Q.    It was not?
22      A.    As I recall, I was not serving as a
23  QI committee at all.
24      Q.    Did you see anything in the staff

158

1  laws that gave you the ultimate authority as to
2  whether a physician was or was not competent to
3  practice medicine on the medical staff of
4  Martha's Vineyard Hospital?
5      A.    Number 1 is I never said he couldn't
6  practice medicine on the Martha's Vineyard
7  Hospital staff.
8      Q.    Well, my question was: Did you ever
9  see such a thing? Not to argue with you.
10      MR. SHIRLEY:    Would you read back my
11  question, please?
12      (Record read.)
13      A.    No.
14      Q.    What were you about to say, sir?
15      A.    I was about to say that I was not
16  making any decisions as to whether or not Dr. Lew
17  could practice on the medical staff. I made no
18  decisions about him getting remedial work. My
19  critique of his care had existed since I came to
20  this hospital. My criticism was confirmed by the
21  evaluation of the American College of Gynecology
22  and Obstetricians, which confirmed that
23  100 percent of my reviewed work was up to the
24  standard of care and 50 to 60 percent of

159

1  Dr. Lew's work was beneath the standard of care.
2              The committee recommended that he
3  get work so that he could reapply to take his
4  American boards, which he had failed three times
5  and was not qualified to take them again. So I
6  was now being guided by the recommendations of
7  the American College, which is the governing body
8  of all obstetricians and gynecologists and makes
9  those recommendations. That was now what I was
10  following because they had confirmed my critiques
11  all along.
12      Q.    I am, again, confused, for which I
13  apologize. I am confident you told me earlier
14  that you didn't, in fact, know what the ACOG
15  report said.
16      A.    I said I didn't see the written
17  report. I said that they gave us a verbal report
18  before they left.
19      Q.    I'm sorry, so you did understand
20  what the ACOG report entailed?
21      A.    I understand that little part of it.
22  That part of it.
23      Q.    I see.
24      A.    As to the standard of care by the

160

1  two obstetricians that were practicing here.
2      Q.    And do you understand any other part
3  of it?
4      A.    I didn't see any other part of it.
5      Q.    And you didn't see that part either,
6  correct?
7      A.    No, this was told by the committee.
8      Q.    I'm trying to understand what you
9  did or didn't see or what you did or didn't
10  understand.
11      A.    I didn't see any of it. I was told
12  this by the committee.
13      Q.    And following the ACOG report,
14  Dr. Lew remained on the staff of the hospital,
15  correct?
16      A.    He remained on the staff, yes.
17      Q.    And you are unaware of anything in
18  the ACOG report that said he could not remain on
19  staff, are you?
20      A.    I'm not aware.
21      Q.    And you saw nothing that suggested
22  that coverage of him would be inappropriate
23  because of his quality of care, did you?
24      A.    From who? ACOG?

169

1  that context?
2       Q.   I'll continue if you need further
3  explication of the concept.
4            MR. SHULTZ:   I object to the
5  comments, the sarcasm.  Dr. Hughes is treating
6  you with respect.  He should be treated with the
7  same respect in the questions without any
8  comments.  You are far too good of an attorney
9  for this, and I would really appreciate that we
10 cut the comments and the sarcasm.
11           MR. SHIRLEY:   I can't agree with the
12 characterization, but I certainly agree with the
13 spirit, that we should do our best to move
14 forward in as professional and responsive a
15 fashion as possible.
16           MR. SHULTZ:   And collegial, I might
17 add.
18           MR. SHIRLEY:   Of course.  I'm
19 attempting to pose questions as best I can, and
20 --
21           MR. SHULTZ:   Which have not been
22 professional and collegial in the last half an
23 hour, which just goes to show that it happens to
24 everybody.  And that's the last comment I'll

Carolyn Haddox, RPR
(508)420-5691

170

1  make.
2            MR. SHIRLEY:   And I'm confident that
3  you will counsel your client do his best to
4  respond to my questions.
5            MR. SHULTZ:   I absolutely will do
6  that and have been, sir.
7            MR. SHIRLEY:   And I regret that
8  there's an apparent misunderstanding over what
9  the term "get along" means.  I'll continue.
10 BY MR. SHIRLEY:
11      Q.   Doctor, I would like, again, to do
12 something we've done twice before.  We're at the
13 end of the calendar year 2002 so far as my
14 questions are concerned.  I would like you to
15 think back through calendar year 2002 with
16 respect to my next set of questions.
17           Do you believe that you were the
18 subject of age discrimination by anyone at the
19 hospital in 2002?
20      A.   Yes.
21      Q.   Who do you believe subjected you to
22 age discrimination?
23      A.   The three doctors that tried to have
24 my license revoked.

Carolyn Haddox, RPR
(508)420-5691

171

1       Q.   Anyone else?
2       A.   I don't recall anyone else that I
3  could specifically make that statement about, no.
4       Q.   Okay.  Will taking more time assist
5  you?
6       A.   I can't recall anybody else.
7       Q.   Those three doctors I think you
8  identified as Drs. Koehler, London, and someone
9  whose name you thought began with a P in
10 anesthesiology?
11      A.   Yes.
12      Q.   Do you have any clearer recollection
13 of who that third physician may have been?
14           MR. SHULTZ:   I know I saw his name
15 in one of the documents you've introduced into
16 evidence, so if we go back a few documents, I
17 think we'll find it.  It was an anesthesiologist
18 whose name started with a P.
19           Can you help us?
20           MR. CHISHOLM:   I wasn't here at the
21 time.
22 BY MR. SHIRLEY:
23      Q.   Without taking more time, you simply
24 don't recall his name?

Carolyn Haddox, RPR
(508)420-5691

172

1       A.   I can't bring it up.  I just can't
2  bring it up.
3            MR. SHULTZ:   Preston.
4            THE WITNESS:   Preston.
5  BY MR. SHIRLEY:
6       Q.   Dr. Preston.  What was his first
7  name, Doctor, do you recall?
8       A.   (No audible response.)
9       Q.   We've exhausted your memory and
10 that's sufficient, a Dr. Preston in
11 anesthesiology.
12           Doctor, do you believe that all
13 three of those physicians submitted that report
14 because of your age?
15      A.   I believe so, yes.
16      Q.   And what's the basis for that
17 belief?
18      A.   Because they had no other reason to
19 submit it that I know of.
20      Q.   Do you have any reason to believe
21 that they didn't submit it simply because,
22 perhaps mistakenly, they sincerely believed that
23 there were issues relative to the quality of your
24 care?

Carolyn Haddox, RPR
(508)420-5691

173

```
1          A.    The cases that they sent to the
2   board, there's no way that they could be confused
3   with a question of quality of care because
4   they — every one of them, they lied. I mean,
5   purely, they lied.
6          Q.    And how do you know that?
7          A.    They sent me the cases and what they
8   said. I got the cases. They sent all ten of the
9   cases to me with the allegations that these
10  physicians made, and I had to respond to all of
11  them. But they were just not true. It wasn't a
12  mistake. You couldn't mistake what they said.
13  They lied.
14         Q.    And you believe they lied because of
15  your age?
16         A.    Yes.
17         Q.    Did any one of those three
18  physicians say or do anything beyond their
19  submission of the report and the lies that they
20  made in connection with that that caused you to
21  conclude that they were lying specifically
22  because of your age?
23         A.    I can't recall anything else at the
24  moment.
```

174

```
1          Q.    Can you recall any other ways in
2   which you believe you were the subject of age
3   discrimination in 2002?
4          A.    At the moment, I cannot recall any
5   others.
6          Q.    And I believe you've already told me
7   that taking more time would not likely assist
8   your recollection?
9          A.    I don't think so.
10         Q.    Okay. Let me pose the same question
11  to you relative to race discrimination in
12  calendar year 2002. Specifically, do you believe
13  that anyone discriminated against you because of
14  your race during that calendar year?
15         A.    I do not.
16         Q.    Let's turn then to 2003, if we
17  could. Doctor, I believe you've correctly
18  asserted that on or about April 1 of 2003,
19  Martha's Vineyard Hospital ran an advertisement
20  for a hospital employee OB/GYN department
21  chairperson; is that correct?
22         A.    Yes.
23         Q.    When did you first learn of that
24  advertisement?
```

175

```
1          A.    When that journal came out.
2          Q.    Did you yourself see it?
3          A.    Yes.
4          Q.    What, if anything, did you do after
5   seeing it?
6          A.    After seeing it, I believe, if I
7   recall correctly, shortly after that, I picked up
8   the phone and called the recruiter and applied
9   for the job.
10         Q.    Do you recall who the recruiter was?
11         A.    I don't remember his name.
12         Q.    And this was a telephone
13  conversation?
14         A.    Yes.
15         Q.    Please tell me as best you can
16  remember what you said to him and what he said to
17  you.
18         A.    I said, I would like to apply for
19  the job. I gave him my name and where I was, and
20  he said, I'm sorry, I was informed that you
21  cannot apply for the job, I'm not to interview
22  you for this job. I said, Why? He said, That's
23  what I was informed, and I will check again
24  with — I believe he said Mr. Walsh -- and see
```

176

```
1   what he says. But he never got back to me.
2          Q.    What, if anything, did you do after
3   that call to follow up on the advertisement?
4          A.    At some point — I can't give you
5   the exact date -- I went to Mr. Walsh and asked
6   him what was going on and what was my role in the
7   future of this institution.
8          Q.    Do you recall approximately when you
9   had that meeting with Mr. Walsh?
10         A.    I can't recall exactly. I have it
11  written somewhere, but I can't recall. It was
12  shortly after these advertisements began to
13  appear.
14         Q.    Was anybody else present for that
15  meeting?
16         A.    No.
17         Q.    Was it in his office?
18         A.    Yes.
19         Q.    Please tell me as best you can
20  recall what each of you said in the course of
21  that meeting.
22         A.    I had two meetings with him, and I
23  can't -- I think it was the second one that it
24  went further. I think after that, I just left, I
```

205

```
1            MR. SHIRLEY:   Mr. Schulz, thank you
2   for the lecture.  Thank you for the speech.  Time
3   is short, I don't need to hear it.
4   BY MR. SHIRLEY:
5        Q.    Dr. Hughes, please do your best to
6   listen to my question and answer as truthfully
7   and responsively as you can.  Thank you, sir.
8            You had a conversation with
9   Mr. Chisholm, correct?
10       A.    Yes.
11       Q.    And you've been testifying
12  throughout the course of the day about your
13  understanding of your contract, have you not,
14  what was allowed and not allowed under your
15  contract?
16           MR. SCHULTZ:   Objection.
17           MR. SHIRLEY:   And the basis for the
18  objection would be?
19           MR. SCHULTZ:   There's no foundation
20  that throughout this day he's testified as to his
21  understanding of the contract.
22           MR. SHIRLEY:   I'm just trying to
23  establish the record for going back before the
24  judge.
```

Carolyn Haddox, RPR
(508)420-5691

206

```
1            MR. SCHULTZ:   You asked him about
2   one section, 3.2.  I can remember one question
3   relating to the contract with respect to Section
4   3.2, if you want to establish that.  So I just
5   don't think that it's an accurate statement.
6            MR. SHIRLEY:   You're establishing
7   your memory.  That's interesting.  Let's
8   continue.
9   BY MR. SHIRLEY:
10       Q.    What was your next conversation
11  after your conversation with Mr. Chisholm
12  relative to the termination notice that you had
13  received?
14       A.    I went to Mr. Walsh.
15       Q.    When did you do that?
16       A.    Shortly after I talked to
17  Mr. Chisholm.
18       Q.    And where did you see him?
19       A.    In his office.
20       Q.    Was anyone else present?
21       A.    No.
22       Q.    Please tell me as best you can
23  recall what you said to him and what he said to
24  you.
```

Carolyn Haddox, RPR
(508)420-5691

207

```
1        A.    As best I can recall, I asked him
2   why I was being terminated and that I didn't
3   think that he had grounds to do so.
4        Q.    That was your interpretation of your
5   contract?
6        A.    I wasn't discussing the contract.
7   You asked me to say what I said to him.
8        Q.    And I'm asking --
9        A.    And that's what I'm telling you.
10       Q.    And I'm asking the next question.
11       A.    I wasn't thinking about the
12  contract, I was discussing this with him.
13       Q.    So you weren't thinking about your
14  contract at that point?
15       A.    I was not.
16       Q.    Okay.  Please continue.
17       A.    He said that they were looking for a
18  new person, just as Mr. Chisholm had said, and
19  they wanted to get more patients.  I said, I
20  don't understand why you would do that, the
21  amount of obstetrical patients has grown
22  significantly since I've been here.  And he said,
23  That's because of Cathy Chase.  I said, That's
24  not true, because Cathy Chase has always been
```

Carolyn Haddox, RPR
(508)420-5691

208

```
1   here, she was here with Dr. Lew, the only person
2   that has changed is me, and that's why it has
3   gone up.
4            He then said, Well, I don't like to
5   get letter from lawyers because that causes legal
6   fees for the institution, and I don't like to get
7   calls from members of the board of trustees.
8   That was his statement.
9        Q.    And what, if anything, did you say
10  in response?
11       A.    I don't think I said anything.  I
12  didn't.  I left.
13       Q.    What was the next conversation you
14  had, if any, with anyone relative to the
15  termination notice that you had received?
16       A.    I had a conversation with
17  Mr. Chisholm.
18       Q.    Again?
19       A.    Yes.
20       Q.    And what was the next one?
21       A.    That was the next one, as I recall.
22       Q.    And when did that occur?
23       A.    I can't -- shortly after that, in
24  that time period.
```

Carolyn Haddox, RPR
(508)420-5691

213

1    and said he had presented the letter to the
2    board.
3         Q.    Without going into the specifics of
4    any response, what, if anything, did he say about
5    whether or not there was the realistic prospect
6    for a resolution?
7         A.    I don't recall what he said.
8         Q.    That makes it easy. Do you recall
9    anything more about the discussion, beyond a
10   possible discussion of the specific terms of a
11   proposal?
12        A.    I don't recall what it was.
13        Q.    Aside from those communications with
14   Dr. Guiney, the discussion, the letter, the
15   telephone call back, do you recall any other
16   communications with anyone relative to the
17   termination notice you received?
18        A.    I had a communication with one of my
19   neighbors.
20        Q.    Who was that?
21        A.    Don Lyons.
22        Q.    Does Mr. Lyons have any relationship
23   to the hospital?
24        A.    No, not that I know of.

Carolyn Haddox, RPR
(508)420-5691

214

1         Q.    Do you recall what you said to him
2    and what he said to you?
3         A.    He told me that he had had a
4    discussion with one of the board members and
5    asked that board member why they were terminating
6    his good friend Deurward Hughes, and he was told
7    by the board member that they were looking to get
8    someone who would be here for a long time,
9    something of that nature. I can't recall the
10   exact words of what he said.
11        Q.    Did he identify who that board
12   member was?
13        A.    Yes, but I'm trying to get the name
14   correct, and it won't come to me right now.
15        Q.    Let me throw out a name to see if it
16   might assist your recollection. Your
17   interrogatory answers I believe suggest that he
18   was referring to a conversation with Earl
19   Sandy --
20        A.    Yes.
21        Q.    -- Ray?
22        A.    That's correct.
23        Q.    Do you recall anything else that he
24   said to you during this conversation?

Carolyn Haddox, RPR
(508)420-5691

215

1         A.    He said nothing else about that that
2    I recall.
3         Q.    Do you recall any other
4    conversations or communications that you had with
5    anyone relative to the termination notice that
6    you received?
7         A.    I don't recall at the moment anyone
8    else.
9         Q.    And I'm obviously excluding
10   conversations with counsel or conversations with
11   your wife.
12        A.    Yes, I don't recall one with anyone
13   else.
14        Q.    Now, prior to the time that you
15   received the notice of termination on August 12,
16   2003, had your schedule and commitments continued
17   to be as you previously described them to me?
18        A.    Yes.
19        Q.    Your office hours remained the same?
20        A.    Yes.
21        Q.    Same days of the week?
22        A.    Yes.
23        Q.    Did your schedule and level of
24   commitment change at all after you received the

Carolyn Haddox, RPR
(508)420-5691

216

1    August 12, 2003, notice of termination?
2         A.    My level of commitment did not
3    change. The number of patients that I began to
4    see began to slowly decrease, and I was told by
5    several of my patients that they had called the
6    office to try to see me, asked for an appointment
7    with me, and were told that they could not see
8    me, they would have to see the new doctor,
9    Dr. Donegan.
10             One of my patients -- I can't
11   remember her name right off, I can get it -- was
12   very disturbed that I was not there to do her
13   cesarean, and she discussed it with Cathy Chase,
14   and Cathy Chase told her that, Don't worry, there
15   was a much younger doctor here and she would do
16   fine. That patient subsequently delivered in
17   Boston.
18        Q.    And how do you know that's what
19   Ms. Chase told her?
20        A.    The patient told me that's what she
21   was told.
22        Q.    And the patient's name, Doctor?
23        A.    I have to get it, I can't recall
24   right off. But I know who she is and I can get

Carolyn Haddox, RPR
(508)420-5691

217

1    the name.
2        Q.    When we go off the record, I'll ask
3    that we follow up on that.
4             Now, you are referring to these as
5    your patients, Doctor?
6        A.    As patients of the Vineyard
7    midwifery practice.
8        Q.    Please review what we'll mark as
9    Exhibit 50.
10            (Exhibit Number 50 was marked for
11   identification.)
12       A.    (Reviewing document.)
13       Q.    Can you identify this, Doctor?
14       A.    The coke?  Sorry.
15       Q.    That was a poorly framed question.
16       A.    Yes.
17       Q.    What is Exhibit 50?
18       A.    It's a letter that I wrote to the
19   new chief of staff stating that I would not be
20   reapplying for privileges at the hospital.
21       Q.    And why did you reach that decision?
22       A.    I reached that decision because I
23   could no longer do obstetrics and gynecology,
24   being that I had been replaced, and I chose to

218

1    have on my record that I didn't reapply, rather
2    than that the staff privileges lapsed or
3    whatever.
4        Q.    When had you made the decision not
5    to reapply for staff privileges?
6        A.    I believe the staff privileges
7    re-application was for February, I believe, and I
8    decided sometime in December that I would not do
9    that.
10       Q.    Doctor, if I understand it, your
11   employment with the midwifery center was being
12   terminated, correct?
13       A.    Yes.
14       Q.    But that had no effect on your staff
15   privileges at the hospital, did it?
16       A.    No.
17       Q.    Why then do you say that you could
18   no longer do OB/GYN at the hospital?
19       A.    Because it would require, one,
20   setting up a new office; two, to pay an
21   exorbitant premium for malpractice, neither of
22   which I could do.
23       Q.    Dr. Lew had been in private practice
24   on the staff ever since you had been there,

219

1    correct?
2        A.    Yes.
3        Q.    So there were purely financial
4    constraints that impeded or interfered with your
5    ability to continue to practice medicine on the
6    staff?
7        A.    Yes, more or less.
8        Q.    And why couldn't you set up a new
9    office?
10       A.    I think I answered that.
11       Q.    I'm sorry, please be patient with
12   me, if you could.  Why couldn't you set up a new
13   office?
14       A.    Want me to answer it again?
15       Q.    I'm asking you to be as patient as
16   you can with this idiot lawyer, yes.  If we could
17   move on, please.
18       A.    It takes finances to set up a new
19   office.  It takes rent money to set up a new
20   office.  And you cannot practice obstetrics and
21   gynecology without having malpractice insurance.
22   That would require an outlay of over $100,000.  I
23   was not going to do that.
24       Q.    Why not?

220

1        A.    The volume of patients at Martha's
2    Vineyard Hospital would not support that.  There
3    would be no way you could make the money to pay
4    that malpractice insurance.
5        Q.    But Dr. Lew had been doing that for
6    the last three years?
7        A.    I have no idea about Dr. Lew's
8    finances, I can only speak for myself.
9        Q.    Your wife had been in private
10   practice?
11       A.    She's in office gynecology.  That's
12   a different premium.
13       Q.    I am correct, am I not, that the
14   decision that you did not want to continue in
15   private practice was your own?
16       A.    Yes, along with my wife, I would
17   say.
18       Q.    We can probably stipulate that that
19   goes without saying.  Did you make any effort to
20   earn income subsequent to the termination of your
21   contract with the midwifery clinic?
22       A.    Yes.
23       Q.    What was the first such effort?
24       A.    I made an application to CompHealth.

237

BY MR. SHIRLEY:

1 BY MR. SHIRLEY:
2      Q.      This may be a question as much for
3 your counsel as it is for you, let me preface it
4 with that introduction.  My understanding,
5 Doctor, is that you are not pursuing a claim for
6 emotional distress in this lawsuit; am I correct
7 in that understanding?
8               MR. SCHULTZ:   Yes, you are.
9               MR. SHIRLEY:   On the record,
10 therefore, I will dispense with any questions
11 relative to emotional distress, treatments,
12 medication, etc.  Is that acceptable?
13               MR. SCHULTZ:   That is acceptable.
14 BY MR. SHIRLEY:
15      Q.      Doctor, I'm going to do my best to
16 be clearer than perhaps I have been through
17 various parts of today's deposition as I turn to
18 the next set of questions.  I would like you to
19 focus, if you would, on calendar year 2003, but
20 for this first set of questions, I want to take
21 out of the equation the hospital's decision to
22 find Dr. Donegan or someone like him and to
23 terminate your contract.
24               So putting contract termination

238

1 issues to one side for the moment, do you believe
2 that you were the subject of age discrimination
3 in calendar year 2003?
4      A.      I can't recall that I was.
5      Q.      The same important qualification
6 relative to race discrimination; that is, putting
7 to one side for the moment issues relating to the
8 termination of your employment, do you believe
9 that you were the subject of race discrimination
10 in calendar year 2003?
11      A.      Not that I recall.
12      Q.      Now, if we could, let's turn our
13 focus to the decision to terminate your
14 employment agreement.
15               Who do you believe was responsible
16 for that decision?
17      A.      I believe Tim Walsh was responsible
18 for it.
19      Q.      Do you believe that his decision was
20 based in any material way on age discrimination
21 against you?
22      A.      I'm not sure of that.
23      Q.      Do you believe that race
24 discrimination played a role in his decision?

239

1      A.      Yes, I believe that.
2      Q.      And what is the basis for that
3 belief?
4      A.      Several reasons.  There were not at
5 that time any blacks on the medical staff, active
6 medical staff, in this institution, and I was the
7 only black on the active medical staff.  There
8 were no black nurses in this institution.  And
9 when I looked around, as I recall, there were no
10 blacks in administration in this institution.  I
11 know that Mr. Walsh is from South Boston.
12      Q.      I'm sorry?
13      A.      I know that Mr. Walsh is from South
14 Boston, and I know that in his earlier years,
15 during the time of racial busing in South Boston,
16 that he left public school and went to private
17 school.  I know that my difficulties with
18 administration only began when he arrived, and he
19 had no reason to believe that I did not do a good
20 job.
21               When Mr. Birchill was here, it was
22 evident that he thought, as he said to me often,
23 You are working harder than any other doctors I
24 know in this institution.  Mr. Walsh had no

240

1 reason, in looking at what I had accomplished,
2 when he sat and told me that I'd accomplished
3 nothing, by that saying that he admitted that
4 there were increases in the obstetrical
5 statistics; but then rather than giving me credit
6 for it, he chose to say that was because of Cathy
7 Chase.
8               And anybody would know that Cathy
9 Chase had been the midwife before I arrived, so
10 the statistics should have gone up then; but it
11 was only after I arrived.  Because a lot of the
12 patients who were going off island because they
13 did not want Dr. Lew taking care of them chose to
14 stay on island and have their babies here.
15               So with that history, there was no
16 other reason that he would not — I'm fully
17 qualified to do this job.  It has since evolved
18 that he tells me one thing, he puts in the
19 newspaper another; he says one thing today, he
20 said I'm being terminated because I only did
21 obstetrics, that I had very few patients.  It is
22 certainly evident that that is not the truth
23 because I increased the gynecological statistics
24 when I came here.

241

```
 1              I operated on patients, who were all
 2   satisfied.  I won't say all, but in general, they
 3   were satisfied.  This practice over here started
 4   with nothing.  They would not have had a
 5   midwifery practice had I not been on island and
 6   started the way it did.  So I saw -- and I was
 7   never offered the opportunity -- it was never
 8   discussed with me at any time during my tenure,
 9   Dr. Hughes, we don't feel you are doing a good
10   job, we don't feel that you are doing enough
11   patients, we would like somebody to work five
12   days a week, can you do that?  I never heard
13   that, Administration thinks you've done a poor
14   job, so, therefore, we're looking for somebody
15   else.
16              I probably did more office
17   gynecology than had been done on this island for
18   a long time, including office operations, which I
19   understand now have been taken out of the office
20   and put in the operating room, which costs the
21   patient about ten times as much money not to have
22   an office procedure.
23              So as I recall, those were enough
24   reasons that I put on paper.  You have me -- I'm
```

Carolyn Haddox, RPR
(508)420-5691

242

```
 1   a known entity, the patients liked me, the
 2   midwife liked me, my office staff liked me.  Why
 3   wouldn't I be given an opportunity to at least
 4   discuss the future of this institution?  Why
 5   wouldn't I be critiqued at some point if I were
 6   not doing a good job?  None of this happened.
 7   None of it happened.  And it all began to go
 8   downhill with this administration that is present
 9   here.
10              I went to Mr. Chisholm and I asked
11   if I could use my leftover CME money to go to a
12   conference this year.  Mr. Chisholm informed me
13   he would take it up with Mr. Birchill.  That was
14   refused.  I went to Mr. Chisholm and asked if he
15   could get me a computer.  He said he would take
16   it up with Mr. Walsh.  That was refused.  So I've
17   got no benefits since Mr. Walsh has been here,
18   and I've come to the conclusion, with his
19   history, it had to be race from him.
20              MR. SCHULTZ:   Can I take my fast
21   break?  Are you almost done, or --
22              MR. SHIRLEY:   No, by all means, take
23   a break.  Let's all take a break.
24              (Recess taken from 4:23 p.m. to
```

Carolyn Haddox, RPR
(508)420-5691

243

```
 1   4:27 p.m.)
 2   BY MR. SHIRLEY:
 3         Q.    Dr. Hughes, does that complete your
 4   answer with respect to why you believe Mr. Walsh
 5   was motivated by racial animus in making the
 6   decision to terminate your contract?
 7         A.    I'm sorry, the question again?
 8         Q.    Have you given me all of the reasons
 9   why you believe Mr. Walsh was motivated by racial
10   animus in reaching the decision to terminate your
11   contract?
12         A.    Well, I said mostly race, but I
13   really -- I've probably given all the reasons,
14   but I also believe with Mr. Walsh, as with
15   everybody else, that both age and race played a
16   significant role in my termination.  Both of
17   them, not just race.
18         Q.    It's interesting, before the break,
19   I believe you testified that you were not sure if
20   age did play a role; after the break, you've said
21   that it certainly did.  What caused you to change
22   your testimony so dramatically from what it was
23   just before the break?
24         A.    Well, because when I started
```

Carolyn Haddox, RPR
(508)420-5691

244

```
 1   discussing what had happened in '02 with age, I
 2   sort of got on the bandwagon of talking about
 3   race with Mr. Walsh.  But I believe it's a
 4   combination of the two.
 5         Q.    Well, I am confident I put my
 6   question to you about age before you ever turned
 7   to the subject of race.  But be that as it may,
 8   why do you now, five minutes after your prior
 9   testimony, immediately after a return from break,
10   believe that your age was also a factor in
11   Mr. Walsh's decision?
12         A.    Well, I tell you, after something
13   like five hours of testimony, it's hard to get
14   everything together at every minute of the day,
15   and my mind was concentrating on Mr. Walsh and
16   his background.  And in that discussion, I didn't
17   concentrate on the combination of the two, which
18   I think is more pertinent than anything else.
19         Q.    Let me try to pose the question
20   again, if I could.  Why do you now believe that
21   age was also a consideration in Mr. Walsh's
22   decision?
23         A.    Because I think the combination of
24   the two had to be used together.
```

Carolyn Haddox, RPR
(508)420-5691

245

1      Q.    What do you mean by that?
2      A.    That's all I can come up with.
3      Q.    Does that complete your answer as to
4  why you believe your age was a factor in his
5  decision?
6      A.    Well, why else would they think I'm
7  not capable of or didn't allow me to pursue doing
8  office hours five days a week?
9      Q.    Dr. Hughes, with respect, I'm not
10  here to answer your questions.
11      MR. SHIRLEY:    Can I have the
12  question read back, please?
13      THE WITNESS:    I'm speaking in terms
14  of --
15      MR. SCHULTZ:    I think it's a
16  rhetorical answer.  I think he's trying to ask
17  you a question.
18      MR. SHIRLEY:    I need an answer to my
19  question.  I don't need a rhetorical question in
20  response.
21      A.    Because they didn't give me the
22  opportunity to do five days a week in the office
23  if they thought that's what needed to be done,
24  although there are not enough patients to do

Carolyn Haddox, RPR
(508)420-5691

246

1  that.  I cannot come up with a specific incident
2  which would point to age or race as a matter of
3  fact, I just think the combination of the two was
4  the reason they wouldn't allow me to continue in
5  this position.
6      Q.    Does that complete your answer as to
7  why you believe age in particular was a factor in
8  their decision?
9      A.    At present, that's all I can answer.
10      Q.    Take as much time as you need unless
11  you want to come back and do it again.
12      A.    No, at present, that's all I recall.
13      Q.    Will taking any additional time
14  enable you to provide a more complete answer if
15  one is appropriate?
16      A.    I cannot come up at this time with
17  anything else, at this time.
18      Q.    What would change such that you
19  would have a different answer?
20      A.    My memory.  I could remember
21  incidents that came up.  I can remember.  If they
22  come up, I'll remember.  You don't remember
23  everything sitting in this chair, so sometimes I
24  might remember something that I completely didn't

Carolyn Haddox, RPR
(508)420-5691

247

1  think of sitting here.
2      Q.    I just want the record to be clear
3  that I'm trying to give you every opportunity to
4  remember anything and everything relevant to this
5  issue.
6      A.    My answer to that is that it is
7  impossible for me, sitting in this chair, to
8  remember everything that happened to me in three
9  years.
10      Q.    I'm asking you to talk about your
11  complaint in a Federal Court action alleging age
12  and race discrimination.  I'm not asking you to
13  recover everything that happened to you in the
14  course of three years.  Is that clear?
15      A.    That's clear.
16      Q.    Okay, let's move on.
17      MR. SCHULTZ:    Let's cut the sarcasm
18  and the tone of this again, which I do object to
19  on the record.  I know a record never shows tone
20  of voice, but I'm simply willing to note that it
21  was biting, loud, and unnecessary.
22      MR. SHIRLEY:    Your characterization
23  is inaccurate and unwarranted.
24      MR. SCHULTZ:    Which is the problem

Carolyn Haddox, RPR
(508)420-5691

248

1  with a deposition transcript.  One will never
2  know why I just decided to make up that fact,
3  which I obviously did not.  That being the first
4  sarcasm on my part.
5      MR. SHIRLEY:    May we continue,
6  Mr. Schulz?
7      MR. SCHULTZ:    Please, go ahead.
8      MR. SHIRLEY:    Do I have permission
9  to do so?
10      MR. SCHULTZ:    You don't need my
11  permission.
12      MR. SHIRLEY:    That had been my prior
13  understanding.
14      MR. SCHULTZ:    Yes.
15  BY MR. SHIRLEY:
16      Q.    Dr. Hughes, I'll represent to you
17  that in your complaint in this action you allege,
18  among other things, that in February 2002,
19  Dr. Koehler refused to perform operations with
20  you or back you up for your operations for
21  approximately six months.  Is that true?
22      A.    That is true.  He made a statement
23  at the medical staff meeting that he would not
24  back me up in the operating room.

Carolyn Haddox, RPR
(508)420-5691

257

```
1        A.    Yes.
2        Q.    And what's the basis for that
3  assertion?
4        A.    Because there were no African
5  Americans on staff at that time.  There's one
6  now, but that was hired after I left.  There
7  hadn't been any on here, and I had been here and
8  done a good job.
9        Q.    Who was the African American
10 physician who was hired subsequent to your
11 contract termination?
12       A.    I don't remember his name.
13       Q.    Is that Dr. Morris?
14       A.    I guess.
15       Q.    How do you explain his hiring?
16       A.    I have no idea, but he was the first
17 after me.  After me.
18       Q.    I understand.
19             MR. SCHULTZ:    There's no question.
20 BY MR. SHIRLEY:
21       Q.    Do you believe that his race played
22 any role in his hiring?
23       A.    I have no idea.
24       Q.    Do you have an explanation as to
```

258

```
1  why, if you are correct, the hospital would have
2  terminated you because you are African American,
3  yet hired him knowing he was African American?
4        A.    They terminated me because they had
5  no reason to terminate me.  Why they hired
6  Dr. Morris, I don't know.
7        Q.    Do you not understand my question?
8             MR. SCHULTZ:    I think he said he
9  doesn't know.
10       A.    I don't know.
11            MR. SHIRLEY:    If the answer is I
12 don't know, I didn't understand it to be that.
13 But if you are testifying for him, Steve --
14            MR. SCHULTZ:    I don't think I am.
15 Do you want what he said repeated?
16            MR. SHIRLEY:    I caught a much longer
17 answer than that, but maybe you didn't.
18 BY MR. SHIRLEY:
19       Q.    Dr. Hughes, I'll represent to you
20 that in your complaint you assert, upon
21 information and belief, that you worked
22 equivalent hours to the hours being worked by
23 Dr. Donegan.
24            Do you believe that to be true?
```

259

```
1        A.    I believe that to be true, yes.
2        Q.    And what's the basis for that
3  assertion?
4        A.    Because there are not enough
5  patients to fill five days a week on this island,
6  so he can't -- and nobody else -- the documents
7  that we received for the three surgeons --
8             MR. SCHULTZ:    He's just asking you
9  about Dr. Donegan.
10       A.    Oh.  Because there are not enough
11 patients to have five days a week office hours.
12       Q.    Or more than a day and a half a
13 week --
14       A.    Or more than a day and a half.
15       Q.    -- office hours?
16       A.    Or more than a day and a half.
17       Q.    Dr. Hughes, I think you testified
18 that on one occasion Mr. Walsh told you that he
19 didn't like getting letters from lawyers and
20 phone calls from the members of the board of
21 trustees; is that correct?
22       A.    Yes.
23       Q.    Do you have any reason to believe
24 that he sincerely didn't like those things?
```

260

```
1        A.    Sorry?
2        Q.    Do you have any reason to believe
3  that he was lying about that?
4        A.    No.
5        Q.    Do you have any reason to believe
6  that he didn't find that you were difficult to
7  work with?
8        A.    Mr. Walsh hadn't worked with me.
9        Q.    Therefore, the answer to my question
10 would be what, sir?
11       A.    Ask it again.  Did he find me
12 difficult to work with?  No.
13       Q.    Did anyone, to your knowledge?
14       A.    To my knowledge, I wouldn't say so.
15       Q.    Dr. Hughes, in your MCAD charge you
16 assert or asserted that you believed you were
17 terminated because the hospital viewed you as the
18 stereotypical uppity 72-year-old black man.  Do
19 you recall that?
20       A.    Yes, I recall that.
21       Q.    What is a stereotypical uppity
22 72-year-old black man?
23       A.    One who stands up for his rights and
24 speaks out and speaks his mind and carries
```

1    himself in proper manner.
2        Q.    And that's a stereotype?
3        A.    I would say so, yes.
4        Q.    I have only one copy of the
5    hospital's position statement to the MCAD in
6    response to your charge. Let me ask you this
7    though: Have you seen that position statement
8    before?
9        A.    Of the hospital?
10        Q.    Yes.
11        A.    I believe so.
12        MR. SHIRLEY:    If your counsel would
13    permit, what I would like to do is just ask you
14    one or two questions about it, and because I only
15    have one copy, if I can physically go around to
16    your side of the table and point out what I'm
17    referring to?
18        MR. SCHULTZ:    No problems with that.
19        MR. SHIRLEY:    Thank you.
20    BY MR. SHIRLEY:
21        Q.    On page 3, a statement is made that
22    you did not have an independent obstetrics
23    practice. My question to you is: Do you agree
24    with that statement?

1        A.    I would agree with that, yes.
2        Q.    Just continuing down the page, some
3    numbers are given relative to how many OB/GYN
4    procedures were performed in the hospital from
5    April 2001 to the present, and it is stated that
6    257 OB/GYN procedures were performed in the
7    hospital during that timeframe.
8        Do you have any reason to believe
9    that that is not the right number?
10        A.    I can't answer that because I don't
11    know how they formulated that statistic at all.
12        Q.    Fair enough. The statement is made
13    that you performed 110 of those 257 procedures.
14    Same question: Do you have any idea whether that
15    is true or not?
16        A.    I would say that the percentages are
17    true, whatever the figures are, and 110 is -- I
18    take the same answer. But I'm sure I performed
19    at least 75 percent of the procedures, yes. Are
20    they talking of OB/GYN, or -- I don't know if
21    they separated them or not. Let me see.
22        (Reviewing document.) OB/GYN
23    procedures I did 110? I can't say how they -- I
24    can't say whether they are accurate or not.

1        Q.    Fair enough. Did you maintain any
2    records of your own relative to how many OB/GYN
3    procedures you performed?
4        A.    Personally?
5        Q.    Yes.
6        A.    I don't think I did.
7        Q.    Did you maintain any records of your
8    own relative to how many deliveries you
9    performed?
10        A.    I did not.
11        Q.    I'm going to ask you to review our
12    next exhibit, please.
13        (Exhibit Number 51 was marked for
14    identification.)
15    BY MR. SHIRLEY:
16        Q.    Let me know when you are ready for
17    the next question, please.
18        A.    (Reviewing document.) I'm ready.
19        Q.    Do you have any reason to disagree
20    with the information set forth on this exhibit?
21        A.    Again, I can't agree or disagree
22    because I don't know where they were compiled
23    from or how.
24        Q.    Is it your understanding, Doctor,

1    that the number of cases for which you were
2    responsible dropped from 98 to 68?
3        A.    That's possible.
4        Q.    Do you know why that would be?
5        A.    No, I don't know why that would be.
6    I can't really recall why that would be. A lot
7    of that time I couldn't go into the operating
8    room because I had no backup. If Koehler was on
9    call, I couldn't operate because he wouldn't back
10    me up if I got into a complication. And GYN
11    varies from year to year, also, but --
12        Q.    Doctor, again with apologies to you
13    and counsel, I only have a single copy of the
14    hospital's response to your interrogatories, so
15    if I could, I'm going to again put before you
16    what I would like you to focus on and then ask
17    you just a question or two about it. My question
18    will be directed to the response to Interrogatory
19    Number 13.
20        MR. SCHULTZ:    This is the hospital's
21    response?
22        MR. SHIRLEY:    It is.
23    BY MR. SHIRLEY:
24        Q.    In fact, let me just place it before

265

```
1   you, and I'll ask you to please review the
2   hospital's response. I will tell you that my
3   question will be: Do you have any reason to
4   believe that the information in that response is
5   not accurate?
6        A.    Which one? Thirteen?
7        Q.    Thirteen. You'll see both the
8   question and then the answer there.
9        A.    (Reviewing document.)
10            MR. SCHULTZ: I would simply object
11  to the extent that you are asking him to answer a
12  legal question as to what is a minority. I don't
13  think he's qualified to do that. But if you are
14  simply asking him whether or not he believes
15  these are the people who would be Hispanic or
16  Asian or Indian, that he could answer. But
17  whether or not an Asian person would be
18  considered to be a minority, I think that's
19  beyond his ability to answer.
20       A.    The question, however, says the
21  number of active staff members. None of these
22  minorities are active staff members.
23       Q.    Putting to one side the question,
24  let's just focus on the listing of physicians in
```

266

```
1   2003 and 2004.
2        A.    Okay.
3        Q.    Do you believe that any of those
4   physicians for whom there's information, that
5   that information is actually incorrect?
6        A.    (Reviewing document.) I have no
7   reason to believe that as far as I can see. You
8   mean the whole page, or just this?
9        Q.    No, Doctor, just the listing of
10  physicians down on the bottom of that next page.
11       A.    As I look at it now, I have no
12  reason to believe that that is incorrect.
13       Q.    Thank you, Doctor. Do you have any
14  idea what the year-round African American
15  population is on the island?
16       A.    I do not.
17       Q.    Are you aware of any African
18  American physicians on the island who you believe
19  have been improperly denied medical staff
20  privileges at the hospital?
21       A.    I do not know that answer.
22       Q.    Are you aware of any African
23  American physicians at Martha's Vineyard Hospital
24  who you believe have been improperly denied
```

267

```
1   employment with the hospital or any hospital
2   related entity?
3        A.    I do not.
4        Q.    Do you believe that any other
5   African American physician has been discriminated
6   against by the hospital since you first were on
7   the staff?
8        A.    There were no active African
9   Americans on there except me.
10       Q.    Without qualifying active,
11  replacement, associate, my question to you was,
12  please -- and I think it was clear -- do you
13  believe that any African American physicians on
14  the staff have been the subject of discrimination
15  because of their race?
16       A.    I cannot answer that. I don't know.
17       Q.    I'm going to ask you, please, to
18  turn to the hospital's Answer to Interrogatory
19  Number 17, and let me know when you are ready for
20  my next question.
21       A.    (Reviewing document.)
22       Q.    All set?
23       A.    Uh-huh.
24       Q.    Again, with your counsel's
```

268

```
1   permission, let me circle around to your side of
2   the table so I can see that while I'm asking you
3   these next questions.
4            Dr. Hughes, do you agree that you
5   often refused to cover Catherine Chase's
6   vacations?
7        A.    I do not agree.
8        Q.    Do you agree that when you did
9   provide coverage, you shared coverage with a
10  nurse midwife?
11       A.    Shared would not be the correct
12  term. A nurse midwife was here on one occasion
13  and did eight hours.
14       Q.    Do you agree that you refused to
15  cover her summer 2003 vacation?
16       A.    Summer 2003 is the vacation that I
17  discussed previously after the hospital was
18  searching for another physician. I did not
19  refuse to cover, I informed her I would cover if
20  administration asked me to cover.
21       Q.    Is it true that in early
22  September 2003, you informed Linda Bereswill that
23  you were not going to take call anymore?
24       A.    I don't recall that I did that.
```

**273**

1  board and try to help me.
2  Q. You then wrote a letter to
3  Dr. Gurney?
4  A. Yes.
5  Q. We talked about this conversation
6  earlier?
7  A. Yes.
8  Q. This is the conversation that led to
9  your letter to Dr. Gurney?
10  A. Yes.
11  Q. All right, thank you. Turn, please,
12  if you would, to page 6.
13  A. (Witness complies.)
14  Q. And review the second paragraph on
15  that page, please.
16  A. (Reviewing document.)
17  Q. Is this the conversation you
18  described for me earlier today with yourself and
19  your wife and Mr. Ferguson?
20  A. Yes.
21  Q. Is this a precise quote, that he
22  told you it wasn't his concern?
23  A. I cannot say it's a precise quote,
24  but in essence, that's what was told to me.

**274**

1  Q. In essence, didn't he tell you that
2  your concerns should be presented to the CEO of
3  the hospital?
4  A. He told me to take it to Tim Walsh.
5  Q. Who was the CEO of the hospital?
6  A. Yes.
7  Q. Please turn to the next paragraph on
8  this page.
9  A. (Witness complies.)
10  Q. Am I correct in understanding that
11  complaints to the Board of Registration can be
12  made on an anonymous basis?
13  A. From what I understand, that's true.
14  Q. Given that, what, if anything, could
15  Mr. Sweet hope to do relative to the complaint
16  that had been filed against you?
17  A. I had no idea what he could do, but
18  I thought someone should be aware of what was
19  happening in this institution.
20  Q. Turn if you would, please, to
21  page 9.
22  A. (Witness complies.)
23  Q. Review the second paragraph at the
24  top of that page.

**275**

1  A. (Reviewing document.)
2  Q. Do you believe that Dr. Pil should
3  have been subject to monitoring?
4  A. If it were true that that was the
5  standard of this hospital, yes.
6  Q. And that is because he was just out
7  of surgical residency?
8  A. That's because, from what I was
9  told, they monitored all new physicians. I was
10  told afterwards that that's what they did, it was
11  the policy.
12  Q. Who told you that?
13  A. I would guess MacArthur.
14  Q. Well, we don't want you to guess.
15  A. MacArthur.
16  Q. Was it your belief that Dr. Fraser
17  should have been monitored?
18  A. Yes, yes.
19  Q. And what is the basis for that
20  belief?
21  A. She was a new physician on the
22  hospital and they did not know what her skills
23  were.
24  Q. Same question relative to

**276**

1  Dr. Donegan.
2  A. Yes.
3  Q. Doctor, is it your understanding
4  that every new physician would be monitored, or
5  only new physicians for whom recent, relevant
6  clinical experience could not be established?
7  A. I can't answer that question. From
8  what I recall, MacArthur told me that the new
9  physicians would be monitored in the operating
10  room. That's the only thing I know about.
11  Q. Turn if you would, please, to
12  page 10.
13  A. (Witness complies.)
14  Q. The top of that page, the paragraph
15  at the top, please.
16  A. (Reviewing document.) Yes.
17  Q. Was it your perspective that no
18  patient was under the care of Ms. Chase?
19  A. Obstetrical patient is what I said.
20  The obstetrical patients in the midwifery
21  practice, that they were not Cathy Chase's
22  independent patients.
23  Q. I'll represent to you that all three
24  of my children were born in a birthing center by

1  refused to do. And the CME money was there, I
2  had not used it, and I asked to use it to get a
3  computer. And when Mr. Chisholm went to him and
4  asked to allow my CME money to roll over for a
5  conference, which was a difference between maybe
6  two weeks of using last year's and this year's,
7  he refused to allow me to use CME money.
8          There was money that was allotted to
9  me that had not been used, and he refused to let
10  it go. I wasn't asking for additional income.
11  Those are several of the instances that I can
12  recall at the moment.
13      Q.   So you believed he wasn't impartial,
14  for example, because he didn't permit you to roll
15  over the CME money?
16      A.   Because of all of the things I just
17  stated. In contrast -- no.
18      Q.   I believe you told me that you
19  believe he was motivated, at least partly, by
20  racial animus in terminating your employment
21  because he had grown up in South Boston?
22      A.   I didn't say that.
23      Q.   I'm sorry, I thought that was a
24  reason you gave me supporting your belief that he

Carolyn Haddox, RPR
(508)420-5691

1  was motivated by race .
2      A.   That was some of the reason in his
3  background. I didn't say that was the reason he
4  terminated me. I didn't say that he grew up in
5  South Boston and terminated me because of that.
6  I don't think I said that.
7      Q.   What, if any, connection do you see
8  between Mr. Walsh's having grown up in South
9  Boston and your termination?
10      A.   It indicates a past history of
11  possibly some type of prejudice. It indicates.
12  I'm not --
13      Q.   I'm sorry, sir, are you asserting
14  that anyone who grew up in South Boston during
15  the busing crisis who is Caucasian is a suspected
16  racist?
17      A.   I didn't say that.
18      Q.   Then why --
19      A.   I did not say that.
20      Q.   What possible relevance could his
21  having grown up in South Boston have to do with
22  your termination, if not for that?
23      A.   I've already stated. Everybody who
24  grew up in South Boston didn't terminate me for

Carolyn Haddox, RPR
(508)420-5691

303

1  reason of age and race.
2      Q.   That's true. I believe in some
3  context you told me that you understood that
4  Mr. Walsh, during the time of the busing issues
5  in South Boston, had gone to a private school?
6      A.   So I was told.
7      Q.   And what possible connection do you
8  see between that and your termination?
9      A.   A background that it might be
10  possible. I didn't say it was. It might be
11  possible from that background.
12      Q.   Do you have any reason to believe
13  that the young Tim Walsh personally decided where
14  he would go to school because of racial animus?
15      A.   I have no idea. I can't answer
16  that.
17          MR. SHIRLEY:   I don't think I have
18  any further questions for you.
19          MR. SCHULTZ:   I have no questions.
20
21          (Whereupon the deposition was
22  concluded at 5:49 p.m.)
23
24

Carolyn Haddox, RPR
(508)420-5691

304

1          CERTIFICATE
2      I, DEURWARD L. HUGHES, M.D., do hereby
3  certify under the pains and penalties of perjury
4  that I have read the foregoing transcript of my
5  testimony, and further certify that said
6  transcript is a true and accurate record of said
7  testimony (with the exception of the following
8  corrections listed below):
9  Page    Line         Correction
10  ____    ____    _____
11  ____    ____    _____
12  ____    ____    _____
13  ____    ____    _____
14  ____    ____    _____
15  ____    ____    _____
16  ____    ____    _____
17  ____    ____    _____
18  ____    ____    _____
19  ____    ____    _____
20  ____    ____    _____
21  Signed under the pains and penalties of perjury
22  this _____ day of _____, 2005.
23
24          _____
           DEURWARD L. HUGHES, M.D.

Carolyn Haddox, RPR
(508)420-5691

# Exhibit 4

DEURWARD L. HUGHES, M. D.

10 DOLPHINE MERRY ROAD
P.O. BOX 1060
WEST TISBURY, MA 02575

May 10, 2000

Henry Nieder, M. D., Chief of Staff
Martha's Vineyard Hospital
P.O. Box 1477
Oak Bluffs, MA 02557

Dear Dr. Nieder:

I respectfully request an application for staff privileges at Martha's Vineyard Hospital. I have
owned a house on Martha's Vineyard for several years and I will be moving to Martha's Vineyard
as of July 1, 2000. I am a board-certified obstetrician and gynecologist, and will be leaving a
faculty position at Hahnemann-MCP University Hospital in late June. I intend to practice on
Martha's Vineyard and would like the opportunity to do work at Martha's Vineyard Hospital. I
feel that I have a contribution to make to the medical well-being of the Martha's Vineyard
community.

Thank you for your attention to this request.

Yours truly,

*R.L. Hughes*

Deurward L. Hughes, M. D.

DLH:sfc

cc:    Kevin R. Burchill, J.D.
       CEO, Martha's Vineyard Hospital

EXHIBIT
Hughes
3
2-15-05

PENGAD 800-631-6989

CONFIDENTIAL
MVH 0247

# Exhibit 5





Fred B. Morgan, Jr.
*Chairman, Board of Trustees*

Kevin R. Burchill, J.D.
*Chief Executive Officer*

December 15, 2000

Deurward L. Hughes, M.D.
PO Box 1060
West Tisbury, MA 02575

Dear Dr. Hughes:

This letter of understanding will serve to outline the OB/GYN coverage at Martha's Vineyard Hospital that you will independently contract for the 2001 calendar year.

| | |
|---|---|
| Coverage: | 84 of the 105 days that Dr. Lew is "away" |
| Quality Assurance: | Remuneration at $300/hour for chart review of OB/GYN service in support of the Medical QI Program and the Perinatal Committee (not included in salary). |
| Teaching: | Remuneration at $300/hour for nursing teaching/in-services as well as any scheduled Medical Staff Rounds topics (not included in salary). |
| Malpractice: | $2M/$6M coverage to be paid by Martha's Vineyard Hospital as part of your total compensation. |
| Salary: | $1,500 bi-weekly payment will be made to compensate you for OB coverage ($39,000 per annum). If your coverage goes above 84 scheduled days, each additional day shall be paid at a rate of $600. |
| Coverage Days: | For purposes of this agreement, "coverage day" is a day in which at least 8 hours of service is provided. For example, if Dr. Lew signs out to you Friday at 4:00 p.m. to return Monday at 8:00 a.m. – that would count as 4 coverage days or if he signed out at |

**CONFIDENTIAL**
**MVH 0057**

"Here for your Health"

Post Office Box 1477 · Oak Bluffs · Massachusetts 02557 · 508 693-0410 · FAX 508-693-5971

4:00pm on Friday to return at 6:00pm on Sunday – that would count as 3 coverage days.

Privileges:    This agreement is subject to your acceptance to the Martha's Vineyard Hospital Medical Staff. Initially the appointment may be "Temporary" privileges. Thereafter, it will be as "Replacement" or in the future as "Active".

Offered by:    _____

Kevin R. Burchill, J.D.
Chief Executive Officer

_____
Date

_____
Deurward L. Hughes, M.D.

_____
Date

Note Below:    This contract may be assigned from Martha's Vineyard Hospital, Inc. to MVH Physicians, Inc. and all terms herein shall remain in full force and effect.

Election of Payments:    _____ W2 Earnings Salary

_____ 1099 Income QA/Teaching

_____
Initials

_____
Date

_____
Initials

_____
Date

CONFIDENTIAL
MVH 0058

"Here for your Health"

# Exhibit 6

1

Pages:     1-116

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

DOCKET NO. 04-10564-DPW

***********************************

DEURWARD L. HUGHES                    *

    Plaintiff                        *

vs.                                   *

MARTHA'S VINEYARD HOSPITAL            *

    Defendant                        *

***********************************


    DEPOSITION of JOHN MacARTHUR, a Witness called by

the Plaintiff, taken pursuant to the provisions of the

Federal Rules of Civil Procedure, before Peter J.

Wood, a Professional Court Reporter and Notary Public

in and for the Commonwealth of Massachusetts, at

Martha's Vineyard Hospital, Martha's Vineyard,

Massachusetts, on Friday, February 18, 2005,

commencing at 12:45 p.m.


**WOOD COURT & CONFERENCE REPORTING**
**77 SUMMER STREET**
**COHASSET, MA 02025**
**(781) 383-6621**

7

1    Q    Were you chief of staff at Martha's Vineyard
2         Hospital at some time?
3    A    Yes.
4    Q    During what years were you chief of staff?
5    A    Maybe late '99 to 2003, something like that.
6    Q    Do you recall when in 2003 you stopped being
7         chief of staff?
8    A    Probably Jan. 1.
9    Q    So during none of 2003 were you chief of staff;
10        is that correct?
11   A    Jan. 1.
12   Q    Of 2004?
13   A    2004.
14   Q    So all of 2003?
15   A    I think so, yeah.  I'm not dead certain on that.
16   Q    How old are you?
17   A    Seventy-one.
18   Q    As an older doctor, have you ever encountered
19        anyone who felt you were not up to the job
20        because of your age?
21             MS. EDSON:  Objection.
22             THE WITNESS:  You want me to answer it
23        anyway?
24             MS. EDSON:  You can go ahead and

WOOD COURT & CONFERENCE REPORTING

19

1           days a week, is she?

2      A    I haven't any idea.

3      Q    You were the person responsible, were you not,

4           for checking Dr. Hughes' references when he

5           applied for privileges at the hospital?

6      A    Yes, I was one of them.

7      Q    Who else was?

8      A    I can't recall now.

9      Q    Was there somebody else?

10     A    I think so.

11     Q    Did you personally make phone calls checking

12          references on Dr. Hughes?

13     A    Yes.

14     Q    How many people do you recall calling?

15     A    I recall two, possibly more.  Two, I'm pretty

16          sure.

17                    MR. SCHULTZ:  Let's mark as Exhibit

18          Number 2 a letter to you, Dr. MacArthur, from Dr.

19          Butterick dated October 30, 2000.

20                         (Whereupon the Letter to Dr.

21                         MacArthur from Dr. Butterick dated

22                         10/30/00 was Marked Exhibit No.

23                         2.)

24     Q    Do you see the handwriting on the bottom of the

40

1    Q    You, in fact, talked to this individual on the

2         telephone as well; isn't that correct?

3    A    I believe that's correct, yes.

4    Q    You had the opportunity to ask this individual

5         any question you wanted to ask; isn't that

6         correct?

7    A    Yes.  What I didn't get was an answer.

8    Q    Exactly what question didn't he answer?

9    A    I asked for some kind of documentation of actual

10        activity in obstetrics and/or gynecology during a

11        previous period of time, any time, six months, a

12        year, two years.

13   Q    So what he wouldn't give you were the records of

14        patient care?

15   A    No, cases done, outcome, quality assurance

16        evaluations.

17   Q    Isn't it this hospital's position that that

18        information is privileged?

19   A    It's not privileged to give out that kind of

20        information as long as you don't identify any

21        patients and as long as you don't indicate that

22        there was -- if there were no quality problems,

23        then there shouldn't have been a problem, right?

24   Q    I'm just asking you, are you saying it's not this

WOOD COURT & CONFERENCE REPORTING

47

1    wanted.

2    Q    But from your handwriting, it's indicated that

3         you talked to Dr. Woodland, and you talked to Dr.

4         Schneider.  There was no, at least on that note,

5         any indication that you had talked to Dr. Rosen;

6         isn't that correct?

7              MS. EDSON:  Objection.

8    A    That's correct.

9    Q    Do you recall talking to a female doctor, or do

10        you recall only talking to male doctors?

11   A    I don't recall.

12   Q    It was also your best guess that if anybody else

13        made the phone call, it would have been Dr.

14        London; isn't that correct?

15   A    I don't like guessing.

16   Q    I understand.  Well, the record will speak for

17        itself.  Who first suggested that Dr. Hughes be

18        monitored in the operating room?

19   A    It may have been me.

20   Q    Again, since you don't like guessing, was it you?

21   A    I don't recall.

22   Q    So you have no recollection of who first made the

23        suggestion?

24   A    No.

WOOD COURT & CONFERENCE REPORTING

48

1    Q    Who made the decision to monitor Dr. Hughes in

2         the operating room?

3    A    I did.

4    Q    Who else, if anyone, was involved in this

5         decision?

6    A    The Executive Committee.  Yes, either the

7         Executive Committee or the Credentials Committee.

8         If they were the same, I don't recall at that

9         time.  They are now.

10   Q    Was there a discussion in the Executive Committee

11        regarding your desire to monitor Dr. Hughes?

12             MS. EDSON:  Objection.

13   A    I don't recall whether there was a lot of

14        discussion or not.

15   Q    But you do have a recollection of this issue

16        being discussed in the Executive Committee?

17   A    Yes.

18   Q    Why was Dr. Hughes monitored in the operating

19        room?

20   A    Because we couldn't find out what he had actually

21        done in the previous period of time.

22   Q    Did you ask Dr. Hughes for this information?

23   A    Yes.

24   Q    What exactly did you ask him for?

49

1    A    We asked him for some statement of what actual
2         cases he had done, and he refused to do that.
3    Q    Didn't you say one of the issues was you were
4         just concerned about volumes, not the specific
5         cases?  Didn't you tell me that earlier?
6    A    Not necessarily specific cases, vaginal
7         hysterectomies, how many; abdominal
8         hysterectomies, how many; you know, did they live
9         or die.
10   Q    Are you saying that Dr. Hughes refused to tell
11        you how many vaginal hysterectomies he had
12        performed?
13   A    Yes.
14   Q    Specifically, you didn't ask him for all of his
15        records, you asked him for statistical
16        information; is that what you're saying?
17   A    We asked him for a review of the cases he had
18        previously done.
19   Q    So you didn't ask him for statistical
20        information; is that correct?
21   A    Well, that would depend on how he interpreted the
22        issue, wouldn't it?
23   Q    No.  It would depend on what you asked him for.
24   A    I asked him for a case listing.  I asked him for

51

1    frame he chose would be okay.

2  Q    In response to that question, I assume he would

3       simply say what do you want to know about my

4       experience, so what did you ask him about

5       records?  What did you ask him as to providing

6       you with records?

7  A    Well, I cannot recall exactly what I said.

8  Q    Give me the gist of it.

9  A    The gist of it was just what I've said two

10      minutes ago.  We wanted to know specifically how

11      many and what type of cases he'd done in a period

12      of time preceding his coming to Martha's Vineyard

13      Hospital.

14  Q    So you didn't ask him for the cases records.  You

15      just wanted to know what type of cases he had

16      done; is that correct?

17  A    We wanted to know what his experience was, yes.

18  Q    Did you ask him for the case records themselves?

19  A    No.  I couldn't get case records.  I mean, you

20      can't have those.

21  Q    For how long did you actually monitor Dr. Hughes?

22  A    I don't recall how long.

23  Q    A couple of months?

24  A    I would think, yes.

52

1    Q    Do you recall how many procedures you monitored,

2         ballpark?

3    A    I scrubbed in on a couple, maybe watched him on

4         two or three others.

5    Q    Were there any bad results?

6                   MS. EDSON:   Objection.

7    A    No.

8    Q    Did you offer any critique of the procedures that

9         you had observed?

10   A    Perhaps.

11   Q    Again, none of us want guessing, so I don't know

12        what perhaps means.

13   A    I may have.

14   Q    Do you have any recollection of offering any

15        critique of any of the procedures you observed?

16   A    We talked about something, and I can't remember

17        what it was, but specific, no.

18   Q    Let's go back to the request for the records.

19        Dr. Hughes refused to give you records, putting

20        aside a dispute as to exactly what he was asked;

21        isn't that correct?  He didn't give you any

22        records?

23   A    He didn't give us any numbers.

24   Q    When he refused to give you what you requested,

WOOD COURT & CONFERENCE REPORTING

53

1     what did you do?

2   A   Well, I think at first, we requested three years.

3       I think that's correct.  Then we reduced the

4       request to six months, and still there was

5       nothing forthcoming, and clearly what we wanted

6       to be sure of was that his performance would be

7       satisfactory.  I mean, we have nothing in the

8       bylaws that says you can request -- for all I

9       knew, he had Parkinson's disease.  He didn't, but

10      I had no way of requesting -- the Medical

11      Executive Committee had no way of requesting a

12      physical exam, for instance, or a neurologic exam

13      to be sure that this individual was able to

14      operate.

15  Q   He had just been at a hospital in Pennsylvania.

16      There was nothing stopping you from asking them,

17      any of the references, if Dr. Hughes had any

18      physical problems; isn't that correct?

19  A   There's nothing stopping one from asking the

20      question.

21  Q   Did anyone refuse to give you information

22      regarding his physical ability to practice at

23      this point?

24  A   Well, no.  On the other hand, unless they want to