# Affidavit of Gretchen Edson Part 3

# Exhibit 7



Deurward Hughes. MD
10 Dolphine Merry Rd.
West Tisbury, MA   02575

February 23, 2001

Dear Dr. Hughes:

I am pleased to advise you that at the Board of Trustees Credentials Subcommittee meeting held on February 23, 2001, the Board of Trustees Credentials Subcommittee approved your membership on the Provisional Active Staff with privileges in Obstetrics/Gynecology.

Your staff membership and clinical privileges have been approved for one year and are consistent with your application for Active membership and clinical privileges as submitted and approved by the Executive Committee of the Medical Staff.

On behalf of the Board of Trustees, I would like to extend my congratulations to you on your appointment. I look forward to working with you.

Sincerely,

Kevin Burchill
C.E.O.



**MVH 0118**

# Exhibit 8



MARTHA'S
HOSPITAL
VINEYARD

Fred B. Morgan, Jr.
*Chairman, Board of Trustees*

Kevin R. Burchill, J.D.
*Chief Executive Officer*

March 30, 2001

Deurward L. Hughes, M.D.
P.O. Box 1060
West Tisbury, MA 02575

Re:     LETTER OF AGREEMENT

Dear Doctor Hughes:

Your engagement letter of 12/15/01 is hereby amended as follows and replaced with:

Compensation Package:
| | |
|---|---|
| Malpractice Premium | $ 45K |
| Dental Insurance* | $ 1K |
| Health Insurance** | $ 10K |
| Salary | $130K |
| CME & Dues/Subscription | $ 5K |

*Standard employee deduction applies - circa $15 per pay period for family coverage.
**Standard employee deduction applies - circa $120 per pay period for family coverage.
(Life and long-term disability will be standard hospital benefits.)

With this new letter of agreement and your Provisional Active Staff privileges as awarded on 2/23/01, we will finalize a complete agreement through MVH Physicians, Inc. through our attorney at Choate, Hall & Stewart.

Your responsibility will be to provide coverage for our hospital-based nurse mid-wife as of 4/1/01, fulfill any previous coverage commitments with Dr. Lew up to 5/1/01 (per accompanying letter), and to provide ongoing medical input with our OB/GYN program. A formal contract will be developed in the next few weeks.



"Here for your Health"

Coverage for your clinical supervision of the nurse mid-wife will be up to 50 days per year at MVH's expense; as well as the coverage within your specialty as defined in the Medical Staff by-laws.

All professional billings related to nurse mid-wifery coverage will be remitted to MVH or its affiliate MVH Physicians, Inc. We will also provide a $5K allowance for CME and dues/subscriptions.

Thank you.

Very truly yours,

Kevin R. Burchill, JD
Chief Executive Officer
KRB/amh

Accepted by:                    Deurward L. Hughes, M.D.                    Date

Addendum to the Coverage Agreement of Deurward L. Hughes:

This issue of coverage is to be worked out in the formal contract to follow.  If satisfactory coverage cannot be worked out with other MVH staff obstetrician – gynecologist (s), weekend coverage will be additional to the 80 days per year, at MVH's expense.

Accepted by: _____     _____
             Kevin R. Burchill, J.D                Date
             Chief Executive Officer

             _____     _____
             Deurward L. Hughes, M.D.              Date

# Exhibit 9

Employment Agreement

THIS EMPLOYMENT AGREEMENT is made and entered into as of this 1st day of April by and between MVH Physicians, Inc. Massachusetts not for profit corporation (the "Company") and, Deurward L. Hughes, M.D. in his individual capacity (the "Physician").

WHEREAS, Company is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts;

WHEREAS, Physician is licensed to practice medicine in the Commonwealth of Massachusetts;

WHEREAS, Company desires to provide OB/GYN health care and services to benefit patients and the community and believes that its employment of Physician will further these objectives and be in the best interests of Martha's Vineyard Hospital (the "Hospital") and the Martha's Vineyard Community;

WHEREAS, Hospital desires to contract with and employ the Physician and the Physician desires to be employed on the terms and conditions provided herein; and

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the parties agree as follows:

1. <u>Duties and Obligations of the Physician.</u>

1.1 <u>Generally.</u>  As of the Commencement Date, Physician shall practice medicine and render professional medical, administrative, supervisory, and collaborative midwifery practice oversight services at the level of expertise expected of a fully-trained physician.  Hospital shall provide Physician with the personnel, facilities, equipment, supplies and other items reasonably necessary to perform his obligations under this Agreement. The location of Physician's practice shall be at the Hospital.

1.2 <u>Time and Effort.</u>  During the term of this Agreement, the Physician shall devote sufficient time and effort for Physician to perform his duties under this Agreement.

1.3 <u>Qualifications.</u>  The Physician shall at all times during the term of this Agreement: (a) maintain a valid license to practice medicine in the Commonwealth of Massachusetts; (b) be a member in good standing on the Medical Staff of the Hospital with appropriate clinical privileges for OB/GYN services; (c) be board certified in OB/GYN; (d) be, and remain, a participating provider in the Medicare and Medicaid programs (Titles XVIII and XIX of the Social Security Act, respectively), and with any managed care program with which Hospital is now or hereafter becomes affiliated. This Agreement is not and should not be construed as any form of guarantee or assurance that


EXHIBIT
Hughes
21
2-15-05

the Physician will receive necessary Medical Staff membership or privileges for purposes of discharging responsibilities hereunder, and application, appointment, reappointment and granting of privileges shall be governed solely by the Medical Staff By Laws of the Hospital then in effect.

1.4    Independent Medical Judgment. It is expressly agreed by the parties hereto that Company shall not exercise control over Physician in his practice of medicine or the treatment of Company's patients, and that it shall not inhibit the freedom necessary for Physician to practice medicine in a manner, which assures that the interests of Company's patients are given primary consideration. It is expressly agreed by the parties that Hospital shall not exercise any control or discretion over the means, manner or method by which Physician provides professional services hereunder, and that Hospital shall not make any treatment decisions for any patient. Physician, in his sole discretion, shall treat patients; provided, however, that Physician shall not discriminate against anyone on the basis of sex, race, creed, color, religion, handicap, ability to pay or insurance carrier/payor. Company agrees it will not interfere with the care of patients who are delinquent in payments to Company.

1.5    Standards. The Physician shall provide services under this Agreement in accordance with (1) rules and regulations of the Hospital's Medical Staff, and (2) in compliance with all applicable statutes, regulations, rules and directives of federal, state and other governmental and regulatory bodies having jurisdiction over the Physician or the Hospital, including, but not limited to, the Massachusetts Board of Registration in Medicine; the By Laws, rules and regulations of the Hospital and its Medical Staff; applicable standards of the Joint Commission on Accreditation of Healthcare Organizations' and currently accepted and approved methods and practices applicable to the practice of medicine.

1.6    Assignment. The Physician hereby assigns and grants Company the right to bill and collect for all professional services rendered by the Physician pursuant to this Agreement, and all accounts receivable and the proceeds thereof arising out of such services. Physician shall maintain the necessary identification numbers to permit Company to bill third-party payors for clinical services which the Physician renders pursuant to this Agreement. Upon termination of this Agreement for any reason whatsoever, all such accounts receivable then outstanding shall be the sole and exclusive property of Company and not subject to any claim by the Physician.

1.7    Records and Reports. The Physician shall complete medical records in a legible fashion; and further as required by applicable laws and in keeping with generally accepted standards of record keeping and documentation and shall maintain and furnish Company with such records, reports and documentation evidencing the performance of the Physician's duties hereunder as may be requested by Company or required by applicable law.

1.8    Patient Billing. The fees for all professional services rendered by Physician under this Agreement shall be determined by the Company according to

2

the usual and customary fees for such services in Southeastern Massachusetts. Physician hereby acknowledges and agrees that all fees for professional services rendered by Physician while this Agreement is in effect shall be the exclusive property of Company, and that Physician shall have no right, title or interest in such fees. Physician shall endorse and assign to Company any payments that he may receive, both while this Agreement is in effect and following its termination, for services rendered by Physician while this Agreement was in effect. Physician shall determine and assign all procedure and diagnostic information for his professional services rendered which Company shall have converted to the appropriate billing codes. Physician shall execute in a timely manner any and all forms necessary to permit Company to bill and receive payments for services rendered by Physician under this Agreement.

      1.9   Coverage. Physician shall provide coverage for Company's hospital-based nurse midwife and shall fulfill any existing coverage commitments to Dr. Lew (up to 5/1/01).

2. Obligations of Hospital.

      2.1   Compensation.  Company shall pay the Physician for services rendered pursuant to this Agreement, compensation as set forth in Exhibit A.

      2.2   Fringe Benefits.  Company shall provide to the physician the fringe benefits as set forth in Exhibit B.

      2.3   Facilities and Services.  Company shall, at it's sole cost and expense, provide or arrange for the provision of secretarial assistance, clinical assistance, supplies and equipment suitable to the performance of the Physician's duties under this Agreement.

      2.4   Coverage.  Company will provide coverage for its OB/GYN Physician's collaborative practice and oversight of a nurse midwifery service at Hospital. Such coverage will be from so-called off-Island physicians, unless Physician deems on-Island physician coverage to be acceptable. Coverage for Physician's clinical supervision of the Company's nurse midwife will be up to 40 days for CME and vacation time plus an additional 52 days for every other weekend (or similar time) per year. Coverage within Physician's specialty shall be provided in accordance with the Hospital's Medical Staff by-laws.

3. Term and Termination.

3.1 Term. This Agreement shall commence on April 1, 2001, and shall have an initial term of 36 months (the "Initial Term"). Unless terminated in accordance with the provisions of this Section 3, this Agreement shall be automatically renewed for successive one year terms upon expiration of the Initial Term.

3.2 Voluntary Termination. At any time, either party may terminate this Agreement without cause by giving at least 180 days prior written notice to the other party, which notice shall specify the effective date for such termination.

3.3 Automatic Termination. This Agreement shall automatically terminate upon the death of Physician.

3.4 Termination by Company. This Agreement may be terminated immediately by Company prior to the end of the then current term, by giving written notice to Physician, upon the occurrence of any one or more of the following events:

3.4.1. The revocation of Physician's license to practice medicine in the Commonwealth of Massachusetts.

3.4.2. The loss of Physician's federal or state registration to prescribe and dispense controlled substances;

3.4.3. A final determination by the Hospital Board or a formally constituted committee thereof (which decision may be subject to Section 12 of this Agreement) that Physician has committed professional misconduct or a violation of the canons of medical ethics of the American Medical Association;

3.4.4. Any disability of Physician which shall preclude him from performing his responsibilities under this Agreement after 6 months of continuous leave. For purposes of this subsection, disability means a sickness or injury where, as a result of such sickness or injury, the physician is:

i) completely and continuously unable to perform the substantial and material duties of his regular occupation; and

ii) receiving treatment for the disabling condition and under the regular care and attendance of a licensed physician; and

iii) not gainfully employed in any occupation for which he is or becomes qualified by education, training, or experience; and

4

iv) eligible for payments of benefits under the Physician's personal and/or Hospital's long term disability insurance plan.

3.4.5. The inability to secure or maintain Physician's professional liability insurance coverage on account of Physician's professional actions;

3.4.6. Conviction of Physician, in any jurisdiction, of a felony or a crime involving moral turpitude;

3.4.7 A final determination by the Hospital Board or a formally constituted committee thereof, which decision may be subject to Section 12 of this Agreement, that Physician has negligently performed his obligations hereunder;

3.4.8. Habitual drunkenness, drug addiction or other substance abuse by Physician as determined by the Hospital Board or a formally constituted committee thereof;

3.4.9. Physician's permanent loss or summary suspension of medical staff privileges for reasons related to his fitness or competency to practice medicine at the hospital where he is required to maintain privileges as part of this Agreement; or

3.4.10. Exclusion of Physician from participation in the Medicare or Medicaid program; provided, however, that this provision shall not apply if such exclusion results solely (a) from mandated changes under applicable regulations and statutes or (b) because of the terms of this Agreement;

3.4.11 Except as otherwise provided in this Section 3.4, Physician fails or neglects to perform, keep or observe any term, provision, condition or covenant contained in this Agreement and the same is not cured or being cured to Company's reasonable satisfaction within thirty (30) days after Company gives Physician written notice identifying such default, provided that such a decision is subject to binding arbitration as set forth in Section 12 of this Agreement.

3.5    Termination by Physician. This Agreement may be terminated immediately by Physician prior to the end of the then current term, by giving written notice to Company, if Company fails or neglects to perform, keep or observe any term, provision, condition or covenant contained in this Agreement and the same is not cured or being cured to Physician's reasonable satisfaction within five (5) days after Physician gives Company notice identifying such default as to default in payment due Physician and within thirty (30) days after such notice as to other defaults. Notwithstanding anything herein to the contrary, Physician may terminate this Agreement prior to the end of the then current term by giving Company at least sixty (60) days written notice, (a)

5

upon the loss by Hospital of its hospital licenses or its accreditation by the Joint Commission on Accreditation for Healthcare Organizations or (b) if Physician's benefits are modified provided, however, that Physician may not terminate this Agreement if (i) the modification is mandated by a governmental agency or any changes in applicable legislation related thereto, or (ii) such modification is applicable to all similarly situated physicians.

4. <u>Notices.</u> Any notices permitted or required to be given hereunder shall be deemed properly given when delivered by hand or sent by certified mail, postage pre-paid, return receipt requested, as follows:

If to Company, to:

MVH Physicians, Inc.
PO Box 1477
Oak Bluffs, MA 02557
Attention:

With a copy to:

Martha's Vineyard Hospital
P.O. Box 1477
Oak Bluffs, MA 02557
Attention: Chief Executive Officer

If to the Physician, to:

Deurward L. Hughes, M.D.
P.O. Box 1060
West Tisbury, MA 02575

With a copy to:

with a copy to:
Harriet Franklin, Esq.
Stevens & Lee, PC
P.O. Box 236
Wayne, PA 19087

or such other person or address as any party may designate by notice duly given.

5. <u>Assignment.</u> Neither party may assign such parties rights or obligations under this Agreement without the prior written consent of the other party, provided that Company may assign the Agreement without prior consent, to any entity wholly owned or controlled by the Hospital or any Corporation which owns or controls the Hospital, as a related corporation.

6. <u>Severability.</u> Should any provision of this Agreement or application thereof be held invalid or unenforceable, the remainder of this Agreement shall not be affected and shall continue to be valid and enforceable to the fullest extent permitted by law unless to do so would defeat the purpose of this Agreement.

7. <u>Waiver.</u> The failure by a party at any time to require performance of any provision of this Agreement shall not constitute a waiver of such provision and shall not affect the right of such party to require performance at a later time.

8. <u>Confidentiality.</u> The parties agree to hold confidential the terms contained herein except to the extent that such terms need to be disclosed to effectuate the terms of this Agreement to close business advisors (such as accountants and attorneys). Any such disclosures shall be subject to the same confidentiality requirement.

6

9.  Exhibits:  Entire Agreement.  The annexed exhibits shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim
herein.  This Agreement, and the exhibits hereto, constitute the entire agreement of the parties hereto with respect to the subject matter hereof and shall supersede and render null and void all prior and contemporaneous agreements, whether written or oral, between the parties, hereto with respect to the subject matter hereof.

10.  Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

11.  Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

12.  Arbitration.  Any dispute between the, parties which cannot be handled informally shall be handled as follows:

(a)  If any dispute or controversy shall arise between the parties hereto with respect to: the making, construction, terms or interpretations of this Agreement; or the rights of any party hereto; or with respect to any transaction involved, the dispute or controversy shall be settled by binding arbitration conducted by one (1) arbitrator, who is selected from the panel of arbitrators of the American Arbitration Association, in accordance with the commercial arbitration rules of the American Arbitration Association.  Any reasonable costs associated with such arbitration proceedings shall be borne equally by the parties.  Where damages are at issue, the arbitrators are not empowered to award damages in excess of actual damages, nor are they empowered to award punitive damages in excess of actual damages, nor are they empowered to award punitive damages or attorney's fees.  Arbitrators are empowered only to decide upon all disputes, including monetary issues, by selecting either of the last best offers of either party.

(b)  Each party shall bear the costs of its own attorney's fees and other related legal services expenses.

IN WITNESS WHEREOF, the parties hereto set their hands to this Agreement as of the day and year first above written.

MVH Physicians, Inc.

By: _____     _____
    Richard H. Koehler, M.D., President      Witness

Date: _____     Date: _____


Physician

By: _____     _____
    Deurward L. Hughes, M.D.                 Witness

Date: _____     Date: _____

8

Exhibit A

<u>Compensation</u>

1. <u>Base Compensation.</u>

    1.1    During the first year of this Agreement, Company shall pay to Physician, the salary of $130,000 per annum (The "Base Compensation").

    1.2    At the end of each year during which this Agreement is in effect, and if the salaries of the Hospital's non-union employees have increased on average during the preceding year, The Base Compensation shall be increased by a percentage at least equivalent to the percentage increase of such Hospital non-union employee's salaries.

    1.3    In addition to Base Compensation, Physician shall be paid at a rate of $300. per hour for staff meetings, chart reviews, P&P development/updates, and similar activities (month-end invoices submitted by Physician).

    1.4    In addition to Base Compensation, Physician shall be paid at a rate of $300. per "minor" GYN procedure and $600 per "major" GYN procedure (month-end invoices submitted by Physician).

2.    <u>Housing.</u> Physician shall be responsible for his own housing.

EXHIBIT B

<u>Health and Dental Insurance:</u>
Company will provide family health and dental insurance at 95% of premium.

<u>Malpractice:</u>
Company will provide malpractice insurance in the amount of $2,000,000/$6,000,000 and will provide for so-called "tail insurance" in the event the Hospital purchases a claims-made policy.

<u>CME:</u>
Company shall provide $5000.00 annually to cover the cost of CME for physician selected conferences. The Hospital may require additional seminars to be attended at the Hospital's sole expense, which will not be charged to this fund or time allocation, and be for general programmatic development purposes.

Physician shall be entitled to 80 (or 2 business weeks) hours of leave per year to attend CME programs. These hours can be rolled over throughout the Initial Term of this Agreement.

<u>Vacation Leave:</u>
Physician shall be entitled to 240 hours (or 6 business weeks) of vacation per year. These hours shall accumulate bi-weekly and can roll over for the following year.

<u>Long-Term Disability Insurance:</u>
All physicians working 20+ hours per week will be covered by the Company provided long-term disability insurance policy. The face value of such policy shall reflects only income earned as an employee of Company.

<u>Pension:</u>
After one year of continuous employment, all physicians working more than 1040 hours in a calendar year are included in the Company's pension plan. It is the responsibility of the Physician to execute the appropriate documents through the Hospital's Human Resources department.

<u>Sick Leave:</u>
The sick leave policy for other full-time Hospital employees shall apply. Such sick leave and/or salary continuation will be funded by the Hospital shall serve to fund short-term disability term, so that Physician is funded for initial six months of time off (before LTD kicks in).

<u>Life Insurance:</u>
Company to provide Term Life Insurance at one times the Base Salary.

10

### First Amendment to Employment Agreement

Exhibit A – Base salary has been increased to $200,000 per annum for the year beginning 4/1/02 (Exhibit A).

This new base salary thereby incorporates the previous so-called "1099" payment provisions as outlined in the (1) 5/17/01 memo relative to additional duties/responsibilities (2) items 1.3 and 1.4 from your initial Exhibit A, and (3) the 1/17/02 on colposcopy remuneration.

Additionally, for your dutiful performance of the Voluntary Supervision of Practitioner "A" in March 2002 and for your willingness to cover his "vacation" while the MEC/Med QI Committee works out his educational remediation plan, a one-time bonus of $10,000 has been awarded to you.

_____
Deurward L. Hughes, M.D.

_____
Kevin R. Burchill
Chief Executive Officer

4-5-02
_____
Date

_____
Date

_____
Witness

_____
Witness

# Exhibit 10

# DEURWARD L. HUGHES, M.D.

July 2, 2001

John MacArthur, M.D.
Chief of Staff
Martha's Vineyard Hospital
One Hospital Road
Oak Bluffs, MA  02557

Dear Dr. MacArthur:

I have received your letter dated June 27, 2001, outlining the request of the Medical Executive Committee for mutually shared practice coverage with Jason Lew, M.D., beginning July 6, 2001.

There are many reasons why this will not be possible. Please recognize that many of our patients are former patients of Dr. Lew's, and for this reason we feel it would be inappropriate for him to cover our practice.   As of now, I share equally in on call coverage of the unassigned patients in the Emergency Room.  I have also offered to cover Dr. Lew's practice one weekend a month, subject to our mutual agreement on scheduling, with the understanding that the Hospital will bill for any billable services rendered by me or the midwife during those periods of coverage.  It is further my understanding that, as appropriate, his patients' calls may first be referred to the midwife during periods that I provide coverage for Dr. Lew's practice.

My salaried position with the Hospital is to cover the midwife and to do any office gyn procedures and any referred gyn surgery.  Therefore, the coverage that I presently provide seems to me to be more than equitable and in accordance with the Medical Staff Bylaws.

I would be happy to discuss these issues with the Medical Executive Committee at a special meeting.  Should you desire to have the meeting, I would ask that we all be prepared to have a frank discussions of all concerns.  Until that time, I intend to continue with my present practice arrangements.

Yours truly,

Deurward L. Hughes, M.D.
Fellow, American College of Obstetricians and Gynecologists



EXHIBIT
Hughes
13
2-15-05

CONFIDENTIAL
MVH 0209

– 2 –                                    July 2, 2001

cc: Kevin Burchill, J.D., CEO
    Fred B. Morgan, Jr., Chairman of the Board of Trustees

CONFIDENTIAL
MVH 0210

# Exhibit 11

PAGE: 3

BUSIN , MINUTES

DATE: July 10, 2001

COMMI1 EE: Medical Executive Committee

| SUBJECT | FINDINGS/DISCUSSION | CONCLUSIONS RECOMMENDATIONS | ACTION FOLLOW-UP | STATUS |
|---|---|---|---|---|
| Additional New Business cont'd | D. Hughes, MD was invited to join the MEC meeting at 1:15pm to discuss the Ob/Gyn coverage issue.<br><br>D Hughes explained that:<br>1. He has offered to cover Dr. Lew's practice for one weekend per month.<br>2. The terms of his agreement with the Hospital call for coverage to be provided for him and that his responsibility is only to provide coverage for the midwifery practice.<br>3. He is sharing equally in the Emergency Room call coverage (copies of weekly schedules were distributed).<br><br>H Nieder expressed that traditionally physicians at MVH have covered each other and the refusal of two physicians to do so would be a negative predecent-setting event.<br>D Hughes was asked to explain why his involvement with the MVH staff has been so "rocky" from the start. He stated he did not know and that he had addressed all concerns regarding recent experience and had explained that he was actively participating in patient care before moving to the island | None at this time | None | Ongoing |

CONFIDENTIAL
MVH 0339

EXHIBIT
Hughes
14
2-15-05
PENGAD 800-631-6989

BUSINE... MINUTES

DATE: July 10, 2001                                                                                    PAGE: 4

COMMITTEE: Medical Executive Committee

| SUBJECT | FINDINGS/DISCUSSION | CONCLUSIONS RECOMMENDATIONS | ACTION FOLLOW-UP | STATUS |
|---------|---------------------|----------------------------|------------------|--------|
| Additional New Business cont'd | Committee members stated that in a small medical community such as that of MV, it is very important to be cooperative and share coverage | None at this time. | None. | Ongoing |
| | D Hughes stated that he will cover J.Lew's practice one weekend per month. D Hughes stated he does not want J.Lew covering the midwifery practice due to differing practice philosophies. He was asked to explain. He indicated that in his opinion there are quality of care issues. He continued to say that he would be able to explain what his issues are, but that this committee was not the appropriate place. In addition, he stated that a significant number of patients have left J.Lew's practice to join the midwifery practice and would not be comfortable having J.Lew care for them and might leave the practice. In addition, C Chase said she would resign if she was to be covered by J.Lew. Committee members explained to D Hughes that Ob/Gyn cases are reviewed through the QI process by an outside reviewer, and that no quality issues have been noted in the care of J.Lew's patients D Hughes questioned the MVH QI process citing that in his opinion cases were not adequately addressed at the last Perioperative Services committee meeting. | | | |

CONFIDENTIAL
MVH 0340

BUSINE... MINUTES

COMMITTEE: Medical Executive Committee

DATE: July 10, 2001

PAGE: 5

| SUBJECT | FINDINGS/DISCUSSION | CONCLUSIONS RECOMMENDATIONS | ACTION FOLLOW-UP | STATUS |
|---|---|---|---|---|
| Additional New Business cont'd | Drs. Lew and Hughes were excused for further MEC discussion. | | | |
| | S.London stated that the MEC members have the right to interpret the Bylaws in the best interest of MVH and the community. He asked what the community would say if they knew that MVH is spending money on unnecessary outside coverage. He continued to say that he was concerned that D.Hughes, MD accused members of the Perioperative Committee of mishandling its case review process | | | |
| | Finding from the summary of the distributed weekly coverage schedules (April through present) shows that D.Hughes has covered half of the ER and unassigned patients call, Easter weekend, Memorial Day week-end, July 4, two week-ends in July, and that the hospital provided coverage for Drs Hughes and Lew by Drs. Gottlieb and Drug in June. Question regarding future outside coverage covering J.Lew was deferred to K.Burchill who was excused from today's meeting | | | |
| | Question regarding the medical legal issue of a physician being covered by someone who they feel has quality of care issues was raised | Recommendation to consult J.Butterick.<br><br>Recommendation to request that D.Hughes submit specific written Q.I. issues to the appropriate committee for review. | Follow up with J.Butterick.<br><br>Follow up through Med Q.I. Committee. | Pending.<br><br>Pending. |

The meeting was adjourned.    The next meeting will be Tuesday, July 17, 2001 at 6:00pm.

CONFIDENTIAL
MVH 0341

# Exhibit 12



MARTHA'S HOSPITAL VINEYARD

July 26, 2001

Deurward Hughes, MD
Martha's Vineyard Hospital
P.O. Box 1477
Oak Bluffs, MA 02557

Dear Dr. Hughes:

At the last Medical Quality Improvement Committee meeting, we specifically addressed the concerns raised about the issue of quality of care, impeding the resolution of mutual equitable coverage between Drs. Hughes and Lew.  Concerns have been raised by both physicians on this matter.

The Committee, after much discussion and sharing of pertinent opinions, decided that a review of all cases in OB/GYN at the Martha's Vineyard Hospital since approximately December of 2000 (when both physicians were in attendance at the Martha's Vineyard Hospital) would be most appropriate and fair.  This would deal with relevant concerns regarding ongoing current care as practiced by both parties.  The Committee will review these charts and make decisions regarding further in-house or outside review in situations where quality concerns are raised.  In the interim, as per Medical Staff Committee resolution, we hope the physicians can come to a mutually agreeable coverage schedule in a collegial, professional manner.

Sincerely,

*Bill*

Bill Tsikitas, MD
Chairman
Medical Quality Improvement Committee

BT:dtr
cc:  Jason Lew, MD



0157

# Exhibit 13

To: John MacArthur, M.D.
From: Deurward L. Hughes, M.D.
Date: July 10, 2001
Re: Coverage of Dr. Jason Lew

I would like to go on record, after today's meeting of the Medical Executive Committee, to oppose any mandated coverage arrangement for Dr. Lew's practice and Vineyard Midwifery. I believe that I have stated my objections to the Committee.

However, it appeared to me that my position was not well received, and probably would not prevail. Therefore, I am making the following offer, in an effort to provide the requested coverage for Dr. Lew's practice.

I will cover Dr. Lew's practice every other weekend, from 5:00 p.m. Friday afternoon until 6:00 p.m. Sunday evening. This will be a strict every other weekend schedule. I will also cover him for 25 weekdays (allowing him 5 weeks for vacation and conference time), arranged in advance. I will also cover him for one half of the legal holidays, also agreed to in advance.

As I have stated previously, the first call will be taken by the nurse midwife, and I will cover her as needed. If I am off Island, and covered by another physician, then the covering physician will back up the nurse midwife. Any services provided by me or the nurse midwife or the covering physician will be billed and collected by the Hospital.

In addition, I want to be clear that I will endeavor to manage patients at the standard of care that I provide in my own practice. This may require a change in a patient's management, and the patient will be informed of this change. Any change in management will be recorded in the patient's record, along with the reasons for the change. I will always act in a professional and ethical manner, but I will also do what is necessary to diminish any medicolegal liability on my part.

I expect, in return, that Dr. Lew will provide me with emergency coverage during illness or at times I am called off Island at short notice.

cc. Kevin Burchill, CEO



EXHIBIT
Hughes
15
2-15-05

C347

# Exhibit 14



July 13, 2001

Deurward Hughes, MD
Martha's Vineyard Hospital
P.O. Box 1477
Oak Bluffs, MA 02557

Dear Dr. Hughes,

At the most recent Medical Executive Committee meeting, your concerns were made clear regarding the adequacy and efficacy of the Quality Improvement Committee in rendering its proposed function of monitoring the level and quality of care provided at the Martha's Vineyard Hospital. The committee, which I currently chair, is I believe, a select group of competent concerned colleagues in multiple specialties including surgery, medicine, anesthesiology, gastroenterology, family and emergency medicine in addition to nursing, committed to its role in their very important function.

In order to act appropriately when concerns are raised such as those you alluded to, we must be made aware of specific cases in question to review, rereview, or if necessary, send for outside specialist review. To that end, we ask you, as we do of all members of the Martha's Vineyard health care team, to bring to our attention any questions regarding quality issues that are of concern so that they may be properly evaluated and acted on. I respectfully ask that you make any cases of concern known to Sharon Clauss-Zanger, RN so that they may be brought forward to this committee for review.

In addition, your concerns regarding specific medical care issues causing difficulty and concern, especially affecting your ability to provide mutual equitable coverage in the field of Obstetrics/Gynecology, need to be addressed as quickly and expeditiously as possible. To that end, we invite you to select a representative sample of charts that you would like us to review (up to six) prior to the next meeting, which is scheduled for Thursday, July 19, 2001. Our intent is to try to address the concerns of all involved in order to settle this issue as fairly and as appropriately as possible. Thank you for your prompt attention to these matters allowing us to act upon your concerns.

Sincerely,

Bill Tsikitas, MD
Chair, Medical Quality Improvement Committee
Member, Medical Executive Committee

BT:nh

EXHIBIT
(Hughes)
16
2-15-05
PENGAD 800-631-6989

0009

# Exhibit 15

DEURWARD L. HUGHES, M.D.

July 18, 2001

Dear Dr. Tsikitas:

I have received your letter regarding the ongoing coverage debate between Dr. Lew and Vineyard Midwifery. I understand the request for charts to be reviewed.

I do want to be clear that I am not belittling the job done by the Quality Improvement Committee. It is difficult, however, to adequately review obstetrical and gynecological charts when there is no one who specializes in ob-gyn on the committee. I hope that the requested charts can be evaluated by an obstetrician-gynecologist from one of the premier Boston hospital-medical schools who has done this before and has the ability and confidence to make pertinent and constructive comments.

I look forward to the resolution of this matter so that we might all return to the practice of medicine, and to a more collegial relationship.

Yours truly,

Deurward L. Hughes, M.D.

P.O. BOX 1060      WEST TISBURY, MA. 02575

PHONE: 508 696 7294



EXHIBIT
Hughes
17
2-15-05

0038

# Exhibit 16

# DEURWARD L. HUGHES, M.D.

July 29, 2001

Bill Tsikitas, MD, Chairman
Medical Quality Improvement Committee
Martha's Vineyard Hospital
P.O. Box 1477
Oak Bluffs, MA 02557

Dear Dr. Tsikitas:

This is a response to your latest letter, dated July 26, 2001, regarding the concerns raised about the quality of care issues that are "impeding the resolution" of coverage issues.

I want to register my dismay with the process and procedures being followed by the Quality Improvement Committee.

I received a previous letter from you dated July 13, 2001, regarding the same issues. You named the multiple specialties represented by committee members, none of whom is an obstetrician-gynecologist. I have never questioned the competence nor concern of "this select group of competent concerned colleagues" in their own areas of practice. Nor do I question their dedication to their committee responsibilities. But I do strongly disagree with their ability to review ob-gyn records, especially in this instance where a new physician is questioning the practice standards. More important, the questions raised revolve significantly about the need for surgery, the appropriateness of the procedure, the documentation of the records, and follow up care. These are issues that are not addressed by looking at operative notes and pathology reports. I believe that a respected clinician and academician from a Boston medical school, or an organization dedicated to record reviews would be more appropriate.

In addition, your letter of July 13 specifically asked me to "select a representative sample of charts that [I] would like [you] to review {up to six} prior to the next meeting....". These charts were selected, sent to the committee, and were rejected. I consider that action inexcusable, as I complied completely with your request.

Your new letter of July 26 states that the committee now desires that all cases in ob-gyn, from December 2000, done by both ob-gyns, be reviewed. (I did not start until mid-January, 2001.) This type of review would also be acceptable to me, as long as the review is conducted by a QUALIFIED outside reviewer, and include ALL charts, as well as office records of the patients reviewed.

I am sure that the committee wishes to see a resolution of this matter, but I would also like to see a process that is fair to the parties involved. I hope for a speedy resolution of this matter.

Yours truly,

Deurward L. Hughes, M.D.

EXHIBIT
Hughes
19
2-15-05
PENGAD 800-631-6989

0336

# Exhibit 17



MARTHA'S HOSPITAL VINEYARD

July 31, 2001

Deurward Hughes, MD
Martha's Vineyard Hospital
P.O. Box 1477
Oak Bluffs, MA 02557

Dear Dr. Hughes:

I received your letter voicing your dismay over the process and procedure of the QI Committee in attempting to address your concerns about quality care issues at the Martha's Vineyard Hospital. Our mission has been in agreement with your summation statement, to resolve this issue in a speedy fashion, fair to <u>ALL</u> parties involved. To this end, all other items on our agenda at our last meeting were dismissed, and an additional meeting on July 31st was scheduled to continue this ongoing process.

At my invitation, you brought forward a sampling of charts for review, encompassing a period of at least 5 years time. After much back and forth discussion, it was decided that an objective evaluation would be impossible without the balanced perspective of review of all cases during the same time period. Most of these cases occurred prior to the initiation of this committee, circa 1999. It was observed and noted that you may have indeed overstepped your bounds in reviewing charts in which you were not involved with ongoing patient care, breaching patient confidentiality issues. You were asked to bring charts to this committee for review, not to review them yourself. That is our function, not an individual physician's right, and should be understood that it is not to be repeated. In addition, in order to address the concerns raised by Dr. Lew and others, a review of all your charts during a similar time period would be appropriate in order to be objective and fair. This would be extremely difficult and hardly settle this matter in a timely fashion. Thus, we unanimously concluded that a review of cases during the period in which both physicians were practicing at the Martha's Vineyard Hospital would be most appropriate for their current relevance.

Your voiced strong disagreement with our ability to review OB-GYN cases, without an OB-GYN physician on the committee, is a concern long recognized by this committee. Till your arrival, there has only been 1 OB-GYN physician on staff, and now, in the current climate where 2 physicians on staff are in conflict, one can hardly expect local evaluation of cases in an objective fashion to occur. To this end, throughout the years OB-GYN cases have been periodically reviewed by outside experienced OB-GYN physicians via Dr. Robert Gottlieb, associated with Southboro Medical Group, MetroWest Medical Center, and Newton-Wellesley Hospital, and prior to that by Dr. Arthur Spector, associated with The Cambridge Hospital.

We are currently assessing, with the input of Jim Butterick, MD, (quite experienced with his involvement with the Southcoast Group on Cape Cod) new avenues for outside OB-GYN review, and will be deciding on this issue very soon. This decision will be a consensus. As far as your concern regarding any review of office records, this is not the realm of this hospital committee.

We will keep you abreast of all our meetings and their outcomes in as timely a fashion as possible.

Sincerely,

Bill Tsikitas, MD
Chairman, Medical Quality Improvement Committee

BT:dtr



EXHIBIT
Hughes
20
2-15-05
FEIGAD 000-031-0989

0072

# Exhibit 18

Joint C.    ___Committee – August 17, 2001
Present:    ...organ, T. Swet, A. Smudbeck, E. Leone, J. MacArthur, B. Tsikitas, K. Burchill, T. Walsh, ...? Monto
Guests: Drs. Hughes, Kriedman

| SUBJECT | FINDINGS/DISCUSSION | CONCLUSIONS/RECOMMENDATIONS | ACTION |
|---|---|---|---|
| 1.0 Review of Old Minutes | Approved | | None required. |
| | REDACTED | | |
| 3.0 Discussion | • Drs. Hughes and Kriedman stated their case to the members of the Joint Conference Committee. The major points of discussion came down to the fact that these 2 doctors are being harassed and not welcomed in the Medical Staff, when the 2 doctors have tried their best to be quite agreeable with many of the issues brought to their attention. Drs. Hughes and Kriedman feel it has become a hostile environment, which will begin to effect patient care. The only staff members in support of the doctors work has been the Administration. Examples of Behavior:<br>  • Credential Process<br>  - Repeated questions of why Dr. Kriedman would like privileges<br>  - How to contribute to hospital?<br>  - PeriNatal committee/not welcomed by other OB/GYN<br>  - Patient in ER – not knowing forms; was told may be on probation for no signature. | | On-going |



EXHIBIT
Hughes
Q2
2-15-05
PENGAD 800-631-6989

CONFIDENTIAL
MVH 1742

CONFIDENTIAL
MVH 1743

Joint Confer... ...Committee – August 17, 2001
Present: T Morgan, T Sweet, A Smadbeck, E Leone, J MacArthur, B Tsikitas, K Burchill, T Walsh, R Monto
Guests: Drs Hughes, Kriedman

- No paperwork or other information to join committees

• Dr. Hughes' initial encounter with Executive Committee – issue was Dr Hughes' ability to practice medicine. The age issue was carried on for the next several months even after the credentials were approved

• Coverage issues began between the two OB/GYN doctors – Both Cathy Chase and Dr Hughes as well as their patients do not want Dr. Lew to cover their practice  Dr Hughes, however, does and will cover for Dr. Lew
Lengthy discussion regarding the coverage issues for both Dr Lew and the Midwifery Program. Both Drs. Hughes and Kriedman would like to see the animosity end and the level of harassment be toned down.

• Mr. Morgan stated that the credentialing process for these individuals has been long and drawn out.  Also, other physicians in the medical staff have their own issues, so they bring down the rest of the medical staff  No others have been treated as poorly as Drs Hughes and Kriedman have been recently – First issue is the question of how to bring the medical staff together

• Discussion of quality issues and how it is being dealt with through the Medical QI committee ACOG is now involved for an overall OB/GYN review of records/process/procedures

• Mr Sweet noticed there is a bit of disconnect Mr Sweet has heard things from the credentialing that Dr. Kriedman was "unwilling to cover for Dr. Lew", when in fact Dr Kriedman was more than happy, yet Dr Lew turned it down. Mr. Sweet says outside the

Joint Comm — August 17, 2001
Present: T. , gan, T. Sweet, A. Smadbeck, E. Leone, J. MacArthur, B. Tsikitas, K. Burchill, T. Walsh, R. Monto
Guests: Drs: Hughes, Kriedman

| | | |
|---|---|---|
| | hospital he has heard nothing but positive feedback regarding Drs. Hughes and Kriedman. The only negative has been heard within the hospital. | None required |
| 5.0 Next Meeting | Meeting adjourned at 10:55am and the next meeting is scheduled September 21, 2001 at 9:30am in the SSCR. | |

REDACTED

CONFIDENTIAL
MVH 1744

# Exhibit 19

BUSINಃ MINUTES

COMMITTEE: Medical Executive Committee

DATE: December 11, 2001

PAGE: 3

| SUBJECT | FINDINGS/DISCUSSION | CONCLUSIONS RECOMMENDATIONS | ACTION FOLLOW-UP | STATUS |
|---|---|---|---|---|
| **4.0  OLD BUSINESS** | | | | |
| 4.1  Ob/Gyn Call Issue | Discussion concerning on-going Ob/Gyn call issue. Review of Interoffice Memorandum dated 12/11/01 from Sharon Clauss-Zanger, RN to J.MacArthur, MD regarding Ob Coverage 1/1/01-1/2/02. Review of letter from D Hughes, MD dated 07/10/01. | | | |
| | Motion to ask D Hughes, MD to meet with the MEC to discuss why he is not following through on his 07/10/01 letter. Motion seconded. Discussion. | | | |
| | Recommendation for J.MacArthur, MD to meet with D Hughes, MD to discuss issue | | | |
| | Motion for J MacArthur, MD to follow through with his proposal outlined in the 07/10/01 letter. If D.Hughes, MD indicates that he does not intend to do so, request that he meet with the MEC Motion seconded. | Motion approved | J.MacArthur, MD to follow up. | Pending. |

REDACTED

The meeting was adjourned.    The next meeting will be Tuesday, January 8, 2002 at 5:30pm.



EXHIBIT
Hughes
24
2-15-05
PENGAD 800-631-6989

CONFIDENTIAL
MVH 0350

# Exhibit 20



Practitioner's Name: _*DJHughes*_

Date Submitted: _11-6-01_

# MARTHA'S VINEYARD HOSPITAL

Application for Reappointment

Please return to:

Medical Staff Office
Martha's Vineyard Hospital
P.O. Box 1477
Oak Bluffs, MA 02557

CONFIDENTIAL
MVH 1511



EXHIBIT
Hughes
23
12-15-05

MEDICAL STAFF REAPPOINTMENT QUESTIONNAIRE                    PAGE 2
PRACTITIONER'S NAME: _Denrward    L.   Hughes_

## MEDICAL STAFF REAPPOINTMENT QUESTIONNAIRE

I hereby apply for reappointment to the following Staff Category:

Active      Associate      Replacement

### I DO NOT WISH TO RENEW MEMBERSHIP

### THIS QUESTIONNAIRE WILL BE RETURNED IF ALL SECTIONS ARE NOT COMPLETED.

IDENTIFYING INFORMATION - All information should be typed or legibly written.
If more space is needed, attach additional sheets and make reference to the question being answered.

Name In Full _Denrward  L.  Hughes_

Office Address _MVH_

Office Telephone: _508 696-7294_  Cellular Phone: _215 - 850-0082_

E-Mail/Internet: _____

Home Address _10 Delphine  Mercy Rd  P.O. 1060_    W. Tisbury,  02575

Home Telephone: _508- 693- 4425_

Visa Status (if not a U.S. citizen) _____

Present Department _OB - Gyn_  Present Staff Category _Active - Provisional_

Please attach copies of the following documents to this application:

a.    Current license(s) to practice medicine and renewal application.
b.    Narcotics registration certificate(s) (DEA and Massachusetts Controlled Substance, as applicable), or
       if no narcotics certificate, the reason why there is none;
c.    Certificate of coverage from insurance carrier;
d.    Evidence of board certification (if certification was obtained during current reappointment/contract
       term).

### CERTIFICATION
Certified by American Board of _OB- Gyn_  Date _1966_
Certified by American Board of _____  Date _____
Recertified by American Board of _N/A_  Date _____
Eligible to apply for certification by American Board of _____  Date _____

### AFFILIATIONS
List all health care facilities where you now practice or with which you have been associated for the past
three (3) years, and who can provide references as to your clinical ability, ethical character, and ability to
work with others; if not applicable, name at least three (3) persons who you have worked with for the past
three (3) years. If additional space is required, please attach a separate sheet:

_Cathy Chase CNM_
_Jerry Yukovitz, M.D._
_Steve Miller, M.D._

CONFIDENTIAL
MVH 1512

MEDICAL STAFF REAPPOINTMENT QUESTIONNAIRE                    PAGE 3
PRACTITIONER'S NAME: *Deurward L. Hughes*

*Martha's Vineyard Hospital*
NAME OF ORGANIZATION/INSTITUTION    ADDRESS              CITY/STATE/ZIP

*OB-Gyn*              *Jan. 2001*
DEPARTMENT            DATES OF AFFILIATION          STAFF MEMBERSHIP STATUS

NAME OF ORGANIZATION/INSTITUTION    ADDRESS              CITY/STATE/ZIP

DEPARTMENT            DATES OF AFFILIATION          STAFF MEMBERSHIP STATUS

NAME OF ORGANIZATION/INSTITUTION    ADDRESS              CITY/STATE/ZIP

DEPARTMENT            DATES OF AFFILIATION          STAFF MEMBERSHIP STATUS

PROFESSIONAL SOCIETY MEMBERSHIP *Fellow, American College Obstetricians Gynecologist; New England Ob-Gyn Society, Mass Medical Soc.*

ANY CHANGES IN PROFESSIONAL SOCIETY MEMBERSHIP *No*

OTHER INFORMATION
If the answer to any of the following questions is "yes", please explain in full on a separate sheet:

1.  Since your last application, have you been denied membership
    on any hospital or healthcare facility Medical Staff, denied
    advancement in medical staff status or has such a denial been
    recommended by a standing committee or governing body of
    any hospital or health care facility?                         Yes____ No_✓_

2.  Since your last application, has your Medical Staff membership
    or Medical Staff staff status at any hospital been limited, reduced,
    withdrawn, suspended, revoked or not renewed, either voluntarily
    or involuntarily?                                             Yes____ No_✓_

3.  Since your last application, have your clinical privileges or
    participation been limited (aside from initial proctorship),
    reduced, withdrawn, suspended, revoked or not renewed, either
    voluntarily or involuntarily or has a denial or limitation
    been recommended by a committee or governing body of any
    hospital, health care entity, healthcare organization, or P.R.O.
    ( e.g. Ambulatory Care Center, HMO, PPO, Group Practice)?     Yes____ No____

5.  Has your practice been investigated at any hospital or other
    institution, resulting in an adverse action, since your last application?
    Yes____ No_✓_

                                                    CONFIDENTIAL
                                                    MVH 1513

6.  Are there presently any proceedings or investigations taking

MEDICAL STAFF REAPPOINTMENT QUESTIONNAIRE                                    PAGE 4
PRACTITIONER'S NAME: *Deurward L. Hughes*

place at any hospital or other organization relating to your clinical competence or professional conduct?                                                                 Yes_____ No _✓_

7.  Have you withdrawn your application for appointment, reappointment or clinical privileges or resigned from the medical staff before a decision was made by a hospital's or health care facility's governing board since you last applied for Contracting Practitioner status?                    Yes_____ No _✓_

8.  Since your last application, have you been subject to probationary conditions or have proceedings toward those ends been instituted or recommended by a committee or governing body of any hospital, healthcare facility, health care organization, or P.R.O.?    Yes_____ No _✓_

9.  Since your last application, has your request for any specific clinical privilege(s) been denied or granted with stated limitations (aside from ordinary and initial requirements or proctorship) or has such a denial or limitation been recommended by a committee or governing body of any hospital, healthcare facility or health care organization, or PRO?    Yes_____ No _✓_

10. Since your last application, has your license to practice your profession in any jurisdiction been surrendered, suspended, revoked, denied, limited, reduced, or subject to probationary conditions or have proceedings toward any of those ends been instituted voluntarily or involuntarily?    Yes_____ No _✓_

11. Since your last application, have you been the subject of any licensure authority investigation or action in any jurisdiction?    Yes_____ No _✓_

12. Since your last application, has your Drug Enforcement Agency or other controlled substances authorization been denied, revoked, suspended, modified, reduced, not renewed, placed on probation, or have proceedings toward any of those ends been instituted voluntarily or involuntarily?    Yes_____ No _✓_

13. Since your last application, have you voluntarily or involuntarily relinquished any Medical Staff Membership, clinical privilege(s), medical organization or professional society membership, professional license(s) or narcotics registration or have they been denied, revoked, suspended, reduced, withdrawn, limited, placed on probation, or not renewed?    Yes_____ No _✓_

14. Have you been subject to probationary conditions or have proceedings to those ends been instituted or recommended by a committee or governing board of any hospital or health care organization, or P.R.O.?    Yes_____ No _✓_

15. Since your last application, have any professional liability claims, cases, or suits been filed against you?    Yes_____ No _✓_

16. Since your last application, have there been any final judgements or settlements entered against you *, or are there currently pending, any malpractice claims, cases, suits, or settlements or

CONFIDENTIAL
MVH 1514

MEDICAL STAFF REAPPOINTMENT QUESTIONNAIRE                                    PAGE 5
PRACTITIONER'S NAME: _Deurward L. Hughes_

arbitration proceedings involving your professional practice
whether or not filed with an insurance carrier, or court, or
another entity?                                                    Yes_____ No_✓__

*     Please include suits against a professional corporation of which you are/were a member, shareholder,
      or employee in any matter in which you were involved in the patient's care.

17.   Since your last application, have you been denied malpractice
      liability insurance or has any malpractice liability insurance
      been cancelled or has there been any change in the amount of
      professional liability insurance you carry?                  Yes_____ No_✓__

18.   Since your last application, has any professional liability
      insurance carrier excluded any specific procedures from
      insurance coverage?                                          Yes_____ No_✓__

19.   Since your last application, have you been named as a
      defendant in any criminal proceeding?                        Yes_____ No_✓__

20.   Since your last application, have you been treated for alcohol
      or other substance abuse?                                    Yes_____ No_✓__

21.   Since your last application, have you been suspended, sanctioned,
      or otherwise restricted from participating in any private,
      federal or state health insurance program (for example,
      Medicare or Medicaid)?                                       Yes_____ No_✓__

22.   Since your last application, have there been any changes in your
      health status as either improvement or deterioration which relates
      to your ability to safely and competently exercise the clinical
      privileges requested?                                        Yes_____ No_✓__

23.   Do you currently have any physical or mental health problem
      which could interfere with your ability to safely and
      competently exercise the clinical privileges requested?      Yes_____ No_✓__

      Most recent physical examination:  Date__/_/_200 1

      Performed by: _Harry Baer, M.D_

      Significant findings: _None_

                                                          _comprehensive - 2001_
24.   Have you received any awards, commendations, or certificates           Yes_✓_     No____
      in the past two years? _Advanced Colposcopy._
      If yes, please list: _National Faculty Award_
      _Council on Resident Education in OB-Gyn 1999_

25.   Have you met Continuing Medical Education requirements as may be

                                                          CONFIDENTIAL
                                                          MVH 1515

MEDICAL STAFF REAPPOINTMENT QUESTIONNAIRE                                          PAGE 6
PRACTITIONER'S NAME: _Deudward  L. Hughes_____

set by the Mass Medical Society and the Massachusetts Board of          Yes ✓    /No___
Registration in Medicine?

Were at least 50% of the CME credits in your                            Yes ✓    No___
Specialty?

---

## COVERAGE ARRANGEMENT

I have made arrangements for coverage of my patients in my absence with the following physicians:

_Peri  Hospital  Arrangement_____

CONDITIONS OF APPLICATION (ACKNOWLEDGEMENTS)

The information given in or attached to this application is accurate and complete to the best of my knowledge, information and belief. I fully understand that any misrepresentations or misstatements in, or omissions from this application, whether intentional or not, shall constitute cause for immediate cessation of the processing of the application and no further processing shall occur.

By making this application for appointment to the Medical Staff,

I acknowledge that I have access to, am aware of, and have had an opportunity to read a copy of the Bylaws of the Hospital, and the bylaws and rules and regulations of the medical staff and their provisions for release and immunity from civil liability in connection with their enforcement and agree to abide by (current Bylaws) and amendments. I am familiar with the principles, standards and ethics of the national, state and local associations that apply to me and govern my specialty and profession. I agree to be bound by the terms thereof without regard to whether or not I am granted membership in the organization. I agree to be bound by the terms of the Bylaws in all matters related to the consideration of my application for appointment to the Medical Staff. I agree to abide by all bylaws, policies, and rules and regulations of the Hospital and the medical staff as shall be in force during my time on the medical staff. By applying for appointment to the Medical Staff, I hereby signify my willingness to appear for interviews in regard to my application , to provide any additional information requested, to submit to an exam by a physician of the hospital's choice, and consent to inspection of records and documents pertinent to my licensure, specific training, experience, and current competence.

I understand that I, as an applicant for Medical Staff membership, have the burden of producing adequate information as may be requested by the Department Chairperson, Credentials Committee, Medical Executive Committee, Administration, or Governing Body for proper evaluation of my professional competence, character, ethics and other qualifications and for resolving any doubts about such qualifications. I agree to notify the Hospital C.E.O. and the Chief of the Medical Staff, of changes in my Malpractice Liability Insurance and of any future or pending claims, as well as any denial or exclusion for cause from participation in Medicare, Medicaid or other third-party payment programs. I understand that my continued staff membership is contingent on maintenance of malpractice insurance coverage in a manner acceptable to the Governing Body.

I agree that, when an adverse ruling is made with respect to my Medical Staff membership, Medical Staff status and/or clinical privilege, I will exhaust the administrative remedies afforded by the Medical Staff and Governing Body Bylaws and policies. I agree to provide either directly or through coverage arrangements for continuous care and supervision of my patients.

CONFIDENTIAL
MVH 1516

MEDICAL STAFF REAPPOINTMENT QUESTIONNAIRE                                    PAGE 7
PRACTITIONER'S NAME: _Deurward L. Hughes_

RELEASE OF LIABILITY

By applying for appointment or clinical privileges, I expressly accept these conditions during the processing and consideration of the application, whether or not appointment or clinical privileges are granted. This acceptance also applies during the time of any appointment or reappointment.

    (a)    Immunity:

To the fullest extent permitted by law, I release from any and all liability, extend immunity to, and agree not to sue the Hospital, their authorized representatives, and appropriate third parties, with respect to any acts, communications or documents, recommendations or disclosures involving me, the applicant, concerning the following:

    (1)    applications for appointment or clinical privileges, including temporary privileges;
    (2)    evaluations concerning changes in clinical privileges;
    (3)    proceedings for suspension or reduction of clinical privileges or for revocation of Medical Staff appointment, or any other disciplinary sanction;
    (4)    precautionary suspension;
    (5)    hearings and appellate reviews;
    (6)    medical care evaluations;
    (7)    utilization reviews;
    (8)    other activities relating to the quality of patient care or professional conduct;
    (9)    matters or inquiries concerning my professional qualifications, credentials, clinical competence, character, mental or emotional stability, physician condition, ethics or behavior; and/or
    (10)    any other matter that might directly or indirectly relate to my competence, to patient care, or to the orderly operation of this or any other hospital or health care facility.

    (b)    Authorization to Obtain Information:

I specifically authorize the Hospital and its authorized representatives to consult with any third-party who may have information bearing on my professional qualifications, credentials, clinical competence, character, mental or emotional stability, physical condition, ethics, behavior, or any other matter reasonably having a bearing on my satisfaction of the criteria for initial and continued appointment to the Medical Staff. This authorization also covers the right to inspect or obtain any and all communications, reports, records, statements, documents, recommendations or disclosures of said third parties that may be relevant to such questions. I also specifically authorize said third parties to release said information to the Hospital and its authorized representatives upon request.

    (c)    Authorization to Release Information:

I specifically authorize the Hospital and its authorized representatives to release such information to other hospitals, health care facilities and their agents, who solicit such information for the purpose of evaluation my professional qualifications pursuant to a request for appointment and/or clinical privileges.

DATE: _11-6-01_  SIGNATURE: _W. Hughes, M.D._

CONFIDENTIAL
MVH 1517



# HEALTHCARE FACILITY RELEASE FORM

I hereby authorize Martha's Vineyard Hospital to consult with, request information from, and exchange information with other Healthcare facilities and their medical staffs with which I have been associated, and others who may have information bearing on my competence, character, and ethical qualifications.

I consent the Hospital's inspection of records and documents that may be material to an evaluation of my professional qualifications and release from any liability all individuals and organizations who provide information concerning my competence, ethics, character and other qualifications for staff appointment and clinical privileges.

Name (Please print)     _D. L. Hughes_

Signature of Practitioner     _____

Date     _11-6-01_

CONFIDENTIAL
MVH 1518

Post Office Box 1477 • Oak Bluffs • Massachusetts 02557 • 508 693-0410 • FAX 508 693-5971



MARTHA'S HOSPITAL VINEYARD

## MEDICAL MALPRACTICE RELEASE FORM

I authorize all past or present insurance (malpractice) companies to release to Martha's Vineyard Hospital, any and all claim(s) or other information in its possession, custody or control on my current policy or any prior policy.

Name (Please print)   _D.L. Hughes_

Signature of Insured   _[signature]_

Date   _11-6-01_

CONFIDENTIAL
MVH 1519

Post Office Box 1477 • Oak Bluffs • Massachusetts 02557 • 508 693-0410 • FAX 508 693-5971

# Exhibit 21



MARTHA'S
**HOSPITAL**
VINEYARD

Deurward Hughes, MD
P.O. Box 1477
Oak Bluffs, MA   02557

February 25, 2002

Dear Dr. Hughes:

I am pleased to advise you that at the Board of Trustees Credentials Subcommittee meeting held on February 22, 2002, the Board of Trustees Credentials Subcommittee approved your membership on the Active Staff with privileges in Obstetrics/Gynecology.

Your staff membership and clinical privileges have been approved for two years and are consistent with your application for Active Staff membership and clinical privileges as submitted and approved by the Executive Committee of the Medical Staff.

On behalf of the Board of Trustees, I would like to extend my congratulations to you on your appointment. I look forward to working with you.

Sincerely,

Kevin R. Burchill
C.E.O.



EXHIBIT
Hughes
26
2-15-05

0022

# Exhibit 22

**FILE COPY**

February 19, 2002

To:     Medical Staff Members
        Martha's Vineyard Hospital

**CONFIDENTIAL**

From:   Richard H. Koehler, MD FACS
Subj:   Privileging and Credentialing of Deurward Hughes, MD

Dr. Hughes arrived without interviewing with the medical staff as a whole. On at least two occasions in staff meetings, I have politely asked Dr. Hughes if he would volunteer a list of his recent operative experience (not complication rates, but just the total caseload). In both cases, he adamantly refused to reveal his recent operative caseload. I asked that my concerns about this issue be put directly into the minutes of these committees (medical staff and perioperative services). There has been no response.

Dr. MacArthur was the proctoring surgeon for Dr. Hughes. Dr. MacArthur is not a OB-GYN surgeon, and hence has extremely limited laparoscopic experience in pelvic surgery. It remains unclear to me why he was chosen for this critical role.

Since then extensive reviews of Dr. Lew's practice were undertaken with Dr. Hughes's involvement, culminating with a recent site visit by the American College of Obstetrics and Gynecology (ACOG). This visit was arranged by the hospital, and my wife and I were not placed on the schedule to be interviewed— despite me being the only advanced-experienced laparoscopic surgeon on staff. I forwarded a written complaint about the state of affairs with Dr. Hughes to the ACOG last October. I have never received a reply, and yet we are now here to fully privilege Dr. Hughes.

I must object to one colleague being subjected to an intensive far-reaching review, who is not a member of ACOG, while a newly arrived colleague—who is a member of ACOG—is allowed a review involving extremely limited cases in the first six months of being here, while his subsequent cases have effectively been put "on hold".

In summary, I am gravely concerned that:

         — Dr. Hughes was improperly proctored

         ---The Hospital's QI system has been preoccupied with Dr. Lew's review, and appears in doing so to have removed itself from ongoing issues with Dr. Hughes's most recent practices

         --- We remain uninformed as to Dr. Hughes's recent active experience in laparoscopic surgery despite appropriate requests, and despite myself being the back-up for life-threatening complications.

         --- Based as it is upon what multiple colleagues have been telling me ---OR Staff and anesthesiologist staff alike—that there may be some basis for these concerns.

         --- If a patient is injured as a result of an inexperienced or improperly proctored surgeon, we all will feel very responsible.

I recognize, and respect, that there may less substance to these issues. However, I must strongly voice my opinion to the staff that until these issues are investigated---including Dr. Hughes's experiences after the ACOG team left, that we refrain from awarding full staff privileges in surgery to Dr. Hughes. I would make such a suggestion about any surgeon, of any specialty, under even remotely similar circumstances.

I offer this opinion with the greatest respect to Dr. Hughes, and with that same respect for all of the medical staff as well.

Very Sincerely,

Richard H. Koehler, MD FACS

EXHIBIT
Hughes
25
2-15-05

PENGAD 800-631-6989

0114

# Exhibit 23

# Martha's Vineyard Hospital
## Personnel Action Form

**Please complete ALL appropriate sections.**

1.  **EMPLOYMENT** Date of Hire: _____/_____/_____

    **Name:** _____
    First                    MI                    Last

    **Address:**_____

    _____

    **Telephone No.:** _____

    **Position:** _____    **Job Grade:** _____

    **Regular full time** _____    **Regular part time** _____ (# of hours/week: _____)

    **Per diem** _____    **Temporary** _____ (from _____ to_____)

    **Hourly rate: $**_____    **Shift:  1st   2nd   3rd**

2.  **PROMOTION/TRANSFER**    **Effective date:** _____

    **Position: from** _____ **to** _____

    **Department: from** _____ **to** _____

    **Hourly rate change: from $**_____ **to $**_____    **Shift: 1st   2nd   3rd**

3.  **LEAVE of ABSENCE** ____ **FMLA** ____ **Medical** ____ **Extension of FMLA**
    ____**Military** ____**Educational**

    **From:** ____/____/____    **To:** ____/____/____

4.  **CHANGE in PERSONAL INFORMATION**

    **Name:** _____    **Address:**_____    **Telephone No.:** _____

    **From:** _____    **To:** _____

    _____    _____

5.  **TERMINATION of EMPLOYMENT**    **Effective Date:** ____/____/_____

    **Resignation** _____    **Involuntary Termination** _____

    **Without Notice** _____

    **Department director/manager signature:** _____ **Date:** _____

6/1/98

CONFIDENTIAL
MVH 0052

# Exhibit 24





EXHIBIT
Hughes
28
2-15-05

Fred B. Morgan, Jr.
*Chairman, Board of Trustees*

April 12, 2002

Kevin R. Burchill, J.D.
*Chief Executive Officer*

Maureen T. Keenan, Esq.
Data Repository Counsel
Board of Registration in Medicine
10 West Street
Boston, MA 02111

Re:  Deurward L. Hughes, M.D.

Dear Attorney Keenan:

Dr. Deurward L. Hughes has shared with me your April 2, 2002 letter to him.  In your letter to Dr. Hughes, you inform him of an anonymous report submitted to the Board pursuant to General Laws chapter 112, Section 5F.  As the Hospital understands that law, it involves reports by physicians of violations of law by other physicians licensed by the Board of Registration in Medicine.  The Hospital assumes, therefore, that the report against Dr. Hughes was filed by a member of our Medical Staff.  While the Hospital is both aware and supportive of the important policies underlying this law, as the Hospital's President I strongly believe that Dr. Hughes has been unfairly charged, and that the charges may stem from issues unrelated to his professional competence and performance.  While I understand Dr. Hughes will respond directly to the allegations against him, the following background may be helpful as your Board weighs them.

Dr. Hughes began work at the Hospital in December, 2000.  Previously, Dr. Hughes had practiced with distinction in Philadelphia where he was Associate Professor of Obstetrics – gynecology at Hahnemann Medical College of Pennsylvania-Hospital.  For his last two years there he was the Director of Ambulatory Services, and also intimately involved in resident teaching, and a clinician in the Faculty Practice Plan.  He received more teaching awards than any other practitioner in the department of obstetrics and gynecology.  Dr. Hughes was not expected to establish a private practice but to provide coverage when the one full-time OB/GYN in private practice, Dr. Jason Lew, was off-island.  The Hospital had agreed to arrange coverage for Dr. Lew for 105 days a year; Dr. Hughes was to provide coverage for 80 of those 105 days.  Dr. Hughes' obligations expanded when, in February 2001, Dr. Lew's midwife was terminated from his private practice.  Owing to the island's need, the Hospital hired that midwife as of April 1, 2001; Dr. Hughes undertook responsibility as her "collaborating physician."  These are Dr. Hughes' principal activities at the Hospital.

CONFIDENTIAL
MVH 1581

8763693.1

"Here for your Health"

Post Office Box 1477 · Oak Bluffs · Massachusetts 02557 · 508 693-0410 · FAX 508-693-5971

.aureen T. Keenan, Esq..                    -2-

By mid-2001, a situation had developed which, in the Hospital's judgment, necessitated the commissioning of a Voluntary Review of Quality of Care by the American College of Obstetricians and Gynecologists ("ACOG"). In an effort to enhance the overall quality of patient care in the OB/GYN area, ACOG was asked to perform a broad-based site review and report of the practice of OB/GYN at the Hospital, focusing upon issues between Dr. Lew and Dr. Hughes, Dr. Hughes' surgical technique and possible surgical complications, and the midwifery program and OB nurses. ACOG performed a site visit on October 18-20, 2001. In late January, 2002, ACOG delivered a lengthy Report of its findings.

REDACTED

While the ACOG Report qualifies for confidentiality protection under General Laws Chapter 111, Section 205, we understand that it may be accessed by the Board of Registration in Medicine. If you decide to request the Report, please confirm both that it is protected under Section 205 and that the Board will take appropriate steps to maintain its confidentiality.

In conclusion, I believe that the ACOG review of Dr. Hughes' work is fair in its conclusion that ie is a competent practitioner. I further believe that Dr. Hughes has performed, and continues to perform, ignificant and valuable services to the Hospital, the island, and the island's residents.

'ery truly yours,

.evin K. Burchill, J.D.
hief Executive Officer

i3693.1

CONFIDENTIAL
MVH 1582

# Exhibit 25



DATE:   April 12, 2002

TO:     Dr. Deurward Hughes

FROM:   Dr. Stephen London,
        Chairman, Perioperative Services Committee

RE:     Quality Improvement at Perioperative Committee     **CONFIDENTIAL**
                                                           **MVH 0281**

Dear Dr. Hughes:

I am writing this letter in order to explain to you some of the
concerns you expressed at the Perioperative Committee meeting of
April 11, 2002. At that meeting, prior to the agenda item during
which cases related to you were to be discussed, you expressed
concern that these cases were even on the agenda for discussion at
all. You directly questioned me as committee chairman as to why the
cases were being discussed at the Perioperative Services Committee.

The Perioperative Committee, as part of the overall Quality
Improvement process at Martha's Vineyard Hospital, receives cases for
review through multiple mechanisms. These include:

        1. Q.I. indicators for the operating room (copy attached).
        2. Quality Improvement reports directed through the Quality
        Improvement Department, either via the incident reporting
        process, or via the review of charts by nursing coders or
        nurse supervisors (copy attached).
        3. Directly through the Quality Improvement Department under
        Sharon Clauss-Zanger.

That has been the routine by which cases reach the committee. Cases
are then discussed at the committee with input both from the
physician assigned to review the case, as well as with input by the
physician directly involved with the case. If it is apparent that
significant morbidity, mortality, or unanticipated complications of a
significant nature or complications related to high risk or
reflecting patterns of concern exists, then cases are referred onto
the Medical Quality Improvement Committee. I also attach for your
review an interesting article taken from the Lay Press, Parade
Magazine, which should enlighten you as to what our patients'
expectations are for a knowledge base regarding the hospitals and
surgeons' track records for the procedures they need, item #5 on the
attached article. As you know, the by-laws of the medical staff
require a quality improvement process that is the responsibility of
the medical staff, and I feel that as the Perioperative chairman that
I do my best to fairly present and discuss the cases that are

selected through the QI review process and are directed to my
committee.

I would greatly appreciate improved cooperation on your part in
becoming an advocate and active participant in the process, and
working with the rest of the medical staff to improve the quality
improvement process over time.  If you have concerns, Dr. Bill
Tsikitas, as chairman of the Quality Improvement Committee, Dr. John
MacArthur, as chief of staff, and Sharon Clauss-Zanger are the key
personnel who are responsible for the overall process, and whom you
should direct your concerns if they exist regarding the process by
which cases are selected for review.


Sincerely,


STEPHEN LONDON, MD

MEDQ36
DD:  04/12/2002   15:49
DT:  04/15/2002   22:04
#163347

CONFIDENTIAL
MVH 0282

_...na is serious
...nd treated prop-
...cost you your life.
example of how im-
.lerstand what your
...e best way to
th...n. Other exam-
...rification of neuro-
Do they reflect Alz-
.ke? If you have a
.e fever, is it due to
.dden cancer? Sup-
.ly prostate cancer,
.et: hormones, sur-
.ratchful waiting?
.er. You should have
.n as possible about
.d your rights—so
.fidence to share in
ect your health, the
.J survival itself. The
.ire to ask informed
.vour chances of re-
.dical care._      It

# ...
# r You

.ders with the
.r     eed when
.s written
_tient_, just pub-
Books. In it, he
.st information
.nd treatment
mon ailments
.ans. For each
.ells out what
.ations to in-
.to request a
.and when to
.zation. He re-
.hat, thus in-
.have a much
.receiving the
.lth care.



# What To Insist On

_You have the obligation to yourself—and the right—to par-
ticipate actively in the decisions concerning your health care.
Here are some of the important rights to keep in mind:_

**YOU HAVE THE RIGHT TO SELECT YOUR
DOCTOR.** Choose a health plan that allows you to
find a physician with whom you are compatible. It's
nearly as important as selecting a spouse. Joining an HMO
usually means you have to leave your doctor of many years.
That's traumatic enough. At least make sure you have
several names to choose from, and insist on meeting him
or her before you make a commitment.

**YOU HAVE THE RIGHT TO BE FULLY
INFORMED ABOUT YOUR HEALTH
STATUS.** There are many ways to diagnose and
manage illness. If your condition requires medication, there
usually are several to choose from. One may be better for
you than the others—and also more affordable. If you need
surgery, there are differences in techniques and expertise
among physicians. Insist on being told all your options
before the therapy plan is finalized.



If you are told you need surgery, insist on knowing the doctor's
track record and on being told all of your treatment options.

**YOU HAVE THE RIGHT TO A SECOND
OPINION.** When your life is on the line, ask for
a second opinion. Two heads are better than one.
If possible, the consultant should come from outside the
group that is caring for you: Doctors in the same clinical
environment tend to think alike. You deserve a fresh and
independent approach. Don't worry about "offending"
your doctor. Your welfare is more important than his or
her ego, and a good physician making the right diagnosis and
recommending what's best will welcome confirmation of
his or her decisions.



Knowing if you are
at risk is good
preventive medicine.
Would a thorough
physical exam have
tipped off this young
man that his knee
was vulnerable?

**YOU HAVE
A RIGHT TO
PREVENTIVE
MEDICINE.** An ounce
of prevention is worth
a pound of cure. Some
health plans still refuse
to reimburse you for
doctor's visits when
you're well. Make sure
that your plan does reimburse. Routine screening can de-
tect vulnerability to heart disease, so you can start pre-
ventive measures in time; many cancers can be cured if
they're found early enough; and some diseases in full bloom
go unrecognized until you have a thorough physical exam.
(The best examples are an underactive thyroid gland whose
symptoms mimic those of depression; angina pectoris that's
attributed to arthritis or indigestion; and bleeding from
colon cancers dismissed as coming from hemorrhoids.)

**YOU HAVE THE RIGHT TO KNOW
YOUR SURGEON'S AND HOSPITAL'S
TRACK RECORD FOR THE PROCEDURE
YOU NEED.** How many operations does the surgeon
perform each year, and what is the success rate? The more
experience that he or she has, the better your chances of
a successful outcome. This information is not posted on any
bulletin board. You have to seek it out. The best source is
the hospital administration. Don't hesitate to ask. They
are obliged to tell you—but only if you ask.

**YOU HAVE THE RIGHT TO KNOW
ABOUT ANY FINANCIAL RELATION-
SHIP BETWEEN YOUR DOCTOR AND
YOUR INSURANCE PROVIDER.** This may influence
your medical care. Doctors sometimes receive a bonus or
other benefits for successfully cutting health costs—or,
put another way, for depriving you of the best treatment.
You need to know if this is the case with your doctor. Ask
him or her about it. You're entitled.

**YOU HAVE THE RIGHT TO A RAPID
MEDICAL-REVIEW PROCESS.** If your claim
for reimbursement has been denied, and you know
enough to realize that you are being short-changed,
appeal the unfair decision. Any plan for which you sign up
should provide an impartial appeal mechanism to hear such
complaints when you know the rejection is arbitrary. Such
panels are required by law in 41 states and Washington, D.C.

MVH 0283

**Martha's Vineyard Hospital – Quality Improvement Report**

| Name of Party Involved | | | | ☐ Male ☐ Female | Medical Rec No. |
|---|---|---|---|---|---|
| Last | First | MI | Age _____ | | |

| Date of Occurrence  Month  Day  Year | Time of Occurrence ☐ AM ☐ PM | Identification ☐ Inpatient ☐ Visitor | ☐ ER patient ☐ Outpatient ☐ Other i.e. Volunteer | Reason for Hospitalization |
|---|---|---|---|---|

| Area Incident Occurred | | Post Op Day　　Post Partum Day　　Attending Physician |
|---|---|---|

Area Incident Occurred
☐ Operating Room
☐ Emergency Room
☐ Patient Room #
☐ Intensive Care Unit
☐ Recovery Room
☐ Labor and Delivery

☐ Xray
☐ Public Areas In House
☐ Hospital Grounds
☐ Other Areas Specify ___

| Equipment Involved | Bedrails ☐ Up ☐ Down | Restraints On ☐ Yes ☐ No |
|---|---|---|
| Medicated past 2 Hrs. ☐  Type of Medication ___ | | |

## EVENT/OCCURRENCE PLEASE CHECK /CIRCLE AS MANY ITEMS AS NEEDED TO FULLY EXPLAIN OCCURRENCE

1. **Safety/Fall Related**
   - ☐ a. Slip & fall
   - ☐ b. Found on floor
   - ☐ c. Fall from bed/chair/table
   - ☐ d. Removed restraints
   - ☐ e. Climbed over siderails
   - ☐ f. Dropped/mishandled patient
   - ☐ g. _____

2. **Communication Related**
   - ☐ a. No report of abnormal or STAT lab/xray/test results
   - ☐ b. MD not notified/No MD response
   - ☐ c. Orders/instructions carried out incorrectly
   - ☐ d. Incomplete chart
   - ☐ e. Consent signed for wrong procedure
   - ☐ f. Procedure done without consent
   - ☐ g. Patient states inadequate informed consent
   - ☐ h. _____

3. **IV/Blood related**
   - ☐ a. Wrong patient
   - ☐ b. Wrong IV solution/rate/time
   - ☐ c. Wrong IV solution/rate/time
   - ☐ d. Wrong blood/blood components
   - ☐ e. Omitted drug/IV
   - ☐ f. IV complication
     - ☐ 1. Nerve involvement
     - ☐ 2. Infiltration/infection
   - ☐ g. Transfusion reaction

4. **Medication Error**
   *Please complete the MVH Med Error Report Form and return to QI Office*

5. **Pyxis Variance**
   *Please complete the MVH Pyxis Variance Form and return to Pharmacy*

6. **Adverse Drug Reaction (ADR)**
   *Please complete the MVH ADR Report Form and return to Pharmacy*

7. **Equipment Related**
   - ☐ a. Equipment burned patient
   - ☐ b. Equipment dropped on pt.
   - ☐ c. Equipment malfunc./failed
   - ☐ d. Equipment not available
   - ☐ e. _____

8. **Diagnosis/treatment related**
   - ☐ a. Hospital admission W/I 7 days for problems treated at last admission
   - ☐ b. Failure to adequately diagnose condition requiring:
     - ☐ 1. Admission to hospital
     - ☐ 2. Repeat visit to ER
   - ☐ c. Xrays read as negative/later read as positive
   - ☐ d. Diagnosed abnormal condition when none existed
   - ☐ e. Treatment condition delayed worsening
   - ☐ f. Complications of procedure
   - ☐ g. Unplanned repeat diagnostic procedure
   - ☐ h. Monitored inadequately
   - ☐ i. Inserted catheter/tube/drain incorrectly
   - ☐ j. Catheter/tube/drain mismanaged
   - ☐ k. _____

9. **Labor and Delivery Related**
   - ☐ a. Fetal distress not timely recognized
   - ☐ b. Delayed C-Section
   - ☐ c. Labor/delivery complication
   - ☐ d. Complication/augmented labor
   - ☐ e. Traumatic birth
   - ☐ f. Forceps injury to infant
   - ☐ g. MD unattended delivery
   - ☐ h. _____

10. **Surgery/anesthesia related**
    - ☐ a. Anesthesia complication
      - ☐ 1. Intubation/extubation
      - ☐ 2. Anesthesia agent
      - ☐ 3. Aspiration
    - ☐ b. Wrong patient/side/site
    - ☐ c. Unplanned organ repair/removal
      - ☐ 1. Bowel
      - ☐ 2. Artery
      - ☐ 3. Bladder/Ureter
      - ☐ 4. Spleen
      - ☐ 5. Uterus/ovary
      - ☐ 6. _____
    - ☐ d. Left in patient
      - ☐ 1. Sponge/instrument/needle
    - ☐ e. Return to OR same or new admission due to:
      - ☐ 1. Hemorrhage
      - ☐ 2. Wound disruption
      - ☐ 3. Wound infection
      - ☐ 4. Removal of retained foreign body
      - ☐ 5. _____
    - ☐ f. Acute MI/CVA/embolus following surgery
    - ☐ g. Admit following same day surgery
    - ☐ h. _____

11. **Miscellaneous**
    - ☐ a. Displeased/dissatisfied patient or family
    - ☐ b. Assault on patient/visitor/staff
    - ☐ c. Refused ER treatment
    - ☐ d. Elopement/left AMA
    - ☐ e. Self-inflicted injury
    - ☐ f. _____

**CONFIDENTIAL**
**MVH 0284**

MVH-DAR 15B-7/01

**12. Musculoskeletal**
- ☐ a. Amputation
- ☐ b. Broken teeth/dental work
- ☐ c. Fracture/dislocation
- ☐ d. Soreness
- ☐ e. Strain/sprain
- ☐ f. _____

**13. Skin/tissue/systematic**
- ☐ a. Abcess/decubitus ulcer
- ☐ b. Allergic/adverse reaction
- ☐ c. Burn
- ☐ d. Contusion/abrasion
- ☐ e. Dehiscence
- ☐ f. Edema/swelling
- ☐ g. Febrile on discharge
- ☐ h. Fistula
- ☐ i. Hematoma/rash/ecchymosis
- ☐ j. Laceration/perforation
- ☐ k. Sloughing/scarring/necrosis
- ☐ l. Wound infection
- ☐ m. _____

**14. Central nervous system**
- ☐ a. Cerebral vascular accident
- ☐ b. Coma
- ☐ c. Neuro damage/deficit/loss
- ☐ d. Para/quadriplegic
- ☐ e. Seizure
- ☐ f. _____

**15. Cardiopulmonary**
- ☐ a. Airway obstruction
- ☐ b. Aspiration
- ☐ c. Cardiopulmonary arrest
- ☐ d. Death
- ☐ e. Hemorrhage
- ☐ f. Phlebitis/embolism
- ☐ g. Respiritory distress
- ☐ h. Shock
- ☐ i. Tracheal injury
- ☐ j. _____

**16. Newborn**
- ☐ a. Apgar <5 at 5 minutes
- ☐ b. Brachial palsy
- ☐ c. Meconium stained
- ☐ d. Newborn resuscitation by intubation
- ☐ e. Still birth
- ☐ f. _____

**Notification/action**
Noted on chart ☐ Yes ☐ No
Attending Physician
notified ☐ Yes ☐ No

**Follow-up Treatment**
☐ Xray Ordered/done/result_____
☐ Treatment rendered

**Seen By**
☐ Attending MD ☐ Emergency MD
Other, specify_____
Name_____
Time called_____
Time Responded_____

**Assessment of injury**
☐ No injury
☐ No apparent injury
☐ Extended length of stay

---

## NOTIFICATION SYSTEM FOLLOW-UP

Patient ☐    Employee ☐    Visitor ☐    Property ☐

**Describe the Occurrence Briefly (Description)**

_____
_____
_____

**REPORTED BY**_____ Date_____

**Cause(s) of this Occurrence (Analysis)**

_____
_____
_____

**SIGNATURE**_____ Date_____

**Determine What Action Should or Can Be Done To Prevent This Occurrence (Action)**

_____
_____
_____

**SIGNATURE**_____ Date_____

**- REVIEW -**

Refer to Committee Or Department For Implementation Or Determination Of Action Taken if Necessary

Committee_____ Date_____ Department_____ Date_____

Follow-up Action Implemented ☐ Yes ☐ No

Risk Manager_____ Date Reviewed_____

Loss Control Review Date_____ L.C.C._____

*** Please Return This Form to Quality Improvement ***

**CONFIDENTIAL**
**MVH 0285**



# .Q I INDICATORS FOR THE OPERATING ROOM

## As of JUNE 27, 2000

1. Cases canceled due to problem: EKG, labs etc.

2. Cases without tissue

3. Wrong patient/wrong procedure

4. Blood transfusions > 2 units

5. Unplanned inpatient admit post-in and Out surgery

6. Unplanned return to surgery

7. Unexpected transfer to ICU

8. Unplanned evacuation (via BMF, NELF or CG)

9. Local or regional anesthesia supplemented by general unplanned

10. Unplanned damage/removal of organ

11. Delay in starting anesthesia due to inadequate work-up, waiting for labs etc.

12. Case canceled post induction

13. Prolonged recovery phase

14. Incorrect count

15. Complications of anesthesia, difficulty w/spinal, block or intubation

16. Equipment failure resulting in patient injury

17. Use of reversal agents (Romazicon, narcan) in patients receiving conscious sedation

18. $O_2$ saturation drops by 3% or more for greater than 5 minutes during and/or post procedure where conscious sedation was used.

19. Unexpected inpatient or observation admission, which is conscious sedation, related

1

CONFIDENTIAL
MVH 0286



# The Pulse

**April 12, 2002**

**Volume IV, Issue 15**



\*\*\*\*\*\*\*\*\*

## Mandatory Day Follow-up...

Corporate Compliance, Employee Hot Lines, Patient Care Assessment Plans, Variance Reporting, Routine Chart Audits—these are all examples of how MVH creates the best possible place for caring for patients and access to information for employees and physicians. Our workplace is better for these efforts - ensuring a place for clinical performance based upon confidential reporting systems that do not place pressures on individuals who avail themselves of these avenues.

Administration, Ext. 487.

\*\*\*\*\*\*\*\*\*



## Patriot's Day Holiday

With the Patriot's Day Holiday on Monday, there will be no early paychecks next week.

Also, please have payroll in as early as possible.

Human Resources, Ext. 216.

## Get Fit for Golf

Dusting off your clubs? Come to the golf exercise seminar!

Rehab and Wellness is presenting a free seminar intended for golfers, Thursday, April 18, from 6 to 7 p.m., in the Rehab and Wellness department.

Instructor and MVH Physical Therapist, Luke Lucashensky, will be teaching golf-specific exercises that can help prevent injuries associated with golfing. Luke is a 1977 graduate of the UCONN. He has 22+ years experience in the field of physical therapy with expertise in the areas of pediatric, balance and vestibular problems.

To reserve a space, call Rehab & Wellness at ext. 247.

## Hospital Accepting Appointments for Tours

Departments are reminded that the week of May 6th has been designated a "group tour week." Schools and other organizations in the community are being encouraged to make prior arrangements through the Community Relations office if they would like to have their groups be given tours of the Hospital.

Department managers are encouraged to contact Cindy McIntosh to discuss how the tours can be as comprehensive and meaningful for our visitors as possible. Volunteers and other members of the staff who would like to help organize or participate in the tours should contact Cindy as well.

Community Relations Ext. 804 and 826.

## Benefit Fair

For those of you who did not make it to the Benefit Fair this week, you still have time to make changes to any of your hospital insurance benefits. Stop by







# The Pulse

Human Resources before April 30th.

Human Resources, Ext. 216.

### Howard Teibel, Inc.

Howard Teibel will be here on April 30th and May 1st for any computer support.

Please contact Human Resources with any requests.

Human Resources, Ext. 216.

### Housing

New Radiology employees are looking for housing to remain as permanent employees at Martha's Vineyard Hospital. If you have any information, please contact Radiology.

Peggy Ekholm, Ext. 805.

### Nurse's & Hospital Week

Keep your eyes pealed for the upcoming events with regard to Nurse's and Hospital Week.

Nurse's Week in May 6-10, and Hospital week is May 12-17.

Human Resources, Ext. 216

### Patient and Community Feedback

"Dear Helen Hall:
I can't begin to thank you and everyone involved in making an employee's life meaningful. You have worked for him to maintain his dignity, in

providing him with employment.

He is proud of himself as I instilled that at an early age, and he is happy to be employed and grateful as we all are.
/s/"

Thank you from the Students and Teachers:

I would like to thank you for your time and energy you gave to our students on Career Day.

From the comments that I heard from the teachers and students, everything seemed to go well.

Thank you again.
/s/"

**What do Windemere, Rehab & Wellness, Patient Registration, Patient Financial Counseling, Nursing, and Community Relations all have in common?**

**Details next week. (But mark April 27 and 28 on your calendars in the meantime!)**

Community Relations, Ext. 804.

## Upcoming Events.....

### Employee Forum
Thursday, April 18th
3:00pm
Hospital Cafeteria.
Cookies & Punch will be served.

### Uniforms Are You
May 9th
Windemere Lobby

### Mark your Calendars
Mandatory Review Days
October 24, 2002



MVH 0288

# Exhibit 26





April 22, 2002

Stephen London, M.D.
Martha's Vineyard Hospital
P.O. Box 1477
Oak Bluffs, MA 02557

Dear Doctor London:

I am writing to you in your capacity as chairman of the Perioperative Services Committee and in follow-up to the last meeting.

I was uncomfortable with both the manner and the mode of presentation of my cases at the last committee. I believe that bringing up three cases for review near the end of the meeting does not provide for adequate discussion by the committee (several members had left the room at that point). Allowing two non-committee members (Dr. R. Koehler and J. Preston) be present at the meeting, concerns me regarding the issue of peer review protection. Both physicians have previously igned from this committee.

I fully understand that the medical executive committee is reviewing its structured peer review process and that required by law changes will likely result from this process review. However, until and unless the committee follows its currently approved format, any cases that come before it may not have the proper peer review protections under our by-laws or Massachusetts laws and regulations. Of course, I will work with Dr. Shah (the external OB/GYN contracted reviewer), and with ACOG for their follow-up annual visit this fall; but I do hope that our committee structure improves internally as well.

I am also requesting that you forward to me the applicable by-laws statement of the function of the Perioperative Committee, and a written description of the criteria for proper case review.

I will be glad to discuss my clinical management of cases in a proper venue, with proper meeting notice, and proper committee composition after they have been reviewed by the designated OB/GYN physician reviewer (Dr. Shah, I believe), and in his presence at the committee meeting.

Thank you.

Deurward, L. Hughes, M.D.
DLH/amh
cc:    Dr. Greg Culley, PCAC Chair
       Dr. James Butterick, CMO
       Dr. John MacArthur, Chief of Staff
       Sharon Clauss-Zanger, Director of Clinical Resource Manager
       Tim Walsh, Interim CEO
       Tim Sweet, Vice Chairman of the Board

0106

# Exhibit 27

*Written for its Therapeutic value, but not sent — (however, did get brought up in a meeting with Tim Sweet)*

April 23, 2002
Memo to: Tim Sweet
From: Deurward and Terry

We ask you to take seriously our tremendous concern regarding the hostile environment present in the operating room – the conspiracy to discredit Deurward and to defame him. From the minute he started to operate at MVH he was challenged and "reported". Everything that he did in a different way was perceived to be wrong. This continues today. London and Preston and Koehler are constantly talking to others about him, and have made it impossible for Deurward to operate. The level of stress is unhealthy for Deurward, and clearly not in the best interests of good patient care. We ask that an impartial third party with a background in resolving these kinds of issues be immediately requested to meet with Deurward and Steve London (since Preston and Koehler will be leaving in a few months). It is a personal liability issue for Deurward, but also a liability issue for the hospital. If you feel that it is appropriate, we will bring this issue up publicly to the general medical staff.

*Who is VICE chair of Board of Trustees of M.V.H.*



EXHIBIT
Hughes
31
2-15-05

0108

# Exhibit 28

FYI    32

April 23, 2002
Memo to: Tim Sweet
From: Deurward Hughes, M.D.
      Terry Kriedman

Re: Suggestions for Perinatal and Perioperative Committee

The events of the past year in obstetrics and gynecology at MVH have precluded any reasonable discussion of case management and outcome at both perinatal and perioperative committee meetings. Perioperative committee has chosen to discuss cases that appear to be an effort to discredit Dr. Hughes' competence. Perinatal committee has chosen not to discuss cases at all because of the obvious hostile environment.

We would like to recommend that these committees seize the opportunity to be educational forums for the ob-gyn department, as well as administrative bodies that make policy. This can be accomplished fairly only in the presence of a third party who is trained in the appropriate field and recognized as someone with credentials and experience. We would suggest that one of the perinatologists from NEMC (where the MVH transfers its high risk patients) come to the monthly perinatal meeting, aid in discussing patients, and periodically give short seminars on pertinent topics. We suggest that Dr. Shah, or any recognized gynecologic surgeon, attend every perioperative meeting to aid in the review of cases involving a gyn surgeon, or in cases that should have involved gyn consultation.

Hopefully, after a while, behavior at these meetings will have changed sufficiently to allow only periodic attendence by these outside reviewers and discussants.

Thank you for your interest in this matter.



EXHIBIT
Hughes
32
2-15-05

# Exhibit 29



TO:      Dr. Bill Tsikitas, Chairman
         Medical Quality Improvement Committee

FROM:    Stephen London, M.D.
         Chairman, Perioperative Services Committee


04/25/2002                                    **CONFIDENTIAL**

RE:  QUALITY IMPROVEMENT MEMO                 **MVH 0290**

Dear Dr. Tsikitas:

I am writing to you regarding the attached letter that I received
today, April 24, 2002 from Dr. Deurward Hughes.  It appears that you
were not an addressee as listed among the people to receive a carbon
copy at the bottom of the letter, however, as chairman of the Quality
Improvement Committee you must be aware of the contents of the
letter.

I am concerned with the contents of the letter on multiple levels,
including inaccurate description of the actual proceedings at the
Perioperative Services Committee meeting and demands by a medical
staff member that exceed his bounds.

Specifically, as far as the agenda of the meeting went, I followed
the cases for review exactly on the order that they were presented to
me for review by the Q.I. Department.  It was apparent toward the end
of the meeting that there would not be adequate time for discussion
and as I was saying that they would be deferred to a future meeting,
I was interrupted by Dr. Hughes in a manner that I can only describe
as accusatory.  It was not clear to him why we would even be
discussing his cases at all, and he made specific remarks that he had
"never worked in a hospital where cases were reviewed for these kinds
of complications."  Of note as well is that the two doctors he
mentions that who were present at the committee were specifically
invited by me, as members of the trauma team, to discuss the issue of
questionable need for continuous availability of a second operating
room for trauma and emergency cases.  The fact that they were in the
room by no means precludes them from participation in and adherence
to all peer review protections.

Dr. Hughes also comments that he is aware that some restructuring of
the Q.I. process may be underway on an executive committee level.  I
believe he is in error in expecting that by-law changes will result
from this review process.  In the interim, we are following the
approved processes that have been in place for quite some time, at
which service level committees act as a screening committee for cases

for review, as an initial step, and then perhaps for higher review at a Quality Improvement Committee level.

Lastly, it is of great concern to me that Dr. Hughes would set terms for review of his cases that are not consistent with current practice, specifically, that his cases only be reviewed by the designated OB/GYN reviewer "in his presence at the committee meeting." It is my understanding that Dr. Shaw has been appointed on some level to act as a reviewer for the OB/GYN department's quality improvement at Martha's Vineyard Hospital, but I have had no indication that his presence at the hospital or any of its meeting is to be anticipated. In any event, the processes that are currently being followed for Quality Improvement review are consistent with the current by-laws and again I plead with Dr. Hughes to, rather than setting terms that meet to his satisfaction, cooperate with the processes that exist that all of the other staff physicians seem to have no particular difficulty in following.

Attached is the copy of Dr. Hughes' letter that I believe you certainly should be aware of.

Sincerely,

STEPHEN LONDON, MD

MEDQ36
DD:  04/25/2002  10:21
DT:  04/25/2002  21:57
#164209

cc: Recipients, 4/22/02  D Hughes Letter

CONFIDENTIAL
MVH 0291

# Exhibit 30

**DEURWARD L. HUGHES, M.D., F.A.C.O.G.**
BOARD CERTIFIED IN OBSTETRICS AND GYNECOLOGY

10 DOLPHINE MERRY ROAD
P.O. BOX 1060
WEST TISBURY, MA 02575
TELEPHONE: (508) 693-4425
FAX: (508) 696-8810

Memo to: Ellen Leone
From: Deurward Hughes
Re: CME, vacation and weekend days (=coverage days)
Date: May 29, 2002

I believe that we (Helen, Ellen, Terry and Deurward) agreed that the contract is clear regarding days off (and their categories), but that the follow through is cumbersome, at best. We also note that it is unlikely that all the allotted days will be taken.

I believe that we agreed that for year two of the contract (April 1 through March 31), there are 18 CME days available. These will be treated separately, taken for CME use, and will not carry over into year three if unused.

There are 60 vacation days available for year two. Vacation days are available for rollover, per contract, but apparently cannot accrue to be greater than 60 days (30 days times two years). There are 52 days of weekend coverage per year, per contract; 14 of these days carried over from last year, and 10 of them have already been used for the ACOG meeting/vacation trip. Therefore, 56 weekend days remain available for year two. Accounting for these days has been a bookkeeping nightmare, especially because I work and am on call seven days a week whenever I am on Island.

My suggestion is as follows: 60 vacation days and 56 weekend (or similar, per contract) days are available for year two. Any nonCME days I would like to have charged against the weekend accrued days first, on a one day for one day basis. The weekly payroll sheet will reflect the same 40 hour week each week (whether it is a seven day week or a one day week) and there could be a quarterly (or monthly, or whatever) accounting of days off taken (whether they are weekend or weekdays).

If it seems that there are many days available to me, please remember that it is unlikely that I will take off that much time, and also that I took off very little vacation/weekend time during year one while the practice was getting started and much was going on.

Thank you. I look forward to your thoughts and suggestions.


EXHIBIT
Hughes
34
2-15-05
PENGAD 800-631-6989

DEURWARD L. HUGHES, M.D., F.A.C.O.G.
BOARD CERTIFIED IN OBSTETRICS AND GYNECOLOGY

10 DOLPHINE MERRY ROAD
P.O. BOX 1060
WEST TISBURY, MA 02575
TELEPHONE: (508) 693-4425
FAX: (508) 696-8810

Memo to: Ellen Leone
From: Deurward Hughes
Re: CME expense account
Date: May 29, 2002

Per contractual agreement, the CME account is funded with $5000 per year (April 1 thru
March 31), with rollover (at least for year one to year two). According to the contract,
attendance at certain courses or seminars at the request of administration are to be reimbursed
from a different account. Before he left, the previous CEO had stated that the Harvard course
on high risk obstetrics would be paid from the nonCME account. Unfortunately, this was not
put in writing during those "turbulent" last days. Therefore, at the end of year one and the
beginning of year two there is either $6003 or $8176 available for year two. (Actually, $2173
has been spent already on ACOG's annual clinical meeting in May, so the available amount
is either $3830 or $6003.)
Please clarify for us the amount that was available on April 1 of this year. Thank you.

# Exhibit 31

**DEURWARD L. HUGHES, M.D., F.A.C.O.G.**
BOARD CERTIFIED IN OBSTETRICS AND GYNECOLOGY

10 DOLPHINE MERRY ROAD
P.O. BOX 1060
WEST TISBURY, MA 02575
TELEPHONE: (508) 693-4425
FAX: (508) 696-8810

Response of Deurward Hughes, M.D. to the issue of coverage with Jason Lew, M.D.
August 20, 2002

I recognize that the coverage issue continues to be an inflammatory one. I also recognize that it is imperative for the administration to be fiscally responsible with its resources, and that coverage for Vineyard Midwifery has been expensive (although no more so than previous coverage for obstetrics or for general surgery).

It is apparent that the Quality Assurance Committee and the administration believe that Dr. Lew has fulfilled or is in the process of fulfilling whatever educational requests were made, and that he practices at the national standard of care for obstetrics and gynecology.

I am certainly willing to enter a mutual coverage arrangement with Dr. Lew under the following circumstances, which should be easily met.

1. This committee and the administration will provide me with a written statement that it is their opinion that Dr. Lew's practice meets the national standard of care.
2. It is recognized by administration that my contract provides for a specified number of weekend days, CME days, and vacation days, and that during the first year while the practice was being established, most of these days were not taken, and remain to be taken. During that same time, I provided coverage for numerous vacations taken by Dr. Lew, as well as covering almost all holidays. Therefore, we do not start anew, but need to take some past history into account.
3. I would request that there be two mediators, each one acceptable to Dr. Lew and to myself, to help initially in setting up the coverage, for at least the first year.
4. Dr. Kriedman, Cathy Chase, and I would cover Dr. Lew. Dr. Lew would cover Dr. Kriedman's practice as well, whenever he is covering and she desires the coverage.



EXHIBIT
Hughes
35
2-15-05

PENGAD 800-631-6989

_= 0044

# Exhibit 32

*for OB/Gyn Coverage file*





**M A R T H A ' S**
**HOSPITAL**
**V I N E Y A R D**

**To:** Dr. Hughes & Dr. Lew
**From:** Sharon Clauss-Zanger
**Subject:** OB/Gyn Coverage
**Date:** August 27, 2002

cc:  Tim Walsh

In an effort to develop a cross-coverage plan for OB/Gyn, please select a physician mediator who will able to attend a coverage meeting with you in early September.

The purpose of the mediator will be to assist in negotiating an equitable coverage arrangement for OB/Gyn which will drastically reduce our need for locum tenens physicians.

Please provide me with the name of your chosen mediator prior to September 6, 2002 at which time schedule a meeting to address the uncovered days y have both requested for the remainder of 2002.

Thank you for your immediate attention to this reque

SCZ/aha

REDACTED

EXHIBIT
Hughes
36
2-15-05

PBIGAD 800 631-6989

Post Office Box 1477 • Oak Bluffs • Massachusetts 02557 • 508 693-0410 • FAX 508 693-5971

**CONFIDENTIAL**
**MVH 0142**

# Exhibit 33



**M A R T H A ' S**
**HOSPITAL**
**V I N E Y A R D**

**MEMORANDUM**

**To:**   Deurward Hughes, MD
**From:**   Sharon Clauss-Zanger
**Subject:**   Follow-Up on your OB/Gyn Coverage Questions
**Date:**   September 9, 2002

I tried to reach you on Friday Afternoon but no one answered the Vineyard Midwifery Telephone.

I met with Tim Walsh on Thursday, September 5, 2002 to clarify questions raised about the OB/Gyn coverage.

1) Cross Coverage is to be arranged between Dr. Lew and yourself.

2) Cathy Chase is not expected to assume first coverage for Dr. Lew's patients.  This has been communicated to Cathy by Tim and Ellen.

Today I have forwarded a memo to you and Jason. When I receive a copy of the OB/Gyn cross coverage schedule from you and Dr. Lew, I will review it and speak with Tim about any uncovered time periods to ascertain how the Hospital will manage this.

I will be in touch with you and Dr. Lew at that time.



EXHIBIT
Hughes
37
2-15-05

0045