# Affidavit of Gretchen Edson
# Part 4

# Exhibit 34



**To:** Jason Lew, MD and Deurward Hughes, MD

**From:** Sharon Clauss-Zanger

**Subject:** OB/Gyn Cross Coverage 10/1/02 - 01/14/03

**Date:** September 9, 2002



I am pleased to hear that you have had a preliminary meeting to discuss cross-coverages of OB/Gyn.

Please schedule another meeting and complete the attached calendars indicating a mutually agreed upon coverage schedule for 10/1/02 through 01/31/03.

Please submit this to me no later than September 20, 2002.

You should both be aware that there has been no outside coverage approved for either of your time off requests after 09/30/02 and Mr. Walsh will not consider this option until I present him with what you both are willing to cross cover.

Thank you for your prompt attention to this matter. As you can see, time is of the essence to prevent disruption in your plans.



0046

# Exhibit 35



M A R T H A ' S
**HOSPITAL**
V I N E Y A R D

**MEMORANDUM**

**To:** Deurward Hughes, MD

**From:** Sharon Clauss-Zanger

**Subject:** OBGyn Draft Coverage Schedule 10/01/02-01/31/03

**Date:** September 10, 2002

I have received your voice mails and have forwarded your issues to Bill Tsikitas, MD and Tim Walsh, CEO.

Dr. Tsikitas will contact you to discuss Dr. Shah's letter and report your meeting with Dr. Shah and a letter from the Medical Quality Improvement Committee. He assures me that these requests will be fulfilled before October 1, 2002. As far as Dr. Lew's coverable vacation time, this will be decided at a later date and you will be informed of that time.

In the interim, please move forward with drafting an OB/Gyn coverage schedule with Dr. Lew for the period of October 1, 2002 through January 31, 2003 and submit the draft to me before September 20, 2002.

The requests for coverage for the time period following September 30, 2002 cannot be honored until I have the draft schedule to present to Mr. Walsh

Thank you for your assistance.



EXHIBIT
Hughes
39

- 0054

# Exhibit 36

# ENGEL & SCHULTZ, P.C.

### Attorneys at Law

125 High Street, Suite 2601
Boston, MA 02110-2704

Mark D. Engel
Email: mdengel@engelschultz.com

Phone: (617) 951-9980
Facsimile: (617) 951-0048

September 18, 2002

<u>VIA FACSIMILE (508) 696-0437 and</u>
<u>AIRBORNE EXPRESS</u>

Mr. Timothy Walsh
Chief Executive Officer
Martha's Vineyard Hospital
P.O. Box 1477
Oak Bluffs, MA 02557

*Re:    Dr. Deurward L. Hughes*

Dear Mr. Walsh:

This office represents the above-referenced Deurward L. Hughes, M.D. regarding his employment by MVH Physicians, Inc. generally and, specifically, his efforts to accommodate Martha's Vineyard Hospital (the "Hospital") by providing expanded OB/GYN coverage.

I have reviewed Dr. Hughes' employment contract dated April 1, 2001 (the "Contract") and, in order to put the present coverage issues in context, it is important to note the following contractual provisions:

1.    Dr. Hughes is granted the control over the means, manner and method by which he provides services to his patients.

2.    Dr. Hughes' obligation to provide coverage to Dr. Lew expired as of May 1, 2001.

3.    Dr. Hughes is <u>entitled</u> to coverage from off-island physicians.

4.    Dr. Hughes is entitled to six (6) weeks of vacation per year which may be utilized in the year following their accumulation. He currently has accumulated 30 vacation days from the first contract year. In addition, Dr. Hughes has accumulated 18 CME days (8 from year 1, 10 from year 2) and is entitled to coverage for an additional 52 days for weekends per year.

ENGEL & SCHULTZ, P.C.

Mr. Timothy Walsh
September 18, 2002
Page 2

Notwithstanding the preceding contractual rights, Dr. Hughes recognizes the cost of such "off-island" coverage and is willing to cooperate with the Hospital in an effort to reduce said costs. The Hospital has requested that Dr. Hughes enter into a cross-coverage arrangement with Dr. Lew. As he has indicated to you previously, Dr. Hughes is willing to attempt to accommodate the Hospital's efforts, but feels it is crucial that the basis upon which he enters into such an arrangement be clear and unambiguous.

Accordingly, please be advised that Dr. Hughes would be willing to enter into a cross-coverage arrangement with Dr. Lew upon the following terms and conditions:

1.      The arrangement would be for a four (4) month period only to cover the period of October 1, 2002 through January 31, 2003 (the "Trial Period").

2.      Dr. Hughes could terminate the arrangement upon thirty (30) days written notice to the Hospital.

3.      The Hospital shall provide coverage for Dr. Hughes, whether by Dr. Lew or, if necessary, by "off-island" physicians for all of the time off, whether for vacation or for CME, to which Dr. Hughes is contractually entitled, as specified in ¶4 on page one of this letter.

4.      The Hospital shall forthwith notify Dr. Hughes, through his counsel, of the number of days that Dr. Hughes is expected to cover for Dr. Lew during the Trial Period and shall specify what, if any, major holidays for which coverage is being requested.

5.      A determination of dates for cross-coverage is to be mutually agreed upon. In the event that there is a disagreement, the Hospital administration shall participate in resolving such disagreement.

6.      During the periods that Dr. Lew is covering for Dr. Hughes, he shall also provide coverage for Dr. Terry Kriedman.

Please note that the above-described proposal is put forth strictly as an accommodation to the Hospital and is intended merely as a trial. Dr. Hughes does not waive any right granted to him under the Contract, either by this proposal nor by his participation in the trial cross-coverage contemplated thereby.

ENGEL & SCHULTZ, P.C.

Mr. Timothy Walsh
September 18, 2002
Page 3


I trust you will find the above-described proposal fair and reasonable and put forth in the spirit of cooperation intended by Dr. Hughes. Kindly contact me at your earliest convenience to arrange for a memorialization of the proposal.

Very truly yours,

Mark D. Engel

MDE/sb
cc:    Dr. Deurward L. Hughes
       Ms. Sharon Claus-Zanger (via facsimile (508) 693-3956)

# Exhibit 37

**DEURWARD L. HUGHES, M.D., F.A.C.O.G.**
BOARD CERTIFIED IN OBSTETRICS AND GYNECOLOGY

10 DOLPHINE MERRY ROAD
P.O. BOX 1060
WEST TISBURY, MA 02575
TELEPHONE: (508) 693-4425
FAX: (508) 696-8810

To: John MacArthur, M.D.
    Chief, Medical Staff, MVH
From: Deurward L. Hughes, M.D.
Date: October 21, 2002

I have just been notified that I am invited to a meeting with Dr. Shah and Dr. Lew and Cathy Chase on Saturday, October 26, 2002, presumably to discuss the outcome of Dr. Lew's remedial training, and in conjunction with the hospital's desire for cross coverage between myself and Dr. Lew.

I want to reiterate, again, that the Hospital has not lived up to the promises made to me. I requested that the QA committee provide me with written assurance that Dr. Lew had satisfactorily finished his remedial work and that he practiced up to the standard of care. I expect that that standard would be the one used by the ACOG review in their assessment of providers at MVH last year. That letter was promised to be given to me prior to October 1, 2002, the start date for the cross coverage, and I have not received it.

I was also told that I would have the opportunity to share my concerns with Dr. Shah, privately, and I have never been allowed to do so. I have never met Dr. Shah, and, to my knowledge, he has not spent time at MVH assessing Dr. Lew, nor has he met with me. I have knowledge of at least four cases of Dr. Lew's that I plan to discuss at Saturday's meeting with Dr. Shah. These are patients that I was asked to cover by Dr. Lew. Please contact me for their names so that the appropriate charts will be available for the meeting.

I regret that I must continue to be critical of the QA process for ob-gyn case reviews at this hospital. I have been told that my cases, as well as Dr. Lew's, have been forwarded to Dr. Shah for review. I have not been given any feedback regarding my cases, nor Dr. Lew's, and therefore, quality review is not serving any teaching function, as it should be doing. In addition, since the ACOG reviewers were not critical of my practice management, I do not understand why my cases are being sent out for review to a peer reviewer who, like me, is a board certified clinician. I believe my teaching credentials to be at least as good as his are..

Despite all of the above problems, I will be present at the meeting with Dr. Shah, and will be voicing my concerns at that time.

Cc: Tim Walsh, CEO
    Sharon Claus-Zanger, QA
    Mark Engel, Esq.



EXHIBIT
Hughes
41
2-15-05
PERIGAD 000 631 6959

# Exhibit 38

To: Members of QA, Sharon Claus-Zanger, and other guests at the meeting with Dr. Shah held on Saturday, October 26, 2002
From: Deurward Hughes, M.D.
       Tery Kriedman, M.D.

For the record, we are hopeful that there will be meaningful quality assurance and improvement both for the department of obstetrics and gynecology and for the hospital as a whole. We hope that it will start without further delay, and look forward to meeting with Dr. Shah, or another physician, in person, during the next few weeks.

Also, for the record, we would like to register our concerns with the choice of Dr. Shah for the position which has now been labeled as "consultant" to the ob-gyn department. The attitude that he displayed at the meeting on Saturday was offensive. He is being paid a substantial fee, we are sure, to work for Martha's Vineyard Hospital, but conveyed that he was far too busy to spend time at an institution with only about 100 deliveries. We agree that Women's and Infants is a fine hospital, but no better than others where we have worked. Dr. Shah's smug self assurance communicated that he was an authority on obstetrics and gynecology. He is not. He may be a well trained, board-certified, clinician who trains residents (as did we both do in Philadelphia), but he does not dictate the standard of care.

Even ACOG is extremely careful to define what recommendations are based on good studies, and what recommendations are based on usual practice, and allows for alternatives of treatment. No where is it stated by ACOG that umbilical cord ph should always be obtained on infants with an apgar greater than 6 at 5 minutes. A cord ph is useful in a depressed baby that does not respond right away to resuscitation, and may be helpful in possible future litigation. Furthermore, the use of a delee suction , stated by Dr. Shah to be the standard of care, was discouraged by the neonatologist from Boston who taught the neonatal resusitation course at MVH. And certainly Dr. Shah would recognize that the lack of chorionic villi in a path note on a hospital chart would require reviewing the office record to recognize that the follow up pregnancy test was done as indicated (especially in a hospital without an inhouse pathologist). Finally, we do not see how his knowledge of the greek or latin root of the word "meconium" makes him anything other than someone with a superiority complex who likes to show off.

We would like to better patient care through the QA process, and learn more in the process. This can only be accomplished through open discussion of cases, in person, without ridicule. Let's hope that that will happen.



0117

# Exhibit 39

1

Pages:    1-77

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

DOCKET NO. 04-10564-DPW

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEURWARD L. HUGHES, M.D.                    \*

    Plaintiff                               \*

vs.                                         \*

MARTHA'S VINEYARD HOSPITAL                   \*

    Defendant                               \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


    DEPOSITION of SAMUEL P. DONEGAN, a Witness called

by the Plaintiff, taken pursuant to the provisions of

the Federal Rules of Civil Procedure, before Peter J.

Wood, a Professional Court Reporter and Notary Public

in and for the Commonwealth of Massachusetts, at

Mansion House, 9 Main Street, Vineyard Haven,

Massachusetts, on Wednesday, March 9, 2005, commencing

at 10:45 a.m.


WOOD COURT & CONFERENCE REPORTING
77 SUMMER STREET
COHASSET, MA 02025
(781) 383-6621

1       do?

2   A   I contacted the hospital administration to verify

3       the contents of the advertisement.

4   Q   To whom did you talk?

5   A   I talked to Ken Chisholm.

6   Q   What did Mr. Chisnolm tell you?

7   A   He, to the best of my recollection, verified that

8       they were seeking a physician to come in and

9       expand the hospital-based practice.

10  Q   What, if anything else, did he tell you?

11  A   He said they were looking for someone with

12      administrative experience and training and

13      management.

14  Q   At that time, did he make any mention of Dr.

15      Hughes?

16  A   He explained that the scope of the existing

17      practice was the midwife and with Dr. Hughes'

18      coverage.

19  Q   What did he tell you?

20  A   He said that their concept would be that the

21      practice would continue to expand with the

22      infusion of new skill levels, new procedures, and

23      with a focused attempt on trying to recoup

24      patients they believed were going off island for

WOOD COURT & CONFERENCE REPORTING

17

1          be employed by the hospital?

2    A     He alluded to the fact that the hospital believed

3          there was a significant volume of patients going

4          off island, and their hope and their expectation

5          was that by bringing another physician in, that

6          they would be able to recoup those patients and

7          build the practice by capturing that patient

8          volume.

9    Q     Did he show you any statistics or mention any

10         statistics regarding the number of patients that

11         were going off island?

12   A     He did not.

13   Q     Did he allude to a study which discussed that

14         issue?

15   A     I don't recall him doing so.

16   Q     Did he discuss at all Dr. Lew during this

17         interview?

18   A     Other than to reiterate that he was in practice

19         with a private practice at the hospital, I do not

20         believe he elaborated more than that.

21   Q     Did he mention what hours he expected you to

22         work?

23   A     He explained that he saw the job as being a full-

24         time job including call coverage as well.

WOOD COURT & CONFERENCE REPORTING

1    Q    Did you meet at all with Tim Walsh?

2    A    I don't believe at that visit I did.

3    Q    Taking them one at a time, what do you recall Mr.

4         Chisholm saying to you and asking you in this

5         interview?

6    A    He again gauged my interest in the practice, my

7         willingness to try and build the practice, my

8         ability to work with a midwife, my interest in

9         activities above and beyond the practice such as

10        community initiatives and public health

11        initiatives.

12   Q    Did he indicate that the job description had at

13        all changed since the first ad that had been

14        issued for this position?

15   A    I don't believe there was any indication at that

16        visit that call coverage arrangements had been

17        changed.

18   Q    Was there any indication that they were no longer

19        seeking a chief of the department?

20   A    Not at that visit.

21   Q    Was there any mention at this time that Dr.

22        Hughes was going to be terminated, and you'd be

23        replacing him?

24   A    Not to my recollection.

# Exhibit 40



# MARTHA'S VINEYARD HOSPITAL

One Hospital Road • P.O. Box 1477 • Oak Bluffs, MA 02557
Tel: 508 693-0410 • Fax: 508 696-0437

Timothy J. Walsh
Chief Executive Officer

August 12, 2003

Dr. Deurward Hughes
Martha's Vineyard Hospital
P. O. Box 1477
Oak Bluffs, MA  02557

Dear Dr. Hughes:

In accordance with Section 3.2 of your employment agreement, the Hospital hereby gives you notice that the Hospital is terminating that agreement effective Tuesday, February 10, 2004.

Until that time the hospital expects you to comply with all provisions of your employment agreement.

Sincerely,

Ken Chisholm
Human Resources Director

KC/cjm



EXHIBIT
Hughes
49
2-15-05

- 0133

# Exhibit 41

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EXHIBIT
*Hughes*
52
2-15-05

| | |
|---|---|
| DEURWARD L. HUGHES, MD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 04 10564 DPW |
| | ) |
| MARTHA'S VINEYARD HOSPITAL, | ) |
| | ) |
| Defendant. | ) |

## PLAINTIFF DEURWARD L. HUGHES, MD'S ANSWERS TO DEFENDANT MARTHA VINEYARD HOSPITAL'S FIRST SET OF INTERROGATORIES

*INTERROGATORY NO. 1*

Identify the person or persons who prepared, or in any way assisted in preparing, any of the answers to these interrogatories and, as to each such individual, identify which answer(s) or portion of the answer(s) the person prepared or assisted in preparing.

*ANSWER TO INTERROGATORY NO. 1*

I prepared the answers to these interrogatories and was assisted by counsel.

*INTERROGATORY NO. 2*

Identify any documents used in any manner to prepare or assist in preparing any of the answers to these interrogatories and, for each such document, identify the particular interrogatory answer(s) or portion thereof for which it was used.

-1-

### ANSWER TO INTERROGATORY NO. 2

I reviewed all documents produced in this case in preparing my answers to the Interrogatories.

### INTERROGATORY NO. 3

Identify each person (other than Plaintiff's attorney) with whom Plaintiff has had any communications relating to any of the allegations in the Complaint; describe the substance of the communications that Plaintiff has had with each such person; and state whether Plaintiff has obtained or sought to obtain a written statement from each such person.

### ANSWER TO INTERROGATORY NO. 3

On February 19, 2002, I was being reviewed for active staff privileges. At a staff meeting on which a vote was being taken on whether I would receive full active staff privileges, Richard Koehler spoke to all staff, including me, and read a document, urging a vote against granting me full staff privileges. Richard Koehler further stated before the entire hospital staff that he would not operate with me or make himself available to me for surgical consultation. After the meeting I asked Dr. McArthur why he did not defend me at the staff meeting, to which he responded, "You got privileges, didn't you."

After the hospital advertised for another OB/GYN, I asked Tim Walsh on two occasions what my future would be at the hospital. One such communication occurred on August 20, 2003. On both occasions, Mr. Walsh stated that he could not tell me at that time. On one occasion, he stated to me that the Hospital was going to hire a full-time person. He also stated that would not discuss the matter because he did not like getting letters from lawyers and phone calls from members of the Board. I asked Tim Walsh how could he explain the fact that the

number of obstetrical deliveries had increased significantly during my tenure. He responded that the increase was due to the presence of Cathy Chase. I replied that Cathy Chase was a constant, since she had practiced with Jason Lew prior to practicing with me. I indicated that the only thing that had changed, and which had led to the increase in deliveries, was my presence in the hospital practice.

I spoke with members of the Quality Assurance Committee following the receipt of an ACOG Review of the OB/GYN physicians and midwife at Martha's Vineyard Hospital. Specifically, I informed the members of the Committee that I would like to review the report on Jason Lew. I was informed that I could not see the report on Dr. Lew. The members of the Committee informed me that ACOG had found my quality of care to be up to the standard of care. I was later informed in a communication with Sharon Clauss-Zanger that the Hospital had allowed Dr. Donegan to review the ACOG report on Dr. Lew.

I spoke with Dr. John McArthur and requested to have a conference with Dr. Shah, who I understood had been hired to monitor Jason Lew. Dr. McArthur told me that I could not communicate with Dr. Shah. I was later informed in a communication with Sharon Clauss-Zanger that Dr. Donegan was flown to Providence, Rhode Island in order to have a conference with Dr. Shah about Jason Lew. Dr. McArthur also informed me on one occasion that Tim Walsh asked him to inform me that I would have to cross-cover with Jason Lew.

I asked Dr. McArthur to place me on the Quality Assurance Committee, which required an OB/GYN on the Committee according to the by-laws. He told me that I was not going to be placed on the Quality Assurance Committee because of my conflict with Jason Lew. I then

requested that he place me, Dr. Lew and Terry Kriedman, MD (the three OB/GYNs on staff) on the committee. Dr. McArthur stated that he would not do this either.

After I was terminated, Ken Chisholm asked me to transition Dr. Donegan. I asked if I could continue my employment for one year during the transition, as had been done by Dr. McArthur, who had been doing less work in the operating room than me and has remained employed for more than one year during the transition of two surgeons who I understood had been hired to replace him. Ken Chisholm told me "No".

At a meeting with office staff, Mr. Chisholm asked me to lie to patients by telling them I had retired. I refused to do so.

When I was terminated, I met with Ken Chisholm to ask why I had been terminated. He stated the Hospital wished to hire a full time OB/GYN and the Hospital expected to increase the number of operations and obstetrical patients.

I communicated with Lisa Rosen, MD, who had been contacted as a reference when I had first applied to work at Martha's Vineyard Hospital. She informed me that a physician, who had indicated he had been designated by the Hospital to make "reference" calls regarding me, had asked her "Why someone [my] age would want to continue to practice medicine and do obstetrics?" Dr. Rosen told me that she informed the reference caller that "Maybe it was because Dr. Hughes was so good at it and loved doing it."

I communicated with Don Lyons. He informed me that he had asked Sandy Ray, a Hospital Board Member, why the Hospital was terminating Dr. Hughes. Mr. Ray informed Mr. Lyons that the "Hospital wished to go with someone who would be around for the long term."

-4-

Greg Culley and Dan Kaplan, both former Board Members, called me to indicate they would do whatever they could to help me. My counsel later spoke with both Dr. Culley and Mr. Kaplan. His communications are attorney-work product and privileged.

I have spoken with Dr. Tim Guiney, a Board of Trustee member, who indicated that he believed what the Hospital was doing to me was totally unfair.

I have produced all written communications relating the allegations in this Complaint.

I have never sought to obtain a written statement from Richard Koehler, Tim Walsh, any members of the Quality and Assurance Committee, Sharon Clauss-Zanger, John McArthur, Ken Chisholm, Don Lyons, Greg Culley, Dan Kaplan or Tim Guiney.

*INTERROGATORY NO. 4*

Identify each Hospital employee, staff physician, administrator or Board Member to whom Plaintiff made a complaint (formally or informally) of discrimination, or informed that he believed he had been the victim of discrimination or treated differently than other Hospital employees, physicians or staff, and for each such response state:

    (a)    the nature of the alleged discriminatory act, including the name(s) of the alleged person(s) who committed the discriminatory act, and a description of the alleged incident or statement;

    (b)    if the alleged discriminatory act was a statement, state the exact words used by the individual who committed the alleged act;

    (c)    whether the·complaint was made orally or in writing;

    (d)    the date of the complaint;

    (e)    the individual's response to the complaint, including but not limited to whether he/she reported such incident to the Hospital; and

    (f)    the Hospital's response to the complaint, including but not limited to whether the Hospital contacted Hughes with respect to the complaint.

*ANSWER TO INTERROGATORY NO. 4*

On August 17, 2001, I met with the Hospital's Joint Conference Committee. I raised complaints that I was being harassed and not welcomed by the Hospital and that I was being forced to work in a hostile environment. According to the minutes of the meeting, after I was asked to leave the meeting, it was stated that "[t]he age issue was carried on for the next several months even after the credentials were approved." According to the minutes oF the meeting, Chairman of the Board Ted Morgan stated that "No others have been treated as poorly as Drs. Hughes and Kriedman have been recently."

Shortly after John Ferguson became Chairman of the Board, my wife, Dr. Kriedman, and I met with Mr. Ferguson after a staff meeting. We complained that the two of us were being treated differently from other staff and were being harassed. He told me that that wasn't his concern and I should make any complaints to Tim Walsh. I did not follow up with Tim Walsh, because I had no faith in his impartiality, based on many prior communications.

In 2002, I spoke with Tim Sweet, Vice Chairman of the Board, to complain that other physicians at the Hospital had made baseless allegations against me to the Board of Registration of Medicine seeking to revoke my license. The Board of Registration subsequently dismissed all of the allegations. I asked him to look into the matter and to please try to stop them from continuing to harass me. I do not know if he ever did anything, although Dr. London, whom I believed to be one of the doctors behind the baseless charges, continued to make baseless charges against me.

In 2003, I complained to Dr. Tim Guiney when I learned that the Hospital was interviewing candidates for a supposedly new OB/GYN position, which in fact was aimed at

replacing me. Dr. Guiney informed me that he spoke with Mr. Walsh and informed Mr. Walsh

that I had to be interviewed for the job. Nevertheless, Mr. Walsh never interviewed me for the

job.

*INTERROGATORY NO. 5*

State all facts which Hughes claims support his allegations in the Complaint that he was

the victim of race discrimination.

*ANSWER TO INTERROGATORY NO. 5*

Plaintiff objects to this Interrogatory as overly broad, vague and burdensome to answer

and seeking privileged work-product of plaintiff's attorney. The interrogatory in essence asks

Plaintiff to state every fact upon which he intends to rely in prosecuting the case. Plaintiff has

set forth certain facts supporting his allegation of race discrimination in his Attachment to his

Complaint to the MCAD. Plaintiff is still conducting discovery relating to facts within

defendant's custody and control relevant to the allegations of race discrimination.

*INTERROGATORY NO. 6*

State all facts which Hughes claims support his allegations in the Complaint that he was

the victim of age discrimination.

*ANSWER TO INTERROGATORY NO. 6*

Plaintiff objects to this Interrogatory as overly broad, vague and burdensome to answer

and seeking privileged work-product of plaintiff's attorney. The interrogatory in essence asks

Plaintiff to state every fact upon which he intends to rely in prosecuting the case. Plaintiff has

set forth certain facts supporting his allegation of age discrimination in his Attachment to his

Complaint to the MCAD.  Plaintiff is still conducting discovery relating to facts within

defendant's custody and control relevant to the allegations of age discrimination.

*INTERROGATORY NO. 7*

State the basis(es) for your contention that "the Hospital had asked one or more of Dr.

Hughes' references why someone of his age would still want to practice obstetrics and

gynecology," as alleged in paragraph 10 of the Complaint; identify the "references" referred to

therein; and identify the Hospital employee or staff member who contacted each "reference(s)".

*ANSWER TO INTERROGATORY NO. 7*

Lisa Rosen, M.D., informed me she had been contacted as a reference when I had first

applied to work at Martha's Vineyard Hospital.  She informed me that a physician, who had

indicated he had been designated by the Hospital to make reference calls regarding me, had

asked her "Why someone [my] age would want to continue to practice medicine and do

obstetrics?"  Dr. Rosen told me that she informed the reference caller that "Maybe it was

because Dr. Hughes was so good at it and loved doing it."  Dr. Rosen does not recall the name of

the doctor who called her on behalf of Martha's Vineyard Hospital.

*INTERROGATORY NO. 8*

State the basis(es) for your contention that "no younger or non-minority doctors with Dr.

Hughes' experience, credentials and references have ever been subjected to the monitoring and

review to which the Hospital sought to subject Dr. Hughes," as alleged in paragraph 13 of the

Complaint.

*ANSWER TO INTERROGATORY NO. 8*

I base my statement on my personal observations of the monitoring and review which the Hospital has imposed upon other doctors at the Hospital.

Specifically, I note that the Hospital approved Pieter Pil to perform gynecological operations without the monitoring to which I was subjected, despite the fact that Dr. Pil was just out of surgical residency. Upon information and belief, the Hospital did not have documentation that Dr. Pil had even performed gynecological surgery in residency. The Hospital also did not require similar monitoring of either Denise Fraser, M.D, or Samuel Donegan, M.D., in the operating room.

*INTERROGATORY NO. 9*

Please state the number of hours per week Hughes maintained office hours at the Vineyard Midwifery Practice for the period April 1, 2001 to February 10, 2004.

*ANSWER TO INTERROGATORY NO. 9*

I had office hours one and one-half days per week, as requested by the practice. I was available to meet with any patients that required my services seven days/week and never refused to see a patient outside of my scheduled office hours. My office staff was informed that I would meet with patients on any day if necessary to accommodate an overflow of patients during normal office hours. My time sheets are in the custody and control of the Hospital.

*INTERROGATORY NO. 10*

Please state the number of obstetric patients seen by Hughes from April 1, 2001 to February 10, 2004 at the Vineyard Midwifery Practice, not including patients under the care of Catherine Chase.

*ANSWER TO INTERROGATORY NO. 10*

-9-

I saw all obstetric patients in the Vineyard Midwifery Practice. There was no such thing as a patient "under the care of Catherine Chase". I insisted on seeing any obstetric patient at least twice during their pregnancy and was available twenty four hours/day for consultation with patients and for delivery.

*INTERROGATORY NO. 11*

Please state whether Hughes ever refused or declined to provide coverage for Catherine Chase, and if your answer is anything other than an unqualified negative (1) state the time period for which he refused to provide coverage, and (2) the reason he refused to provide coverage.

*ANSWER TO INTERROGATORY NO. 11*

Prior to the Hospital's decision to seek a replacement for me, it was the Hospital's practice to hire a midwife to cover for Cathy Chase when she went on vacation. The Hospital hired a midwife who worked eight hours/day. I provided the back-up for the midwife during these eight hour periods. If a patient went into labor during the other 16 hours of the day, I provided complete coverage for the patient during this period, including the care which would normally be provided by a midwife.

In 2003, after I had learned that Cathy Chase had been active on a committee seeking to find a replacement for me and that she had deliberately not told me about these activities, she requested that I cover for her without any midwife participation. I told her that I would do so only if requested to do so by Administration. The Administration never requested that I do so.

*INTERROGATORY NO. 12*

Please state whether Hughes ever refused or declined to provide coverage for Hospital physicians or staff, and if your answer is anything other than an unqualified negative (1) state the

name of the physician for whom Hughes refused to provide coverage; (2) state the time period

for which he refused to provide coverage; and (3) state the reason he refused to provide

coverage.

### ANSWER TO INTERROGATORY NO. 12

I was involved in negotiations, spelled out in documents produced to defendant, to

determine the extent of my obligations to cover Dr. Lew.  Even while negotiations were

ongoing, I covered for Dr. Lew.  To the best of my recollection, I never refused or declined to

provide coverage for Dr. Lew or any other physician on any occasion that I was requested to do

so.  It is conceivable, although I have no recollection of it occurring, that having no contractual

obligation to cover for Dr. Lew, that I might have declined to cover for him if he requested that I

cover on a date that I would have had my own plans to be off-island.

### INTERROGATORY NO. 13

Please state the basis(es) for all damages Hughes claims in the Complaint and provide the

following information for each element of the damages claimed:

(a)     state the amount of damages claimed;

(b)     identify all documents relied upon by Hughes to establish such damage and the
        amount thereof;

(c)     identify all facts upon which Hughes relies in support of his claim for damages;
        and

(d)     state the manner in which Hughes determined the amount of each damage item
        calculated.

### ANSWER TO INTERROGATORY NO. 13

I have retained an expert to review the issue of damages and shall supplement this answer

in a timely manner.

-11-

*INTERROGATORY NO. 14*

Please identify each employer, including but not limited to each hospital, physicians

practice group, or other medical establishment, with the exception of Defendant, that Hughes

contacted or was contacted by or on behalf of concerning employment from his date of hire at

Hospital to present, and include in your answer the following information with respect to each

such entity:

(a)    the specific source or referral or recruitment, if any, to or by the employer (e.g., advertisements, employment agencies, personnel services, personal contacts, etc.);

(b)    the date of each such contact with the employer, employment agencies or personnel service, the form of the contact (e.g., in person, by letter, or by telephone), the identity of each person contacted and the substance and result of each such contact;

(c)    the nature of the specific position or positions sought, including the job title and responsibilities, if available;

(d)    whether or not Hughes submitted a written application, resume or any type of correspondence in connection with initiation of the employment process, and if so, the date thereof and the identity of the person to whom it was submitted;

(e)    the dates of all interviews, if any, and the identity of the person(2) with whom Hughes spoke;

(f)    whether or not Hughes received a job offer, and if so, the date of such offer, the terms and conditions of such offer (including the job title, salary level and fringe benefits), and whether or not Hughes accepted said offer(s); and

(g)    if the job offer(s) was not accepted, please state the precise reason for the rejection.

*ANSWER TO INTERROGATORY NO. 14*

On January 23, 2004, I wrote Comp Health seeking employment. Comp Health is a

company that provides physician coverage nationally for physicians and hospitals needing

-12-

coverage for vacations, illnesses, etc. I was informed by phone in or around July 2004 that my application has been approved. However, to date, I have not been offered any positions by Comp Health. The amount of compensation depends on the assignment.

I applied for a position as an OB/GYN at Jordan Hospital, Plymouth, Massachusetts. I sent my resume to the Hospital. I was informed that they were reviewing my application, but I was never interviewed. They hired another physician.

I was contacted on one occasion during my employment with the Hospital by Attorney Kevin Wright to review a malpractice case. Since I have been terminated by the Hospital, I have provided services to Attorney Wright regarding a malpractice action. To date, I have billed Attorney Wright $7,400, but have received no payment.

*INTERROGATORY NO. 15*

Please state whether Hughes has been employed in any manner (including self-employed) at any time from his separation from employment with Hospital to date, and if so please state:

    (a)    the name, address, and telephone number of each company or business enterprise where Hughes is or has been employed (or self-employed) and the exact dates of employment with each;

    (b)    the nature of the business of each of the above companies or business enterprises;

    (c)    for each of the above companies or business enterprises, the titles of each position held by Hughes, the job responsibilities in each position, career progression and promotional opportunities available in such position, the dates each such position was held, and the salary and fringe benefits received in each position;

    (d)    the gross earnings to date received by Hughes from each of the above employers or business or gross earnings received from self-employment;

    (e)    identify all of Hughes' supervisors in each position held; and

    (f)    if Hughes has left any such position, describe in detail the reason(s) therefore and provide the date(s) of such departure.

-13-

*ANSWER TO INTERROGATORY NO. 15*

See Answer to Interrogatory No. 14.

*INTERROGATORY NO. 16*

Please state whether Plaintiff has sought staff privileges (or the right to practice) at any

hospital or medical establishment (including private practice) at any time from his separation

from employment with Hospital to date, and if so please state:

> (a)    the name, address, and telephone number of each hospital or medical
>        establishment
>        where Hughes has applied for staff privileges;

> (b)    if Hughes has been granted staff privileges (or the right to practice) at any of the
>        establishments listed in subpart (a).

*ANSWER TO INTERROGATORY NO. 15*

No.

Signed under the pains and penalties of perjury this ___/___ day of _September_, 200*4*.

_____
Deurward Hughes, M.D.

As to Objections:                          PLAINTIFF'S ATTORNEY,


_____
Stephen Schultz, Esq.
BBO# 447680
Engel & Schultz, P.C.
125 High Street, Suite 2601
Boston, MA 02110
(617) 951-9980 (Tel)
(617) 951-0048 (Fax)

Date: _____9/1/04_____

-14-

Certificate of Service

I hereby certify that I served a copy of the above-entitled document on counsel of record for defendant in the case by first class mail/by hand on this ___/___ day of _September_ , 200_5_.

Stephen Schultz

-15-

# Exhibit 42

DEURWARD L. HUGHES, M.D., F.A.C.O.G.
BOARD CERTIFIED IN OBSTETRICS AND GYNECOLOGY

10 DOLPHINE MERRY ROAD
P.O. BOX 1000637
WEST TISBURY, MA 02575
TELEPHONE: (508) 693-4425
FAX: (508) 696-8810

Memo to: Director of Clinical Resource Management
From: Deurward L. Hughes, M.D.  *DLH*
Date: April 17, 2003

This memo is being submitted under Administration Department Policy #9 regarding Disruptive Conduct by a Member of the Medical Staff. The incident involved Dr. Steve London, and occurred on April 16, 2003 at approximately 4:00 p.m. Unfortunately, this incident was only one of the more egregious acts in a pattern of conduct of disruptive, unprofessional and unethical behavior of this physician towards me. It also occurred in the presence of other hospital staff members, and right outside of the patient's room.

Present at the time that this behavior occurred were Brian Hendrickson, R.N. nurse manager, Chris Fielder, R.N., nursing supervisor, Susan Cahill, R.N. on maternity, and Susan Bettencourt, R.N. on maternity.

The patient involved in this case is Judy Marie Maynard, admitted on April 15, 2003. Dr. London's behavior had the potential to significantly delay the emergency surgical care that Ms. Maynard required, and could have undermined the confidence that the patient had in her obstetrician.

Briefly, the facts of the patient's clinical course are as follows: she was admitted in labor, delivered by the midwife. On the morning of April 16, the patient had a post partum hemorrhage and was taken to the operating room with the diagnosis of retained tissue and underwent a D and E. Bleeding was controlled, and she was returned to her room in stable condition. In the afternoon of April 16, the patient had a recurrence of bleeding and was symptomatic. I evaluated the patient and determined that some placental fragments could still have been retained, and recommended a repeat D and E. The patient was counseled regarding the possibility of the need for a uterine artery ligation or even a hysterectomy. Her questions were addressed and her consent obtained.

The operating room was notified, and the case was scheduled ahead of the remaining O.R. cases. Dr. London then confronted me on the Maternity floor, in front of several nurses and a nursing supervisor. Dr. London immediately challenged the necessity of the procedure. He proceeded to question my care of the patient, asking in a provocative tone about how often this type of hemorrhage occurred and about how many of these repeat D and C's I had done. I informed Dr. London that it was his job to deliver the anesthesia (and to determine whether the patient was able to have anesthesia), and that it was my job to determine the proper surgical procedure that was needed. I also informed him that I had seen and done and taught this procedure. At about this time, because of the continued escalating confrontation, the nursing supervisor left to find the nurse manager, and returned with him. Dr. London then

CONFIDENTIAL
MVH 1702

EXHIBIT
Hughes
43
2-15-05

PENGAD 800-631-6989

DEURWARD L. HUGHES, M.D., F.A.C.O.G.
BOARD CERTIFIED IN OBSTETRICS AND GYNECOLOGY

10 DOLPHINE MERRY ROAD
P.O. BOX 1000 637
WEST TISBURY, MA 02575
TELEPHONE: (508) 693-4425
FAX: (508) 696-8810

informed me that he had to determine whether the patient should be transferred to New
England Medical Center , and I informed him that the transfer of the patient for obstetrical
reasons would be my decision. He then demanded that I request a surgical consultation. I
responded that there were no general surgical decisions required for this patient, but only
gynecological decisions that I was fully qualified to make. He stated that he wanted a
surgeon present to assist me in this operation, and I informed him that that would be a
gynecologic decision made by me, and that I was capable of knowing if and when I needed
the assistance of a general surgeon.

After this unnecessary delay and confrontation, the patient did go to the operating room. She
had a D and E, her bleeding stopped, and she remains stable. Because of this distressing
experience for me personally, and because of my ongoing desire to provide my patients with
the highest standard of care, I did call the perinatologist at New England Medical Center the
next day. He agreed completely with my diagnoses and with my management of this patient.

This interaction with Dr. London is but one illustration of a long and continuing effort by
him to undermine me at Martha's Vineyard Hospital. He is particularly adept at demeaning
my abilities to other physicians. None of his accusations regarding my patient care have ever
been substantiated. He does not have the right as an anesthesiologist to continually criticize
my care of patients as an obstetrician when impartial reviewers following accepted Q.I.
standards have found no fault with my management. That is a witch hunt which this hospital
administration and medical staff can no longer afford to ignore.

CONFIDENTIAL
MVH 1703

Martha's Vineyard Hospital - Quality Improvement Report        (03-128)

**Name of Party Involved**

Las

Medical Rec No.

☐ Male
☒ Female

Age 32

07733 ]

| Occurrence | Time of Occurrence | Identification | ER patient |
| --- | --- | --- | --- |

Month  Day  Year
4  16  03

Time of Occurrence
☐ AM
☐ PM

Identification
☐ Inpatient
☐ Visitor

☐ ER patient
☐ Outpatient
☐ Other i.e. Volunteer

Reason for Hospitalization

**Area Incident Occurred**
☒ Operating Room
☐ Emergency Room
☐ Patient Room #____
☐ Intensive Care Unit
☐ Recovery Room
☐ Labor and Delivery
☐ Xray
☒ Public Areas In House
☒ Hospital Grounds
☐ Other Areas Specify ____

Post Op Day    Post Partum Day    Attending Physician

Equipment Involved

Medicated past 2 Hrs.
Type of Medication

Bedrails
☐ Up
☐ Down

Restraints On
☐ Yes
☐ No

---

**EVENT/OCCURRENCE PLEASE CHECK /CIRCLE AS MANY ITEMS AS NEEDED TO FULLY EXPLAIN OCCURRENCE**

1. **Safety/Fall Related**
   ☐ a. Slip & fall
   ☐ b. Found on floor
   ☐ c. Fall from bed/chair/table
   ☐ d. Removed restraints
   ☐ e. Climbed over siderails
   ☐ f. Dropped/mishandled patient
   ☐ g. ____

2. **Communication Related**
   ☐ a. No report of abnormal or STAT lab/xray/test results
   ☐ b. MD not notified/No MD response
   ☐ c. Orders/instructions carried out incorrectly
   ☐ d. Incomplete chart
   ☐ e. Consent signed for wrong procedure
   ☐ f. Procedure done without consent
   ☐ g. Patient states inadequate informed consent
   ☐ h. ____

3. **IV/Blood related**
   ☐ a. Wrong patient
   ☐ b. Wrong IV solution/rate/time
   ☐ c. Wrong IV solution/rate/time
   ☐ d. Wrong blood/blood components
   ☐ e. Omitted drug/IV
   ☐ f. IV complication
   ☐ 1. Nerve involvement
   ☐ 2. Infiltration/infection
   ☐ g. Transfusion reaction

4. **Medication Error**
   *Please complete the MVH Med Error Report Form and return to QI Office

5. **Pyxis Variance**
   *Please complete the MVH Pyxis Variance Form and return to Pharmacy

6. **Adverse Drug Reaction (ADR)**
   Please complete the MVH ADR Report Form and return to Pharmacy

7. **Equipment Related**
   ☐ a. Equipment burned patient
   ☐ b. Equipment dropped on pt.
   ☐ c. Equipment malfunc./failed
   ☐ d. Equipment not available
   ☐ e. ____

8. **Diagnosis/treatment related**
   ☐ a. Hospital admission W/I 7 days for problems treated at last admission
   ☐ b. Failure to adequately diagnose condition requiring:
   ☐ 1. Admission to hospital
   ☐ 2. Repeat visit to ER
   ☐ c. Xrays read as negative/later read as positive
   ☐ d. Diagnosed abnormal condition when none existed
   ☐ e. Treatment delayed worsening condition
   ☐ f. Complications of procedure
   ☐ g. Unplanned repeat diagnostic procedure
   ☐ h. Monitored inadequately
   ☐ i. Inserted catheter/tube/drain incorrectly
   ☐ j. Catheter/tube/drain mismanaged
   ☐ k. ____

9. **Labor and Delivery Related**
   ☐ a. Fetal distress not timely recognized
   ☐ b. Delayed C-Section
   ☒ c. Labor/delivery complication
   ☐ d. Complication/augmented labor
   ☐ e. Traumatic birth
   ☐ f. Forceps injury to infant
   ☐ g. MD unattended delivery
   ☐ h. ____

10. **Surgery/anesthesia related**
    ☐ a. Anesthesia complication
    ☐ 1. Intubation/extubation
    ☐ 2. Anesthesia agent
    ☐ 3. Aspiration
    ☐ b. Wrong patient/side/site
    ☒ c. Unplanned organ repair/removal
    ☐ 1. Bowel
    ☐ 2. Artery
    ☐ 3. Bladder/Ureter
    ☐ 4. Spleen
    ☒ 5. Uterus/ovary
    ☐ 6. ____
    ☐ d. Left in patient
    ☐ 1. Sponge/instrument/needle
    ☒ e. Return to OR same or new admission due to:
    ☐ 1. Hemorrhage
    ☐ 2. Wound disruption
    ☐ 3. Wound infection
    ☐ 4. Removal of retained foreign body
    ☐ 5. ____
    ☐ f. Acute MI/CVA/embolus following surgery
    ☐ g. Admit following same day surgery
    ☐ h. ____

11. **Miscellaneous**
    ☐ a. Displeased/dissatisfied patient or family
    ☐ b. Assault on patient/visitor/staff
    ☐ c. Refused ER treatment
    ☐ d. Elopement/left AMA
    ☐ e. Self-inflicted injury
    ☐ f. ____

CONFIDENTIAL
MVH 1704

MVH•DAR 158-7/01

**12. Musculoskeletal**
- ☐ a.Amputation
- ☐ b.Broken teeth/dental work
- ☐ c.Fracture/dislocation
- ☐ d.Soreness
- ☐ e.Strain/sprain
- ☐ f._____

**13. Skin/tissue/systematic**
- ☐ a.Abcess/decubitus ulcer
- ☐ b.Allergic/adverse reaction
- ☐ c.Burn
- ☐ d.Contusion/abrasion
- ☐ e.Dehiscence
- ☐ f.Edema/swelling
- ☐ g.Febrile on discharge
- ☐ h.Fistula
- ☐ i.Hematoma/rash/ecchymosis
- ☐ j.Laceration/perforation
- ☐ k.Sloughing/scarring/necrosis
- ☐ l.Wound infection
- ☐ m._____

**14. Central nervous system**
- ☐ a.Cerebral vascular accident
- ☐ b.Coma
- ☐ c.Neuro damage/deficit/loss
- ☐ d.Para/quadriplegic
- ☐ e.Seizure
- ☐ f._____

**15. Cardiopulmonary**
- ☐ a.Airway obstruction
- ☐ b.Aspiration
- ☐ c.Cardiopulmonary arrest
- ☐ d.Death
- ☑ e.Hemorrhage
- ☐ f.Phlebitis/embolism
- ☐ g.Respiratory distress
- ☐ h.Shock
- ☐ i.Tracheal injury
- ☐ j._____

**16. Newborn**
- ☐ a.Apgar <5 at 5 minutes
- ☐ b.Brachial palsy
- ☐ c.Meconium stained
- ☐ d.Newborn resuscitation by intubation
- ☐ e.Still birth
- ☐ f._____

**Notification/action**
Noted on chart ☐ Yes ☐ No
Attending Physician
notified ☐ Yes ☐ No

**Follow-up Treatment**
- ☐ Xray Ordered/done/result
- ☐ Treatment rendered

**Seen By**
- ☐ Attending MD ☐ Emergency MD
Other,specify_____
Name_____
Time called_____
Time Responded_____

**Assessment of injury**
- ☐ No injury
- ☐ No apparent injury
- ☐ Extended length of stay

---

## NOTIFICATION SYSTEM FOLLOW-UP

Patient ☐        Employee ☐        Visitor ☐        Property ☐

**Describe the Occurrence Briefly (Description)**

*Unprofessional behavior by Dr. Steve London towards me (D.L.H nurse) in reference to care of Katherine Campbell.*   REPORTED BY *D.L.Hughes*   Date *4/17/03*

**Cause(s) of this Occurrence (Analysis)**

*full report to follow*

SIGNATURE *D.L.Hughes*        Date_____

**Determine What Action Should or Can Be Done To Prevent This Occurrence (Action)**

SIGNATURE_____        Date_____

### - REVIEW -

Refer to Committee Or Department For Implementation Or Determination Of Action Taken if Necessary

Committee_____ Date_____    Department_____ Date_____

Follow-up Action Implemented ☐ Yes ☐ No

Risk Manager_____        Date Reviewed_____

Loss Control Review Date_____        L.C.C._____

*** *Please Return This Form to Quality Improvement* ***

CONFIDENTIAL
MVH 1705

Martha's Vineyard Hospital— Quality Improvement Report

| Name of Party Involved | | | | | Medical Rec No. |
|---|---|---|---|---|---|
| | | | ☐ Male | | |
| | | | ☐ Female | | |
| Last | First | MI | Age | | |

| Date of Occurrence | Time of Occurrence | Identification | Reason for Hospitalization |
|---|---|---|---|
| Month  Day  Year | ☐ AM | ☐ ER patient ☐ Inpatient ☐ Outpatient ☐ Visitor ☐ Other i.e. Volunteer | |
| | ☐ PM | | |

**Area Incident Occurred**
☐ Operating Room    ☐ Xray
☐ Emergency Room    ☐ Public Areas In House
☐ Patient Room #___    ☐ Hospital Grounds
☐ Intensive Care Unit    ☐ Other Areas Specify ___
☐ Recovery Room    ___
☑ Labor and Delivery    ___

**Post Op Day    Post Partum Day    Attending Physician**

**Equipment Involved**

| | Bedrails | Restraints On |
|---|---|---|
| Medicated past 2 Hrs. ☐ | ☐ Up | ☐ Yes |
| Type of Medication | ☐ Down | ☐ No |

**EVENT/OCCURRENCE PLEASE CHECK /CIRCLE AS MANY ITEMS AS NEEDED TO FULLY EXPLAIN OCCURRENCE**

1. **Safety/Fall Related**
   ☐ a.Slip & fall
   ☐ b.Found on floor
   ☐ c.Fall from bed/chair/table
   ☐ d.Removed restraints
   ☐ e.Climbed over siderails
   ☐ f.Dropped/mishandled patient
   ☐ g.___

2. **Communication Related**
   ☐ a.No report of abnormal or STAT lab/xray/test results
   ☐ b.MD not notified/No MD response
   ☐ c.Orders/instructions carried out incorrectly
   ☐ d.Incomplete chart
   ☐ e.Consent signed for wrong procedure
   ☐ f.Procedure done without consent
   ☐ g.Patient states inadequate informed consent
   ☐ h.___

3. **IV/Blood related**
   ☐ a.Wrong patient
   ☐ b.Wrong IV solution/rate/time
   ☐ c.Wrong IV solution/rate/time
   ☐ d.Wrong blood/blood components
   ☐ e.Omitted drug/IV
   ☐ f.IV complication
   ☐ 1. Nerve involvement
   ☐ 2. Infiltration/infection
   ☐ g.Transfusion reaction

4. **Medication Error**
   *Please complete the MVH Med Error Report Form and return to QI Office*

5. **Pyxis Variance**
   *Please complete the MVH Pyxis Variance Form and return to Pharmacy*

6. **Adverse Drug Reaction (ADR)**
   *Please complete the MVH ADR Report Form and return to Pharmacy*

7. **Equipment Related**
   ☐ a.Equipment burned patient
   ☐ b.Equipment dropped on pt.
   ☐ c.Equipment malfunc./failed
   ☐ d.Equipment not available
   ☐ e.___

8. **Diagnosis/treatment related**
   ☐ a.Hospital admission W/I 7 days for problems treated at last admission
   ☐ b.Failure to adequately diagnose condition requiring:
   ☐ 1.Admission to hospital
   ☐ 2. Repeat visit to ER
   ☐ c.Xrays read as negative/later read as positive
   ☐ d.Diagnosed abnormal condition when none existed
   ☐ e.Treatment delayed worsening condition
   ☐ f.Complications of procedure
   ☐ g.Unplanned repeat diagnostic procedure
   ☐ h.Monitored inadequately
   ☐ i..Inserted catheter/tube/drain incorrectly
   ☐ j.Catheter/tube/drain mismanaged
   ☐ k.___

9. **Labor and Delivery Related**
   ☐ a.Fetal distress not timely recognized
   ☐ b.Delayed C-Section
   ☐ c.Labor/delivery complication
   ☐ d.Complication/augmented labor
   ☐ e.Traumatic birth
   ☐ f.Forceps injury to infant
   ☐ g.MD unattended delivery
   ☐ h. *Re - Operation for postpartum bleeding*

10. **Surgery/anesthesia related**
    ☐ a.Anesthesia complication
    ☐ 1.Intubation/extubation
    ☐ 2.Anesthesia agent
    ☐ 3.Aspiration
    ☐ b.Wrong patient/side/site
    ☐ c.Unplanned organ repair/ removal
    ☐ 1.Bowel
    ☐ 2.Artery
    ☐ 3.Bladder/Ureter
    ☐ 4.Spleen
    ☐ 5.Uterus/ovary
    ☐ 6.
    ☐ d.Left in patient
    ☐ 1.Sponge/instrument/ needle
    ☑ e.Return to OR same or new admission due to:
    ☑ 1.Hemorrhage
    ☐ 2.Wound disruption
    ☐ 3.Wound infection
    ☐ 4.Removal of retained foreign body
    ☐ 5.
    ☐ f.Acute MI/CVA/embolus following surgery
    ☐ g.Admit following same day surgery
    ☐ h.

11. **Miscellaneous**
    ☐ a.Displeased/dissatisfied patient or family
    ☐ b.Assault on patient/ visitor/staff
    ☐ c.Refused ER treatment
    ☐ d.Elopement/left AMA
    ☐ e. Self-inflicted injury
    ☐ f.

CONFIDENTIAL
MVH 1706

MVH•DAR 158-7/01

**12. Musculoskeletal**
- ☐ a.Amputation
- ☐ b.Broken teeth/dental work
- ☐ c.Fracture/dislocation
- ☐ d.Soreness
- ☐ e.Strain/sprain
- ☐ f._____

**13. Skin/tissue/systematic**
- ☐ a.Abcess/decubitus ulcer
- ☐ b.Allergic/adverse reaction
- ☐ c.Burn
- ☐ d.Contusion/abrasion
- ☐ e.Dehiscence
- ☐ f.Edema/swelling
- ☐ g.Febrile on discharge
- ☐ h.Fistula
- ☐ i.Hematoma/rash/ecchymosis
- ☐ j.Laceration/perforation
- ☐ k.Sloughing/scarring/necrosis
- ☐ l.Wound infection
- ☐ m._____

**14. Central nervous system**
- ☐ a.Cerebral vascular accident
- ☐ b.Coma
- ☐ c.Neuro damage/deficit/loss
- ☐ d.Para/quadriplegic
- ☐ e.Seizure
- ☐ f._____

**15. Cardiopulmonary**
- ☐ a.Airway obstruction
- ☐ b.Aspiration
- ☐ c.Cardiopulmonary arrest
- ☐ d.Death
- ☐ e.Hemorrhage
- ☐ f.Phlebitis/embolism
- ☐ g.Respiratory distress
- ☐ h.Shock
- ☐ i.Tracheal injury
- ☐ j._____

**16. Newborn**
- ☐ a.Apgar <5 at 5 minutes
- ☐ b.Brachial palsy
- ☐ c.Meconium stained
- ☐ d.Newborn resuscitation by intubation
- ☐ e.Still birth
- ☐ f._____

**Notification/action**
Noted on chart      ☐ Yes ☐ No
Attending Physician
notified      ☐ Yes ☐ No

**Follow-up Treatment**
☐ Xray Ordered/done/result
☐ Treatment rendered

**Seen By**
☐ Attending MD ☐ Emergency MD
Other,specify_____
Name_____
Time called_____
Time Responded_____

**Assessment of injury**
☐ No injury
☐ No apparent injury
☐ Extended length of stay

---

## NOTIFICATION SYSTEM FOLLOW-UP

Patient ☐       Employee ☐       Visitor ☐       Property ☐

Describe the Occurrence Briefly (Description)

Management of hemorrhage - related shock & potential need to perform hysterectomy on postpartum pt reflected, in my opinion, judgement is sound

REPORTED BY _Dr Landon_      Date _4/16/0_

Cause(s) of this Occurrence (Analysis)

SIGNATURE_____      Date_____

Determine What Action Should or Can Be Done To Prevent This Occurrence (Action)

SIGNATURE_____      Date_____

### - REVIEW -
Refer to Committee Or Department For Implementation Or Determination Of Action Taken if Necessary

Committee_____ Date_____      Department_____ Date_____

Follow-up Action Implemented    ☐ Yes ☐ No

Risk Manager_____      Date Reviewed_____

Loss Control Review Date_____      L.C.C._____

*** Please Return This Form to Quality Improvement ***

CONFIDENTIAL
MVH 1707

03-128

RETURN

Martha's Vineyard Hospital – Quality Improvement Report

| Name of Party Involved | | | | | Medical Rec. No. |
|---|---|---|---|---|---|
| THIS IS DUC TO AN INCIDENT IN THE OB CENTER | | | | ☐ Male<br>☐ Female | |
| Last | First | MI | Age _____ | | |

| Date of Occurrence<br>4  16  03<br>Month  Day  Year | Time of Occurrence<br>1630  ☐ AM<br>☐ PM | Identification<br>☐ ER patient<br>☐ Inpatient<br>☐ Visitor | ☐ ER patient<br>☐ Outpatient<br>☐ Other i.e. Volunteer | Reason for Hospitalization<br>- |

| Area Incident Occurred | | Post Op Day    Post Partum Day    Attending Physician | | |
|---|---|---|---|---|
| ☐ Operating Room | ☐ Xray | | | |
| ☐ Emergency Room | ☐ Public Areas In House | Equipment Involved | Bedrails<br>☐ Up<br>☐ Down | Restraints On<br>☐ Yes<br>☐ No |
| ☐ Patient Room # ___ | ☐ Hospital Grounds | | | |
| ☐ Intensive Care Unit | ☐ Other Areas Specify | | | |
| ☐ Recovery Room | OB NURSING DESK | Medicated past 2 Hrs.☐ | | |
| ☐ Labor and Delivery | AREA | Type of Medication ___ | | |

## EVENT/OCCURRENCE PLEASE CHECK CIRCLE AS MANY ITEMS AS NEEDED TO FULLY EXPLAIN OCCURRENCE

1. Safety/Fall Related
   - ☐ a. Slip & fall
   - ☐ b. Found on floor
   - ☐ c. Fall from bed/chair/table
   - ☐ d. Removed restraints
   - ☐ e. Climbed over siderails
   - ☐ f. Dropped/mishandled patient
   - ☐ g. ___

2. Communication Related
   - ☐ a. No report of abnormal or STAT lab/xray test results
   - ☐ b. MD not notified/No MD response
   - ☐ c. Orders/instructions carried out incorrectly
   - ☐ d. Incomplete chart
   - ☐ e. Consent signed for wrong procedure
   - ☐ f. Procedure done without consent
   - ☐ g. Patient states inadequate informed consent
   - ☐ h. ___

3. IV/Blood related
   - ☐ a. Wrong patient
   - ☐ b. Wrong IV solution rate/time
   - ☐ c. Wrong IV solution rate/time
   - ☐ d. Wrong blood/blood components
   - ☐ e. Omitted drug/IV
   - ☐ f. IV complication
     - ☐ 1. Nerve involvement
     - ☐ 2. Infiltration/infection
   - ☐ g. Transfusion reaction

4. Medication Error
   *Please complete the MVH Med Error Report Form and return to QI Office

5. Pyxis Variance
   *Please complete the MVH Pyxis Variance Form and return to Pharmacy

6. Adverse Drug Reaction (ADR)
   *Please complete the MVH ADR Report Form and return to Pharmacy

7. Equipment Related
   - ☐ a. Equipment burned patient
   - ☐ b. Equipment dropped on pt.
   - ☐ c. Equipment malfunc./failed
   - ☐ d. Equipment not available
   - ☐ e. ___

8. Diagnosis/treatment related
   - ☐ a. Hospital admission W/I 7 days for problems treated at last admission
   - ☐ b. Failure to adequately diagnose condition requiring:
     - ☐ 1. Admission to hospital
     - ☐ 2. Repeat visit to ER
   - ☐ c. Xrays read as negative/later read as positive
   - ☐ d. Diagnosed abnormal condition when none existed
   - ☐ e. Treatment delayed worsening condition
   - ☐ f. Complications of procedure
   - ☐ g. Unplanned repeat diagnostic procedure
   - ☐ h. Monitored inadequately
   - ☐ i. Inserted catheter/tube/drain incorrectly
   - ☐ j. Catheter/tube/drain mismanaged
   - ☐ k. ___

9. Labor and Delivery Related
   - ☐ a. Fetal distress not timely recognized
   - ☐ b. Delayed C-Section
   - ☐ c. Labor/delivery complication
   - ☐ d. Complication/augmented labor
   - ☐ e. Traumatic birth
   - ☐ f. Forceps injury to infant
   - ☐ g. MD unattended delivery
   - ☐ h. ___

10. Surgery/anesthesia related
    - ☐ a. Anesthesia complication
      - ☐ 1. Intubation/extubation
      - ☐ 2. Anesthesia agent
      - ☐ 3. Aspiration
    - ☐ b. Wrong patient/side/site
    - ☐ c. Unplanned organ repair/removal
      - ☐ 1. Bowel
      - ☐ 2. Artery
      - ☐ 3. Bladder/Ureter
      - ☐ 4. Spleen
      - ☐ 5. Uterus/ovary
      - ☐ 6. ___
    - ☐ d. Left in patient
      - ☐ 1. Sponge/instrument/needle
    - ☐ e. Return to OR same or new admission due to:
      - ☐ 1. Hemorrhage
      - ☐ 2. Wound disruption
      - ☐ 3. Wound infection
      - ☐ 4. Removal of retained foreign body
      - ☐ 5. ___
    - ☐ f. Acute MI/CVA/embolus following surgery
    - ☐ g. Admit following same day surgery
    - ☐ h. ___

11. Miscellaneous
    - ☐ a. Displeased/dissatisfied patient or family
    - ☐ b. Assault on patient/visitor/staff
    - ☐ c. Refused ER treatment
    - ☐ d. Elopement/left AMA
    - ☐ e. Self-inflicted injury
    - ☐ f. ___

CONFIDENTIAL
MVH 1708

MVH-QAR 158-7/01

**12. Musculoskeletal**
- [ ] a.Amputation
- [ ] b.Broken teeth/dental work
- [ ] c.Fracture/dislocation
- [ ] d.Soreness
- [ ] e.Strain/sprain
- [ ] f._____

**13. Skin/tissue/systematic**
- [ ] a.Abcess/decubitus ulcer
- [ ] b.Allergic/adverse reaction
- [ ] c.Burn
- [ ] d.Contusion/abrasion
- [ ] e.Dehiscence
- [ ] f.Edema/swelling
- [ ] g.Febrile on discharge
- [ ] h.Fistula
- [ ] i.Hematoma/rash/ecchymosis
- [ ] j.Laceration/perforation
- [ ] k.Sloughing/scarring/necrosis
- [ ] l.Wound infection
- [ ] m._____

**14. Central nervous system**
- [ ] a.Cerebral vascular accident
- [ ] b.Coma
- [ ] c.Neuro damage/deficit/loss
- [ ] d.Para/quadriplegic
- [ ] e.Seizure
- [ ] f._____

**15. Cardiopulmonary**
- [ ] a.Airway obstruction
- [ ] b.Aspiration
- [ ] c.Cardiopulmonary arrest
- [ ] d.Death
- [ ] e.Hemorrhage
- [ ] f.Phlebitis/embolism
- [ ] g.Respiratory distress
- [ ] h.Shock
- [ ] i.Tracheal injury
- [ ] j._____

**16. Newborn**
- [ ] a.Apgar <5 at 5 minutes
- [ ] b.Brachial palsy
- [ ] c.Meconium stained
- [ ] d.Newborn resuscitation by intubation
- [ ] e.Still birth
- [ ] f._____

**Notification/action**
Noted on chart  [ ] Yes [ ] No
Attending Physician
notified  [ ] Yes [ ] No

**Follow-up Treatment**
- [ ] Xray Ordered/done/result _____
- [ ] Treatment rendered
_____

**Seen By**
- [ ] Attending MD [ ] Emergency MD
Other,specify_____
Name _____
Time called_____
Time Responded_____

**Assessment of injury**
- [ ] No injury
- [ ] No apparent injury
- [ ] Extended length of stay

## NOTIFICATION SYSTEM FOLLOW-UP

Patient [ ]      Employee [ ]      Visitor [ ]      Property [ ]

**Describe the Occurrence Briefly (Description)**
The Anesthesiologists Dr Landon + Dr Chrohene were arguing c Dr Harboa regarding Dr Harbea patient who needed emergent surgery. This was in the OR area where they were being observed & heard by not only the pt involved but also all the other patients & their visitors. They were asked to leave the pt area & the nursing supervisor went to get the REPORTED BY C fieldre RN arode care #358    Date _____ Nurse Manager to Help. The argument continued in hallway & Nurse Manager had to

**Cause(s) of this Occurrence (Analysis)** interrupted ot them to go to the OR for pts sx.

_____
SIGNATURE _____ Date _____

**Determine What Action Should or Can Be Done To Prevent This Occurrence (Action)**

_____
SIGNATURE _____ Date _____

## - REVIEW -
Refer to Committee Or Department For Implementation Or Determination Of Action Taken if Necessary

Committee_____Date_____ Department_____Date_____
Follow-up Action Implemented [ ] Yes [ ] No

Risk Manager_____ Date Reviewed_____

Loss Control Review Date_____ L.C.C._____

CONFIDENTIAL
MVH 1709

*** Please Return This Form to Quality Improvement ***