UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                        )
DEURWARD L. HUGHES, MD,        )
                                                        )
         Plaintiff,             )
                                                        )
              v.                        )        CIVIL ACTION NO. 04 10564 DPW
                                                        )
MARTHA'S VINEYARD HOSPITAL,  )
                                                        )
         Defendant.          )
_____)

**Plaintiff Deurward L. Hughes' Opposition
to Defendant Martha's Vineyard Hospital's
Motion for Summary Judgment**

**INTRODUCTION**

      This is a case in which the defendant Hospital, by its own admission, fired a doctor who "served them well", performing his clinical duties in a "very competent manner". *Pl. Rule 56.1 Statement of Disputed Facts (hereafter "Dis. Fact") #s 4, 6.* According to the Chairman of the Board of the Hospital, no other doctor was "treated as poorly" as Dr. Hughes. *Id., # 74.* According to the former CEO of the Hospital, Dr. Hughes was "well liked and respected". *Id. # 49.* According to the nurse midwife (the person at the Hospital with whom Dr. Hughes worked the most), she learned more from Dr. Hughes in the first few months of his employment than she had learned in three years while working with his predecessor. *Id. # 41.*

      Yet, Dr. Hughes was terminated, because his presence was somehow bad for the Hospital. Dr. Hughes was an African-American 72 year old male when he was terminated. *Def. Statement of Undisputed Facts (hereinafter "Def. Fact") # 7.* Defendants, for purposes of their

summary judgment motion, do not dispute that plaintiff has established a prima facie case of discrimination. *Def. Memo in Support of Summary Judgment (hereinafter "Def. Memo") at 4, 13*.

The number of false and contradictory statements made by the Hospital in this case is startling.  By plaintiff's count, the Statement of Disputed Facts shows more than 30 different false and contradictory statements made by the defendant, for which either defendant contradicts itself or for which undisputed, objective facts show the opposite to be true.  In order to justify terminating a popular, competent doctor, who had raised the level of OB-GYN practice on the Vineyard, the Hospital has adopted a defense of throwing as much mud against the wall as possible, in the hopes that some of it might stick.  They have continually changed the reasons they set forth for terminating Dr. Hughes, and there is certainly a dispute of material facts as to whether the reasons they have set forth are pretextual and whether direct and circumstantial evidence is sufficient to establish a case of age and race discrimination against the Hospital.

**STATEMENT OF FACTS**

Plaintiff's Statement of Facts are set forth fully in Plaintiff Deurward L. Hughes' Rule 56.1 Statement of Disputed Facts.

**ARGUMENT**

**I.     THERE IS DIRECT EVIDENCE OF AGE DISCRIMINATION**

There is direct evidence of age discrimination in this case.  When an employee is able to prove by direct evidence that discriminatory animus motivated the employment decision, he does not have to rely on the indirect method of proving animus by disproving at least one of the

employer's articulated, nondiscriminatory reasons.  *Lipchitz v. Raytheon*, 434 Mass. 493, 501 (2001); *see, also Wynn & Wynn v. MCAD*, 431 Mass. 655 (2000).   Moreover, proof that one or more of the employer's stated reasons is false may be accomplished by offering some direct evidence of discriminatory animus.  *Lipchitz*, *supra* at 502.  Even when the direct evidence may be insufficient to satisfy the evidentiary threshold for so-called "direct evidence" cases set out in *Wynn & Wynn*, *supra* at 669-670, it may be sufficient to permit the fact finder to conclude that at least one of the employer's reasons is false, and therefore to support an inference that the adverse employment action was made because of discrimination.  *Lipchitz*, *supra* at 502.

According to CEO Tim Walsh, he informed the Board of Trustees of his decision to terminate Dr. Hughes..  *Dis. Fact # 47.*  Shortly after the Hospital terminated Dr. Hughes, his neighbor Donald Lyons attended a meeting with Earle "Sandy" Ray, a member of the Hospital's Board of Trustees, who Mr. Lyons had known for years.  *Dis. Fact # 1.*  Mr. Lyons asked Mr. Ray why Dr. Hughes had been terminated.  *Id.*  Mr. Ray told Mr. Lyons, among other things, that the Hospital wished to go with someone who would be around for the long haul.[1]  *Id.*

The Hospital seeks to dismiss the significance of this Admission by a member of its Board of Trustees.  They argue that isolated, stray remarks, tending to suggest animus based on age, "standing alone" are insufficient to prove an employer's discriminatory intent.  *Def. Memo at 17.*  As noted below, this statement hardly "stands alone".  Moreover, Mr. Ray's admission as to the reason Dr. Hughes was terminated is simply not the type of stray remark noted in the cases cited by defendants.  As the First Circuit stated in *Straughn v. Delta Air Lines,* 250 F.3d 23, 35-

---

[1]     While claiming he does not recall the conversation, Mr. Ray noted that Mr. Lyons is a priest and has no reason to make up the conversation.  *Ray Dep., 53.*

36 (1st Cir. 2001), while the probativeness of stray remarks is circumscribed if not related to the employment decision, remarks pertaining to the decisional process may permit a jury reasonably to determine that an employer was motivated by a discriminatory intent. *Id.* at 36; *see, also, Fernandes v. Costa Brothers Masonry*, 199 F.3d 572, 583 (1st Cir. 1999) (same).

In addition to Mr. Ray's admission, there is further direct evidence of age discrimination. According to the minutes of the Hospital's Board of Trustees meeting held on January 27, 2001, the "Medical Staff had feelings that age had much to do with the mixed feelings of Dr. Hughes working in Maternity." *Dis. Fact # 2.* According to the minutes of the Hospital's Joint Conference Committee meeting held on August 17, 2001, "Dr. Hughes' initial encounter with Executive Committee – issue was Dr. Hughes' ability to practice medicine. The age issue was carried on for the next several months even after the credentials were approved." *Dis. Fact # 3.*

## II. THERE IS A DISPUTE OF MATERIAL FACT AS TO WHETHER ONE OR MORE OF THE REASONS SET FORTH BY THE HOSPITAL FOR TERMINATING DR. HUGHES IS PRETEXTUAL.

In its Memorandum in Support of Summary Judgment, the Hospital offers four reasons for terminating Dr. Hughes: (1) an alleged contentious relationship with most medical staff, (2) a disadvantageous contract for the Hospital, (3) a poor relationship with the CEO, and (4) a desire to expand the volume of the OB-GYN practice and to keep patients from going off-Island for care. *Def. Memo at 4.* By plaintiff's count, the Hospital has, in fact, offered eight (8) different reasons since the beginning of this case for terminating Dr. Hughes. In addition to the four reasons that they now embrace, the Hospital has indicated that it terminated Dr. Hughes for the following additional reasons: (1) the desire to move to a full-time practice model for the midwifery practice as opposed to Dr. Hughes' part-time schedule, (2) Dr. Hughes' alleged

frequent refusal to provide additional coverage for Cathy Chase (the midwife) so that she could go off-island, (3) Dr. Hughes' alleged difficulties in working with Ms. Chase, and (4) Dr. Hughes' alleged arguments in front of patients and staff.

Plaintiff, to meet his burden of proof that discrimination was the determinative cause of the adverse employment action, is not required to disprove every reason articulated by the defendant or suggested in the evidence. *Lipchitz, supra at* 506. Plaintiff can prevail by proving any of the eight reasons proffered by the Hospital to be false, whether or not it is one of the reasons they continue to put forward today. As the court stated in *Chief Justice v. MCAD*, 439 Mass. 729, 733, n. 13 (2003), "an employer cannot avoid the adverse inference created by advancing a false reason merely by acknowledging it as false at a later date."

This Court in *Bloomfield v. Bernardi Automall Trust,* 170 F. Supp. 2d 36 (D. MA 2001) (Woodlock, J.), extensively discusses the standards to be applied to summary judgment motions in discrimination cases. This Court noted that under both federal and state law "'it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. No additional independent evidence of discrimination is necessary." (citation omitted). 170 F. Supp. at 41. The Hospital notes that this Court in *Bloomfield* questioned the "analytical underpinnings" of allowing plaintiff to defeat summary judgment even if only proving one reason offered by the defendant to be false. *Def. Memo at 6.* While it is true that this Court expressed some misgivings as to whether the *Lipchitz* language, with its emphasis on "at least one" false reason, fairly states the principles of *federal law*, this Court concluded that *Lipchitz* "is plainly the last word on Massachusetts law and represents the minimum standard plaintiff must meet for his discrimination claims to survive." 170 F. Supp. at 42, n.4. The Court

concluded that summary judgment should be denied on both the federal and state claims even though there was only a clear dispute of facts as to the falsity of two of three reasons offered by defendant, given the totality of the circumstances. *Id.* at 43.

> **A.     There is a Dispute of Material Fact as to Whether Each and Every Reason Put Forth by the Defendants for Terminating Dr. Hughes is Pretextual.**
>
> **1.     The Hospital's Alleged Desire to Switch to a Full-Time Practice Model, As Opposed to Dr. Hughes' Alleged Part-Time Schedule.**

In its Response to Dr. Hughes' Discrimination Complaint filed with the MCAD, the Hospital stated that it terminated Dr. Hughes because "it wanted to move to a full-time practice model for the midwifery practice as opposed to Dr. Hughes' part-time schedule." *Dis. Fact # 25*. It claimed that Dr. Hughes "saw patients" only 1 ½ days/week, while Dr. Donegan (Dr. Hughes' successor) saw patients full time and maintained both an obstetric and gynecologic practice. *Id.* Hospital CEO Tim Walsh has stated that Dr. Hughes works a day and a half a week in the office, and the Hospital wanted somebody to do five days, so they brought in Dr. Donegan. *Id., # 26.*

In fact, the Hospital knew very well at the time that it was giving these pretextual reasons for terminating Dr. Hughes, that he "worked" far more than 1 ½ days per week and "saw patients" far more than 1 ½ days per week.[2] Dr. Hughes held office hours 1 1/2 days per week, performed surgeries one day per week, and on other days reviewed charts, reviewed records, reviewed lab reports, attended committee meetings, met with and taught nurses and the nurse midwife and spent an inordinate amount of time day or night taking care of obstetrical patients who were having problems. *Dis. Fact # 27.* He was in the hospital regularly four days/week,

---

[2]     On its Tax Forms filed with the Internal Revenue Service, the Hospital indicated that Dr. Hughes worked 40 hours/week. *Dis. Fact # 35.*

plus the time he spent on-call, at the hospital responding to calls, and covering for Dr. Lew. *Id.* He saw both obstetric and gyencologic patients. *Dis. Fact # 29.* Dr. Hughes was on-call more than any other doctor in the surgical department. *Dis. Fact # 27.* Hospital CEO Kevin Burchill informed Dr. Hughes that he worked harder than any other doctor at the Hospital. *Dis. Fact # 28.*

While the Hospital contrasted Dr. Donegan's hours to Dr. Hughes' hours to justify Dr. Hughes termination and claimed that Dr. Donegan, unlike Dr. Hughes worked five days/week, Dr. Donegan immediately established a schedule when he came to Hospital, whereby he only worked four days/week at the Hospital, taking Tuesdays off. ³ *Dis. Fact # 30.*

In its Response to Dr. Hughes' Charge of Discrimination, the Hospital further claimed that it terminated Dr. Hughes, in part, because of "his <u>refusal</u> . . . to work more than 1 ½ days per week. . . ." (emphasis added). *Dis. Fact # 31.* In fact, no one from the Hospital ever requested that Dr. Hughes work any additional hours, and the Hospital admits that Dr. Hughes never refused to work more than 1 1/2 days per week. *Id.*

Dr. Hughes' schedule was commensurate with other full-time staff at the Hospital, many of whom worked less hours than Dr. Hughes and some of whom spent virtually no time at the Hospital other than on call. *Dis. Fact # 32-34 .* As the Hospital's Chief of Staff stated, "I wouldn't be here if I was working 40 hours a week. People come to Martha's Vineyard not to make a lot of money but for the lifestyle." *Dis. Fact # 33.*

### 2. Dr. Hughes' Alleged Refusal to Provide Additional Coverage for Cathy Chase So That She Could Go Off-Island.

---

³ The Hospital falsely stated in its Answers to Interrogatories, # 6, that Dr. Donegan worked five days/week, performing chart reviews and administrative functions on Tuesdays. *Dis. Fact # 30, n. 5.*

In its Response to Dr. Hughes' Discrimination Complaint filed with the MCAD, the Hospital stated that it terminated Dr. Hughes because "Dr. Hughes frequently refused to provide additional coverage for Cathy Chase so that she could go off-island."[4]  *Dis. Fact # 36.*

However, Mr. Walsh stated at his deposition that there were no occasions Dr. Hughes refused to cover for Ms. Chase. *Dis. Fact # 38*  He then changed his testimony to state that there was one occasion that Dr. Hughes refused to cover for Ms. Chase.  *Id.*

The coverage arrangement with Ms. Chase was always that the Hospital would first try to get a midwife, rather than a doctor, to try to cover for Ms. Chase. *Dis. Fact # 39.*  Ms. Chase could only recall two instances where Dr. Hughes, in accordance with the understanding reached by the parties, asked the Hospital to get a midwife rather than his covering Ms. Chase's vacation time.  *Id.*  In both instances, the Hospital, in fact, did get a mid-wife to cover for Ms. Chase, who was not prevented from going off-island.  *Id.*

### 3. Alleged Difficulties in Working with Ms. Chase

Yet a third pretextual reason set forth by the Hospital for terminating Dr. Hughes was his alleged difficulties in working with the mid-wife Cathy Chase.  In its Response to Dr. Hughes' Discrimination Complaint filed with the MCAD, the Hospital stated that it terminated Dr. Hughes because Dr. Hughes' "personality traits made it difficult for Ms. Chase . . . to work with him.  Although the Hospital envisioned that Dr. Hughes would collaborate with Ms. Chase to build the midwifery practice, he was unwilling to work with her as a colleague, choosing instead to treat her as a subordinate." *Dis. Fact # 40.*

---

[4]  At his deposition, Mr. Walsh both reasserted and denied that Dr. Hughes' alleged refusal to cover for Ms. Chase was a reason she was terminated.  He at first stated it was not a reason, but then stated that the failure to cover for Ms. Chase was an indication that Dr. Hughes did not have "much of a team".  *Dis. Fact # 37.*

Again the Hospital had no basis, and knew it had no basis, for setting forth this pretextual reason for terminating Dr. Hughes. According to Cathy Chase, Dr. Hughes worked with her "as a colleague", sought her input in patient care and met with her regularly to discuss patients with problems. *Dis. Fact # 41.* According to Ms. Chase, she, in fact, informed Dr. Hughes shortly after he had begun work at the Hospital that she had learned more from Dr. Hughes in that short period of time than she had learned from Dr. Lew in the three years they had worked together. *Id.* She testified that she thanked Dr. Hughes "a lot" for what he was teaching her. *Id.*

    4.    **Alleged Arguments in Front of Patients and Staff**

At his deposition, Tim Walsh claimed that one reason he decided to terminate Dr. Hughes was because he began to have arguments in front of staff and patients. *Dis. Fact # 42.* In fact, at one point, Walsh relates this to be one of only two reasons that he terminated Dr. Hughes. *Id.* Specifically, Walsh cites to a dispute that Dr. Hughes had with Dr. London involving Dr. Hughes' decision to undertake surgery for a patient, where Dr. Hughes, Dr. London and Dr. Cheshire had a "heated argument" in the hallway, which Walsh insists occurred prior to his making the decision to terminate Dr. Hughes. *Id.*

Walsh decided to terminate Dr. Hughes in or several months prior to February 2003. *Def. Fact # 52.* Written documentation of the incident described by Mr. Walsh involving Dr. London, Dr. Hughes and Dr. Cheshire conclusively shows that it occurred on April 16, 2003, at least two months after Mr. Walsh had already decided to terminate Dr. Hughes. *Dis. Fact # 43.* Moreover, a review of the incident, conducted by the Vice Chair of the Medical Staff, concluded that it was Dr. London, and not Dr. Hughes, that made a poor choice when he began the

discussion in a public area. *Dis. Fact # 44* A report from the Nurse Manager concluded that it was Dr. Hughes who walked away to end the conversation. *Id*.

### 5. Alleged Contentious Relationship with Most of Medical Staff

The Hospital contends that it terminated Dr. Hughes because of his alleged contentious relationship with "*most* of the medical staff" (emphasis added). *Def. Fact #54*.

At a minimum, there is a clear dispute of fact as to the nature of Dr. Hughes relationship with the medical staff. According to former Hospital CEO Kevin Burchill, Dr. Hughes was "well liked and respected". *Dis. Fact # 49*. In his only performance evaluation, Dr. Hughes received the highest rating (i.e. "Exceeds standards. Consistently exceeds the performance standard") in the category of "Collaboration/Communications". *Id*. Dr. Hughes received the highest rating in the sub-category "Consistently demonstrates attitude of cooperation and professionalism with patients, co-workers, visitors, families, physicians." *Id*.

According to Cathy Chase, "the nursing staff, generally speaking, were very happy with Dr. Hughes and got along well with him." *Dis Fact # 50*. She contrasted Dr. Donegan's professional and respectful relationship with the nursing staff with Dr. Hughes' "friendly and warm" relationship. *Id*. She noted that Dr. Hughes had a professional and courteous relationship with and was treated well by a number of the doctors at the Hospital. *Dis. Fact # 51*.

Mr. Walsh, although claiming it was his practice to meet with any doctor about whom he had concerns, admits that he never met with Dr. Hughes to discuss what he allegedly considered to be his poor relationship with the medical staff. *Dis. Fact # 54-55*.

Dr. Hughes acknowledges that he had a sometimes contentious relationship with a small group of influential members of the medical staff and their supporters on the board. However,

this relationship supports, rather than discredits, Dr. Hughes' contention that he was terminated for discriminatory reasons, as these individuals exhibited stereotypical thinking, characterizing him as an older, rigid, cantankerous black person with deteriorating medical skills, when Dr. Hughes insisted, without backing down, that quality medical care be offered at the Hospital by one of the members of their group.  *Dis. Fact # 56.*   This group, which included Steven London, M.D. (Chief of Perioperative Committee, later Chief of Staff),  Richard Koehler, M.D., Jason Lew, M.D., Kathleen Kohler, M.D. (member of the Board), John MacArthur (Chief of Staff) and Timothy Walsh (CFO from July 2000 - April 2002, and CEO from April 2002 - date) (hereinafter collectively referred to as "the cabal") orchestrated a campaign against Dr. Hughes which included direct attacks against his competence allegedly because of his age. *Id.*  As the court stated in *Abramian v. President and Fellows of Harvard College*, 432 Mass. 107, 118 (2000),   as "the evidence of cronyism itself could be viewed as a symptom of bigotry, the question properly is one for the jury."   Similarly, in *Lipchitz,* the court concluded that plaintiff's difficulties in getting along with certain individuals may well not be the result of the plaintiff's personality, but rather the result of defendants' biases.  493 Mass. at 498-499.  The court concluded that "[s]tereotypical thinking . . . involves categorizing people on the basis of broad generalizations, not necessarily accompanied by deliberate reflection or conscious thought. Employment decisions that are made because of stereotypical thinking about a protected characteristic of members of a protected class, whether conscious or unconscious, are actionable under G.L. c. 151B."   *Id. at 503.*

   At more than one meeting of the Board of Trustees, board member Kathleen Koehler, M.D., made statements that Dr. Hughes' age was impacting his ability to perform surgical

-11-

procedures required by OB/GYN patients.  *Dis. Fact # 57.*  Dr. Koehler accused Dr. Hughes of not utilizing modern techniques and not being as efficient as other doctors.[5]  The type of "age slander" engaged in by Dr. Koehler is still evident today, as seen in Dr. MacArthur's deposition, where he first testified that Dr. Hughes "was a little . . . may be a little behind the times.  He did all of his tubal ligatures (*sic.*) open.  He didn't do any tubal ligatures (*sic.*) with the laparoscope which is kind of state of the art. . ."  *Dis. Fact # 57, n. 10.*  When pressed, Dr. MacArthur testified he, in fact, did not remember whether Dr. Hughes used a laparoscope in the procedures that he had observed, and he did not know what was the standard of care today for doing tubal ligations through a laparoscope.  *Id.*

The most contentious issue faced by Dr. Hughes was the cabal's desire to protect one of their group, i.e. Jason Lew, M.D., an OB-GYN with hospital privileges, with whom Dr. Hughes did not wish to create a cross-coverage arrangement.  *Dis. Fact # 58.*  The Hospital has both claimed and denied that Dr. Hughes was terminated because of the position he took relating to cross-coverage with Dr. Lew.[6]  *Id.*  While Dr. Hughes supposedly got terminated in part because of his position relating to cross-coverage with Dr. Lew, when Dr. Donegan came to the Hospital to replace Dr. Hughes, Dr. Donegan informed the Hospital administration that he felt Dr. Hughes

---

[5] Mr. Walsh's credibility is again undermined, when he claims that he never heard Dr. Koehler make any references to Dr. Hughes' age at Board meetings, although Mr. Walsh attended substantially all of the Board meetings during the relevant time period.  *Dis. Fact # 57.*

[6] Dr. Hughes misgivings relating to cross-coverage with Dr. Lew's were based on Dr. Hughes' concerns regarding Dr. Lew's level of practice. *Dis. Fact # 60.*  A report of the American College of Gynecologists and Obstetricians confirmed Dr. Hughes' concerns when it concluded that Dr. Lew's care fell below acceptable standards of practice. *Dis. Fact #s 61-62.*  The Hospital has now admitted (after fighting him for two years) that it was reasonable for Dr. Hughes to have concerns about Dr. Lew's practice.  *Dis. Fact #s 63-64.  See Disputed Fact #s 65-67* for the many attempts Dr. Hughes made to resolve this problem.

"cross-coverage" arrangement with Dr. Lew was reasonable, where Dr. Hughes would cover for Dr. Lew but Dr. Lew would not cover for Dr. Hughes. *Dis. Fact # 59.* The Hospital informed Dr. Donegan that if he were "comfortable with Dr. Hughes' arrangements for coverage, that would be acceptable to the administration." *Id.*

### 6. Allegedly Disadvantageous Contract

The Hospital contends that one reason it terminated Dr. Hughes was because his contract was disadvantageous to the Hospital. *Def. Fact # 53.* On its face, this is a nonsensical and pretextual reason for terminating Dr. Hughes. If the Hospital were concerned about Dr. Hughes' contract, it would have sought to renegotiate his contract; it would not have terminated him. Dr. Hughes' contract expired less than two months after the effective date of his termination, *Edson Aff., Ex. 9,* and the Hospital could easily have insisted on renegotiating the terms of the contract as a condition of Dr. Hughes' continued employment.[7]

Mr. Walsh claims that the "biggest" problem he had with Dr. Hughes' contract was that, unlike the standard contract, it did not require his full-time effort and focus, as it did not prohibit him from lecturing or performing other kind of services to other organizations without getting the written approval from the Hospital. *Dis. Fact # 72.* However, Walsh admits that he had no idea whether Dr. Hughes was working for someone other than the Hospital at the time he was terminated and he never sought to sit down with Dr. Hughes to ask if he was working for anyone other than the Hospital. *Id.*

---

[7]    Mr. Walsh admits that he never asked Dr. Hughes if he was willing to amend his contract to add what he considered to be the standard provisions found in other contracts. *Dis. Fact # 73.*

Mr. Walsh claims that Dr. Hughes had a contract to work part-time with the Hospital, based on nothing more than a provision requiring Dr. Hughes to devote "sufficient time and effort" to perform his duties. *Dis. Fact #s 68-69.* When pressed, Mr. Walsh admitted that Dr. Hughes' contract does not say anything about his being part-time. *Dis. Fact. # 68.*

Mr. Walsh claims that one problem with Dr. Hughes' contract is that it didn't require cross-coverage, which he states is against the by-laws. *Dis. Fact # 70.* In fact, Dr. Hughes' contract did require him to "provide services . . . in compliance with . . . the By Laws, rules and regulations of the Hospital and its Medical Staff." *Id.* However, there is no requirement in the By-Laws requiring doctors in the same discipline to cross-cover. *Id.*

Finally, Mr. Walsh claimed that one reason Dr. Hughes contract was a bad contract was that Kevin Burchill "bumped up" Dr. Hughes' salary from $130,000 to $200,000 in Mr. Burchill's last week of employment. *Dis. Fact. # 71.* Mr. Walsh further claimed that one reason Dr. Hughes was terminated was because his salary "was way too high for what it was." *Id.* In fact, Mr. Burchill did not "bump up" Dr. Hughes' salary, but simply made it more in keeping with the other doctor's contracts, by paying him all in salary, rather than paying him partially in salary and partially in additional 1099 payments for attending meetings and performing procedures. *Id.* The total compensation received by Dr. Hughes remained the same after his contract was amended in April 2002 by Mr. Burchill. *Id.* Finally, Mr. Walsh again admitted, when pressed, that Dr. Hughes' pay was in line with the pay that other members of the active staff were earning. *Id.*

    **7.**    **Mr. Walsh's Alleged Difficult Time Working with Dr. Hughes After Becoming CEO.**

Tim Walsh contends that one reason that Dr. Hughes was terminated was because he had a very difficult time working with Dr. Hughes after he became CEO. *Def. Fact # 53.* Yet, by his own admission, Mr. Walsh talked with Dr. Hughes personally for probably less than one hour from the time he became CEO in April 2002 until the time that Dr. Hughes left the Hospital in 2004. *Dis. Fact # 75.*

Mr. Walsh claims that Dr. Hughes "would continually go around me to the board." *Dis. Fact # 74.* Yet, he could not relate the specifics of any occasion in which Dr. Hughes supposedly went around him to the board.. *Id.* He complained about Dr. Hughes and his wife addressing the Joint Conference Committee directly regarding their complaints, but this event had occurred nearly eight months before Mr. Walsh became CEO , and was the meeting at which the Chairman of the Board concluded that"[n]o others have been treated as poorly as Drs. Hughes and Kriedman (Dr. Hughes' wife) have been recently." *Id.*

The Hospital claims that one reason Dr. Hughes was terminated was because Mr. Walsh did not like to get "letters from lawyers". *Def. Fact #s 59, 60.* However, at his deposition, Mr. Walsh at first denied that one reason Dr. Hughes was terminated was that Mr. Walsh did not like getting letters from lawyers. *Dis. Fact # s 76-77.* Moreover, the Hospital only received one letter from Dr. Hughes' attorney, and it was a letter written seeking a compromise on the issue of cross-coverage. *Id.*

**8.    Alleged Desire to Expand the OB-Gyn Practice.**

Finally, the Hospital claims that it terminated Dr. Hughes in order to expand its OB-GYN practice, increase its volume, and attract OB-GYN patients who were going off-Island for care. *Def. Fact # 53.*

However, facts generated by the Hospital, available at the time Dr. Hughes was terminated and of which the Hospital was clearly aware, show that the Hospital knew that Dr. Hughes had successfully increased the number of women staying on the Island for gynecological care at the time he was terminated. *Dis. Fact # 79.*

The Hospital further claims that Dr. Hughes' failure to generate more revenue was also a reason he was terminated. Mr. Walsh at first claimed that "the hospital revenue generated on Dr. Hughes' patients had come down a little bit. I think it went down quite a bit, really." *Dis. Fact # 80.* In fact, Mr. Walsh regularly received revenue reports, showing that Dr. Hughes had nearly tripled revenues and had turned a non-profitable center into a profitable center at the time he was terminated.[8] *Id.*

### III. THERE IS A DISPUTE OF MATERIAL FACT AS TO WHETHER CIRCUMSTANTIAL EVIDENCE, IN ADDITION TO THE PRETEXTUAL CHARACTER OF DEFENDANTS' PROFFERED REASONS FOR TERMINATING DR. HUGHES, IS SUFFICIENT TO ESTABLISH AGE AND RACE DISCRIMINATION.

A factfinder may find discriminatory intent through circumstantial evidence. *Lipchitz, supra at 504.* In addition to the inference of discrimination that can be drawn from defendants's pretextual reasons given for Dr. Hughes termination, there is additional circumstantial evidence in this case supporting an inference that the Hospital acted with discriminatory intent.

It is undisputed that Dr. Hughes was a highly skilled, competent doctor. *Dis. Fact #s 4, 5, 10, 11.*

---

[8] Prior to Dr. Hughes' termination, there were never any reports to the Board of Trustees of criticisms of the amount of work Dr. Hughes was performing. Rather, reports to the Board regarding the OB/GYN practice were that the practice had picked up since Dr. Hughes' arrival and that "business was booming". *Dis. Fact # 81.*

It is undisputed that there was no precipitating event allegedly leading to Dr. Hughes' termination. *See Def. Fact # 53.* This case can be clearly contrasted with the facts in *Bloomfield* (where summary judgment was still denied), where this Court noted the relevance of the employer acting immediately after the event allegedly justifying the termination. 170 F. Supp. at 40

Dr. Hughes, a former head of a department and instructor at a leading teaching hospital in a major city, was subjected to being monitored in the operating room, despite his excellent credentials and the fact that he had not been monitored in the previous 30 years of his career.[9] *Dis. Fact # 7.* Defendants contend, and it is not disputed, that Dr. Hughes was not the only doctor who had ever been monitored in the operating room. *Def. Fact # 62.* However, similarly defendant does not dispute that every doctor was not monitored. *Dis. Fact # 12.* The fact remains that the reasons given for monitoring Dr. Hughes were totally bogus, *Dis. Fact #s 8-12,* and the fact that Dr. Hughes was monitored supports his claim that he was treated unreasonably because of his race and age, given the lack of any other reason for monitoring him.

---

[9] While defendants seek to limit plaintiff to the presentation of evidence directly related to the actions of CEO Tim Walsh, *Def. Memo at 3,* the law is not so limiting. As the First Circuit stated in *Cariglia v. Hertz Equipment Rental*, 363 F.3d 77, 85 (1st Cir. 2004), "evidence of corporate state-of-mind or discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or time frame involved in the specific events that generated a claim of discriminatory treatment." (citations omitted).  The court noted that "[t]he inquiry into a corporation's motives need not artificially be limited to the particular officer who carried out the action." (citation omitted). *Id.* The court concluded that "[i]f the employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary coworkers, it is proper to impute their discriminatory attitudes to the formal decisionmaker." (citation omitted). *Id.*

Dr. Hughes was subjected to a frivolous complaint to the Board of Registration of Medicine, which required him to undertake considerable time, and some expense, to defend. *Dis. Fact # 13.*

One surgeon refused to perform surgeries or provide back-up to Dr. Hughes, and the Hospital did nothing to rectify this situation. *Dis. Fact #s 14-15.*

Although the Hospital's Quality Improvement Committee was required to include an OB-GYN physician, the Hospital appointed the Chief of Surgery to supposedly represent the OB-GYN doctors, rather than appoint Dr. Hughes.[10] *Dis. Fact # 16.*

The Hospital's credibility is further undermined by misleading statements it made regarding (1) the manner in which it reached the decision to terminate Dr. Hughes, *Dis. Fact # 45,* (2) responsibilities to be undertaken by Dr. Donegan, *Dis. Fact # 46,* and (3) the search conducted to find a doctor to replace Dr. Hughes. *Dis. Fact # 47.*

Finally, there is statistical evidence of race discrimination at the Hospital and a history of lack of efforts to do anything about it. As this Court noted in *Bloomfield*, while statistical evidence in and of itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision to dismiss an individual employee, both the First Circuit and the SJC have acknowledged that "statistical evidence" may be admissible in a disparate treatment case to

---

[10] The Hospital asks this Court to ignore all of this circumstantial evidence of age discrimination, as well as the circumstantial evidence which follows from the pretextual reasons given for terminating Dr. Hughes, based on one statement made by Dr. Hughes at his deposition that "I'm not sure [if I was terminated as the result of age discrimination]". *Def. Memo at 13-14.* At worst, the response states the obvious proposition that no one can be "sure" of anything, and plaintiff's burden is hardly to prove to a certainty that he was discriminated against. Moreover, Dr. Hughes clarified his answer to note that he believed that both age and race played a significant role in his termination. *Id.* Finally, a plaintiff's belief as to whether or not he was fired because of a discriminatory reason is not even relevant. *Cutshall v. Potter,* 347 F. Supp. 2d 228, 237-238 (W.D. N.C. 2004).

support the inference that the particular employment decision was discriminatory, and may be found to be "highly relevant."  170 F. Supp. 2d at 45.

The Hospital employs 172 individuals full-time.  *Dis. Fact # 20.*  The Hospital CEO can name only three minority employees.  *Id.*  Dr. Hughes was one of only two doctors on the active staff that defendants claim to be minorities.  *Dis. Fact # 17.*  There is not a single minority (black, Hispanic, Native-American or Brazilian) on the thirteen member Board of Trustees.  *Dis. Fact # 18.*  There is not a single minority officer at the Hospital. *Id.*  Dr. Hughes cannot recall ever working with a single minority staff nurse at the Hospital.  *Dis. Fact # 19.*   While it is possible that there may be some minorities on the Hospital staff of which he is not aware, the only blacks, Hispanics, Native-Americans or Brazilians to his knowledge employed by the Hospital work on the custodial staff.  *Id.*

The Hospital cites misleading statistics to seek to explain their failure to hire minority staff.  Specifically, the Hospital claims that census data indicates that only 2.4% of the Island's year long residents are African-American.[11]  *Dis. Fact # 21.*  However, the summer population on the Island is more than six times the year-round population.  *Id.*  Martha's Vineyard has been described as "the largest black resort in the U.S.", with the "highest concentration of black celebrities and really affluent doctors and lawyers" in the country .  *Id.*   Dr. Hughes indicates that one of the reasons he moved to the Island was his knowledge that it had a diverse community, including a large black population.  *Id.*  He indicates further  that he personally knows at least 10 black doctors with homes on the Island, and that there is a large pool of black

---

[11]    10.2% of the year-round residents are non-White.  *Dis. Fact # 21.*

doctors who might be interested in working on the Island if the Hospital were to seek their services. *Id.*

It is undisputed that the Hospital has made no effort to recruit these black doctors. The Hospital CEO could not recall a single discussion he ever had with anyone relating to the need to hire more minorities on the active staff or a single effort he made to hire more minorities. *Dis. Fact #s 22, 23*. Similarly, the Board of Trustees never had a single discussion relating to the need to hire more minorities or undertaking an effort to hire more minorities. *Id.* Under these circumstances, it is not a coincidence that Dr. Hughes was the only black doctor on the active staff.

## Conclusion

For the reasons stated in this Opposition, defendants' Motion for Summary Judgment should be denied.

BY PLAINTIFF'S ATTORNEY,

  /s Stephen Schultz_____
Stephen Schultz, Esq., BBO # 447680
Engel & Schultz, P.C.
125 High Street, Suite 2601
Boston, MA 02110
(617) 951-9980 (Tel)
(617) 951-0048 (Fax)

Date: 6/14/05

Certificate of Service

I, Stephen Schultz, hereby certify that a true and accurate copy of the above named document was served upon all counsel of record by hand/by first class mail, on June 14, 2005.

/s Stephen Schultz_____
Stephen Schultz