UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
DEURWARD L. HUGHES, MD,                 )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )      CIVIL ACTION NO. 04 10564 DPW
                                        )
MARTHA'S VINEYARD HOSPITAL,             )
                                        )
            Defendant.                  )
_____)

**Plaintiff Deurward L. Hughes' Rule 56.1**
**Statement of Disputed Facts**

Pursuant to Local Rule 56.1, plaintiff submits this Statement of Material Facts in Dispute.

The Statement both meets, on a paragraph by paragraph basis, the Statement of Undisputed Facts

submitted by defendants, noting those paragraphs which in fact are in dispute, as well as setting

forth additional undisputed facts which support the denial of Defendants' Motion for Summary

Judgment and additional material facts in dispute in this case.

**I.      Additional Undisputed Facts Which Support the Denial of Defendants' Motion for
         Summary Judgment and Additional Material Facts in Dispute in this Case .**

    **A.      Direct Evidence of Discrimination**

1.    Shortly after the Hospital terminated Dr. Hughes' contract, Dr. Hughes' neighbor Donald

      Lyons attended a meeting with Earle "Sandy" Ray, a member of the Hospital's Board of

      Trustees, who Mr. Lyons had known for years.  Mr. Lyons asked Mr. Rey why Dr.

      Hughes had been terminated.  Mr. Rey told Mr. Lyons, among other things, that the

      Hospital wished to go with someone who would be around for the long haul.  *Lyons Aff.,*

*¶¶ 1-4.*  While claiming he does not recall the conversation, Mr. Ray noted that Mr. Lyons is a priest and has no reason to make up the conversation.  *Schultz Aff., Ex. # 1 (Ray Dep.), at 53.*

2.      According to the minutes of the Hospital's Board of Trustees meeting held on January 27, 2001, the "Medical Staff had feelings that age had much to do with the mixed feelings of Dr. Hughes working in Maternity." *Schultz Aff., Ex. 2.*

3.      According to the minutes of the Hospital's Joint Conference Committee meeting held on August 17, 2001, "Dr. Hughes' initial encounter with Executive Committee  – issue was Dr. Hughes' ability to practice medicine.  The age issue was carried on for the next several months even after the credentials were approved." *Schultz Aff., Ex. 3.*

**B.      Circumstantial Evidence of Discrimination Other Than Pretext**

**1.      Dr. Hughes' Competence**

4.      The Hospital admits that Dr. Hughes was performing his clinical duties in a very competent manner at the time he was terminated.  *Schultz Aff., Ex. 4 (Walsh Dep.), at 14.*

5.      In his only Performance Evaluation, Dr. Hughes was given the highest rating in each and every category.  *Schultz Aff., Ex. 4 (Walsh Dep.) at 13; Schultz Aff., Ex. 5 (Peformance Evaluation).*

**2.      Dr. Hughes' Disparate Treatment Compared to Others**

6.       According to Board of Trustees Chairman Ted Morgan, "[n]o others have been treated as poorly as Drs. Hughes and Kriedman (Dr. Hughes' wife) have been recently." *Schultz Aff., Ex. 3 at 1743.*

**a.      The Monitoring of Dr. Hughes with Request to Submit Three Years of Cases**

7.  The Hospital monitored Dr. Hughes for one-two months despite the fact that Dr. Hughes had a wealth of experience, had not been monitored for over thirty years, came from a clinical practice and had been chief of gynecology at a medical school prior to coming to Martha's Vineyard Hospital. *Schultz Aff., Ex. 6 (CV); Schultz Aff., Ex. 7 (Hughes Dep.) at 35, 92-93, 104.*

8.  In its Response filed on January 8, 2004 to Dr. Hughes' Charge of Discrimination to the MCAD, the Hospital states that it had to monitor Dr. Hughes, because "Dr. Hughes' most recent previous experience was at a teaching facility; he did not come from an active practice."[1] *Schultz Aff., Ex. 8, at 3.* The Hospital further claims that it "decided to monitor Dr. Hughes because it was unable to obtain information concerning his hands on experience or surgeries he preformed in recent years." *Schultz Aff., Ex. 9 (Int. Answers), Int. # 1.* The Hospital claims that it in fact "believed that Dr. Hughes' practice was limited to overseeing residents." *Id.*

9.  The Hospital also requested that Dr. Hughes provide them with records of his patient care from the previous three years. *Schultz Aff., Ex. 7 (Hughes Dep.) at 33-34.* No other physician was requested to provide a review of three years of case records.[2] *Schultz Aff., Ex. 10 (MacArthur Dep.) at 57.*

---

[1]     Mr. Walsh acknowledges that he reviewed the Hospital's response prior to its being sent to the MCAD. *Schultz Aff., Ex. 4 (Walsh Dep). at 8.*

[2]     Dr. MacArthur contradicts himself when he indicates at first that he asked Dr. Hughes for records indicating what cases he had done, then indicates he did not ask for "three years of medical records", and then states he did ask for three years of records or information. *Schultz Aff., Ex. 10 (MacArthur Dep.) at 49-55.*

10.    Dr. MacArthur, responsible for calling references for Dr. Hughes, indicated that he could not find out whether Dr. Hughes had done any actual cases during the previous 1-3 years. *Schultz Aff. (MacArthur Dep.) at 21*.  He stated that the only information he could get regarding Dr. Hughes was that he was an excellent teacher[3], and that the references assumed Dr. Hughes was a good surgeon and obstetrician, but could not give information about Dr. Hughes' clinical skills. *Id., 25-26*.  Finally, he indicated that he could not get anything in writing from the references. *Id., 26*.

11.    In fact, there was no need to monitor Dr. Hughes and the Hospital knew this fact.  The Hospital received three written references relating to Dr. Hughes.  In one reference, he was described as an "excellent clinician". *Schultz Aff., Ex. 11*.  In one reference, he was described as a "skillful practitioner". *Schultz Aff., Ex. 12*.  A third doctor indicated that it was a privilege to work with and be taught by Dr. Hughes for the past 12 years. *Schultz Aff., Ex. 13*.  Each and every reference described Dr. Hughes' "Clinical Competence" and "Technical Skill" to be "Superior", while one reference placed three checkmarks in "Superior" box next to "Technical Skills". *Id.*  Dr. MacArthur acknowledges that he spoke on the phone with at least two of these references, but does not recall asking them about the basis of their opinions regarding Dr. Hughes' clinical competence and technical skills. *Schultz Aff., Ex. 10 (MacArthur Dep.) at 20, 35, 39-41, 43,45*.  After being shown all three references at his deposition, Dr. MacArthur acknowledged, "We don't have to go through every single question.  The basic medical knowledge, sense of responsibility,

---

[3]    Dr. MacArthur did note that he was informed that Dr. Hughes had been voted instructor of the year. *MacArthur Dep., 22*.

clinical competence, the whole nine yards, yes, yes, yes, yes, yes.  He got on the staff,

right?"  *Id., (MacArthur Dep.) at 44.*

12.     The Hospital regularly allows off-island doctors to use the operating room without

monitoring.  *Schultz Aff., Ex. 7 (Hughes Dep.) at 105.*  The Hospital cites to only four

doctors that have been monitored in the operating room in the past 10 years other than

Drs. Hughes and Donegan.  *Schultz Aff., Ex. 14, (Def. 2nd Supp. Ans. To Interrogatories),*

*Int. # 2.*

### b.     The Complaint to the Board of Registration

13.     In 2002, a complaint against Dr. Hughes was filed with the Board of Registration of

Medicine.  While the complaint was filed anonymously, given the information contained

in the complaint, Richard Koehler (who had never been in the operating room with Dr.

Hughes) and Steven London, MD, had to be two of the complainants.  *Schultz Aff., Ex. 7*

*(Hughes Dep.) at 131-133, 136-137.*  The complaint was eventually dismissed by the

Board of Registration.  *Id.*  Dr. Hughes had never previously been the subject of any

complaint to any board of registration, and had to undertake considerable time and some

expense in defending the complaint.  *Hughes Aff., ¶ 4.*

### c.     Failing to Provide Dr. Hughes with Surgical Back-up

14.     During 2002, surgeon Richard Koehler refused to perform operations with Dr. Hughes or

back him up for his operations.  *Schultz Aff., Ex. 15 (Def. Response to Req. for*

*Admissions), Req. # 6; Id., Ex. 7 (Hughes Dep.) at 248.*

15.     CEO Tim Walsh was aware of the fact that Dr. Koehler was refusing to provide back-up

to Dr. Hughes.  *Schultz Aff., Ex. 4 (Walsh Dep.) at 106.*  Mr. Walsh justified Dr.

Koehler's refusal under the pretext that an OB-GYN has no need of a general surgeon for backup.  *Id.*  Mr. Walsh claimed that the Hospital By-Laws do not require one doctor to back up another doctor, when in fact the By-Laws require that a doctor serve on the on-call roster.  *Id.; Schultz Aff., Ex. 16 at 1153 (§3.A.3(d)).*

> **c.** **The Failure to Place Dr. Hughes on the Quality Review Committee**

16.  The Medical Staff Organizational Manual establishes a Quality Improvement Committee, which is required to include an active staff member representing obstetrics and gynecology.  *Schultz Aff., Ex. 4 (Walsh Dep.) at 147; Ex. 17 (Manual) at 1283.*  Yet, no OB-GYN served on the Quality Improvement Committee.  *Hughes Aff., ¶ 5 .*  Mr. Walsh claims that the Hospital was not in violation of its own requirements because the chief of surgery represents the OB-GYN physicians.  *Schultz Aff., Ex. 4 (Walsh Dep.), at 148-149.*

> **3.** **Race Discrimination: Statistical Evidence of Discrimination**

17.  Prior to the date that Dr. Hughes was terminated, he was one of only two doctors on the active staff that defendants claim to be minorities.  *Schultz Aff., Ex. 9 (Int. Ans. # 13); Schultz Aff., Ex. 4 (Walsh Dep.) at 151.*  The other "minority" was Asian.

18.  There is not a single minority (black, Hispanic, Native-American or Brazilian) on the thirteen member Board of Trustees.  There is not a single minority officer at the Hospital.  *Hughes Aff., ¶ 9*

19.  Dr. Hughes cannot recall ever working with a single minority staff nurse at the Hospital. While it is possible that there may be some minorities on the Hospital staff of which he is

not aware, the only blacks, Hispanics, Native-Americans or Brazilians to his knowledge employed by the Hospital work on the custodial staff. *Hughes Aff., ¶ 10.*

20.    The Hospital employs 172 individuals full-time and 79 individuals part-time. *Schultz Aff., Ex. 8, p. 2.* Yet, CEO Tim Walsh could name only three minority employees (Dr. Morris [who was not added to the staff until after Dr. Hughes was terminated], Dr. Tsai [Asian] and a maintenance worker). *Schultz Aff., Ex. 4 (Walsh Dep.) 151, 154.* While the hospital employs 35-40 nurses, Mr. Walsh could not name a single minority nurse. *Id.*

21.    The Hospital cites misleading statistics to seek to explain their failure to hire minority staff. Specifically, the Hospital claims that census data indicates that only 2.4% of the Island's residents are African-American. *Def. Fact # 70.* While only 2.4% of the year round population of 14,987 is African-American, the Island's summer population grows to over 100,000. *Schultz Aff., Ex. # 18.* According to "SoulofAmerica.com", Martha's Vineyard reflects a diverse group of cultures: Native Americans, Europeans, and African Americans. *Id., Ex. # 19.* In fact, according to Soul of America, Martha's Vineyard is "the largest black resort in the U.S." *Id.* According to Soul of America founder Thomas Dorsey, Martha's Vineyard has the "highest concentration of black celebrities and really affluent doctors and lawyers" in the country. *Id., Ex. 20.* Dr. Hughes indicates that one of the reasons he moved to the Island was his knowledge that it had a diverse community, including a large black population. *Hughes Aff.., ¶ 11.* He indicates that he personally knows at least 10 black doctors with homes on the Island, and that there is a large pool of black doctors who might be interested in working on the Island if the Hospital were to seek their services. *Id.* In addition, there is one town on the Island, Aquinnah, which is

close to a majority Native-American. *Edson Aff., Ex. 50.* Census data further indicates

that 10.2% of the year round residents on the Island are non-white. *Id.*

### 4.    Race Discrimination: Lack of Effort to Diversify Staff

22.    The Hospital CEO could not recall a single discussion he ever had with anyone relating

to the need to hire more minorities on the active staff. *Schultz Aff. (Walsh Dep.) at 158.*

The Board of Trustees never had a single discussion relating to the need to hire more

minorities. *Schultz Aff., Ex. 1 (Ray Dep.) at 48.*

23.    The Hospital CEO could not cite a single effort the Hospital had ever made to recruit a

diverse staff. *Schultz Aff., Ex. 4 (Walsh Dep.) at 158.* The Board of Trustees never had a

single discussion relating to efforts being made to hire more minorities. *Schultz Aff., Ex.*

*1 (Ray Dep.) at 48.*

### C.    Pretextual Reasons for Termination Abandoned by Defendant

24.    The Hospital has offered conflicting reasons for terminating Dr. Hughes. *See Disputed*

*Findings of Fact #s 25-83.*

### 1.    Alleged Desire to Switch to a Full-Time Practice Model, As Opposed to Dr. Hughes' Alleged Part-Time Schedule.

25.    In its Response filed on January 8, 2004 to Dr. Hughes' Charge of Discrimination, the

Hospital offered the following reasons, among others, for terminating Dr. Hughes:

> "[T]he Hospital decided it wanted to move to a full-time practice model for the
> midwifery practice as opposed to Dr. Hughes' part-time schedule."

*Schultz Aff., Ex. 8, p. 1.* The Hospital claimed that its action to terminate Dr. Hughes was

supported by the facts that "at most, Dr. Hughes saw patients, many of whom were Ms.

Chase's patients, 1 ½ days per week; . . .." *Id. at p. 3.* The Hospital further claimed that

it hired a successor, who "[u]nlike Dr. Hughes, . . . sees both obstetric and gynecology patients and works full-time, seeing patients in the office, performing surgeries, and providing coverage for Ms. Chase." *Id. at* 4.

26.     Tim Walsh told the Martha's Vineyard Gazette that "Dr. Hughes works a day and a half a week in the office.  We want somebody to do five days a week and so we brought in Dr. Donegan.  None of this was meant to put down Dr. Hughes.  He served us well in the role he had." *Schultz Aff., Ex. 15, Req. For Admiss. # 1; see, also, Schultz Aff., Ex. 4 (Walsh Dep.) at 50-51.*

27.     In fact, Dr. Hughes worked far more than 1 ½ days per week and saw patients far more than 1 ½ days per week.  Dr. Hughes held office hours 1 1/2 days per week, performed surgeries one day per week, and on other days reviewed charts, reviewed records, reviewed lab reports, attended committee meetings, met with and taught nurses and the nurse midwife and spent an inordinate amount of time day or night taking care of obstetrical patients who were having problems.  *Schultz Aff., Ex. 7 (Hughes Dep.) at 83.* He was in the hospital regularly four days/week, *Chase Dep., 18,* plus the time he spent on-call, at the hospital responding to calls, and covering for Dr. Lew.  Dr. Hughes was on-call more than any other doctor in the surgical department.[4]  *Schultz Aff., Ex. 10 (MacArthur Dep.) at 63.*  Given Dr. Hughes' coverage obligations, Mr. Walsh admitted that Dr. Hughes was working more than one and one-half days per week.  *Schultz Aff., Ex. 4 (Walsh Dep) at 68.*  Dr. MacArthur, Chief of Staff for most of the period that Dr.

---

[4]      While Mr. Walsh at first denied that Dr. Hughes was on-call more than many of the other doctors at hospital, he too later admitted that Dr. Hughes was on-call seven days/week 24 hours a day, a situation which only occurs when a doctor on the active staff is the only doctor in their discipline on the active staff.  *Schultz Aff., Ex. 4 (Walsh Dep.) at 66.*

Hughes worked at the Hospital, described Dr. Hughes, as the only "full-time" active OB-GYN on staff until Dr. Donegan was hired.  *Schultz Aff., Ex. 10 (MacArthur Dep.) at 59-60.*

28.    Hospital CEO Kevin Burchill informed Dr. Hughes that he worked harder than other doctor he knew in the institution.  *Schultz Aff., Ex. 7 (Hughes Dep.) at 239-240.*

29.    Mr. Walsh further contradicted the Hospital's Response to the MCAD when he admitted that Dr. Hughes saw both obstetric and gynecology patients.  *Schultz Aff., Ex. 4 (Walsh Dep.)  at 114.*

30.    While the Hospital contrasted Dr. Donegan's hours to Dr. Hughes' hours to justify Dr. Hughes termination, Dr. Donegan immediately established a schedule whereby he only worked four days/week at the Hospital, taking Tuesdays off.  *Schultz Aff., Ex. 21 (Donegan Dep.) at 32-34.*  While initially scheduling Tuesdays off because Dr. Hughes held office hours on Tuesdays, *id.,* Dr. Donegan continues to this date not to work on Tuesdays.[5]  *Id., 39.*  He sees patients approximately 14-15 hours/week. *Id., 39.*  In contrast, Dr. Donegan regularly leaves the Hospital at 3:00 - 3:30 PM, and takes between thirty minutes to one hour off for lunch.  *Schultz Aff., Ex. 22 (Chase. Dep.) at 28-29.*  He indicated he has no reason to believe he spends any more time than Dr. Hughes spent at the Hospital during non-regular working hours.  *Schultz Aff., Ex. 21 (Donegan Dep.) at 41-42*

---

[5]    The Hospital falsely stated in its Answers to Interrogatories, # 6, that Dr. Donegan worked five days/week, performing chart reviews and administrative functions on Tuesdays.  *Schultz Aff., Ex. 9, Int. # 6.*

31.    In its Response to Dr. Hughes' Charge of Discrimination, the Hospital further claimed

that it terminated Dr. Hughes, in part, because of "his refusal . . . to work more than 1 ½

days per week. . . ." (emphasis added). *Schultz Aff., Ex. 8, p. 5.*    In fact, no one from the

Hospital ever requested that Dr. Hughes work any additional hours, and the Hospital

admits that Dr. Hughes never refused to work more than 1 1/2 days per week.  *Schultz*

*Aff., Ex. 4 (Walsh Dep.) at 72-73; Ex. 15, Def. Response to Req. for Admissions, # 3.*

32.    Dr. Hughes' schedule was commensurate with other full-time staff at the Hospital.  Three

of the five pediatricians at Hospital work only four days/week.  *Schultz Aff., Ex. 22*

*(Chase Dep.) at 54.*  Two of the five pediatricians share a practice, and each works part-

time.  *Id., 55.*  The surgeons are not on the Hospital premises 40 hours/week.  *Schultz*

*Aff., Ex. 10 (MacArthur Dep.) at 14-15.*

33.    John MacArthur, M.D., General Surgeon and former Chief of Staff, indicated that in the

off-season (i.e. other than the summer), he works as little as 12 hours/week (office hours

= 6 hours, surgeries = 5-6 hours, minor surgeries = 2-3 hours).  *Schultz Aff., Ex. 10*

*(MacArthur Dep.) at 8-11.*  As he indicated, "I wouldn't be here if I was working 40

hours a week.  People come to Martha's Vineyard not to make a lot of money but for the

lifestyle." *Id., 13.*

34.    While the Hospital employs two anesthesiologists, they are never both at the Hospital at

the same time, and at times neither one is at the Hospital.[6]  *Schultz Aff., Ex. 22 (Chase*

*Dep.) at 56-58.*  The anestheseologists split their time with one covering days and one

---

[6]        The Hospital falsely indicated in its Second Supplemental Answers to Interrogatories,
Response # 5, that both Hospital anesthesiologists, Drs. London and Cheshire, were on the hospital
premises for approximately 42 hours/week.  *Schultz Aff., Ex. 10 (MacArthur Dep) at 16-17; Ex. 14, Int. #*
*5.*

covering nights, *Schultz Aff., Ex. 10 (MacArthur Dep.) at 15;* the night-time anesthesiologist does not spend any time physically on the hospital premises other than when he is responding to an emergency during the week he is covering nights. *Hughes Aff., 6; Schultz Aff., Ex. 10 (MacArthur Dep.) at 15-16.* Dr. London goes to Hawaii approximately six weeks each winter and goes to Nantucket one day/week throughout the year. *Id. (MacArthur Dep.) at 17-18.*

35. In its Form 990 filed with the Internal Revenue Service for FY 2003 (April 1, 2002 - March 31, 2003), the Hospital indicated that Dr. Hughes worked 40 hours/week, which was the same number of hours/week that it indicated Drs. London, MacArthur and Hirshberg worked. *Schultz Aff., Ex. 23.*

> **2.    Alleged Refusal to Provide Additional Coverage for Cathy Chase So That She Could Go Off-Island**.

36. In its Response filed on January 8, 2004 to Dr. Hughes' Charge of Discrimination, the Hospital offered the following reason, among others, for terminating Dr. Hughes:

"Dr. Hughes frequently refused to provide additional coverage for Cathy Chase so that she could go off-island." *Schultz Aff., Ex. 8, p. 5.*

37. At his deposition, Mr. Walsh both reasserted and denied that Dr. Hughes' alleged refusal to cover for Ms. Chase was a reason he was terminated. He at first stated it was not a reason, and he then stated that the failure to cover for Ms. Chase was an indication that Dr. Hughes did not have "much of a team". *Schultz Aff., Ex. 4 (Walsh Dep.) at 52-53.*

38. Mr. Walsh then stated at his deposition that there were no occasions Dr. Hughes refused to cover for Ms. Chase. *Schultz Aff., Ex. 4 (Walsh Dep.) at 104.* He then changed his testimony to state that there was one occasion that Dr. Hughes refused to cover for Ms.

Chase, and that this occurred prior to the decision to terminate Dr. Hughes. *Id. at 105.*

Dr. Hughes could recall only one instance that he told Ms. Chase he would not cover for

her, and this occurred after he had learned that he was being terminated; even in this one

instance, he told Ms. Chase that he would cover for her if requested by administration to

do so. *Schultz Aff., Ex. 7 (Hughes Dep.) at 186-187.*

39.    The coverage arrangement with Ms. Chase was always that the Hospital would first try to

get a midwife, rather than a doctor, to try to cover for Ms. Chase. *Schultz Aff., Ex. 22*

*(Chase. Dep.) at 70-71.*  Ms. Chase could only recall two instances where Dr. Hughes, in

accordance with the understanding reached by the parties, indicated that the Hospital

should get a midwife rather than his covering Ms. Chase's vacation time. *Id., 73.*  In both

instances, the Hospital, in fact, did get a mid-wife to cover for Ms. Chase, who was not

prevented from going off-island. *Id.*

### 3.    Alleged Difficulties in Working with Ms. Chase

40.     In its Response to Dr. Hughes' Charge of Discrimination, the Hospital offered the

following reason, among others, for terminating Dr. Hughes:

> Dr. Hughes' "personality traits made it difficult for Ms. Chase . . . to work with
> him.  Although the Hospital envisioned that Dr. Hughes would collaborate with
> Ms. Chase to build the midwifery practice, he was unwilling to work with her as a
> colleague, choosing instead to treat her as a subordinate." *Schultz Aff., Ex. 8, p. 5.*

41.    According to Ms. Chase, Dr. Hughes worked with her as a colleague, *Schultz Aff., Ex. 22*

*(Chase Dep.) at 46,* would seek her input in patient care and meet with her regularly to

discuss patients with problems. *Id., 44-45.*  Ms. Chase, in fact, informed Dr. Hughes

shortly after he had begun work at the Hospital that she had learned more from Dr.

Hughes in that short period of time than she had learned from Dr. Lew in the three years

they had worked together. *Id., 45.* She testified that she thanked Dr. Hughes a lot for what he was teaching her. *Id., 46.*

### 4.    Alleged Arguments in front of Patients and Staff

42.    At his deposition, Tim Walsh claimed that one reason he decided to terminate Dr. Hughes was because he began to have arguments in front of staff and patients, so he thought he really needed to do something. *Schultz Aff., Ex. 4 (Walsh Dep.) at 17.* In fact, at one point, Walsh relates this to be one of only two reasons that he terminated Dr. Hughes. *Id. at 75-76.* Specifically, Walsh cites to a dispute that Dr. Hughes had with Dr. London involving Dr. Hughes' decision to undertake surgery for a patient, where Dr. Hughes, Dr. London and Dr. Cheshire had a heated argument in the hallway. *Schultz Aff., Ex. 4 (Walsh Dep.) at 112-113*, which Walsh insists occurred prior to his making the decision to terminate Dr. Hughes. *Id.*

43.    Walsh decided to terminate Dr. Hughes in or several months prior to February 2003. *Schultz Aff., Ex. 4 (Walsh Dep.) at 17-18, 21-23; Ex. 24.* The incident described by Mr. Walsh involving Dr. London, Dr. Hughes and Dr. Cheshire occurred on April 16, 2003, at least two months after Mr. Walsh had already decided to terminate Dr. Hughes, and well after the search had begun for his successor. *Schultz Aff., Ex. 25.*

44.    Moreover, a review of the incident conducted by Michael Goldfein, MD, Vice Chair of the Medical Staff concluded that Dr. London made a poor choice when he began the discussion in a public area. *Schultz Aff., Ex. 25.* A report from the Nurse Manager, who witnessed the incident, noted that Dr. London was "very challenging" to Dr. Hughes, as to his competence to perform the surgery, and that Dr. Cheshire accused Dr. Hughes of

having already had his chance that morning to fix the bleeding.  *Schultz Aff., Ex. 26.*   It

was further noted that Dr. Hughes did defend himself, and that it was Dr. Hughes who

walked away to end the conversation.  *Id*

### D.    Further History of Mis-statements by the Hospital

45.    All of the reasons set forth by the Hospital for terminating Dr. Hughes are subject to

doubt as the Hospital has lied about the manner in which it reached its decision to

terminate Dr. Hughes.  Tim Walsh claims that he would not terminate a doctor without

first reporting to the Board that he was going to do so.  *Schultz Aff., Ex. 4 (Walsh Dep.) at

14-15.*   Yet, Earl Ray, a member of the Board for eleven years, *Schultz Aff., Ex. 1 (Ray

Dep.) at 5,* stated that the Board is not consulted prior to a doctor being terminated.  *Id.,

at 9.*  Moreover, Mr. Walsh claims that he reported to the full Board his decision to

terminate Dr. Hughes prior to hiring a recruiter to search for a new OB-GYN doctor on

February 18, 2003.  *Schultz Aff., Ex 4 (Walsh Dep.)  at 22; Ex. 24.*  However, there are no

minutes of any Board Meeting showing a discussion of Dr. Hughes' termination.[7]  *Id. at

23-24.*

46.    Tim Walsh claims that he informed Dr. Donegan, from the first time that he met him, that

he was being hired to replace Dr. Hughes.  *Schultz Aff., Ex. 4 (Walsh Dep.) at 29-30, 142-

143.*  Dr. Donegan, on the other hand, indicated that he was led to believe after three

interviews with the personnel director Kenneth Chisholm and one interview with Mr.

Walsh that he would be working with Dr. Hughes, rather than replacing him. *Schultz Aff.,*

---

[7]        According to Ray, the minutes as a rule reflect the discussions that occurred at the
previous meeting.  *Ray Dep., 36.*

*Ex. 21 (Donegan Dep.) at 14-16, 20, 27.* He further indicated that he did not learn that Dr. Hughes had been terminated until several weeks after he had begun working at the Hospital. *Schultz Aff., Ex. 21 (Donegan Dep.) at 31.*

47.    The Hospital did not even tell the truth about the OB-GYN position in its advertisement for a new doctor. The advertisement sought a "Department Chairperson", who would be on call one of every three days for a "high volume" practice. *Schultz Aff., Ex. 27.* In fact, the Hospital was not seeking a Department Chairperson, the doctor to be hired would need to be on call one of every two days, and the practice is not "high volume". *Schultz Aff., Ex. 4 (Walsh Dep.) at 33-34.*

**E.    Pretextual Reasons Set forth by Defendants in Support of Summary Judgment**

       **1.    Alleged Contentious Relationship with Most of Medical Staff**

48.    Defendants contend that they terminated Dr. Hughes, in part, because of his alleged contentious relationship with "most of the medical staff"[8]. *Def. Statement, ¶ 53.*

49.    In fact, Dr. Hughes had a good relationship with "most of the medical staff". *Schultz Aff., Ex. 7 (Hughes Dep.) at 254.* According to former Hospital CEO Kevin Burchill, unlike Dr. Lew, Dr. Hughes "is well liked and respected". *Schultz Aff., Ex. 28.* In his only performance evaluation, Dr. Hughes received the highest rating (i.e. "Exceeds standards. Consistently exceeds the performance standard") in the category of

---

[8]    Defendants rely, in support of this argument, on the statement made by Chief of Staff John MacArthur, M.D., that "every time we met with Dr. Hughes, it ended up in a donnybrook, an argument, a fight." *Def. Proposed Finding # 50.* Dr. MacArthur made this assertion in the context of justifying the Executive Committee decision of June 26, 2001, to require Dr. Hughes to cross-cover Dr. Lew after hearing from Dr. Lew but without even first meeting with Dr. Hughes to discuss his reasons for declining the coverage. *Schultz Aff., Ex. 10 (MacArthur Dep) at 68-70; Ex. 29.* Minutes of the Executive Committee meetings produced by defendants show that, in fact, Dr. Hughes had never addressed the Executive Committee prior to June 26, 2001.

"Collaboration/Communications".  *Schultz Aff., Ex. 5 at MVH 0687.*  Dr. Hughes

received the highest rating in the sub-category "Consistently demonstrates attitude of

cooperation and professionalism with patients, co-workers, visitors, families, physicians."

*Id.*

50.    "The nursing staff, generally speaking, were very happy with Dr. Hughes and got along

well with him."  *Schultz Aff., Ex. 22 (Chase Dep.) at 33.*  Cathy Chase contrasted Dr.

Donegan's professional and respectful relationship with the nursing staff with Dr.

Hughes' "friendly and warm" relationship.  *Id., 49.*

51.    Dr. Hughes had a professional and courteous relationship with and was treated well by a

number of the doctors at the Hospital.  *Schultz Aff., Ex. 22 (Chase. Dep.) at 50.*

52.    When Dr. Hughes applied for permanent credentials in 2002, the Hospital accepted

Confidential Practitioner Evaluations regarding Dr. Hughes.  The Hospital received only

one evaluation, which was from Gerald Yukevitch, MD, who stated that "Dr. Hughes is

an outstanding practitioner with superior skills and rapport with patients, nurses, and

consulting physicians."  *Schultz Aff., Ex. 10 (MacArthur Dep.) at 106-107; 0003-0004.*

53.    Although now claiming that Dr. Hughes had a contentious relationship with "most of the

medical staff", the Hospital admits that it holds Dr. Hughes in "high regard both as a

physician <u>and an individual</u>." (emphasis added).  *Schultz Aff., Ex. 4 (Walsh Dep.) at 14.*

54.    Mr. Walsh contends that if he  has a concern with a doctor, it is his practice to meet with

the doctor.  *Schultz Aff., Ex. 4 (Walsh Dep.) at 12.*  Yet, Walsh admits that he never met

with Dr. Hughes to discuss what he allegedly considered to be his poor relationship with

the medical staff. *Id., (Walsh Dep.) at 46.*   In fact, Walsh admits that he never had any

conversations with Dr. Hughes where he requested that Dr. Hughes change anything, be it his behavior, his contract or the amount of revenue he was generating. *Id.*

55. The Hospital has a written policy on how to handle "Disruptive Conduct by members of the Medical Staff". *Schultz Aff., Ex. 4 (Walsh Dep.) at 110-111; Schultz Aff. , Ex. 30.* The policy notes that "[d]ocumentation of disruptive conduct is critical since it is ordinarily not an incident that justifies action, but rather a pattern of conduct." *Id.* The Policy requires that "Unusual Occurrence Report Form" be filled out to report disruptive conduct. *Id.* No such form was ever filled out regarding Dr. Hughes prior to the decision being made to terminate him.

56. Dr. Hughes had a sometimes contentious relationship with a small group of influential members of the medical staff and their supporters on the board, who exhibited stereotypical thinking of characterizing older, black people as rigid and cantankerous with deteriorating medical skills, when Dr. Hughes insisted, without backing down, that quality medical care be offered at the Hospital. This group, which included Steven London, M.D. (Chief of Perioperative Committee, later Chief of Staff),  Richard Koehler, M.D., Jason Lew, M.D., Kathleen Kohler, M.D. (member of the Board), John MacArthur (Chief of Staff) and Timothy Walsh (CFO from July 2000 - April 2002, and CEO from April 2002 - date)(hereinafter collectively referred to as "the cabal") orchestrated a campaign against Dr. Hughes which included direct attacks against his competence allegedly because of his age[9]. *See Proposed Finding of Fact #s* 13-16, 42-44, 57.

---

[9]    While denying Dr. Hughes was terminated because of his age or his race, Dr. MacArthur has a more cynical view of the reason Dr. Hughes was terminated than the "pretextual" reasons set forth by the Hospital, when he states that Dr. Hughes was hired as "a cheap way" to get rid of Dr. Lew, and after Dr. Lew was out of the picture, Dr. Hughes was no longer needed. *Schultz Aff., Ex. 10 (MacArthur*

57.   At more than one meeting of the Board of Trustees, board member Kathleen Koehler,

M.D., made statements that Dr. Hughes' age was impacting his ability to perform

surgical procedures required by OB/GYN patients.  Dr. Koehler accused Dr. Hughes of

not utilizing modern techniques and not being as efficient as other doctors.[10]  *Harff Aff., ¶*

*4; Kaplan Aff., ¶ 4.*  Mr. Walsh's credibility is again undermined, when he claims that he

never heard Dr. Koehler make any references to Dr. Hughes' age at Board meetings,

*Schultz Aff., Ex. 4 (Walsh Dep.) at 108, 139-140,* although Mr. Walsh attended

substantially all of the Board meetings during the relevant time period. *Schultz Aff., Ex.*

*14, Int. Ans. # 4.*

58.   The most contentious issue faced by Dr. Hughes was the cabal's desire to protect one of

their group, i.e. Jason Lew, M.D., an OB-GYN with hospital privileges, with whom Dr.

Hughes did not wish to create a cross-coverage arrangement.  Tim Walsh claims that one

reason Dr. Hughes was terminated was because of his conflicts with the medical staff

over the issue of cross-coverage with Dr. Lew.  *Schultz Aff., (Walsh Dep.) at 76-77.*  Yet,

Walsh totally contradicts himself when he further states that Dr. Hughes was not

terminated to eliminate the conflict that existed over the issue of cross-coverage with Dr.

Lew. *Id.  at 75.*

---

*Dep.) at 109-110.*

    [10]    The type of "age slander" engaged in by Dr. Koehler is still evident today, as seen in Dr. MacArthur's deposition, where he first testified that Dr. Hughes "was a little . . . may be a little behind the times.  He did all of his tubal ligatures (*sic.*) open.  He didn't do any tubal ligatures (*sic.*) with the laparoscope which is kind of state of the art. . ."  *Schultz Aff., Ex. 10 (MacArthur Dep.) at 55.*  When pressed, Dr. MacArthur testified he, in fact, did not remember whether Dr. Hughes used a laparoscope in the procedures that he had observed, *id., 55-56,* and he did not know what was the standard of care today for doing tubal ligations through a laparoscope.  *Id., 72..*

59.    While Dr. Hughes supposedly got terminated in part because of his position relating to cross-coverage with Dr. Lew, when Dr. Donegan came to the Hospital to replace Dr. Hughes, Dr. Donegan informed the Hospital administration that he felt Dr. Hughes "cross-coverage" arrangement with Dr. Lew was reasonable, where Dr. Hughes would cover for Dr. Lew but Dr. Lew would not cover for Dr. Hughes.  *Schultz Aff., Ex. 21(Donegan Dep.) at 48.*  The Hospital informed Dr. Donegan that if he were "comfortable with Dr. Hughes' arrangements for coverage, that that would be acceptable to the administration." *Id., 49.*

60.    Dr. Hughes misgivings relating to cross-coverage with Dr. Lew's were based on Dr. Hughes' concerns regarding Dr. Lew's level of practice.  *Schultz Aff., Ex. 7 (Hughes Dep.) at 50.*  Dr. Lew had failed his OB-GYN boards on more than one occasion.  *Schultz Aff., Ex. 4 (Walsh Dep.) at 87.*  Dr. Hughes had developed misgivings regarding Dr. Lew's level of practice, as the result of covering for Dr. Lew prior to the Hospital's hiring him full time, complaints he had received from the nurse midwife and nurses, review of Dr. Lew's cases he was covering, and complaints he heard from patients who had switched from Dr. Lew to Dr. Hughes' wife.  *Id.*

61.    In view of ongoing concerns about the quality of care in the Hospital's OB/GYN practice (concerns that antedated Dr. Hughes' employment), the Hospital requested the American College of Gynecologist/Obstetricians (ACOG) to conduct a special review of that practice.  *Harff Aff., ¶ 5.*

62.    The ACOG report concluded that Dr. Hughes was competent, *Harff Aff., ¶ 6; Kaplan, Aff., ¶ 5,* but that Dr. Lew's care fell below acceptable standards of practice.  *Schultz Aff.,*

*Ex. 10 (MacArthur Dep.) at 83; Schultz Aff., Ex. 7 (Hughes Dep.) at 158-159* As the result of the ACOG report, the Hospital required Dr. Lew to attend classes, take an examination, be supervised by Drs. Hughes and Koehler, and have his cases reviewed by Dr. Shah. *Schultz Aff., Ex. 8 (MacArthur Dep.) at 85; Ex. 7 (Hughes Dep.) at 122-123.*

63.     Dr. Kathleen Koehler refused to accept the findings of the report and insisted that Kevin Burchill (the Hospital's former CEO) must have improperly influenced the conclusions of this independent review body. *Harff Aff., ¶ 6; Kaplan Aff., ¶ 5.*

64.     In fact, Mr. Walsh admits that "it was reasonable for Dr. Hughes to be concerned about Dr. Lew covering for him." *Schultz Aff., Ex. 4 (Walsh Dep.) at 90.* Chief of Staff Dr. MacArthur admits that certainly after issuance of the report of the American College of Obstetricians and Gynecologists , Dr. Hughes had defensible grounds for not wanting Dr. Lew to cover for him. *Schultz Aff., Ex. 10 (MacArthur Dep.) 65-66.* As Dr. Hughes notes, an issue simply cannot be worked out "collegially", given his ethical obligations as a doctor, when he was being asked to cross-cover for a physician whom he did not feel had the quality of care that the patients deserved. *Schultz Aff., Ex. 7 (Hughes Dep.) at 68, 78.*

65.     While Mr. Walsh claims that Dr. Hughes should have taken his concerns regarding Dr. Lew's level of care to the Quality Improvement Committee, *Schultz Aff., Ex. 4 (Walsh Dep.) at 91,* Dr. Hughes in fact did send six of Dr. Lew's cases to Quality Improvement to review; however, they decided to undertake a general review of the OB-GYN department, rather than review these cases. *Schultz Aff., Ex. #s 32, 33.*

66.    While the Hospital claims that the dispute regarding coverage between Dr. Hughes and

Dr. Lew continued before and after the ACOG report was received in January 2002, in

fact, the dispute regarding Dr. Hughes' covering for Dr. Lew first resolved itself in July

2001 when Dr. Hughes graciously and realistically wrote to the Chair of the Medical

Executive Committee, noting that he had stated his objections to the Committee, he

recognized that his position was not well received and he would probably not prevail, so

he would agree to cover Dr. Lew every other weekend and 25 weekdays and allow Dr.

Lew to provide him with emergency coverage during illness or when called off Island at

short notice.  *Schultz Aff., Ex 33.*   One week after Dr. Hughes made his proposal, the

Medical Executive Committee concluded that the coverage proposed by Dr. Hughes was

found to be acceptable, *Schultz Aff., Ex. 34 at MVH 0345.*  Dr. Hughes, in fact, did cover

for Dr. Lew, if asked to do so, every other weekend.  *Schultz Aff., Ex. 35 at MVH 1745.*

67.    Additional coverage issues did not emerge until after the ACOG report had confirmed

Dr. Hughes' concerns, and Dr. Hughes reasonably wanted assurances before Dr. Lew

covered for his patients that Dr. Lew had received appropriate remedial review to raise

his practice to acceptable standards.   As Dr. Hughes was covering for Dr. Lew when he

was off-island, he was aware of the fact that Dr. Lew had only attended classes for two

days and that Dr. Shah had never come to the Hospital to observe Dr. Lew.  *Hughes Aff.,*

*¶8.*  Thus, Dr. Hughes wrote that he would be willing to cover for Dr. Lew, after the

administration issued a written statement that it is their opinion that Dr. Lew's

practice meets the national standard of care.  *Edson Aff., Ex. 31.*  Dr. Hughes' position

after receipt of the ACOG report was consistent with the earlier findings of the Medical

Executive Committee, which had concluded that "the results of the [ACOG] review will serve as a final recommendation to settle the Ob/Gn coverage issue." 0347-0348 at 0348.

### 2. Allegedly Disadvantageous Contract

68. Tim Walsh claims that Dr. Hughes had a contract to work part-time with the Hospital. *Schultz Aff., Ex. 4 (Walsh Dep.) at 16-17.* Yet, Mr. Walsh admits Dr. Hughes' contract does not say anything about his being part-time. *Schultz Aff., Ex. 4 (Walsh Dep.) at 53.*

69. Dr. Hughes' contract required him to devote "sufficient time and effort" to perform his duties. *Schultz Aff., Ex. 36 at 0104.* The contract was drafted by the Hospital, including the language requiring him to devote "sufficient time and effort" to perform his duties, *Hughes Aff., ¶ 2,* and presumably has similar language to other contracts drafted by the Hospital during that time period.

70. Tim Walsh claims that one problem with Dr. Hughes' contract is that it didn't require cross-coverage[11], which he states is against the by-laws and in effect would put Dr. Lew out of business. *Schultz Aff., Ex. 4 (Walsh Dep.) at 37.* In fact, Dr. Hughes' contract did require him to "provide services . . . in compliance with . . . the By Laws, rules and regulations of the Hospital and its Medical Staff." *Schultz Aff., Ex. 36 at MVH 0105.* However, there is no requirement in the By-Laws requiring doctors in the same discipline to cross-cover. *See Schultz Aff., Ex. 16.* [12] Moreover, the Hospital agreed to provide Dr.

---

[11]    In fact, the contract, signed by the Hospital and presumably reviewed by its lawyers, specifically provides that Dr. Hughes does not need to provide cross-coverage and that the Hospital will provide off-island coverage for his practice. *Schultz Aff., Ex.36 at MVH 106, §§* 1.9, 2.4

[12]    While Dr. MacArthur wrote to Dr. Hughes and Dr. Lew on behalf of the Medical Executive Committee requesting that they arrange a mutually shared practice coverage based upon three provision of the Medical Staff Credentials Policy and one provision of the Medical Staff Bylaws, Dr. MacArthur admits that there is nothing in any of the provisions to which he cited which would require Dr.

Donegan with off-island coverage since the fall of 2003, i.e. within months of his

beginning work at the Hospital, and did not insist that Dr. Lew cover for him.  *Schultz*

*Aff., Ex. 21 (Donegan Dep.) at 50.*

71.    Tim Walsh alleges that one reason Dr. Hughes contract was a bad contract was that

Kevin Burchill "bumped up" Dr. Hughes' salary from $130,000 to $200,000 in Mr.

Burchill's last week of employment.  *Schultz Aff., Ex. 4 (Walsh Dep.) at 39.*  Mr. Walsh

further claims that one reason Dr. Hughes was terminated was because his salary "was

way too high for what it was."  *Id.  at 50.*  In fact, Mr. Burchill did not "bump up" Dr.

Hughes' salary, but simply made it more in keeping with the other doctor's contracts by

paying him all in salary, rather than paying him  partially in salary and partially in

additional 1099 payments for attending meetings and performing procedures.  *Schultz*

*Aff., Ex. 7 (Hughes Dep.) at 126-130; Ex. 36, at MVH 0112, 0114.*  The total

compensation received by Dr. Hughes remained the same after his contract was amended

in April 2002.  *Id.*  Moreover, Mr. Walsh admits that Dr. Hughes' pay was in line with the

pay that other members of the active staff were earning.  *Id. at 43.*

72.    Tim Walsh claimed that the "biggest" problem he had with Dr. Hughes' contract was that,

unlike the standard contract, it did not require his full-time effort and focus, as it did not

prohibit him from lecturing or performing other kind of services to other organizations

without getting the written approval from the Hospital.  *Schultz Aff., Ex. 4 (Walsh Dep.)*

*at 39.*  However, Walsh admits that he had no idea whether Dr. Hughes was working for

---

Hughes to arrange for a mutually-shared practice coverage.  *Schultz Aff., Ex. 10 (MacArthur Dep.) at 73-74; Ex. 37.*

someone other than the Hospital at the time he was terminated and he never sought to sit down with Dr. Hughes to ask if he was working for anyone other than the Hospital. *Id. at 40-41.*

73. Mr. Walsh admits that he never asked Dr. Hughes if he was willing to amend his contract to add what he considered to be the standard provisions found in other contracts. *Schultz Aff., Ex. 4 (Walsh Dep.) at 43.*

### 3. Mr. Walsh's Alleged Difficult Time Working with Dr. Hughes After Becoming CEO.

74. Tim Walsh contends that one reason that Dr. Hughes was terminated was because Dr. Hughes "would continually go around me to the board." *Schultz Aff., Ex. 4 (Walsh Dep.) at 19-20.* Yet, while claiming this is a reason he terminated Dr. Hughes, he testified he does not know what was discussed when Dr. Hughes spoke to the Chairman of the Board on one occasion, he cannot recall anything about a second conversation Dr. Hughes allegedly had with the Chairman, and he does not recollect what he was told when Dr. Hughes allegedly spoke on one occasion to the Vice Chairman of the Board. *Walsh Dep, at 77-84.* Mr. Walsh related one incident where Dr. Hughes spoke to a member of the Board after Dr. Hughes had been terminated, which Mr Walsh then admitted could not have had anything to do with the decision to terminate Dr. Hughes. *Id. At 78-79.* Finally, Mr. Walsh complained about Dr. Hughes and Dr. Kriedman addressing the Joint Conference Committee to complain about their treatment by the medical staff, which he claimed occurred "right when I was made CEO". *Id. at 80.* In fact, Dr. Hughes and Dr. Kriedman addressed the Joint Conference Committee on only one occasion, *Hughes Aff., ¶ 7; Schultz Aff., Ex. 3,* which was on August 17, 2001, which was nearly eight months

prior to Mr. Walsh being hired as CEO; it was at this meeting that Board Chairman Ted Morgan commented that "[n]o other have been treated as poorly as Drs. Hughes and Kriedman (Dr. Hughes' wife) have been recently." *See Disputed Fact # 6.*.

75.    Tim Walsh claims that one reason Dr. Hughes was terminated was because Dr. Hughes' relationship with Mr. Walsh was "not a good one". *Schultz Aff., Ex. 4 (Walsh Dep.) at 50.* Yet, Mr. Walsh admits that he talked with Dr. Hughes personally for probably less than one hour from the time he became CEO in April 2002 until the time that Dr. Hughes left the Hospital in 2004. *Id. at 50.*

76.    Mr. Walsh claims that one reason Dr. Hughes was terminated was because he did not like to get "letters from lawyers". *Def. Statement ¶ 59.* However, at his deposition, Mr. Walsh at first denied that one reason Dr. Hughes was terminated was that Mr. Walsh did not like getting letters from lawyers. *Schultz Aff., Ex. 4 (Walsh Dep.) at 102.*

77.    In fact, Dr. Hughes did not have his lawyer send a letter to Mr. Walsh until Mr. Walsh had blatantly overstepped his powers, by informing Dr. Hughes (without the courtesy of speaking to him personally) that he would not approve any requests for time-off by Dr. Hughes until he worked out a new cross-coverage schedule with Dr. Lew. *Schultz Aff., Ex. 4 (Walsh Dep.) at 99; Ex. 38.* Dr. Hughes' attorney, Mark Engel, wrote to Mr. Walsh in a spirit of cooperation, attempting to de-escalate the situation by having someone other than the principals try to negotiate a coverage agreement, offering a compromise whereby the Dr. Lew and Dr. Hughes would fully cross-cover for each other on a trial four month basis. *Schultz Aff., Ex. 39.* The only other letter sent to Mr. Walsh by Dr. Hughes'

attorney was a follow-up letter still seeking a compromise, but noting that Mr. Walsh had not extended the courtesy of replying to the original letter. *Schultz Aff., Ex. 40.*

### 4. Alleged Desire to Expand the OB-Gyn Practice.

78. The Hospital claims that one reason it terminated Dr. Hughes was to expand its OB/GYN practice, increase its volume, and attract OB-GYN patients who are going off-Island for care. *Def. Statement, ¶ 53.*

79. However, facts generated by the Hospital showed that Dr. Hughes had successfully increased the number of women staying on the Island for gynecological care. A study performed for the Hospital showed that in 1999 only 4 of 30 (i.e. 13%) gynecological surgeries for Island women were performed on the Island. *Schultz Aff., Ex. 4 (Walsh Dep.) at 116-117; Ex. 41, at MVH 1322.* The same study indicated that in 2000, prior to Dr. Hughes being given provisional credentials, 0 gynecological surgeries were performed on Island. *Id.* However, in 2001 (Dr. Hughes' first year of practice) the study indicated that 17 gynecological surgeries were performed on-Island. *Id.; Schultz Aff., Ex. 4 (Walsh Dep.) at 120.* Further reports generated by the Hospital (which Mr. Walsh knew the Hospital generated) showed that in FY 2002 , Dr. Hughes performed at least 54 gynecological surgeries on-Island. *Schultz Aff., Ex. 4 (Walsh Dep.) at 121-125; Ex. 42.*

80. Mr. Walsh claims that Dr. Hughes' failure to generate more revenue was also a reason he was terminated. *Schultz Aff., Ex. 4 (Walsh Dep.) at*, *126.* Mr. Walsh at first claimed that "the hospital revenue generated on Dr. Hughes' patients had come down a little bit. I think it went down quite a bit, really." *Id., 127.* He later contradicted himself, by testifying in response to a question as to whether it was his understanding when he made

the decision to terminate Dr. Hughes that Dr. Hughes' overall net revenues had gone

down between 2002 and 2003, "No. I mean, I didn't – I can't say I even looked at it, no."

In fact, Mr. Walsh regularly received revenue reports. *Id., pp. 126-127.* The reports

showed that in his first year of practice, while he was getting established, Dr. Hughes'

gross revenues equaled $224, 996 and that expenses exceeded revenues by $282,885.

*Schultz Aff., Ex. 43.* The reports show that in his second year of practice, Dr. Hughes'

gross revenues equaled $668,568 and that gross revenues exceed expenses by $136,882.

*Schultz Aff., Ex. 44.* Mr. Walsh acknowledged that the second year revenue and expense

figures were the figures available to him at the time that he made the decision to

terminate Dr. Hughes. *Schultz Aff., (Walsh Dep.) at 132-134.*

81.  Prior to Dr. Hughes' termination, there were never any reports to the Board of Trustees

of criticisms of the amount of work Dr. Hughes was performing. Rather, reports to the

Board regarding the OB/GYN practice were that the practice had picked up since Dr.

Hughes' arrival and that "business was booming". *Harff Aff., ¶ 7; Kaplan Aff., ¶ 6;*

*Schultz Aff., Ex. 1 (Ray Dep.) at 42-43.*

82.  In its Response to Dr. Hughes' Charge of Discrimination, the Hospital claimed that from

April 2001 - the date of their response, 257 ob-gyn procedures were performed in the

Hospital, only 110 of which were performed by Dr. Hughes. *Schultz Aff., Ex. 8* at p. 3.

The Hospital stated that "[g]iven that these figures were not high enough to generate the

increased revenue desired by the Hospital, it began to consider how to expand the

number of ob-gyn procedures being done there (as opposed to patients going 'off island')

and to increase the midwifery practice." *Id.*. However, the actual data generated by

Hospital reports show that Dr. Hughes performed 170 OB-GYN procedures from FY

2002 - FY 2004. *Schultz Aff., Ex. 42.*

83.    While Mr. Walsh contends that if he has a concern with a doctor, it is his practice to meet

with them,  *Schultz Aff., Ex. 4 (Walsh Dep.) at 12*, he admits that he never met with Dr.

Hughes to discuss any concerns he had regarding the amount of revenue being generated

by the OB-GYN midwife department. *Id. at 46.*

**II.    Response to Defendants' Statement of Undisputed Facts**

1.    Not disputed.

2.    Not disputed.

3.    Not disputed.

4.    Not disputed.

5.    Not disputed.

6.    Not disputed.

7.    Not disputed.

8.    Not disputed.

9.    Not disputed.

10.    Not disputed.

11.    Not disputed.

12.    Not disputed, except Dr. MacArthur was uncertain as to the dates he served as Chief of

Staff, and it is possible that Dr. Steven London was Chief of Staff for some dates relevant

to this action.

13.    Not disputed that Dr. Hughes' application for privileges were approved. *See Pl. Disputed Fact #s 7-12* re. information available to the Hospital.

14.    *See Pl. Disputed Fact # 9.*

15.    *See Pl. Disputed Fact #s 7-12.*

16.    Not disputed.

17.    Not disputed.

18.    Not disputed.

19.    Not disputed.

20.    Disputed to the extent that services upon which payment was to be made are characterized as "additional" services, when in fact Dr. Hughes was to be given compensation in addition to salary for performance of services expected to be performed as part of job description. *See Pl. Disputed Fact # 71.*

21.    Disputed to the extent that the contract required Dr. Hughes' coverage to be from off-island, unless Dr. Hughes deemed on-island physician coverage (possibly by his wife or other physician) to be acceptable. The contract did not mention Dr. Lew by name in relationship to coverage.

22.    Plaintiff does not dispute that Dr. Hughes' contract had different language than Dr. Frazier's contract, which is cited to by defendants. There is no evidence that there was a "standard physician contract", and if so, what was the language of that contract.

23.    Plaintiff disputes that he considered the contract to give him a "limited role". *See Pl. Disputed Fact #s 27-35* re. Dr. Hughes' job responsibilities.

24.    It is not disputed that Dr. Hughes had a positive relationship with Mr. Burchill.  *See Pl.*
       *Disputed Fact #s 49-67* re. Dr. Hughes' relationship with other staff.

25.    *See Pl. Disputed Fact #s 58-64* re. cross-coverage.

26.    It is not disputed that one unnamed individual on the Medical Executive Committee made
       the noted comment.

27.    Plaintiff admits that he cited "differing practice philosophies" as one reason he did not
       wish to have Dr. Lew cover for him, but disputes that this was some type of "initial"
       reason which was later changed.  *See Pl. Disputed Fact # 60* for statement of Dr. Hughes'
       reasons for not wanting Dr. Lew to cover his patients.

28.    Plaintiff does not dispute the occurrence of all events noted, although does dispute the
       sequencing.  *See Response to Def. Proposed Fact # 27.*

29.    Plaintiff does not dispute that all of the noted Committees reviewed the matter, but
       disputes the use of the words "embroiled" and "escalated".

30.    Not disputed.

31.    Not disputed, except to the extent that the statement implies that Dr. Lew carried out his
       agreement to undergo remedial training.  *See Pl. Disputed Fact # 67.*

32.    *See Pl. Disputed Fact #s 66, 67.*

33.    Not disputed.

34.    Plaintiff disputes that anyone other than Dr. Koehler raised any questions about his
       credentials and that there was any discussion relating to any issue raised by Dr. Koehler.
       *Hughes Aff., ¶ 3.*

35.    Not disputed.

36.    *See Pl. Disputed Fact #* 71.

37.    Not disputed.

38.    Mr. Walsh attended numerous meetings discussing Dr. Hughes, including the two

meetings where his age was discussed, prior to his appointment as CEO.  *See, for ex.,*

*Schultz Aff., Ex. #s 2 and 3.*

39.    Not disputed.

40.    *See Pl. Disputed Fact #s 48-67.*

41.    *See Pl. Disputed Fact #s 48-67.*

42.    Not disputed.

43.    Not disputed.

44.    *See Pl. Disputed Fact #s 75, 77.*

45.    It is not disputed that Dr. Hughes wrote the quoted letter.  It was not his "first response"

as he had been seeking to resolve this ongoing issue for more than one year.  *See Pl.*

*Disputed Fact #s 66, 67.*

46.    It is not disputed that plaintiff's counsel wrote the letter.  *See Pl. Disputed Fact # 77*  for

the circumstances in which the letter was written.

47.    It is disputed that the purpose of the meeting was to address quality of care and cross-

coverage issues, as opposed to addressing whether Dr. Lew was practicing at an

acceptable level of practice.  *See Edson Aff., Ex. 37.*

48.    Not disputed.

49.    It is not disputed the letter written in part by Dr. Hughes reads in part as quoted.  There is

absolutely no evidence that plaintiff and his wife immediately entered into an adversarial

relationship with Dr. Shah, as opposed to Dr. Shah immediately adopting a smug attitude and seeking to dictate procedures which in fact are not the standard of care. *See Edson Aff., Ex. 38.*

50. *See Pl. Disputed Fact # 48, n. 8,* showing the lack of foundation to the comments made by Dr. MacArthur.

51. It is unclear from the minutes of the meeting what attitude/divisional problems were believed to be  difficult to work out. *See Walsh Aff., Ex. 25.*

52. Not disputed.

53. *See Pl. Disputed Facts, #s 1-83.*

54. It is disputed that Mr. Walsh envisioned a "new and expanded" role for Dr. Hughes' replacement. *See Pl. Disputed Fact #s 25-35.*

55. Not disputed.

56. Not disputed.

57. *See Pl. Disputed Fact # 46.*

58. Not disputed.

59. Mr. Walsh at first stated he hired a new doctor to get more patients.  When Dr. Hughes pointed out that the practice had grown significantly under his stewardship, Mr. Walsh claimed that the practice only grew because of Ms. Chase.  When Dr. Hughes noted that Ms. Chase had also worked with Dr. Lew, Mr. Walsh then changed his story to state that Dr. Hughes was terminated because he doesn't like to get letters from lawyers and calls from members of the board of trustees. *See Edson Aff., Ex. 3, pp. 207-208.*

60. *See Pl. Disputed Fact #s 74-77.*

61.    *See Pl. Disputed Fact #s 48-67.*

62.    Dr. Donegan notes only that several of his operations were monitored.

63.    In effect, hospital privileges were meaningless absent a salaried arrangement with the Hospital. Dr. Lew in fact left the Hospital shortly after having to compete with a hospital salaried doctor. *See Def. Undisputed Fact # 65.* The cost of establishing a private practice to compete with a hospital salaried OB-GYN was prohibitive. *Schultz Aff., Ex. 7 (Hughes Dep.), pp. 218-220.*

64.    Not disputed.

65.    Not disputed.

66.    Not disputed.

67.    Not disputed.

68.    The records speak for themselves and plaintiff does not know what defendants mean when they state they employed a "number" of minority physicians.

69.    Plaintiff denies that 4.2% of the staff is African-American, as defendants seek to count two physicians with replacement or associate staff privileges, who may or may not exercise these privileges and actually appear at the hospital in these statistics. There are 172 full time staff in the Hospital. *See Pl. Disputed Fact # 20.* There is one full time African American doctor on staff.

70.    *See Pl. Disputed Fact #* 21.

71.    Plaintiff contends that he was improperly denied employment and discriminated against by the Hospital.

72.    Not disputed.

BY PLAINTIFF'S ATTORNEY,


/s Stephen Schultz
Stephen Schultz, Esq.
BBO # 447680
Engel & Schultz, P.C.
125 High Street, Suite 2601
Boston, MA 02110
(617) 951-9980 (Tel)
(617) 951-0048 (Fax)

Date: 6/14/05

Certificate of Service

I, Stephen Schultz, hereby certify that a true and accurate copy of the above named document was served upon all counsel of record by hand/by first class mail, on June 14, 2005.

/s Stephen Schultz
Stephen Schultz