UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DEURWARD L. HUGHES, MD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04 10564 DPW |
| | ) | |
| MARTHA'S VINEYARD HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S REPLY MEMORANDUM
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Martha's Vineyard Hospital (the "Hospital") respectfully submits this Reply

Memorandum in Support of its Motion for Summary Judgment.

**ARGUMENT**

**I.     PLAINTIFF HAS NO EVIDENCE OF RACE DISCRIMINATION.**

Plaintiff has conceded that he does not believe he was subject to race discrimination in

any respect other than the termination of his Contract with the Hospital.[1]  His Opposition

provides no evidence of such discrimination in connection with his Contract termination beyond

so-called "statistical evidence" relating to the Hospital's general workforce.  See Opposition at

18-20.  This evidence is woefully inadequate to defeat summary judgment for the reasons set

forth in Defendant's Principal Memorandum at 9-11.  It lacks any probative value for the

following additional reasons as well.

---

[1]  Plaintiff conceded this with respect to each of calendar years 2000, 2001, 2002 and 2003.  Defendant inadvertently failed to provide the Court with the section from Plaintiff's deposition which relates to 2002 in its Principal Memorandum.  It is provided with this Reply Memorandum as Shirley Aff., Ex. 1 at 174.

1.      Plaintiff relies principally on alleged statistics relating to the Hospital's non-physician workforce and its Board. All such evidence was ruled irrelevant and outside the scope of permissible discovery by Magistrate Judge Cohen in his December 29, 2004 Order. See Defendant's Principal Memorandum at 10. Plaintiff did not file any objection to this Order. Over Defendant's continuing objection, he then posed deposition questions relating to this evidence in flagrant disregard of the Magistrate Judge's ruling, and now seeks to use such evidence to defeat summary judgment. See Shirley Aff., Ex. 2 at 153-156. The Magistrate Judge's ruling was clearly correct. Of equal importance, Plaintiff has waived any right to argue to the contrary at this juncture. See Fed. R. Civ. P. 72(a).[2]

2.      As Magistrate Judge Cohen found, the only arguably relevant group is the Hospital's medical staff. The percentage of African-American physicians on the medical staff -- whether measured by active staff or all medical staff members -- exceeds the percentage of African-Americans residing on Martha's Vineyard Island. Defendant's Undisputed Facts ¶¶ 3, 68-70. And, while Plaintiff correctly notes that the summer population on the Island is dramatically larger, he presents no evidence that the percentage of African-American residents increases with it.

3.      Plaintiff's argument relative to the Hospital's recruitment efforts conveniently overlooks the fact that, following Plaintiff's departure, a second African-American physician joined the active staff on March 21, 2004 and entered into an employment relationship with the

---

[2] Rule 72(a) reads in relevant part as follows:

> A magistrate judge to whom a pretrial matter not dispositive of a claim or defense of a party is referred to hear and determine shall promptly conduct such proceedings as are required and when appropriate enter into the record a written order setting forth the disposition of the matter. Within 10 days after being served with a copy of the magistrate judge's order, a party may serve and file objections to the order; a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made.

Hospital on June 22, 2004. See Defendant's Principal Memorandum at 11. To quote Mr. Walsh: "We were able to convince him to take the job after about six months, I think." See Shirley Aff., Ex. 2 at 151-152.

In sum, Plaintiff's Opposition confirms that he has no evidence of race discrimination.

## II.    PLAINTIFF HAS NO EVIDENCE OF AGE DISCRIMINATION.

Plaintiff similarly lacks evidence of age discrimination. He seeks to rely principally on alleged issues significantly predating and entirely unrelated to Mr. Walsh's decision to terminate his Contract. These will be briefly reviewed in chronological order below, followed by an examination of Plaintiff's *de minimis* evidence of age discrimination with respect to the termination of his Contract with the Hospital.

### A.    Allegations Unrelated to the Contract Termination.

1.    Plaintiff notes that during his initial staff application process, Board minutes from January 27, 2001 state that "there was discussion regarding the Dr. Hughes/Kriedman team. Medical Staff had feelings that age had much to do with the mixed feelings of Dr. Hughes working in Maternity." Opposition at 4. Plaintiff fails to note that the Board minutes say nothing whatsoever about who had "mixed feelings" about Plaintiff working in Maternity or why. If anything, the minutes appear to reflect that the medical staff and Board did not believe those "feelings" had merit -- as evidenced by the fact that Plaintiff received his privileges (and retained them until he elected to let them lapse in February 2004).

2.    Plaintiff asserts that he should not have been monitored after receiving staff privileges in early 2001. Opposition at 17. There is no reasonable dispute, however, that the limited monitoring was undertaken because Dr. MacArthur, the Hospital's 67 year old Chief of Staff, did not believe he had sufficient evidence of Plaintiff's recent clinical volume. See Defendant's Undisputed Facts, ¶ 13. It is equally undisputed that Plaintiff said he had "no issue"

with monitoring at the time; and, that his successor was similarly monitored following his admission to the medical staff.  Id. at ¶¶ 15, 62; Defendant's Principal Memorandum at 15-16. What is lacking is any evidence of age bias.

3.       Plaintiff notes that minutes of the Hospital's Joint Conference Committee meeting held on August 17, 2001 state that "Dr. Hughes' initial encounter with Executive Committee -- issue was Dr. Hughes' ability to practice medicine.  The age issue was carried on for the next several months even after the credentials were approved."  See Schultz Aff., Ex. 3.  Plaintiff fails to note that this was an assertion which he and his wife made -- hardly "direct evidence of age discrimination" as now claimed by Plaintiff.  Opposition at 4.

4.       Plaintiff asserts that "[a]lthough the Hospital's Quality Improvement Committee was supposed to include an OB-GYN physician," the Hospital appointed the Chief of Surgery to the Committee, rather than Plaintiff.  Opposition at 18.  However, even a cursory review of the Medical Staff Organizational Manual reveals that the combined practice groups of "surgery and subspecialties, anesthesia, and obstetrics/gynecology" were entitled to have at least a single representative from among them.[3]  Further, no other staff member from OB-GYN has been appointed to the Quality Improvement Committee -- including Dr. Lew and Plaintiff's successor, Dr. Donegan.  See Walsh Reply Aff., ¶ 1.  Here again, therefore, this "issue" could not conceivably relate to Plaintiff's age.

5.       Plaintiff claims a Board member, Dr. Kathleen Koehler, stated at "more than one" Board meeting that Plaintiff's age was impacting his ability to perform surgical procedures.

---

[3]  The Organizational Manual states in relevant part that the Committee:

> shall include seven (7) Active Staff members representing:  (a) internal medicine, family medicine, pediatrics, (b) surgery and subspecialties, anesthesia and obstetrics/gynecology, (c) emergency medicine, and (d) additional members to comprise seven (7) physicians.

Schultz Aff., Ex. 17, pp. MVH1283.

Opposition at 11-12. The two affidavits on which this assertion is based both appear to suggest that the alleged statements were made through the release of the ACOG report, *i.e.*, January 2002. See Harff, Kaplan Aff.; Defendant's Undisputed Facts ¶ 31. There is not a scintilla of evidence that the statements influenced or affected Mr. Walsh's decision to terminate Plaintiff's contract in February 2003. Defendant's Undisputed Facts, ¶ 39.[4]

6.     Plaintiff asserts that a second physician, Dr. Richard Koehler (husband of Dr. Kathleen Koehler), refused to perform surgeries or provide backup for him in 2002, and that the Hospital did nothing to rectify the situation. Opposition at 18. Dr. Koehler clearly did harbor reservations concerning Plaintiff's clinical competence which he believed warranted review. Defendant's Undisputed Facts ¶ 34. There is, however, no evidence that in his case this was related to Plaintiff's age. See Edson Aff., Ex. 22. Moreover, he announced his resignation from the medical staff on January 9, 2002, effective July 9, 2002. See Walsh Reply Aff. ¶ 2. Mr. Walsh had been CEO for less than three months at that juncture. Contrary to Plaintiff's assertion, there is no evidence that Mr. Walsh was even aware of any alleged issue at this time,

---

[4] Two related points merit brief mention here. The first is that, contrary to Plaintiff's assertion, Mr. Walsh was entirely truthful where he stated he could not remember any discussion of Plaintiff's age at any Board meeting. Opposition at 12. Plaintiff's counsel established that, prior to becoming CEO in April 2002, Mr. Walsh would typically make only a financial presentation at Board meetings (in his then-capacity as CFO) and then leave. Shirley Aff., Ex. 2 at 140-141.

The second point is more substantive. According to Plaintiff's (identical) supporting affidavits, Dr. Koehler stated that "[Plaintiff's] age was impacting his ability to perform surgical procedures required by OB/GYN patients. Dr. Koehler stated that it was her opinion that Dr. Hughes did not use modern techniques and was not as efficient as other doctors." Harff, Kaplan Aff. At ¶ 4. There is nothing in the record to suggest that any such statement, if made, did not reflect Dr. Koehler's personal, sincerely held belief about a physician who was then almost 71 years old. The Board -- any hospital board -- would be remiss if it did not consider such quality of care issues, which can hardly be dismissed as "age slander," to use Plaintiff's casual epithet. Opposition at 12. See, e.g. Shirley Aff., Ex. 3 (2/15/05 Boston Globe article reporting Harvard Medical School study on importance of age and years since medical school in determining physician's skills). "The ADEA does not make all discussion of age taboo." Raskin v. Wyatt Co., 125 F. 3d 55, 63 (2d Cir. 1997).

and it appears undisputed that the matter was never brought to his attention in the form of a

complaint or concern by Plaintiff (or anyone else).[5]

7.    Plaintiff asserts that he was subjected to a frivolous anonymous complaint to the

Board of Registration in Medicine in early 2002.  Opposition at 5; Defendant's Undisputed

Facts, ¶ 37.  Such complaints, as a matter of law, are confidential.[6]  There is no record evidence

as to who filed the complaint or what their (or his, or her) reasons -- proper or improper -- may

have been.  In particular, there is no evidence the complaint was age-based.

**B.    Allegations Relating to the Contract Termination.**

None of the foregoing allegations on their face relate to Mr. Walsh's decision to

terminate Plaintiff's Contract, which he reached in February 2003.  See Defendant's Undisputed

Facts ¶ 52.  This is particularly true since all of the above allegations involve supposed issues

between Plaintiff and other members of the medical staff relating to clinical competence -- a

factor which Mr. Walsh did not even consider in making his termination decision.  Id.; see

generally Defendant's Opposition at 15-16.

Plaintiff is correct in noting that "[i]f the [plaintiff] can demonstrate that others had

influence or leverage over the official decisionmaker, and thus were not ordinary coworkers, it is

proper to impute their discriminatory attitudes to the formal decisionmaker."  See Opposition at

17 n.9 (quoting Cariglia v. Hertz Equipment Rental 363 F. 3d 77, 85 (1st Cir. 2004)) (emphasis

supplied).  Missing here, however, is any demonstration of such influence or leverage over the

official decisionmaker, Mr. Walsh.  Nor can this deficiency be remedied through the simple

---

[5] Two more brief points here.  First, Plaintiff's assertion that Mr. Walsh was aware of the alleged issue at the time is
false.  Mr. Walsh in fact testified only that he was aware of the issue prior to his decision to terminate Plaintiff's
contract -- i.e. in early 2003 -- because "I read it in the file."  Shirley Aff., Ex. 2 at 105-108.  Second, Plaintiff's
claim that Mr. Walsh had the ability to discipline Dr. Koehler -- and the underlying assertion that discipline was
warranted -- finds no support in the record.  Id.  The citations relied upon by Plaintiff do not support his claim.

[6] See 243 CMR 1.02 (8)(c)(6): "Closed anonymous complaints, which are determined to be frivolous or lacking
either legal merit or factual basis, consistent with 243 CMR 1.03 (3)(a), are not public records and are confidential."

expedient of labeling Mr. Walsh part of a "cabal," see Opposition at 11. Stated simply, there is

no record evidence, anywhere, that Mr. Walsh was part of a "conspiratorial group" [7] that

"orchestrated a campaign" against Plaintiff for any reason, age-related or otherwise.

It is not surprising, therefore, that Plaintiff initially conceded that even he was not sure if

Mr. Walsh's decision to terminate his Contract was based on his age. See Defendant's Principal

Memorandum at 13-15. It is not surprising that, even after he attempted to reverse his testimony

immediately after a break requested by his counsel, he was completely unable to articulate a

basis for his volte-face. Id. And, contrary to Plaintiff's somewhat extraordinary assertion, a

plaintiff's own uncertainty as to the merits of his claim is highly relevant and material at this

critical juncture of his case.[8]

Plaintiff is thus left with a single alleged statement by a single member of the Hospital's

Board, Earle Ray, to a neighbor of Plaintiff, Donald Lyons. According to Lyon's eight-line

affidavit, he attended a meeting with Ray, asked him why Plaintiff's Contract had been

terminated, and was told "among other things, that the Hospital wanted to go with someone who

would be around for the long haul." Lyons Aff. ¶¶ 3-4 (emphasis supplied). No context is

provided for this alleged remark and no explanation of what "other things" were discussed is

provided. The affidavit thus confirms that this single alleged statement, standing alone, is

insufficient to support an inference of discrimination. See Defendant's Principal Memorandum

at 16-17.

## III.    THERE IS NO EVIDENCE OF PRETEXT.

Plaintiff devotes most of his Opposition to an effort to demonstrate pretext, without

---

[7] The American Heritage College Dictionary defines "cabal" as a "conspiratorial group" or "secret scheme."

[8] The case cited by Plaintiff for the contrary position, Cutshall v. Potter, 347 F. Supp. 2d 228 (W.D.N.C. 2004), in no way supports Plaintiff's view. To the contrary, it stands for the well-settled proposition that a plaintiff's unsupported belief that he was fired because of a discriminatory reason is not sufficient to defeat a motion for summary judgment. Cutshall, 347 F. Supp. 2d at 237-238.

regard to whether either race or age bias was "a material and significant ingredient in [his]
discharge." See Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 57 (2005), quoting Knight v.
Avon Prods., Inc., 438 Mass. 413, 426-427 (2003). This effort is fundamentally flawed. Perhaps
most significantly, it is based upon an attempt to demonstrate that the Hospital's articulated
reasons for its decision were incorrect. In assessing pretext, however, the issue is not whether
the employer's articulated reason is correct, but whether the employer believed the reason to be
correct. See Defendant's Principal Memorandum at 6-7; Matthews v. Ocean Spray Cranberries,
Inc., 426 Mass. 122, 128 (1997); Ruiz v. Posadas de San Juan Assocs., 124 F.3d 243, 248 (1st
Cir. 1997) (to determine pretext, court must "focus on whether the employer believed that its
proffered reason was credible"); Martin v. Wellesley College, 51 F. Supp.2d 32, 34-35 (D. Mass.
1999) (plaintiff denied merit increase on basis of "shoddy" scholarship could not show pretext by
demonstrating that he was not a bad scholar, but instead needed to focus on whether the
employer believed its proffered reason); Costello v. Massachusetts Rehabilitation Comm'n., 982
F. Supp. 61, 67 (D. Mass. 1997) (employee cannot establish pretext by challenging the factual
underpinnings of employer's actions). Plaintiff has no credible evidence of such pretext here.

The rationale for Mr. Walsh's decision to terminate Plaintiff's Contract is not nearly as
complicated or multi-faceted as Plaintiff's Opposition attempts to suggest. Put most simply,
Mr. Walsh believed that the Hospital's OB-GYN practice "was not being well served by the
arrangement we had." Defendants Undisputed Facts, ¶ 53. He had inherited a difficult physician
-- Plaintiff -- with a contract signed by a prior CEO which Mr. Walsh considered
disadvantageous to the Hospital. The OB-GYN practice was dysfunctional by any rational
measure. Mr. Walsh himself found Plaintiff difficult and uncooperative. He believed that the
Hospital could expand the practice under new leadership. He did not consider either Plaintiff or

Dr. Lew, the second, younger, Caucasian OB-GYN active staff member, to be viable candidates for the role. He therefore exercised the Hospital's contractual right to terminate Plaintiff's employment relationship without cause on six months notice, leaving Plaintiff free to pursue a private practice as a continuing member of the Hospital's medical staff, just as Dr. Lew had done for years. See Defendant's Principal Memorandum at 4-5, 7-9. Plaintiff may sincerely believe that Mr. Walsh was badly mistaken with respect to each and every part of this thought process. What he cannot demonstrate is that the foregoing does not reflect Mr. Walsh's sincerely held belief.

1.    Mr. Walsh was concerned about the contentious relationship between Plaintiff and most of the medical staff. It defies credulity that, in light of the overwhelming record evidence of his inability to get along with numerous key members of the medical staff, Plaintiff could assert that Mr. Walsh was not seriously concerned about this critical issue. He is correct that Mr. Walsh's predecessor, Mr. Burchill, did not view this as an issue. He is just as clearly incorrect in asserting that Mr. Walsh was of the same opinion.[9]

By the Spring of 2003, conflicts had escalated to the level of a shouting match between Plaintiff and a second physician in front of patients and staff. Plaintiff is again correct that this specific incident occurred shortly after Mr. Walsh made the decision to terminate Plaintiff's contract. See Opposition at 9. His further assertion -- that this somehow demonstrates that Mr. Walsh had not been sincerely concerned about such conflicts, well before they reached such a level -- enjoys no record support.

---

[9] Plaintiff attempts to establish pretext by noting, correctly, that Mr. Walsh did not warn him that he might be terminated if certain things did not change. See Opposition at 10. Conveniently omitted from Plaintiff's voluminous materials is Mr. Walsh's testimony that if he does not meet with a physician about a concern, this does not mean he does not have a concern, see Shirley Aff., Ex. 2 at 12, and Mr. Walsh's compelling explanation as to why he did not pursue such a discussion with Plaintiff prior to making his contract termination decision, see id. at 35-39.

Equally meritless are Plaintiff's related assertions that he had no coverage issues with the nurse midwife, Ms. Chase, and that his continuing coverage dispute with Dr. Lew was not a subject of concern for Mr. Walsh. Turning first to Ms. Chase, her deposition testimony -- of course omitted again by Plaintiff -- is that Plaintiff was "obstinate" "when it came to covering my time off. That became a thorn in our relationship." See Shirley Aff., Ex. 4 at 48. When subsequently asked by Plaintiff's counsel if she could cite instances where Plaintiff had refused to provide coverage for her, she further testified as follows:

> A.   There were other times -- two other vacations that I took in the years prior to the deterioration where Dr. Hughes and I had to go talk to Ellen because Dr. Hughes refused to cover my time off. He said I'm not hired to cover the midwifery vacation time. You need to get somebody else.
>
> Q.   Did the hospital get a midwife?
>
> A.   Through difficult and costly measures, yes.

Id. at 72-73.[10]

Plaintiff's tortured mischaracterization of Mr. Walsh's testimony concerning the coverage dispute relating to Dr. Lew is even more misguided. See Opposition at 12; Plaintiff's Disputed Facts, ¶ 58. It is abundantly clear that Mr. Walsh made a concerted effort to arrange for cross-coverage in August and September 2002 and that he was rebuffed by Plaintiff, who stood on his contractual right to refuse such coverage. See Shirley Aff., Ex. 2 at 52, 74-77. This formed a backdrop both to Mr. Walsh's conclusion that the contract was disadvantageous to the Hospital, see infra, and further reinforced his concern relating to problems between Plaintiff and other members of the medical staff. Id. There is nothing remotely "pretextual" about any of this.

---

[10] If Plaintiff's underlying assertion is that the Hospital should not have been unhappy with "only" two such coverage issues involving Plaintiff and Ms. Chase, or that Ms. Chase should not have viewed such coverage issues to be a "thorn in our relationship," the Hospital returns to the salient legal principal enunciated above: Plaintiff's personal opinion on such issues is irrelevant to the issue of pretext.

Plaintiff's final argument in this regard -- that his successor, Dr. Donegan was not required to cross-cover with Dr. Lew -- is cynical in the extreme. Dr. Donegan testified that his initial understanding was that there would be call coverage between Dr. Lew, Plaintiff and himself. This changed only after his arrival and initial meeting with Plaintiff, when Plaintiff persuaded him that he should not agree to cross-cover with Dr. Lew. Shirley Aff., Ex. 5 at 48-50. The Hospital agreed to this arrangement as an interim measure because, by that juncture, a review was under way as to whether Dr. Lew's medical staff privileges would be renewed. Id. at 44-45, 48-50.[11] The Hospital was then forced to obtain off-Island coverage for Dr. Donegan during this period because Plaintiff elected not to cover for him or Dr. Lew. Id. at 50.

In short: no reasonable person could conclude that Mr. Walsh was not concerned about the contentious relationship between Plaintiff and most of the medical staff.

2.    Mr. Walsh believed that Plaintiff's Contract was disadvantageous to the Hospital. Plaintiff's arguments to the contrary in his Opposition are meritless. Taking them in order, Plaintiff first asserts that if Mr. Walsh had really believed the Contract was disadvantageous, he would have attempted to renegotiate it. This contention overlooks the fact that, as seen, Mr. Walsh had made an effort to obtain flexibility under the Contract relative to Plaintiff's cross-coverage arrangement with Dr. Lew in August and September 2002. He had met with no success at that time, and had no reason to wish to try again with respect to a renegotiation of the Contract as a whole. More fundamentally, why was it "nonsensical and pretextual" (to use Plaintiff's terms) not to seek to renegotiate a disadvantageous contract with a difficult physician, but instead to exercise an undisputed contractual right to terminate the contract without cause on six month's written notice? Plainly, it was not.

---

[11] Dr. Lew's privileges in fact did terminate on February 29, 2004, less than three weeks after Plaintiff's employment relationship with the Hospital had concluded. Defendant's Undisputed Facts, ¶¶ 58, 65.

Plaintiff next asserts that Mr. Walsh could not reasonably have concluded that the Contract did not require Plaintiff's "full-time effort and focus." Opposition at 13-14; see also Opposition, 6-7. This misguided invitation to argue over whether Plaintiff was "part-time" or "full-time" completely misses the mark. However one defines those terms, the record evidence is clear that Mr. Walsh believed the Contract limited Plaintiff's obligation to the role of collaborating physician and overseer of the midwife. Plaintiff himself went on record -- in an effort to justify his refusal to do more -- that "[m]y salaried position with the Hospital is to cover the midwife and to do any office GYN procedures and any referred GYN surgery." Defendant's Undisputed Facts, ¶ 23. This is entirely consistent with the description of his role which Mr. Burchill gave to the Board of Registration of Medicine in April 2002, that Plaintiff saw and concedes is correct. Id., ¶ 37. He did not have an independent obstetrical practice. Id., ¶ 23. His Contract did not require him to do more; it did not require him to be flexible; and, perhaps most critically, it provided him with no incentive to cooperate with the other physicians on the Hospital's medical staff.

Finally, Plaintiff argues that his salary under the Contract was not too high, and that Mr. Walsh was incorrect in holding a contrary view. Opposition at 14. Missing yet again is any evidence that Mr. Walsh did not in fact hold a contrary view -- that is, that he did not sincerely believe Plaintiff's salary was too high in light of his limited role.

In short: no reasonable person could conclude that Mr. Walsh did not believe Plaintiff's Contract was disadvantageous to the Hospital.

3.    Mr. Walsh himself had a difficult time working with the Plaintiff after becoming CEO. Plaintiff's highly selective and distorted summary of Mr. Walsh's deposition testimony does nothing to put this point in legitimate dispute. Opposition at 14-15. In the interest of

-12-

brevity, the Hospital simply refers the Court to Mr. Walsh's <u>actual</u> deposition testimony relating to this issue. <u>See</u> Shirley Aff., Ex. 3 at 20, 44-48, 50, 77-83. Here again, Plaintiff's essential argument is that Mr. Walsh should not have been unhappy that Plaintiff went around him to the Board, or with the way that Plaintiff responded to Mr. Walsh's efforts to resolve the coverage dispute with Dr. Lew in August and September 2002. To repeat: this argument is irrelevant to the question of pretext. There is no evidence of pretext here.[12]

    4.    <u>Mr. Walsh did not believe Plaintiff was the right person to lead the Hospital's effort to expand its OB-GYN practice</u>. The parties dispute the extent to which the OB-GYN practice had grown between 2000-2003[13] and who was principally responsible for any such growth -- Plaintiff or Ms. Chase. <u>See, e.g.</u>, Edson Aff., Ex. 3 at 207-208 (Mr. Walsh told Plaintiff that Ms. Chisholm was responsible for any increase in patients; Plaintiff told Mr. Walsh that he was). What cannot reasonably be disputed is that Mr. Walsh wanted more growth, increased patient care, and greater retention of OB-GYN patients who were going off-Island for care. This is what he told Plaintiff; this is what was emphasized to his successor, Dr. Donegan; and this is precisely what Mr. Walsh testified to at his deposition. Defendant's Undisputed Facts, ¶¶ 57, 59; Shirley Aff., Ex. 2 at 51-52, 115. Whether, in Plaintiff's view, he "should have" considered the practice sufficiently successful -- or attributed whatever success it had achieved principally to Plaintiff, rather than Ms. Chase -- is, for a final time, beside the point. There is no evidence of pretext.

---

[12] Plaintiff has in fact <u>conceded</u> that he has no reason to believe Mr. Walsh was not being entirely truthful when he told Plaintiff that he did not like getting letters from lawyers or calls from Board members. Defendant's Undisputed Facts, ¶ 60.

[13] The Kaplan Affidavit states that reports to the Board regarding the OB-GYN practice were that "business was booming." Kaplan Aff., ¶ 6. Significantly, however, there is no suggestion that any such report was ever made after Mr. Walsh became CEO in April 2002. The incontrovertible fact is that <u>he</u> did <u>not</u> consider the practice to be "booming", never made such a report to the Board, and never heard anyone else so describe the practice at any Board meeting after he became CEO. Walsh Reply Aff., ¶ 3.

## CONCLUSION

The Hospital respectfully requests that this Court grant is Motion for Summary

Judgment.

Respectfully submitted,

MARTHA'S VINEYARD HOSPITAL

By its attorneys,

Thomas E. Shirley, Esq. (BBO # 542777)
CHOATE, HALL & STEWART LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109
(617) 248-5000

Dated: June 22, 2005

3944266_1.DOC

I HEREBY CERTIFY THAT A TRUE COPY
THE ABOVE DOCUMENT WAS SERVED
UPON THE ATTORNEY OF RECORD FOR
EACH OTHER PARTY BY MAIL/HAND ON:
6/22/05
TES

-14-