# Exhibit 2

Pages:    1-171

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

DOCKET NO. 04-10564-DPW

******************************************

DEURWARD L. HUGHES, M.D.            *

    Plaintiff                       *

vs.                                 *

MARTHA'S VINEYARD HOSPITAL          *

    Defendant                       *

******************************************


DEPOSITION of TIMOTHY WALSH, a Witness called by the Plaintiff, taken pursuant to the provisions of the Federal Rules of Civil Procedure, before Peter J. Wood, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Engel & Schultz, 125 High Street, Boston, Massachusetts, on Thursday, March 10, 2005, commencing at 9:40 a.m.


WOOD COURT & CONFERENCE REPORTING

77 SUMMER STREET

COHASSET, MA 02025

(781) 383-6621

Page 10

1  where it's in practice, we usually -- I will meet
2  with them to review some performance on occasion.
3  Q  Is there anything done on a regular basis or on
4     an annual basis?
5  A  For the vast majority of employees, yes. It's
6     done --
7  Q  What about -- I'm sorry. I didn't mean to
8     interrupt you. Please go ahead. If I interrupt
9     an answer, it's only accidental on my part
10    because I'm hearing your voice go down, and I
11    think you're done. It's never my intention to
12    interrupt your answer, so please go ahead.
13 A  It's done annually for employees.
14 Q  Does that include doctors?
15 A  No.
16 Q  What is the regular practice as to how frequently
17    doctors are reviewed by you, if at all?
18       MR. SHIRLEY: What period of time are
19    we discussing?
20 Q  Since you've been CEO or since you've been at the
21    hospital.
22 A  I'm trying to do them annually now, and that's
23    something that I have been doing. We just
24    started around meeting with some of the people

Page 11

1  who were hired last year between 12 and 15 months
2  ago to review performance and kind of see where
3  we are with them.
4  Q  But this is a program you just recently started?
5  A  Yes. I mean, I've always felt like when you're
6     dealing with professionals, it's -- you know,
7     unless there's an issue, if things seem to be
8     going all right, we meet frequently. I try to
9     meet with all the doctors on a quarterly basis
10    when I can.
11 Q  Has that been your practice since you've been
12    CEO, seeking to meet with the doctors on a
13    quarterly basis?
14 A  No. It's more -- I would say it's something
15    that's been established over the last year or so
16    that I've been there.
17 Q  During any period of Dr. Hughes' employment, was
18    it your policy and practice to meet with doctors
19    on a quarterly basis, if possible?
20 A  Yes, I was meeting with some.
21 Q  For the performance reviews that you do for
22    doctors, do these include written evaluations?
23 A  I have not done that yet in my tenure.
24 Q  Do you have any policy or practice relating to

Page 12

1  meeting with doctors with whom you have any
2  concerns about their performance or practice?
3  A  Yes.
4  Q  What practice is that?
5  A  If I have a concern, I'll meet with them.
6  Q  Is it fair to say that if you don't meet with a
7     doctor or did not meet with a doctor about an
8     issue, that you did not have a concern about it?
9  A  No, I don't think I could say that.
10 Q  Under what circumstances would you decide to meet
11    with a doctor to discuss your concerns?
12 A  If I was trying to make a correction in course,
13    if I thought, you know, a doctor needed to be
14    pushed in a certain direction, if I thought there
15    was a particular problem that I wanted to try to
16    correct, I'd meet with them and try and work that
17    out.
18       MR. SCHULTZ: Let's mark as Exhibit 2
19    to this deposition a performance evaluation for
20    Deurward Hughes for the period of April 1, 2001
21    through September 30, 2001.
22       (Whereupon the Performance
23       Evaluation was Marked Exhibit No.
24       2.)

Page 13

1  Q  Mr. Walsh, I've placed in front of you what's
2     been marked as Exhibit 2 in this case. Have you
3     ever seen this document before?
4  A  Yes, I believe I have.
5  Q  What would have been the circumstances in which
6     you would have seen this document previously?
7  A  Just reviewing files.
8  Q  For this case?
9  A  Yes.
10 Q  Now, it's fair to say, is it not, that in this
11    performance evaluation, that for each and every
12    single category, Dr. Hughes was given the highest
13    rating of 1?
14 A  Yes.
15 Q  That includes a group of questions that relate
16    to, on Page 687, collaboration and communications
17    with others?
18 A  Yes.
19 Q  Would you agree that there are no other
20    performance evaluations that have ever been
21    performed for Dr. Hughes other than this Exhibit
22    2?
23 A  To my knowledge, yes, I would agree.
24 Q  Isn't it true, Mr. Walsh, that in your opinion,

Page 18

1    THE WITNESS: I should answer?
2    MR. SHIRLEY: Yes.
3 Q  Any objection, you should answer. If he
4    instructs you not to answer a question, it will
5    be on a matter of privilege. I'm sure you'll
6    hear from me on that, too, and we'd have a
7    discussion, but an objection is for the record.
8    Counsel could say differently, but I believe I'm
9    stating it accurately just so we can move it
10   along.
11 A  Okay.
12   MR. SHIRLEY: I agree.
13 A  I think it was around February of 2003, in that
14   time frame. I don't have an exact date, but it
15   was in around that time.
16 Q  When you made this decision, did you have any
17   conversations with anybody about the decision
18   prior to finalizing it in your mind, or was this
19   something you just finalized in your mind that
20   this is what you wanted to do, and then you
21   started talking to people about it?
22 A  No. I think I spoke with the vice chair of the
23   board, Tim Sweet, about it. The makeup of the
24   board, the chairman of the board is off island.

Page 19

1    He's a summer resident. The vice chair of the
2    board is Tim Sweet. He's on island all the time,
3    so I end up, you know -- he's sort of the go-to
4    person for me with regard to the board, so he
5    would be the one that I would work with on it.
6    I'm sure I had discussions with him.
7 Q  Would you relate to me your recollection of these
8    initial discussions you had with Mr. Sweet?
9 A  Well, I really kind of explained what I saw going
10   on. There was a lot of problems with the medical
11   staff. There was a lot of problems with trying
12   to make a team out of what we were doing. We
13   were trying to bring back -- to bring the medical
14   staff really to be part of a team, and it had
15   gone through a long period under Kevin Burchell,
16   my predecessor, of having a really tumultuous
17   time with various people on the medical staff,
18   and the medical staff was really kind of torn
19   apart, I thought, and I was trying to bring that
20   together.
21       I thought that the OB practice was not
22   being served well by the arrangement we had, and
23   again, nothing to do with the clinical side of
24   it. I've always had high regard for Dr. Hughes'

Page 20

1    clinical abilities. It really had to do with the
2    fact that it wasn't a full-time position, so it's
3    a combination of things, but it -- and I had a
4    very difficult time working with Dr. Hughes. Dr.
5    Hughes I don't think ever really accepted me as
6    the CEO and would continually go around me to the
7    board which, you know, you really don't like. As
8    a CEO, it's not good to have employees that go to
9    the board.
10 Q  Let me go back to this question, though, of your
11   conversations with Mr. Walsh. What, if anything,
12   do you recollect Mr. Walsh saying to you when you
13   first spoke to him about the possibility of your
14   thoughts of terminating Dr. Hughes' contract?
15      MR. SHIRLEY: Objection to the form.
16   Do you mean his conversations with Mr. Sweet?
17      MR. SCHULTZ: Yes, I did. Who did I
18   say?
19      MR. SHIRLEY: Mr. Walsh.
20 A  I think he understood what I was saying, and he
21   concurred.
22 Q  I said I wouldn't interrupt you, and I'm going to
23   violate my own rule now. I'm going to tell you
24   what counsel told you. I don't want to know what

Page 21

1    you think or what a possibility is. I'm asking
2    your recollection of what is your recollection of
3    what Mr. Sweet said to you when you talked to
4    him?
5 A  He thought I was correct in what I was doing.
6 Q  Do you recollect what he said other than that?
7 A  No, I don't.
8 Q  Had you already signed a contract with a
9    recruiter for a new OB-GYN prior to speaking with
10   Mr. Sweet?
11 A  No, I did not.
12 Q  So you spoke to Mr. Sweet prior to going out and
13   arranging the contract with the recruiter?
14 A  Yes.
15 Q  So from a time point of view, if the contract
16   with the recruiter is signed sometime I believe
17   it is February of 2002, it would be sometime
18   before that --
19 A  Yes.
20 Q  -- that you had made this decision that you
21   believed that this would be in the best interests
22   of the hospital; is that correct?
23 A  That's correct.
24 Q  After you talked to Mr. Sweet, again to try to

Page 34

1  practice?
2  A  No.
3  Q  So those three factors in that ad would all be
4     wrong; is that correct?
5  A  That's correct.
6  Q  Do you know who drew up this ad?
7  A  No, I don't.
8  Q  Had you seen this ad when it was running?
9  A  No, I didn't.
10 Q  Did you ever give any instructions to the people
11    who were interviewing for the new position as to
12    what type of doctor you were looking for?
13 A  I don't believe -- no, no.
14 Q  You never had any conversations with them as to
15    the characteristics of the individual that you
16    would like to see in the doctor that would be
17    hired?
18 A  No.
19 Q  Did you ever explain to them what you considered
20    to be the problems of Dr. Hughes that you wanted
21    to see eliminated by the new candidate?
22 A  I may have had a discussion about the problems
23    with the medical staff, and that we had to go --
24    you know, kind of move forward and bring the

Page 35

1     medical staff closer together and get by all of
2     the problems that we were having but in a very
3     general way.
4  Q  Again, I'm not asking you what may have happened.
5     Do you have a recollection of that happening?
6  A  No.
7  Q  So again, as you sit here today, you have no
8     recollection of giving any instructions to the
9     people conducting interviews?
10 A  No.
11        MR. SHIRLEY: Beyond what he believes
12    may have happened.
13 Q  Prior to your deciding to terminate Dr. Hughes'
14    contract, did you ever give Dr. Hughes any
15    warning that he might be terminated if certain
16    things didn't change?
17 A  No.
18 Q  Why not?
19 A  It really -- I mean, I really need to talk about
20    the whole package of where I think things were as
21    I saw it. I was part of the -- in the early --
22    prior to Dr. Hughes coming on board when Dr. Lew
23    was employing the midwife, Dr. Lew got in a real
24    disagreement with Kevin Burchell, my predecessor,

Page 36

1     about the midwife subsidy.
2        The hospital was subsidizing the
3     midwife. Dr. Lew was a private physician. He
4     employed the midwife, and the hospital subsidized
5     him a piece of the midwife's salary, and there
6     was a disagreement over how much that subsidy --
7     I think the hospital's intention, Kevin
8     Burchell's intention, was to back out of the
9     subsidy. Dr. Lew wanted more money. It became
10    pretty contentious to the point where Dr. Lew
11    said he would let the midwife go if Kevin
12    Burchell didn't give him more money, which he
13    didn't do.
14       Dr. Lew let the midwife go. That's
15    when Kevin hired Dr. Hughes to oversee the
16    midwife. The midwife needs to have a
17    collaborating physician to practice, and he hired
18    Dr. Hughes to do that. The unique part of Dr.
19    Hughes' contract at that time was, in my mind,
20    had to do with the cross-coverage that was
21    written into that contract that basically allowed
22    Dr. Hughes to refuse cross-coverage, something
23    that is in direct contradiction with the bylaws
24    of the medical staff.

Page 37

1        The bylaws of the medical staff require
2     that physicians in the same discipline cross-
3     cover each other. I think it looked to me and
4     certainly to some members of the medical staff
5     that Kevin Burchell was really kind of going
6     after Jason because if Jason didn't have
7     coverage, he was pretty much out of business.
8     You can't work 24/7, 365 days a year which is
9     what that would mean if he didn't have cross-
10    coverage.
11       I think that's really where, you know,
12    as we went down that track with the whole medical
13    staff, you know, you have all these documents
14    that show a lot of that, it was quite a problem
15    to the whole medical staff that Dr. Hughes would
16    not cross-cover Dr. Lew. I know there's a lot in
17    there about quality issues about Jason Lew, and
18    Jason Lew had quality issues about Dr. Hughes,
19    and the medical staff was really trying to say
20    look, if you have quality issues, there's the
21    quality committee. When it comes to the bylaws,
22    you have to cross-cover. We should keep them
23    separate.
24       That's really like a history of over a

Page 38

1  two-year period, really, that really caused a
2  load of problems on the medical staff, and that
3  really, you know, I was trying to deal with that.
4  In the middle of all of that, I became the CEO,
5  and Kevin Burchell had been asked to leave by the
6  board really because of all the problems with the
7  medical staff. Richard Koehler left. He
8  resigned. He was a surgeon on the staff. The
9  community liked him. It was a mess. It was a
10 real mess.
11       The problem was that contentious
12 relationship between Dr. Hughes and really the
13 medical staff of the hospital continued, and when
14 I took over as CEO, you know, my goal was to have
15 everybody treated the same and to work with
16 everybody. We had gone through an awful lot
17 around the quality issues. We had, you know, a
18 report done by an outside agency, you know, under
19 the peer review process. We followed their
20 recommendations. We really tried to do
21 everything, and it continued, and even after all
22 of that, the problems continued and persisted.
23       Then I was left with a contract that
24 really, you know, with all the rights, the

Page 39

1  hospital had very little rights. The salaries
2  that were given in that, originally Dr. Hughes
3  was hired at $130,000 to oversee the midwife.
4  That got bumped up to $200,000 the last week of
5  Kevin Burchell's employment at the hospital. So
6  it ended up being really a bad contract for the
7  hospital.
8        It wasn't a full-time contract. Our
9  full-time contracts are standard, and they give a
10 lot of rights to the hospital, and there are a
11 lot of issues in there of cross-coverage and what
12 you can do outside, you know, whether or not you
13 can do anything else outside of the practice
14 which is pretty restrictive, and I had none of
15 those rights in the contract that I had.
16 Q  Tell me everything that was not in Dr. Hughes'
17    contract that you believe was in the, quote,
18    standard contract for other doctors.
19 A  I think probably the biggest issue is the
20    standard contract under the time and effort
21    required states that the duties under this
22    contract will require your full-time effort and
23    focus, and that you're not allowed to do
24    anything, lectures, any other kind of service to

Page 40

1  any other organization without getting a written
2  approval from the hospital.
3  Q  Was Dr. Hughes working for someone other than the
4     hospital at the time he was terminated?
5  A  I have no idea.
6  Q  So you had no idea if the lack of this contract
7     provision was making any difference as to what
8     Dr. Hughes was doing?
9       MR. SHIRLEY: Objection. That's not
10 what he said at all.
11      MR. SCHULTZ: Let's not have a speech.
12 I note your objection.
13 Q  Can you answer the question?
14      MR. SHIRLEY: Can we have the question
15 read back, please? I'll object to the form of
16 the question as well, and if we could slow down
17 just a little bit, it would be helpful to me and,
18 I suspect, to all of us.
19 (The question was read back by the reporter.)
20 A  Well, where the contract really was a hindrance
21    to me was around the coverage issue, as an
22    example.
23 Q  I'm not asking about the coverage. You had said
24    the most important difference in the contract, I

Page 41

1  believe was your testimony, was the fact that it
2  didn't require Dr. Hughes to work only for the
3  hospital full-time and didn't have this provision
4  which was in these other contracts.
5       MR. SHIRLEY: He said that was the
6  biggest difference in the contracts.
7  Q  My question to you is isn't it true that at the
8     time that you decided to terminate Dr. Hughes,
9     you had no idea whether or not the lack of that
10    provision in Dr. Hughes' contract had made any
11    difference, had any practical effect in the sense
12    of whether or not Dr. Hughes was, in fact,
13    spending any time working for anyone other than
14    the hospital?
15      MR. SHIRLEY: Objection to the form of
16 the question.
17 A  The lack of that provision meant that I couldn't
18    sit down and talk to Dr. Hughes about what he was
19    doing, okay, because I didn't have the rights
20    under the contract to demand to know what was
21    going on in any other part of his life, all
22    right? When I have a full-time contract with the
23    provisions -- and I'm trying to remember what
24    they say -- but there is a distinct difference

Page 42

1  between a standard full-time contract and Dr.
2  Hughes' contract.
3  Q  Mr. Walsh, did you ever seek to sit down with Dr.
4     Hughes and ask him if he was working for anyone
5     other than the hospital?
6  A  No, I didn't.
7  Q  Did you ever ask Dr. Hughes if he would be
8     willing to amend his contract by adding a
9     provision which indicated he would only work for
10    the hospital?
11        MR. SHIRLEY: I'm going to note early
12   in this deposition that during the deposition of
13   the plaintiff, plaintiff's counsel frequently,
14   arguably appropriately, objected not just to the
15   question posed but to the manner by which the
16   question was posed. There was a specific
17   objection raised on several occasions to sarcasm,
18   to the tone of voice, to the tenor of the
19   question. I regret that I need to make the same
20   objection for the record as early in the day.
21        MR. SCHULTZ: I will note for the
22   record that the objection is well taken, and I
23   will make an effort only because the objection
24   noted that my objections are well taken the other

Page 43

1  day.
2  Q  Mr. Walsh, did you ever ask Dr. Hughes if he was
3     willing to amend his contract by adding this
4     standard provision that was in these other
5     contracts that related to working solely for the
6     hospital?
7  A  No, I didn't.
8  Q  Didn't the contract have a provision which
9     allowed for amendments of the contract?
10 A  Yes.
11 Q  You indicated that Dr. Hughes was earning some
12    $200,000; is that correct?
13 A  That's correct.
14 Q  That's in line with the pay that the other
15    members of the active staff also earned; isn't
16    that correct?
17 A  Yes.
18        MR. SHIRLEY: Who were employees of the
19   hospital?
20        MR. SCHULTZ: That's correct. I think
21   to be on the active to staff, I think by
22   definition --
23 Q  That's not correct?
24 A  No. Active staff is really anyone who's actually

Page 44

1  living on the island is a member of the active
2  staff whether they're employed or not. They can
3  be in private practice.
4  Q  Then my question is intended to be limited to
5     those who are the employees of the hospital. You
6     had mentioned meeting with doctors if possible on
7     a quarterly basis if you believed there were
8     serious concerns that needed to be changed. Did
9     you ever meet with Dr. Hughes?
10 A  No, I didn't. Well, no, I'm sorry, yes, I did
11    meet with Dr. Hughes.
12 Q  On how many occasions did you meet with Dr.
13    Hughes to express your concerns about anything
14    that was happening at the hospital?
15 A  Well, I met with Dr. Hughes because he had
16    concerns that he wanted to express to me about
17    his -- I think one was about his CME coverage.
18    There's a provision in the contract that we pay I
19    think it's up to $5,000 or something for
20    continuous medical education, and I believe he
21    wanted to swap that to do something else with it,
22    and I know I met with him on one occasion on
23    that. You know, quite frankly, it became a very
24    contentious arrangement.

Page 45

1        You know, we were nitpicking the
2  contract. You know, when we came out of the
3  whole quality issue around the -- where both OB
4  physicians were accusing each other of having bad
5  quality, we went out and had outside reviews
6  done. The outside review came back, and I got a
7  letter from the outside review saying that, you
8  know, Dr. Lew is fine and should be part of a
9  cross-coverage group, and everything is okay.
10        And I met with Dr. Hughes about that,
11  about cross-covering, and got a letter from his
12  lawyer, you know, going by the contract, and
13  that's the other part of the contract that's
14  really pretty bad is that, you know, to me, the
15  contract should say nothing about cross-coverage.
16  That's something the bylaws have of the medical
17  staff, and it's really a medical staff issue how
18  they run that, and they have a contract that
19  isn't a contradiction to that. It just puts the
20  hospital in a terrible position.
21 Q  Do you recollect any conversations you ever had
22    with Dr. Hughes other than the two that you've
23    just related?
24 A  I don't remember. I checked my calendar, and I

Page 46

1  know I had three meetings that I see on the
2  calendar before he was given his 180-day notice.
3  Q  You've just related two of them?
4  A  I think so, yes.
5  Q  Is it fair to say you have no recollection of
6     ever meeting with Dr. Hughes to discuss your
7     general concerns about what you considered to be
8     his poor relationship with the medical staff?
9  A  Yes, it is fair.
10 Q  Is it fair to say you never met with Dr. Hughes
11    to discuss any concerns you had regarding the
12    amount of revenue being generated by the OB-GYN
13    midwife department?
14 A  Yes.
15 Q  Is it fair to say that you never had any
16    conversations with Dr. Hughes where you requested
17    that he change anything, whether or not it's the
18    amount of revenue brought in or his conduct or he
19    would be terminated; you never had any such
20    conversation with him?
21 A  Right, that's correct. I was working off the
22    contract.
23 Q  You've testified that Dr. Hughes was cantankerous
24    and difficult, something to that effect. These

Page 47

1  three meetings, how long did they take place?
2  For the two that you recall, how lengthy were
3  these meetings?
4  A  I don't recall. I don't know how long. I don't
5     think they were too long.
6  Q  Five, ten-minute meetings?
7  A  I don't know.
8  Q  Do you have any recollection of Dr. Hughes being
9     cantankerous or difficult in either of those
10    meetings?
11 A  Yes. You know, on the issue of the CME, it was
12    pretty cantankerous, I would say.
13 Q  So the only occasion you personally observed Dr.
14    Hughes being cantankerous would relate to his
15    desire to have some CME credits?
16 A  No. You know, Dr. Hughes also kept going to the
17    board on several occasions to different board
18    members, and that's just -- you know, when you're
19    the CEO, you just can't have that.
20 Q  I understand that, but my question was isn't it
21    true that the only time that you personally
22    observed Dr. Hughes being cantankerous or
23    difficult related to his desire to be given some
24    CME credits?

Page 48

1  A  No.
2     MR. SHIRLEY: Objection.
3  Q  What's inaccurate about that statement?
4  A  Well, there were other issues. There were other
5     issues around vacation, carryovers and how much
6     vacation time he had, and they were all -- you
7     know, what I felt was happening is we were
8     getting kind of nitpick on the contract, and it
9     was, you know, very difficult. In my opinion,
10    contracts are really meant to be kind of a global
11    thing that you work with. They're not to go in
12    and vary and specifically outline how you get
13    along and how you work as a group. It doesn't
14    work that way.
15 Q  Let's accept that the problem is with my
16    question. Does the only occasion that you
17    personally observed Dr. Hughes being cantankerous
18    or difficult relate to this one meeting when he
19    was talking about CME credits, vacation, and
20    whatever else was talked about at that meeting?
21 A  Well, there were several meetings. You know, the
22    vacation and CME were two different issues.
23    MR. SHIRLEY: I'm unclear. Is the
24    question meant to say that the only time he

Page 49

1  personally observed him in a personal interaction
2  being difficult was at that single meeting,
3  because he's attempting to recount to you I think
4  other ways in which he believed he was being
5  difficult. With respect, I think you're sort of
6  at cross purposes. If the issue is was he
7  verbally or in a face-to-face setting difficult
8  with you only on one occasion, I think that might
9  better -- if that's what you're after, I think he
10 can answer that specific question.
11 Q  Can you answer the question that is being
12    suggested by your counsel?
13 A  Yes. I would say probably on a couple of
14    occasions because there was a vacation problem
15    that we tried to deal with.
16 Q  So is it fair to state when your calendar only
17    shows three meetings, that the third meeting, we
18    now know that the discussion involved vacation?
19 A  The fourth meeting.
20 Q  I thought you said your calendar only showed
21    three meetings?
22 A  Three meetings prior to the meeting where he was
23    given his 180-day notice.
24 Q  That's all I'm talking about. I don't care about

13 (Pages 46 to 49)

Page 50

```
 1   anything that happened after that. Is it fair to
 2   say that that third meeting dealt with issues of
 3   vacation?
 4  A   I don't know which one it was, one of them.
 5  Q   Would you state for me, please, each and every
 6   reason why Dr. Hughes was terminated?
 7  A   He was a disruptive force with the medical staff.
 8   He kept going around me to the board. He had a
 9   contract that was really not in the best interest
10   of the hospital. The salary that was given in
11   that contract in the last week of Kevin
12   Burchell's tenure really priced it in a way that
13   was way too high for what it was.
14  Q   Anything else?
15  A   And his relationship with me was I think not a
16   good one.
17  Q   Is it fair to say you had talked to him
18   personally for maybe less than an hour after you
19   became CEO?
20  A   Oh, I think it was more than that, but I don't
21   know.
22  Q   But that could be the ballpark?
23  A   Probably, yes. Yes, that could be the ballpark.
24  Q   Was the fact that Dr. Hughes was only a part-time
```

Page 51

```
 1   physician one of the reasons his contract was
 2   terminated?
 3  A   Yes.
 4  Q   Was the fact that Dr. Hughes did not see
 5   gynecological patients one of the reasons he was
 6   terminated?
 7  A   No.
 8  Q   Was the desire to increase revenue for the
 9   midwifery practice one of the reasons he was
10   terminated?
11  A   No.
12  Q   Was the desire to increase the number of
13   gynecological surgeries being performed on island
14   one of the reasons Dr. Hughes was terminated?
15  A   Certainly the desire that I had was to try to
16   capture some of the GYN surgical business that
17   was going on by a substantial amount of that
18   business was going off island. I had a hope of
19   trying to capture some of it that should and
20   could be done on the island, and to the extent
21   that I felt like I had someone I really couldn't
22   work with very well with a contract that I
23   couldn't call him in and discuss those issues
24   that well with because the contract really wasn't
```

Page 52

```
 1   a full-time contract, so in that sense, yes, it's
 2   a piece of it.
 3  Q   Was Dr. Hughes' past failure to cover for Dr. Lew
 4   one of the reasons Dr. Hughes was terminated?
 5  A   No. When you say past, I'm assuming you mean
 6   before?
 7  Q   Was it your understanding that as of the date you
 8   decided to terminate his contract that Dr. Hughes
 9   was refusing to cover for Dr. Lew?
10  A   No. No, it's not my understanding.
11  Q   So when I say past, I mean the history of --
12  A   Again, to the extent -- I'm sorry.
13  Q   -- the history at least during some period of
14   time of not wishing to cover for Dr. Lew?
15  A   Yes, I think that is a piece of it.
16  Q   Was Dr. Hughes' past refusal to allow Dr. Lew to
17   cover for him one of the reasons he was
18   terminated?
19  A   To the extent it had to do with the contract,
20   yes. Again, that contract was in contradiction
21   to the bylaws of the medical staff.
22  Q   Was Dr. Hughes' refusal to cover for Kathy Chase
23   one of the reasons he was terminated?
24  A   No. Well, to the extent it's in the contract, to
```

Page 53

```
 1   me, you hope to form a team when you have people
 2   working together, and to try to kind of put that
 3   together and make it work right, I think that was
 4   an indication to me certainly that it wasn't much
 5   of a team.
 6  Q   Now, you had indicated, I believe, when I was
 7   asking you the list of reasons that Dr. Hughes
 8   was terminated that one of the reasons that he
 9   was terminated was because you wanted to move
10   from a part-time to a full-time OB-GYN doctor; is
11   that correct?
12  A   Yes.
13  Q   What, if anything, in Dr. Hughes' employment
14   agreement made him a part-time doctor?
15  A   It basically says he will be the collaborating
16   physician and be overseer of the midwife.
17  Q   Does it say anything about his being part-time?
18  A   No.
19  Q   So there's nothing in the contract that made him
20   a part-time doctor; isn't that correct?
21       MR. SHIRLEY: Objection. He gave an
22   answer. You may not have liked the answer, but
23   he just gave an answer.
24       MR. SCHULTZ: I'm asking another
```

1 reasons that Dr. Hughes was terminated was
2 because he refused to provide coverage for Dr.
3 Lew; is that correct?
4 A No. Well, he had this history of not -- with the
5 medical staff where he didn't want to cover Lew
6 for the quality issues and all those reasons that
7 came through, so there was a history of that.
8 When I asked him to cover Dr. Lew and go into a
9 cross-coverage arrangement, that's when I
10 realized how bad the contract was because I got a
11 letter from his attorney about the cross-coverage
12 saying that he would but his own stipulations
13 and, you know, under the contract, I have these
14 rights, which is true. He did have all those
15 rights.
16 Q You never had a meeting with Dr. Hughes asking
17 him to do cross-coverage, did you, personally?
18 A I don't recall. I don't think so.
19 Q So when you say you asked him, you asked him
20 through another employee that passed on that you
21 wanted him to cross-cover; is that right?
22 A I would guess, yes.
23 Q Again, I don't want you to guess, and your
24 attorney doesn't want you to guess. Is that your

1 best recollection?
2 A Yes.
3 Q So is it fair to say that the elimination of the
4 conflicts that existed as a result of the cross-
5 coverage issue was one of the reasons Dr. Hughes
6 was terminated?
7 A I'm sorry, could you state it again?
8 Q Is it fair to say that elimination of the
9 conflicts with Dr. Lew over this cross-coverage
10 issue was one reason Dr. Hughes was terminated?
11      MR. SHIRLEY: Objection.
12 Q Is that accurate?
13 A I'm not sure what you're asking. Is it fair to
14 say that resolution of --
15 Q Was Dr. Hughes terminated, in part, to eliminate
16 the conflict that existed over this issue of
17 cross-coverage?
18 A No.
19 Q That's because the issue had already been
20 resolved at the time you decided to terminate
21 him?
22 A It's not because of that, no.
23 Q Then why do you say no to that question?
24 A Because that's not the reason why I issued a 180-

1 day notice. It was medical staff problems we
2 were having, problems we were having with
3 different physicians having problems in front of
4 employees and patients with Dr. Hughes. It had
5 to do with, in particular, Dr. Hughes going to
6 the board around me.
7 Q So the conflict that Dr. Hughes had with Dr. Lew
8 over coverage was not one of the reasons he was
9 terminated; is that correct?
10 A That's correct, it was not a direct reason why he
11 was terminated.
12 Q You said the conflicts Dr. Hughes had with the
13 medical staff was one of the reasons he was
14 terminated. What conflicts did you have in mind
15 when you made that testimony?
16 A If you review the minutes of the Medical
17 Executive Committee which I know you've seen a
18 lot of them, you'll see that for quite a long
19 time, all they were dealing with was the issue
20 around Dr. Hughes and Dr. Lew. There was a real
21 problem on the coverage side, again because the
22 bylaws of the medical staff require cross-
23 coverage. It's a particularly important issue to
24 all of the physicians on the medical staff.

1 Q So the conflict he had with the medical staff
2 related to his concerns of having what he
3 considered to be an incompetent doctor covering
4 for him; is that correct?
5 A That's correct.
6 Q Is there anything else that you have in mind when
7 you say he had conflicts with the medical staff?
8 A Every meeting that I was in attendance on once I
9 became CEO, several meetings, it was a very bad
10 situation. I think that's -- I think there's a
11 lot in the files that you looked through where
12 you'll see it.
13 Q Did they all deal with the same subject of the
14 coverage with Dr. Lew? Is that what you're
15 talking about?
16 A No, no. You know, there were issues about -- you
17 know, there was an outside review done. As a
18 result of that, an outside physician was engaged
19 by the hospital to oversee both OB-GYN
20 physicians. There was a lot of conflict around
21 that. It was just an untenable situation, in my
22 mind, and a very difficult time for me to try to
23 deal with all of that.
24 Q How many times did Dr. Hughes go to the board to

Page 78

1   get around you?
2   A   I'm not sure of all the times I'm aware of. I
3       know when I first became CEO, he went to the
4       chairman of the board.
5   Q   To do what?
6   A   To complain.
7   Q   About what?
8   A   I don't know. The chairman of the board told him
9       to come and see me, which he didn't do.
10  Q   Do you know what this was about?
11  A   He didn't come and see me.
12  Q   So one occasion is he went to the chairman of the
13      board about something, but you don't know what it
14      was about; is that correct?
15  A   Right.
16  Q   What other occasions did Dr. Hughes go to members
17      of the board to, quote, get around you?
18  A   Well, I think he went to the chairman of the
19      board on more than one occasion. He spoke with
20      Tim Sweet, the vice chair of the board, and he
21      spoke with Tim Guiney, Dr. Guiney.
22  Q   About what?
23  A   Well, Dr. Guiney, it was about the termination.
24  Q   That was after he had already been terminated?

Page 79

1   A   Yes, right.
2   Q   So that couldn't have been one of the reasons you
3       terminated him.
4   A   Right.
5   Q   So the only occasion you can recall is one
6       occasion with the chairman of the board that you
7       don't remember what it was about, and Dr. Hughes
8       then never followed up?
9           MR. SHIRLEY: Objection to the form of
10      the question.
11  Q   Is that the only occasion you can recall?
12          MR. SHIRLEY: Objection to the form of
13      the question. It's completely inconsistent with
14      the record. If that's the way we're going to
15      proceed, that's fine. Objection to the form.
16  Q   Can you recall any other occasion?
17  A   I believe he went several times to the chairman
18      of the board. He was going to complain about and
19      register complaints about what was going on at
20      the hospital and his problems with the medical
21      staff, I believe. He didn't come and talk to me
22      as was suggested by the chairman of the board.
23  Q   Why do you believe this?
24  A   Because I --

Page 80

1           MR. SHIRLEY: I'm going to suggest
2       again that both the attorney and the deponent
3       wait for the other to finish before they begin.
4       I'm also going to again ask that we maintain an
5       appropriate level of civility in terms, in
6       particular, of the questions that are being posed
7       to the witness.
8   Q   Why do you believe that?
9   A   Because that's what was going on in the hospital.
10      That's what -- we had a joint conference
11      committee where we brought in Dr. Hughes and his
12      wife. Dr. Kriedman wanted to come in and address
13      the joint conference. I know you've seen some of
14      the minutes of those meetings. They were
15      complaining about their treatment by the medical
16      staff, so there was a lot -- you know, all of
17      that stuff, you know, for me to have an employee
18      doing that, okay, any employee, you know,
19      shouldn't go to the chairman of the board once,
20      in my mind, because I'm the CEO. That's my job.
21          My job is to deal with that and, you
22      know, that happened right when I was made CEO.
23      He didn't come to me first. It's not like he
24      came to me and was unsatisfied with something.

Page 81

1       He went to the chairman of the board. He did
2       talk to Tim Sweet, the vice chair of the board,
3       and they would always call me and tell me. I
4       believe their message was always the same, that
5       you need to go talk to the CEO because it's
6       operational issues.
7   Q   On how many occasions do you recall them telling
8       you that Dr. Hughes had gone to them about some
9       issue?
10  A   The two to the chairman of the board and once
11      with the vice chair.
12  Q   Why did Dr. Hughes go to the chairman of the
13      board on these two occasions?
14          MR. SHIRLEY: Objection. Do you want
15      him to speculate?
16  Q   What were you told?
17          MR. SHIRLEY: That's a different
18      question. Can you answer that one?
19  A   I was told that Dr. Hughes wanted to see him,
20      that he started to express -- to complain about
21      the way things were going on with the medical
22      staff and thought that he was being mistreated by
23      the medical staff, and they told him to come see
24      me. That's what I was told.

21 (Pages 78 to 81)

Page 82

1  Q  The question specifically was to the chairman of
2     the board, so I'm confused when you give an
3     answer of "they" told him to go see you. The
4     chairman of the board is Mr. Ferguson?
5  A  Yes.
6  Q  On how many occasions do you recall speaking with
7     Mr. Ferguson?
8        MR. SHIRLEY: On this subject?
9        MR. SCHULTZ: On this subject.
10 A  Two times.
11 Q  What's the time frame, more or less, of the first
12    occasion?
13 A  The first occasion was around April, May of 2002.
14 Q  So that's right after you were appointed acting
15    CEO?
16 A  Right.
17 Q  What is it your recollection Mr. Ferguson said to
18    you on that occasion?
19 A  Basically, that he told Dr. Hughes he should come
20    see me.
21 Q  What was it that he told you that Dr. Hughes had
22    said to him?
23 A  That he was complaining about his treatment by
24    the medical staff is the best I can recall.

Page 83

1  Q  What is the second occasion you recollect Mr.
2     Ferguson telling you that he had had contact from
3     Dr. Hughes?
4  A  I can't remember the time frame.
5  Q  Can you recall anything about that conversation?
6  A  No.
7  Q  When did Mr. Sweet come to you and tell you that
8     he had had contact from Dr. Hughes?
9  A  I don't remember the time frame.
10 Q  Do you recollect whether or not this was soon
11    after you took office, or was this --
12 A  I don't recall.
13 Q  Do you know whether or not this was, in fact,
14    before you made the decision to terminate Dr.
15    Hughes?
16 A  Yes.
17 Q  Do you recollect what it was that Mr. Sweet told
18    you Dr. Hughes had said to him?
19 A  No.
20 Q  Do you recollect what Mr. Sweet said to you?
21 A  That he told him that he should come talk to me.
22 Q  But you have no recollection as to why it was
23    that Dr. Hughes had gone to Mr. Sweet?
24 A  No. I don't know that I was given -- I don't

Page 84

1     know that Mr. Sweet knew. I don't know. I don't
2     know when it was in their conversation that they
3     suggested he come see me, so I don't know.
4  Q  Did you ever consider revoking Dr. Lew's
5     privileges at the hospital as one method of
6     resolving the conflict that existed between Dr.
7     Hughes and Dr. Lew?
8  A  Say it again, revoking?
9  Q  Dr. Lew's privileges to practice at the hospital.
10 A  No. The answer is no, not as a resolution to
11    anything.
12 Q  Why did you not consider revoking Dr. Lew's
13    privileges after you had received the ACOG
14    report?
15 A  It's really a medical staff matter. I mean, it
16    has to do with the peer review. The medical
17    staff working with outside consultants put
18    together a plan after the ACOG report. You know,
19    that's not something a CEO does.
20 Q  You stated, I believe, that Dr. Lew had complied
21    with the ACOG recommendations?
22 A  Yes.
23 Q  What were the recommendations with which he
24    complied?

Page 85

1        MR. SHIRLEY: I'm going to object. I'm
2     going to permit the witness to answer. I'm going
3     to note that by permitting the witness to answer,
4     the hospital does not waive in any way, shape, or
5     form the peer review privilege that we're bumping
6     up against, but I'm not pursuing it yet as
7     actually into.
8  Q  Do you recall the question?
9  A  Yes. He was asked to attend some courses and do
10    some remedial work in specific areas that they
11    thought he was weak in.
12 Q  Did you, in fact, check to see that he attended
13    all of the courses he was supposed to attend?
14 A  Yes.
15 Q  What's your understanding of the number of
16    courses he was supposed to attend?
17 A  I don't remember now. There were several. I
18    mean, it was more clinical than anything. I
19    wouldn't understand a whole lot of it anyway, but
20    we had an outside reviewer really monitoring that
21    process and working with that, and my piece was I
22    got a letter from the outside reviewer stating
23    that Dr. Lew was in full compliance, that he was
24    -- there was no reason not to have cross-

22 (Pages 82 to 85)

Page 102

1  attorney.
2  Q  You had indicated one of the reasons you had
3     terminated him, in fact I believe you said, was
4     you didn't like getting letters from lawyers or
5     something to that effect; isn't that what you
6     said? What did you say? Is that correct or not?
7  A  No, that's not correct.
8  Q  Didn't you earlier today, when I was asking you
9     to list reasons that Dr. Hughes was terminated,
10    didn't you indicate that going around you and
11    sending you letters from lawyers was one of the
12    things that contributed to the decision to
13    terminate Dr. Hughes?
14 A  Yes.
15 Q  Isn't it true that you only received one letter
16    from a lawyer from Dr. Hughes; isn't that
17    correct?
18 A  Yes.
19 Q  Isn't it true that you did not receive that
20    letter until you had announced to Dr. Hughes that
21    there was going to be no outside coverage
22    approved on your part to which he was
23    contractually entitled unless he did something;
24    isn't that correct?

Page 103

1         MR. SHIRLEY: Objection to the form of
2     the question.
3  A  Unless he did something, yes, unless he told me
4     what he was willing to do, not that he had to,
5     that he told me what he was willing to do.
6  Q  But you had put this condition on approval of
7     outside coverage which was not in the contract
8     before you heard from a lawyer; isn't that
9     correct?
10        MR. SHIRLEY: Objection to the form of
11    the question.
12 A  Yes.
13 Q  You indicated partially yes when I asked you if a
14    refusal to cover for Kathy Chase was one of the
15    reasons that Dr. Hughes was terminated. What did
16    you mean by partially yes?
17        MR. SHIRLEY: Objection.
18 A  I think it's very important when you have a
19    practice going that you have a team approach to
20    it, especially in an OB-GYN practice with a
21    midwife. I think it's a team kind of approach.
22    To me, where that kind of fits in in my book is
23    just more of, you know, a real problem with Dr.
24    Hughes really kind of trying to work in a

Page 104

1  congenial way. I think it just doesn't work that
2  well.
3  Q  On how many occasions prior to your decision to
4     terminate Dr. Hughes did Dr. Hughes refuse to
5     provide coverage for Kathy Chase?
6  A  None. I'm sorry. Could you say that one again?
7  Q  I think you've answered the question correctly.
8         MR. SHIRLEY: Let the record reflect
9     that comically what an interesting response from
10    counsel.
11 Q  Do you wish to change your answer?
12 A  I might. I need to hear the question again.
13        MR SCHULTZ: Would you please limit
14    your comments to objections without the
15    commentary? I have a straightforward question in
16    front of the witness.
17        MR. SHIRLEY: I'm responding to your
18    commentary.
19        MR. SCHULTZ: You're responding to the
20    answer that you don't like that your witness gave
21    which you know to be truthful.
22        MR. SHIRLEY: Objection. I'm going to
23    take another short break. Come on. This is
24    beyond the pale. You're commenting as to whether

Page 105

1  you think an answer to a question is correct or
2  incorrect. I'm objecting to that, and you have a
3  problem with it. That's the problem.
4         MR. SCHULTZ: Again, I'd like the
5     record to note the loss of temper on the part of
6     counsel, please.
7         (Brief recess taken.)
8  Q  Do you wish to change your answer to the question
9     of whether prior to your decision to replace Dr.
10    Hughes -- strike that. I had asked you on how
11    many occasions prior to your decision to replace
12    Dr. Hughes did Dr. Hughes refuse to provide
13    coverage for Kathy Chase, and you answered none.
14    Do you wish to change that answer?
15 A  Yes. There was an instance where Kathy I believe
16    wanted to go off island for a day and asked Dr.
17    Hughes to cover for her, and he refused.
18 Q  Did that happen prior to your decision to
19    terminate Dr. Hughes?
20 A  I believe it did, yes.
21 Q  What's the basis of your belief that it happened
22    prior to your decision?
23 A  That's my recollection that it did.
24 Q  What involvement did you have in that issue at

Page 106

1    that time?
2  A  That was reported to me by Ken Chisholm.
3  Q  Are you aware of the fact that yesterday, Kathy
4     Chase at her deposition said it didn't occur
5     prior to the decision being made to terminate Dr.
6     Hughes?
7  A  No.
8  Q  Were you aware of the fact that in 2002, Dr.
9     Koehler had refused to provide backup to Dr.
10    Hughes when he was performing operations?
11 A  Yes. I read that in the file.
12 Q  Were you aware of that prior to the time that you
13    terminated Dr. Hughes?
14 A  Yes.
15 Q  Do you believe it was reasonable for Dr. Hughes
16    to complain about that?
17 A  No.
18 Q  Why not?
19 A  General surgeons really don't back up OB-GYN
20    surgeons.
21 Q  So it's your understanding that there is no
22    occasion when an OB-GYN has need of a general
23    surgeon for backup in an operation?
24 A  Generally, no, there's no reason. I can't say it

Page 107

1    never happened. The fact is we have one general
2    surgeon on duty on call at any one time, so if
3    the general surgeon's operating and the GYN is
4    operating, there's no backup anyway, and that
5    happens.
6  Q  Just so I understand, you don't believe it
7     violates the bylaws for one doctor to refuse to
8     provide backup for another?
9  A  No, I'm not aware of anything in the bylaws about
10    backup of that sort.
11 Q  You've testified that the bylaws require
12    coverage. What's your understanding of the
13    bylaws as to the requirement to provide coverage
14    one doctor for another?
15 A  Coverage is within a discipline. They're cross-
16    covering each other.
17 Q  It's your understanding that that's in the
18    bylaws?
19 A  Yes.
20 Q  What's your understanding of what the bylaws say?
21 A  That physicians are -- I don't know the exact
22    words, but the gist of it is that physicians are
23    expected to cross-cover each other and to work
24    out in a congenial fashion cross-coverage

Page 108

1    schemes.
2  Q  That's for all occasions, that's what the bylaws
3     say, as you understand them?
4  A  Yes.
5  Q  Did you ever hear Dr. Koehler make any references
6     to Dr. Hughes' age?
7  A  No.
8  Q  Did you ever hear Dr. Koehler make any references
9     to Dr. Hughes' race?
10 A  No.
11 Q  Did you ever hear Dr. Koehler's wife make any
12    references to Dr. Hughes' age?
13 A  No, I don't recall.
14 Q  Did you ever hear Dr. Koehler's wife make any
15    references to Dr. Hughes' race?
16 A  No.
17 Q  Did you ever hear Jason Lew tell anyone that Dr.
18    Hughes was 80 years old?
19 A  No.
20 Q  Did you ever hear about that?
21 A  No.
22 Q  Did you ever hear Dr. London make any comments
23    relating to Dr. Hughes' age?
24 A  The only time I ever had heard anything on age

Page 109

1    from the medical staff was around the
2    credentialing process, and I know, for instance,
3    when Dr. MacArthur was coming up for
4    credentialing this past year, there was a
5    discussion about how well he was doing in the
6    O.R. and, you know, whether -- that's something
7    they do as part of the credentialing process.
8         It's generally a clinical thing, and
9    there has been discussion on and off. I don't
10   know about the timing of when I heard anything.
11   I know I heard one about Dr. MacArthur, a
12   discussion about, you know, whether or not --
13   really whether he was okay in the O.R. or not, if
14   he still had his skills. That's the piece that
15   is part of the credentialing and part of the
16   quality review, but I don't recall when, and I
17   know I've heard a discussion around that issue
18   several times.
19 Q  Relating to Dr. Hughes or just to Dr. MacArthur?
20 A  I don't know about Dr. Hughes. I remember Dr.
21   MacArthur because it was fairly recent. It was
22   last summer, I think, that the discussion was
23   held. I know -- it's hard because I've read a
24   lot of this stuff and I've seen stuff in there

Page 114

1  whether or not there had been positive or
2  negative evaluations made by his colleagues when
3  he sought to have his privileges renewed; is that
4  correct?
5  A  That's correct.
6  Q  I believe you stated that you did not know
7  whether or not Dr. Hughes saw gynecological
8  patients; is that correct?
9  A  No. I think we discussed that and talked about
10  how GYN surgeries were done.
11  Q  Is it your understanding what when Dr. Hughes was
12  at Martha's Vineyard Hospital, that he was seeing
13  both obstetric and gynecology patients?
14  A  Yes.
15  Q  I'm going to show you what's been marked as
16  Exhibit 1 which was the Martha's Vineyard
17  Hospital response to the complaint to the MCAD.
18  Calling your attention to Page 4, Section C,
19  second paragraph, second sentence which states,
20  "Unlike Dr. Hughes, Dr. Donegan sees both
21  obstetric and gynecology patients." Is it fair
22  to state that that's an inaccurate statement
23  given that Dr. Hughes also saw gynecology
24  patients?

Page 115

1  A  Well, the sentence as I read it is, "Unlike Dr.
2  Hughes, Dr. Donegan sees both obstetric and
3  gynecology patients and works full-time seeing
4  patients in the office, performing surgeries, and
5  providing coverage for Ms. Chase." My read of it
6  is the difference is the full-time versus part-
7  time.
8  Q  So you don't think anyone could read that
9  sentence to indicate that it was stating that Dr.
10  Hughes did not see both obstetric and gynecology
11  patients?
12  A  No, they could.
13  Q  It's accurate, is it not, that a failure to build
14  a gynecology practice was not one of the reasons
15  that Dr. Hughes was terminated?
16  A  Well, certainly part of what we were trying to do
17  is to build the OB-GYN practice because it's not
18  -- it's really not a full practice on the island.
19  There's not enough volume or enough population to
20  make a full practice. We know there's a lot of
21  GYN surgery that goes off island, a significant
22  amount, and we were hoping to capture more of
23  that, but that's a part of --
24  Q  But you understood that Dr. Hughes had, in fact,

Page 116

1  built a gynecology practice; isn't that correct?
2  A  He had a practice.
3  Q  Which included gynecology as well as obstetrics?
4  A  Yes.
5  Q  You just mentioned the concern regarding
6  gynecology patients going off island. Do you
7  have any statistical support for your belief that
8  a number of on island residents have their
9  gynecological surgeries off island?
10  A  Yes.
11  Q  What is that support?
12  A  It was a part of a strategic planning process.
13  We hired an outside consultant to gather some
14  information, and they came up with reports really
15  of the whole hospital, and one of the outstanding
16  numbers that showed is that we captured I think
17  it was something like 13 percent of all the GYN
18  surgeries done on females from the island were
19  done at Martha's Vineyard, and the rest were
20  going off island.
21  Q  Do you recall when that report was conducted?
22  A  No, but it's been a while. It's probably 2000,
23  2001, something like that.
24     MR. SCHULTZ: Let's mark as Exhibit 10

Page 117

1  to this deposition a report entitled Clinical
2  Services Strategic Plan and Critical Access,
3  Hospital's Strategic Priorities for Martha's
4  Vineyard Hospital dated September 6, 2001.
5     (Whereupon the Plan dated 9/6/01
6     was Marked Exhibit No. 10.)
7  Q  I've placed in front of you what's been marked as
8  Exhibit 10. Is this, in fact, the report to
9  which you were referring in your testimony?
10  A  I believe it is.
11  Q  I want to call your attention to Page 1303 which
12  indicates gynecology surgery, and it says
13  Martha's Vineyard Hospital, 4; it says off
14  island, 26; and then it says, percentage of
15  retention, 13.3 percent. So that's, again,
16  consistent with what your testimony was.
17  A  Yes.
18  Q  It also indicates that the data source appears to
19  be from 1999; is that correct?
20  A  Yes.
21  Q  So it was your understanding when you made the
22  decision to terminate Dr. Hughes in early 2003 or
23  late 2002 that at least you knew that as of 1999,
24  that there was a considerable amount of

30 (Pages 114 to 117)

Page 138

1  A  Yes, 257.
2  Q  Then it states only 110 were performed by Dr.
3     Hughes?
4  A  Yes.
5  Q  Do you believe those numbers to be correct?
6  A  Yes, sure.
7  Q  They were reviewed prior to being sent to the
8     MCAD?
9  A  Yes.
10 Q  Did you in any way rely on these numbers or
11    similar numbers in reaching your decision to
12    terminate Dr. Hughes?
13 A  No.
14 Q  Let me show you what's been marked as Exhibit 11
15    previously, and that is a summary of OB-GYN
16    procedures at the hospital?
17 A  Yes.
18 Q  You recollect Martha's Vineyard Hospital
19    statement. Martha's Vineyard Hospital said that
20    Dr. Hughes had only performed 110 OB-GYN
21    procedures; do you recollect that being stated?
22 A  Yes.
23 Q  Isn't it true that your own statistics indicate
24    that in fiscal '02, Dr. Hughes performed 90 OB-

Page 139

1     GYN procedures?
2  A  Yes.
3  Q  Will you turn to fiscal year '03?
4  A  Yes. I'm not sure that the databases that we're
5     talking of what we were counting.
6  Q  They don't correlate at all, do they?
7  A  No.
8  Q  Because Exhibit 11 shows that Dr. Hughes had
9     performed far more than 110 OB-GYN procedures
10    between April '01 and January 2004; isn't that
11    correct?
12 A  That's right. I mean, the numbers don't add up
13    to the 257.
14 Q  That's correct.
15 A  I mean, I'd need to check. I suspect that
16    counting -- oh, I don't know. I'd have to look
17    at the data.
18 Q  Did you ever discuss Dr. Hughes' age in any
19    conversation prior to the commencement of this
20    litigation?
21 A  No.
22 Q  You've already testified, I believe, that Dr.
23    Hughes' age was never mentioned in any board
24    meeting that you can recollect; is that correct?

Page 140

1  A  Yes. I did tell you, you know, that under the
2     credentialing process, I've heard discussions on
3     whether or not something like that ever got said
4     or not, but I don't recall that.
5  Q  The credentialing process generally does not take
6     place at board meetings; isn't that correct?
7  A  No, but there's always a medical staff report for
8     the chief of staff, and it could have been said
9     at a board meeting, but I don't recall it.
10 Q  The only circumstances that you believe may have
11    happened would have related to the credentialing
12    process; is that correct?
13 A  Yes.
14 Q  Shortly after you were appointed CEO of the
15    hospital in the spring of 2002, did you tell the
16    board that Deurward was history?
17 A  No.
18 Q  Did you ever state that to any member of the
19    board?
20 A  No.
21    MR. SCHULTZ: Let's mark as Exhibit 14
22    minutes of the board meeting from January 27,
23    2001.
24    (Whereupon the Minutes of the

Page 141

1     Board Meeting of 1/27/01 were
2     Marked Exhibit No. 14.)
3  Q  Do you have Exhibit 14 in front of you?
4  A  Yes.
5  Q  Take as much time as you need to review it.
6  A  (Witness complies.)
7  Q  Now, Exhibit 14 are minutes of the board meeting
8     of January 27, 2001, and it indicates that you
9     were present at this meeting; isn't that correct?
10 A  Yes.
11 Q  It indicates that "There was a discussion
12    regarding the Dr. Hughes-Kriedman team. Medical
13    staff had feelings that age had much to do with
14    the mixed feelings of Dr. Hughes working in
15    maternity." Do you recollect that conversation
16    at the board meeting?
17 A  No. This was one of the things we talked about
18    at the beginning of this.
19 Q  This is the meeting you left before this
20    conversation?
21 A  Yes. I was the CFO, and normally I was there
22    just to give the financial presentation and then
23    leave.
24 Q  Did you have any conversations with Dr. Donegan

36 (Pages 138 to 141)

Page 150

1    review the cases of both Dr. Lew and Dr. Hughes.
2    Do you recall that testimony?
3  A  Yes.
4  Q  Why was Dr. Shaw brought on to review the cases
5    of Dr. Hughes?
6  A  I don't know. That was prior to my being CEO,
7    and that was really worked out by the chief
8    medical officer at the time, Dr. Butterick, who
9    was a part-time physician, administrative
10   position, that was really trying to help us
11   through the process, and he was instrumental, I
12   think, in working through the ACOG
13   recommendations and the whole plan around that.
14 Q  Is there anything in the ACOG recommendations, to
15   your recollection, that indicated Dr. Hughes
16   needed to have his cases reviewed by an outside
17   reviewer?
18 A  I really don't know.
19      MR. SHIRLEY: Let me attempt to
20   interject just briefly for the record that to the
21   extent we're skirting close to peer review
22   privilege concerns, I do want to note that
23   concern and objection.
24 Q  How many employees work at the hospital?

Page 151

1  A  I believe about 240 employees total.
2  Q  I wouldn't expect you to know the exact number.
3    You feel a hundred percent certain that more than
4    a hundred employees work at the hospital?
5  A  Oh, yes.
6  Q  Now, according to the hospital's answers to
7    interrogatories, during 2003 and 2004, only three
8    active staff members were claimed as minorities,
9    and that was Dr. Gerald Morris, Dr. Timothy Cy,
10   and Dr. Hughes. When did Dr. Morris come on
11   staff?
12 A  On the staff, I believe sometime around
13   September, October of 2003. I know we were
14   recruiting for an internal medicine physician,
15   and we needed a locum tenens, someone to come in
16   and work the practice while we recruited, and Dr.
17   Morris came in as a locum originally, and it was
18   around that time frame I know we talked to him
19   around August of '03, and then he actually
20   started work I believe around September or
21   October of '03, and then became an employee. We
22   were able to convince him to take the job after
23   about six months, I think.
24 Q  So that was sometime after Dr. Hughes left?

Page 152

1  A  That he actually took the job?
2  Q  That's correct.
3  A  Yes. He had been working as a locum and then
4    took the job.
5  Q  According to the answers to interrogatories,
6    there were 33 associate staff members, one of
7    whom was black, a Dr. Michael Bigby. How many
8    days a year does Dr. Bigby practice at the
9    hospital?
10 A  I'm not sure. At best, it would be one day a
11   week, but I'm not sure if it's even that
12   frequent. The holiday off island physicians have
13   arrangements where they come in and do a day of
14   clinic, either one, two times a month. Some of
15   them come every week, and some come every other
16   week, and I'm not sure of Dr. Bigby's schedule.
17 Q  What type of doctor is Dr. Bigby?
18 A  Dermatologist.
19 Q  According to the answer, there are 16 contracted
20   staff members. What is a contracted staff
21   member? Let's start there.
22 A  They're coverage physicians I believe is what
23   they're talking about.
24 Q  According to the interrogatory answer, there's

Page 153

1    only one black contracted staff member, a Dr.
2    Fatai Ilupeju.
3  A  I'm not familiar with them.
4  Q  I take it from your answer you do not know who
5    Dr. Ilupeju is in a similar vein that I don't
6    know how to pronounce his name?
7  A  That's right.
8  Q  Nor do you?
9  A  Right.
10 Q  So I take it that you would not know how often
11   Dr. Ilupeju has practiced at the hospital?
12 A  No.
13 Q  It could be as little as one day, it could be
14   more?
15 A  That's true.
16 Q  According to the MCAD response to the complaint
17   filed by Dr. Hughes, it says 172 individuals work
18   at the hospital on a full-time basis. Do you
19   know how many minorities are included in that
20   group of 172 individuals?
21      MR. SHIRLEY: Objection. I'm going to
22   permit the witness to answer, but I think the
23   question has to be put in knowing disregard of
24   the magistrate-judge's discovery ruling in the

Page 154

```
 1   case, that that evidence is not relevant to this
 2   lawsuit.
 3 Q Can you answer the question?
 4 A I don't know off the top of my head.
 5 Q How many minorities can you name off the top of
 6   your head who work at the hospital on a full-time
 7   basis?
 8        MR. SHIRLEY: My continuing objection
 9   should be noted.
10 A I don't know. Jamie Harris, a physician-
11   assistant, in the O.R.
12 Q Any others?
13 A I mean, I don't know the names, no.
14 Q So there's one minority whose name you know on
15   the full-time staff; is that correct?
16 A We have physicians. We have Gerald Morris is a
17   minority. Tim Cy is an E.R. physician.
18   Sebastian.
19 Q Who's that?
20 A Sebastian is a maintenance worker.
21 Q Are there any other minority full-time employees
22   whose names you know?
23 A No.
24        MR. SHIRLEY: At this point, I'm going
```

Page 155

```
 1   to object, and I'm going to ask for an
 2   explanation as to why, despite the magistrate-
 3   judge's clear ruling that this line of inquiry is
 4   not part of this case, counsel is pursuing it.
 5        MR. SCHULTZ: The magistrate's ruling,
 6   at the most, is arguable law of the case. We're
 7   certainly going to seek to introduce this at
 8   trial. I'm sure, as you're well aware, the judge
 9   in no way is bound by the ruling of the
10   magistrate, and there is considerable case law
11   that such information is relevant, and the
12   decision will have to be made by Judge Woodlock
13   as to whether or not it will be allowed to be
14   introduced.
15        MR. SHIRLEY: I find that position
16   wrong. I have to believe that you know it is
17   wrong. A ruling on discovery governs discovery
18   in the case until such time as it is overturned.
19   You've not sought to overturn it. I'll simply
20   note my continuing objection for the record. You
21   don't get a ruling from the judge and one month
22   later say I'm free to disregard it. At least
23   that's not my view of the practice.
24        MR. SCHULTZ: For the record, I'm
```

Page 156

```
 1   simply going to state the disregard of the ruling
 2   would be to somehow say that I'm entitled to a
 3   document that I wasn't given. Frequently, I've
 4   been in many a situation where magistrates,
 5   judges believe that you shouldn't get something
 6   as a document, but you can ask about it in a
 7   deposition, and in law, the case, we all know, is
 8   a fluid doctrine. It's not a res adjudicata
 9   doctrine. It's changed frequently, so I just
10   disagree with you as to what the practice is, but
11   since you're letting him answer, it really
12   doesn't matter.
13        MR. SHIRLEY: At the moment. We're not
14   going to sit here for an extended period of time
15   if that's your explanation, but let's continue.
16 Q Mr. Walsh, how many nurses are employed by the
17   hospital on the full-time staff?
18        MR. SHIRLEY: Please note my continuing
19   objection.
20 A I don't know, probably around 35 to 40, maybe.
21        MR. SHIRLEY: Mr. Schultz, just to make
22   it easier, I assume that your response to my
23   objection would be the same as you provided?
24        MR. SCHULTZ: Yes.
```

Page 157

```
 1 Q Can you name a single minority nurse on the full-
 2   time staff?
 3 A No.
 4 Q The hospital's answer to interrogatory Number 12
 5   was, and I quote, "The hospital states that it is
 6   an equal" -- this may or may not be the full
 7   answer. Let me put in front of you Defendant's
 8   Second Supplemental Response to Plaintiff's First
 9   Set of Interrogatories. Let's look at answer
10   Number 12, and look at the last sentence of the
11   answer. "The hospital states" -- and I quote,
12   "The hospital states that it is an equal
13   opportunity employer and makes every effort to
14   recruit and retain a diverse staff." Do you see
15   that?
16 A Yes.
17 Q Since you've been the CEO of the hospital, will
18   you relate to me please every effort you've made
19   to recruit a diverse staff?
20 A I think one of the problems we have on the island
21   is recruiting a staff, and we have dire need of
22   nurses. It's a continuing problem. We'll hire
23   any nurse that has the credentials. I guess my
24   answer is we try everything we can think of for
```