# Exhibit 5

Page 1

Pages: 1-77

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

DOCKET NO. 04-10564-DPW

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEURWARD L. HUGHES, M.D.            \*

    Plaintiff                       \*

vs.                                 \*

MARTHA'S VINEYARD HOSPITAL          \*

    Defendant                       \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


DEPOSITION of SAMUEL P. DONEGAN, a Witness called by the Plaintiff, taken pursuant to the provisions of the Federal Rules of Civil Procedure, before Peter J. Wood, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at Mansion House, 9 Main Street, Vineyard Haven, Massachusetts, on Wednesday, March 9, 2005, commencing at 10:45 a.m.


WOOD COURT & CONFERENCE REPORTING

77 SUMMER STREET

COHASSET, MA 02025

(781) 383-6621

Page 42

1     MS. EDSON: Objection.
2  A  I have no intimate knowledge of how much time Dr.
3     Hughes spent doing these things, so I can't
4     answer.
5        MS. EDSON: Would you mind if we take a
6     short break?
7        MR. SCHULTZ: Not at all.
8        (Brief recess taken.)
9  Q  Dr. Donegan, is it your understanding that as of
10    today, you are the chairman of the OB-GYN
11    department?
12 A  No, it is not.
13 Q  Why is that?
14 A  After some deliberation of the medical staff,
15    they elected to incorporate the OB-GYN department
16    or section within the department of surgery.
17 Q  So as of today, there is no separate independent
18    OB-GYN department; isn't that correct?
19 A  Correct.
20 Q  There's nothing different about that than the way
21    it was when you came to the hospital?
22       MS. EDSON: Objection.
23 A  Can you rephrase the question?
24 Q  When you say they decided to incorporate the OB-

Page 43

1     GYN department into the surgery department, in
2     fact, wasn't that the situation from the time you
3     came to the hospital?
4  A  I'm not sure that the bylaws had reflected a
5     separate department. I think they had
6     undertaken, the year prior to my arrival, a plan
7     to redesign the department structure at the
8     hospital, and one of those ideas was to split the
9     OB-GYN department off as a separate department.
10    As they completed that process, I think they
11    decided it was better served by being
12    incorporated within the department of surgery.
13 Q  But again, when you say one idea was to split it
14    off, the notion of splitting it off meant
15    because, as of that time, it was not its own
16    department?
17 A  That's correct.
18 Q  When did you first learn that Dr. Hughes was over
19    70 years old?
20       MS. EDSON: Objection.
21 A  I believe it was when we had our first meeting in
22    the office.
23 Q  Had anyone ever mentioned his age to you in any
24    of your discussions that you had had with any of

Page 44

1     the administrators from the Martha's Vineyard
2     Hospital?
3  A  No one had.
4  Q  Had there been any discussions that because of
5     his age, you might be inheriting his part of the
6     practice?
7  A  No.
8  Q  Did the hospital ever show you a copy of the ACOG
9     report which had reviewed the OB-GYN department
10    at Martha's Vineyard Hospital?
11 A  They did.
12 Q  When did they show you a copy of that report?
13 A  Late in the fall of 2003.
14 Q  What were the circumstances under which they
15    showed you this report?
16 A  At that juncture, I believe there were some
17    questions about Dr. Lew's privileges being
18    renewed, and they asked me to participate in a
19    quality assurance initiative.
20 Q  So it was shown to you as part of the review of
21    whether or not to renew Dr. Lew's license or
22    privileges at the hospital?
23 A  That's correct.
24 Q  Were you on a committee that was reviewing his

Page 45

1     privileges at that point?
2  A  No, I was not.
3  Q  So what's your understanding of what the process
4     was as to who would be making the decision as to
5     whether or not to renew Dr. Lew's privileges?
6        MS. EDSON: Objection.
7  A  My understanding was that it was a joint effort
8     in between the Medical Staff Executive Committee
9     and the hospital's Board of Directors.
10 Q  What was your understanding of your role in that?
11 A  I was requested to act as an independent observer
12    of Dr. Lew's practice.
13 Q  When you were given the ACOG report, did it also
14    include a review of Dr. Hughes' practice?
15 A  It did not. Strike that. Within the substance
16    of the ACOG report, there was a hospital site
17    visit that reviewed the entire department and all
18    the practitioners within the department, and in
19    that section, there was review of both Dr. Lew
20    and Dr. Hughes, that is correct.
21 Q  But you were not reviewing at that time Dr.
22    Hughes' privileges at the hospital; is that
23    correct?
24 A  That is correct.

Page 46

1  Q  The hospital didn't white out anything relating
2     to Dr. Hughes claiming that this was
3     confidential?
4  A  No, they did not.
5  Q  The hospital didn't claim anything relating to
6     Dr. Hughes had a peer review privilege attached
7     to it; is that correct?
8  A  That is correct.
9  Q  What did this report conclude regarding Dr. Lew's
10    practice?
11         MS. EDSON: Objection. Going to the
12 court's decision on the plaintiff's motion to
13 compel, I instruct the witness not to answer with
14 the conclusion that the report states based on
15 the peer review privilege.
16         MR. SCHULTZ: I thought we had the
17 standing objection, that you would be making the
18 objection, but letting the witnesses testify?
19         MS. EDSON: That was our understanding
20 for last time. I think as regards to peer
21 review, the substance of any report or actions
22 deemed to be peer review, I'm taking the
23 position, at least for this deposition and
24 perhaps others, they will not respond to the

Page 47

1  substance of any conclusions in the report based
2  on the peer review privilege.
3         MR. SCHULTZ: So you're instructing him
4  not to answer?
5         MS. EDSON: That's correct.
6  Q  Are you going to not answer based on the
7     instructions of counsel?
8  A  That's correct.
9  Q  Did anyone from the hospital ever tell you that
10    Dr. Lew would be leaving the hospital prior to
11    the time that it was made public knowledge?
12        MS. EDSON: Objection.
13 A  No, they did not.
14 Q  Did you ever tell Dr. Hughes that the hospital
15    had guaranteed to you that Dr. Lew would be gone
16    shortly after you began?
17 A  Not to my recollection.
18 Q  Did you ever say anything to that effect to Dr.
19    Hughes?
20 A  After my arrival, I believe I said to Dr. Hughes
21    that I knew that there were quality concerns
22    regarding Dr. Lew based on my own community
23    solicitations after my arrival, and that I had
24    indicated to the hospital administration that I

Page 48

1  felt that it was their role to deal with the
2  quality issues rather than my role.
3  Q  Did you say anything to Dr. Hughes about what
4     anyone on the hospital administration had said
5     back to you when you said that?
6  A  They were in agreement with that after my initial
7     arrival at the hospital.
8  Q  Did you ever tell anyone at the hospital it was
9     not acceptable to you for Dr. Lew to be covering
10    your patients?
11 A  I believe that I reiterated what Dr. Hughes'
12    position had been with the management of the
13    midwifery practice. In our initial meeting, Dr.
14    Hughes informed me that based on his observation
15    of Dr. Lew's skill level, that he was comfortable
16    covering Dr. Lew's patients, but was not
17    interested in having Dr. Lew cover the midwifery
18    practice, and coming into a new situation and a
19    practice situation, I felt that that was a
20    reasonable situation until the details could be
21    worked out.
22 Q  You expressed that opinion to people on the
23    hospital administration?
24 A  That's correct.

Page 49

1  Q  To whom did you tell that?
2  A  To Ken Chisholm.
3  Q  What, if anything, did he say to you in response?
4  A  He said his feeling was that the hospital would
5     be expediting Dr. Lew's coverage and
6     credentialing process so that we would soon know
7     what the outcome of that would be, and that if I
8     was comfortable with Dr. Hughes' arrangements for
9     coverage, that that would be acceptable to the
10    administration.
11 Q  Did you ever tell anyone in the administration
12    that Dr. Lew had to go or you would quit?
13 A  No.
14 Q  Did you ever tell anyone at the hospital anything
15    to that effect?
16 A  I believe any statement to that effect would have
17    been that his credentialing issues would have to
18    be settled in order for our practice to progress.
19 Q  You meant by that that if his credentials were
20    renewed, that you did not feel that you could
21    keep working there?
22        MS. EDSON: Objection.
23 A  No, that's not correct.
24 Q  What did you mean by that?

13 (Pages 46 to 49)

Page 50

1  A  I meant that if his privileges were renewed, then
2     we would understand what our coverage
3     arrangements would be.
4  Q  Does the hospital pay off island doctors to cover
5     for you?
6  A  They do.
7  Q  For how long have they been doing that?
8  A  Since the fall of 2003.
9  Q  So from the beginning?
10 A  Not from the beginning. Initially, the
11    understanding was that it was going to be a call
12    of Dr. Lew, Dr. Hughes, and myself. Only after
13    my arrival and my initial meeting with Dr. Hughes
14    did it become clear that our plan was not to rely
15    on Dr. Lew to cover our patients.
16 Q  So as soon as it became clear that Dr. Lew would
17    not be covering your patients, the hospital began
18    to pay for off island doctors to cover for you?
19 A  Not at that juncture. Subsequently, Dr. Hughes
20    decided not to continue to participate in the
21    coverage, and at that point, left me as being the
22    only covering physician.
23 Q  When was it that you learned that Dr. Hughes had
24    supposedly said he would not participate in

Page 51

1     coverage?
2  A  I believe it was perhaps late September, early
3     November of 2003.
4  Q  Is that something he said directly to you?
5  A  It is.
6  Q  What exactly did he say to you?
7  A  My recollection is he felt like, given the
8     circumstances and his interactions with the
9     administration of the hospital, it was something
10    he felt he couldn't contribute to the practice.
11 Q  Did he specifically indicate he would not cover
12    for you if requested to do so?
13 A  He did not state his participation in that
14    fashion, no.
15 Q  So he never made that statement?
16 A  He made the statement that he would not be
17    participating in the call coverage for the
18    practice. In addition, he said, however, if I
19    was in an emergent situation and needed his help,
20    he would personally help me.
21 Q  In your opinion, what are some of the limitations
22    placed on a doctor practicing on Martha's
23    Vineyard in growing his or her practice?
24       MS. EDSON: Objection.

Page 52

1  A  My opinion is that given the geographic nature of
2     the island, there are some limits to the extent
3     at which the practice can be marketed. In
4     addition, the hospital, due to its limited size
5     and scope, can only provide a certain level of
6     high-risk OB-GYN care.
7  Q  Specifically regarding OB-GYN care, what type of
8     matters do you believe the hospital cannot cover?
9       MS. EDSON: Objection.
10 A  These would include certain types of premature
11    obstetrical deliveries and care. In addition,
12    certain reproductive or gynecologic procedures
13    would be inappropriate for this facility.
14 Q  Such as?
15 A  Such as in vitro fertilization programs.
16 Q  Anything else that you believe would be
17    inappropriate to be covered at Martha's Vineyard
18    Hospital?
19 A  Complicated gynecologic cancer care would be
20    inappropriate for this hospital.
21 Q  Anything else?
22 A  That covers most areas that would be limited from
23    an obstetrical and gynecologic practice
24    perspective.

Page 53

1  Q  Were you able to grow the midwifery practice
2     prior to Dr. Lew giving up his privileges at the
3     hospital in February of 2004?
4       MS. EDSON: Objection.
5  A  Yes, I was.
6  Q  What is the evidence of that?
7  A  We incorporated a variety of new surgical
8     procedures at the operating room that had not
9     ever been practiced on the island.
10 Q  What were those?
11 A  Hysteroscopic uterine surgeries as well as
12    vaginal hysterectomies and vaginal repair
13    procedures.
14 Q  So it's your understanding that no hysteroscopic
15    uterine surgeries had been performed at the
16    hospital prior to you?
17 A  That is correct.
18 Q  And it's your understanding that no vaginal
19    hysterectomies had been performed at the hospital
20    prior to you?
21 A  Correct.
22 Q  And it's your understanding that no vaginal
23    repair procedures had been done at the hospital
24    prior to you?